IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, ex rel. | : | |
| INTERNATIONAL BROTHERHOOD | : | |
| OF ELECTRICAL WORKERS, | : | CIVIL ACTION |
| LOCAL UNION NO.  98 | : | |
| Plaintiffs | : | |
| | : | No. 09-4230 |
| v. | : | |
| | : | |
| THE FARFIELD COMPANY, | : | |
| Defendant | : | |

M E M O R A N D U M

STENGEL, J.                                                           July 2, 2013

        In this case, a labor union contends that a contractor failed to pay the appropriate

"prevailing wage" to certain union workers on several projects.  The labor union filed its

Complaint seeking relief on its behalf and on behalf of the Government.  Defendant then

filed a Motion to Dismiss and Plaintiff replied.  For the reasons stated below, I will deny

the Defendant's Motion to Dismiss.

## I.      Background

        Relator/Plaintiff International Brotherhood of Electrical Workers, Local Union

No. 98 ("Plaintiff" or "Local 98"), on behalf of the United States of America, alleges that

Defendant, The Farfield Company's ("Defendant" or "Farfield") intentional and

methodological misclassification of workers violated the Davis-Bacon Act ("DBA"), 40

U.S.C. § 276(a) et seq.,[1] its contracts with Southeastern Pennsylvania Transportation

_____

[1] The DBA is a protective labor law that, among other things, requires certain federal government contracts "for construction, alteration, and/or repair . . . of public buildings or public works of the United States" to contain a provision "stating the minimum wages to be paid various classes of laborers and mechanics."  United States ex rel.

Authority ("SEPTA") and Delaware River Port Authority Port ("DRPA"), and the False

Claims Act ("FCA"), 31 U.S.C. § 3729, et. seq.[2]  Id. at ¶ 26.

Farfield is an electrical contractor that performed work on at least five (5)

federally funded projects between 2001 and 2009 in the Philadelphia region.  Amend.

Compl. ¶ 14.  Specifically, these projects were the Girard Avenue Infrastructure Renewal

Project ("the Girard Project"); the PATCO Egress Lighting Project ("the PATCO

Project"); the SEPTA Wayne Junction to Glenside and Signal Project ("the Wayne

Junction Project"); and the SEPTA Smart Stations Project I and II ("the Smart Stations

---

Windsor v. Dyncorp, Inc., 895 F. Supp. 844, 848-49 (E.D. Va. 1995) (citing DBA, 40 U.S.C. § 276(a)).  If the contracting government agency determines that the contract is subject to the DBA's provisions, the agency "must determine the appropriate minimum wage for each of the various classes of mechanics and laborers predicted to be needed for the contract."  Id.; Universities Research Ass'n v. Coutu, 450 U.S. 754, 760 (1981); 29 C.F.R. § 5.5. "Those minimum wages must be based upon wage rates determined by the Secretary of Labor, 40 U.S.C. § 276(a), and 'the correctness of the Secretary's wage rate determination is not subject to judicial review.'"  Dyncorp, Inc., 895 F. Supp. at 848-49 (citing Coutu, 450 U.S. at 761 n.10).  The determination of minimum wages is subsequently included in the request for contract bids, reviewed, and ultimately incorporated into the contract.  Id.

The Department of Labor regulations also require the contractor to maintain and submit payroll records containing "the name, address, and social security number of each [] worker, his or her correct classification, hourly rates of wages paid . . ., daily and weekly number of hours worked, deductions made and actual wages paid." Dyncorp, Inc., 895 F. Supp. at 849 (citing 29 C.F.R. § 5.5(a)(3)(i)). The contractor must then submit copies of these payroll records, 29 C.F.R. § 5.5(a)(3)(ii)(A), and a statement certifying that the payroll information is correct and complete and the workers have been paid "not less than the applicable wage rates . . . for the classification of work performed." Id. (citing 29 C.F.R. § 5.5(a)(3)(ii)(B)). Regulations further provide that falsification of the certifications may subject the contractor to liability under the False Claims Act. Id.; 29 C.F.R. § 5.5(a)(3)(ii)(D).

[2] The False Claims Act provides:

  (a)  Liability for certain acts … any person who --
  (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval;
  (2) knowingly makes, uses or causes to be made or used, a false record or statement to get a false claim or fraudulent claim paid or approved by the Government;
  (3) conspires to defraud the Government by getting a false or fraudulent claim allowed or paid; …
  (7) knowingly makes, uses, or causes to be made or used, a false record or statement to conceal, avoid, or decrease an obligation to pay or transmit money or property to the Government, … is liable to the United States Government for a civil penalty of not less than $ 5,000 and not more than $ 10,000, plus three times the amount of damages which the Government sustains because of the act of that person . . . .

31 U.S.C. § 3729.

Project").  Id.  Each of the projects was funded by grants from agencies of the federal government and the Federal Transit Administration ("FTA").  Id. ¶¶ 18-19.  The grants included federal regulatory requirements, including the DBA.  Id. ¶¶ 20, 21.

The contracts for the projects each required Farfield to pay prevailing wages to its employees pursuant to the Davis-Bacon Act.  Id. ¶ 30.  Farfield was also contractually required to submit the certified payrolls and an accompanying "Certificate of Compliance" to the SEPTA or the DRPA on a weekly basis, which were then submitted to the FTA.  Id. ¶¶ 32, 33.

## A. Department of Labor's 2004 Audit of Farfield

In September 2004, the U.S. Department of Labor ("DOL") conducted an audit of the Farfield practices under the DBA, the Fair Labor Standards Act, and the Contract Work Hours and Safety Standards Act.  Peirce Aff. ¶ 10.[3]  In 2004, Farfield had completed the Girard Project, the PATCO Project, and the Wayne Junction Project.  Id. ¶ 12.  The audit consisted of a site visit, interviews of Farfield employees, and documents concerning Farfield's classification and payment of employees.[4]  Id. ¶ 13.

## B. Investigations of Farfield's Bidding and Payment Practices

Local 98 conducted an independent investigation of Farfield's bidding and payment practices on the projects.  Plaintiff claims this investigation revealed that Farfield misclassified a significant number of its workers on the projects for the purpose

---

[3] When deciding a Motion to Dismiss under 12(b)(1), a court may consider additional facts as set forth in an affidavit.  Atkinson v. PA Shipbuilding Co., 473 F.2d 506, 514 (3d Cir. 2007).

[4] The audit revealed that Farfield had paid four (4) employees the shop rate for the Labor Day holiday rather than the prevailing wage rate, which amounted to $811.52 to the underpaid workers.  Pierce Aff. ¶ 14.

of paying these workers at a lower rate than required.  Specifically, Plaintiff claims that in order to gain a bidding advantage, Farfield manipulated the number of workers it planned to assign to each work classification established by the DOL by intentionally allocating workers to the laborer and groundsman classifications although it knew that many of these workers would be performing work properly classified as Electrician's work.[5]  Id. ¶¶ 36 c, 36d.  This allowed Farfield to underestimate its labor costs and underbid competitors in order to win the public works contracts.  Id. ¶¶ 25, 36g.  Farfield's course of conduct was devised, authorized and effectuated by Farfield senior level management employees.  Id. ¶ 36.

Plaintiff alleges that once Farfield was awarded the contracts, it continued to misclassify workers who performed electrical work and submitted fraudulent certified payrolls to SEPTA and DRPA.[6]  Id. ¶ 36 m.  For example, Plaintiff alleges that employees classified and paid as laborers performed electrician's work, such as pulling cable, terminating wire, installing switch gears, installing junction boxes, and terminations, installing conduit and performing hot and cold wiring tasks.  Id. ¶ 36 v.  Plaintiff claims that the certified payrolls often did not reflect the proper wage rates for the actual work performed by Farfield's employees and were prepared and submitted

---

[5] The prevailing wages for a Laborer and Groundsman are less than the prevailing wage for an Electrician.  Id. ¶¶36 e, f.

[6] The Plaintiff claims that the foreman on the work site would prepare a foreman's log/report identifying and recording the employees performing the work, the location of the work, and a description of the type of work performed.  Id. ¶ 36 n.  This information was then transferred to a time sheet and given a Phase Code. Plaintiff alleges that the wage rate recorded on the time sheets was crucial to the underpayment and misclassification of Farfield's employees.  Id. ¶ 36 q.

with the intention that the false certifications would be material to the FTA's decision to pay or approve the claims.  Id. ¶¶ 36 aa, cc.

## II.    Procedural History

Local 98 filed its initial Complaint on September 17, 2009.  Doc. No. 1.  Pursuant to the FCA, Local 98 gave the U.S. Department of Justice ("USDOJ") an opportunity to intervene, which it declined on September 21, 2011.[7]  Doc. No. 3.  The Complaint was unsealed on October 31, 2011.  Doc. No. 4.  In response to Defendant's first Motion to Dismiss, Doc. No. 25, Plaintiff filed an Amended Complaint on February 3, 2012.  Doc. No. 30.  Defendant then filed a Motion to Dismiss the Amended Complaint or in the Alternative for Summary Judgment.[8]  Doc. No. 35.

## III.    Standard

A motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted examines the legal sufficiency of the complaint.[9]  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).  The factual

---

[7] An action under the FCA may be commenced in two ways.  The USDOJ may file suit to collect damages suffered as the result of fraudulent claims which cause government money to be expended from the United States Treasury.  Alternatively, a private plaintiff may bring a qui tam action on behalf of the government to recover losses incurred because of fraudulent claims.  31 U.S.C. § 3730(b)(1).  When a private plaintiff brings a qui tam action, the government is permitted to intervene.  But the private plaintiff may continue his suit even if the government declines to intervene.  31 U.S.C. § 3730(c)(1).  If the qui tam suit is ultimately successful, the private plaintiff, known as a relator, is entitled to up to 30% of the funds the government recovers. 31 U.S.C. § 3730(d).

[8] Defendant argues that under the DBA, the Department of Labor, not the district court, has primary jurisdiction over plaintiff's claims. Additionally, Defendant claims that the DOL had previously investigated any wrongdoing with respect to classifications and thus Plaintiff cannot bring a subsequent action. Defendant also argues that Plaintiff failed to state its FCA claim with the requisite particularity called for by Fed. R. Civ. P. 9(b) and that Plaintiff failed to supplement the deficient pleadings pursuant even in its amended complaint.

[9] In deciding a motion to dismiss, the Court should consider the allegations in the complaint, exhibits attached to the complaint, and matters of public record.  See Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993).  The Court may also consider "undisputedly authentic" documents when the plaintiff's claims are based on the documents and the defendant has attached copies of the documents to the motion to dismiss.

allegations must be sufficient to make the claim for relief more than just speculative. Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007).  In determining whether to grant a motion to dismiss, a federal court must construe the complaint liberally, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  Id.; see also D.P. Enters. v. Bucks County Cmty. Coll., 725 F.2d 943, 944 (3d Cir. 1984).

The Federal Rules of Civil Procedure do not require a plaintiff to plead in detail all of the facts upon which she bases her claim.  Conley, 355 U.S. at 47.  Rather, the Rules require a "short and plain statement" of the claim that will give the defendant fair notice of the plaintiff's claim and the grounds upon which it rests.  Id.  The "complaint must allege facts suggestive of [the proscribed] conduct."  Twombly, 550 U.S. at 564.  Neither "bald assertions" nor "vague and conclusory allegations" are accepted as true.  See Morse v. Lower Merion School Dist., 132 F.3d 902, 906 (3d Cir. 1997); Sterling v. Southeastern Pennsylvania Transp. Auth., 897 F. Supp. 893 (E.D. Pa. 1995).  The claim must contain enough factual matters to suggest the required elements of the claim or to "raise a reasonable expectation that discovery will reveal evidence of" those elements.  Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (quoting Twombly, 550 U.S. at 556).

---

Id.  Plaintiff has included a surveillance tape of the incident, which I will consider in my analysis of the motion to dismiss.

**IV.    Discussion**

    A.    <u>Whether the Alleged False Statement Constitutes a 'False Claim' under the</u>

        <u>FCA</u>

Congress enacted the FCA to protect government funds and property from

fraudulent claims. [10] <u>Rainwater v. United States</u>, 356 U.S. 590 (1958).  Specifically, the

FCA imposes liability on any person who "knowingly presents" to the government a

"false or fraudulent claim for payment or approval," <u>United States ex rel. Windsor v.</u>

<u>Dyncorp, Inc.</u>, 895 F. Supp. 844, 849-50 (E.D. Va. 1995) (quoting 31 U.S.C. § 3729(a)(1)

(Supp. 1995)), or who "knowingly makes . . . a false record" in order to have "a false or

fraudulent claim paid or approved by the government."  <u>Id.</u> (quoting 31 U.S.C. §

---

[10] In <u>McNinch</u>, the Supreme Court traced the legislative history of the FCA stating,

> The False Claims Act was originally adopted following a series of sensational congressional investigations into the sale of provisions and munitions to the War Department. Testimony before Congress painted a sordid picture of how the United States had been billed for nonexistent or worthless goods, charged exorbitant prices for goods delivered, and generally robbed in purchasing the necessities of war. Congress wanted to stop this plundering of the public treasury. At the same time it is equally clear that the False Claims Act was not designed to reach every kind of fraud practiced on the Government.

356 U.S. at 599.

The FCA seeks to redress fraudulent activity which attempts to or actually causes economic loss to the United States government.  As the Supreme Court held in <u>United States ex rel. Marcus v. Hess</u>, 317 U.S. 537, <u>reh'g denied</u>, 318 U.S. 799 (1943), the purpose of the FCA "was to provide for restitution to the government of money taken from it by fraud."  317 U.S. at 551.  It was not intended to impose liability for every false statement made to the government.  <u>Costner v. URS Consultants, Inc.</u>, 153 F.3d 667, 677 (8th Cir. 1998).

3729(a)(2)).[11]  However, "not every false statement made to a government entity constitutes a 'false claim' under the Act."  Id. (citing United States v. Board of Educ. of City of Union City, 697 F. Supp. 167, 174 (D.N.J. 1988); United States v. Greenberg, 237 F. Supp. 439, 442 (S.D.N.Y. 1965)).

In order to be considered a false claim under the act, the claim must potentially result in "financial loss to the government."[12]  United States ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 306 (3d Cir. 2011) (citing United States v. Neifert-

---

[11] In other words, there are two categories of false claims under the FCA: a factually false claim and a legally false claim.  United States ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 305 (3d Cir. N.J. 2011) citing U.S. ex rel. Conner v. Salina Reg'l Health Ctr., Inc., 543 F.3d 1211, 1217 (10th Cir. 2008).  A claim is factually false when the claimant misrepresents what goods or services that it provided to the Government and a claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment.  Id.  A legally false FCA claim is based on a "false certification" theory of liability.  United States ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 305 (3d Cir. N.J. 2011).  See also Rodriguez v. Our Lady of Lourdes Med. Ctr., 552 F.3d 297, 303 (3d Cir. 2008), overruled in part on other grounds by U.S. ex rel. Eisenstein v. City of New York, 556 U.S. 928, 129 S.Ct. 2230, 173 L. Ed. 2d 1255 (2009).

[12] For example, in United States ex rel. Windsor v. Dyncorp, Inc., 895 F. Supp. 844 (E.D. Va. 1995), Plaintiff argued that DynCorp violated the FCA by failing to submit, or submitting on an untimely basis, the payroll documentation required under the DBA.  Dyncorp, Inc., 895 F. Supp. at 850.  However, the court found that "DynCorp's delinquency in submitting certified copies of its payroll reports, though violative of the Davis-Bacon Act and subject to the Act's prescribed penalties…[did] not constitute a false claim under the FCA" because "there [was] simply no logical nexus between the failure to submit reports, by itself, and economic injury to the government."  Id.

Additionally, in United States v. Tieger, 234 F.2d 589 (3d Cir. 1956), cert. denied, 352 U.S. 941 (1956), the court dismissed plaintiff United States' action against defendant loan officer for failure to state a cause of action, stating that actionable false claims on the government under 31 U.S.C.S. § 231 must be for money or property, and not for fraud inducing the government to make a guarantor's promise.  In that case, plaintiff alleged that defendant violated the False Claims Act by misrepresenting to plaintiff that certain clients needed loans for home improvement and inducing plaintiff to guarantee repayment of the loans, when the loans were actually used for down payments on the purchase of property.  In each case, the loan was repaid in full by the borrower so that no claim was made on plaintiff as guarantor.  The trial court granted defendant's motion to dismiss and the appellate court affirmed.  Tieger, 234 F.2d 589.  See also United States v. Cochran, 235 F.2d 131 (5th Cir. 1956), cert. den'd, 352 U.S. 941(1956) (finding that false statements made by defendant for purpose of securing bank loans, for which defendant was convicted under 18 U.S.C. § 1010, did not amount to false claims which would entitle government to damages when defendant had not defaulted on repayment of loans and no actual claim for payment had been made against government by banks.  United States v. Cochran, 235 F.2d 131 (5th Cir. 1956); United States v. Farina, 153 F. Supp. 819, 822 (D.N.J. 1957) (stating a "claim" under the FCA is restricted to the conventional meaning of demand for money or property to which a right is asserted against the Government founded upon the government's own liability and finding that a bid is merely a calling upon another to enter into a contract and is not a 'claim' within the intendment of the statute as construed).

White Co., 390 U.S. 228, 232 (1968)).  Therefore, only "actions which have the purpose

and effect of causing the government to pay out money" where it is not due, Union City,

697 F. Supp. at 175 (quoting United States v. Lawson, 522 F. Supp. 746, 750 (D.N.J.

1981)), or actions which intentionally deprive the government of money it is lawfully

owed, United States v. Douglas, 626 F. Supp. 621, 627-29 (E.D. Va. 1985), are

considered "claims" within the meaning of the FCA.[13]  Dyncorp, Inc., 895 F. Supp. at

849-50.  The putative false statement must have the purpose and effect of causing

financial loss to the government.[14]  United States ex rel. Sanders v. American-Amicable

---

[13] United States ex rel. Windsor v. Dyncorp, Inc., 895 F. Supp. 844 (E.D. Va. 1995), provided an example of a financial loss to the government where a contract pursuant to which the amount the government paid the contractor for project work was a multiple of the contractor's actual labor costs.  In that event, the misrepresentation of actual labor costs would result directly in an overpayment by the government.  Additionally, in Dyncorp, the contract was a "fixed price" contract, "meaning that the parties calculated a contract price by estimating in advance the cost of the project..." Because DynCorp billed the government based on that pre-determined, fixed price a loss to the government would have occurred if DynCorp intentionally paid its workers "lower wages than were due by misclassifying them." Dyncorp, Inc., 895 F. Supp. at 851.  "In short, as with all Davis-Bacon Act contracts, the government paid more for the contract in order that the workers would be paid more."  Id.

[14] A significant consideration is whether the FCA only applies where an individual falsely convinces the government to pay out too much in funds or to "overpay," versus "claims" that include all fraudulent attempts to cause the Government to pay out money."  The contract at issue in this case compared to all of the fair market competitors' bids actually caused the government to expend less money in payment of the undertaking proposed by the bid.  In fact, the government does not appear to be damaged or be subject to any potential damages under the circumstances where it paid less than it would have under the prevailing market rates.  There was no collusive bidding, no conspiracy between the defendant and a government official, and no failure of performance.  The government received what it contracted for at the best price for which it could obtain the services.

Many cases interpret the term "claim" as any fraudulent misrepresentation that induces the government to pay out funds.  See United States v. Rivera, 55 F.3d 703, 709 (9th Cir. 1995) (finding that one "who submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the Government to pay out funds or to suffer any loss.").  In Rivera, the court found that the statute attaches liability, not to the underlying fraudulent activity or to the government's wrongful payment, but to the "claim for payment." Indeed, a contractor who submits a false claim for payment may still be liable under the FCA for statutory penalties, even if it did not actually induce the government to suffer any loss.  See, e.g., Rex Trailer Co. v. United States, 350 U.S. 148, 153 & n.5 (1956); United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991).  Further, Congress did not include a reference to actual payment of a claim by the federal government as an element of an FCA violation.  See § 3729(a)(1).  The focus of FCA liability is on the presentment of the false claim, not the payment of it.  See e.g., United States ex rel. Hagood v. Sonoma County Water Agency, 929 F.2d 1416, 1421 (9th Cir. 1991).  By attaching liability to the claim itself, Congress decided that fraud against the government is best deterred by attacking the act that presents the risk of wrongful payment by the United States.  The government need not wait until the false claim is paid before liability attaches.  Tyger Constr. Co. v. U.S., 28 Fed. Cl. 35 (Fed. Cl. 1993); United States v. Hughes, 585 F.2d 284 (7th Cir. 1978); Fallon 921 F. Supp at 611.

Life Ins. Co., 545 F.3d 256, 259 (3d Cir. 2008); Garg v. Covanta Holding Corp., 2012

U.S. App. LEXIS 9313, 13-14 (3d Cir. N.J. May 8, 2012); United States v. Douglas, 626

F. Supp. 621, 628 (E.D. Va. 1985) (the term "'claims' … should be interpreted so as to

reach all types of fraud that result in immediate financial loss to the government");[15]

---

United States v. Neifert-White Co., 390 U.S. 228, 232 (1968).  See also Tieger, 234 F.2d 589 (3d Cir. 1956).
Hence, an FCA qui tam suit may be initiated to recover civil penalties without showing actual compensatory
damages.  See e.g., Rabushka ex rel. United States v. Crane Co., 122 F.3d 559 (8th Cir. 1997); Hagood, 921 F.2d at
1421.

However, another line of cases requires that the claim must cause monetary loss or be capable of causing monetary
loss.  See Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176 (3d Cir. 2001) (finding that the submission of
inflated legal bills to a bankruptcy court did not result in liability under the FCA because the government did not
suffer economic loss); Fleming v. United States, 336 F.2d 475 (10th Cir. 1964), cert. denied, 380 U.S. 907, 13 L. Ed.
2d 795, 85 S. Ct. 889 (1965) (holding that appellant was properly convicted under the FCA by presenting false
purchase orders to the government for payment, when in fact, he had not delivered the allocated grain to the farmers
as he was required to do thereby causing the government to pay out money for services not rendered); United States
v. Erlich, 643 F.2d 634 (9th Cir. 1981) (involving intentional *overstatement* of construction costs on a federally
insured mortgage on a housing project) (*emphasis added*); United States ex rel. Gibbons v. Aker Phila. Shipyard,
Inc., 2006 U.S. Dist LEXIS 5172 (E.D. Pa. 2006) (involving alleged submission of false claims to receive training
subsidies from the Departments of Labor and Defense); Al Munford, Inc. v. United States, 34 Fed. Cl. 62 (1995)
(involving allegations that a construction company submitted dual claims for building and repairing washracks at
Fort McClellan, Alabama); United States ex rel. Longest v. Dyncorp, No. 6:03-cv-816-Orl-31JGG, 2006 U.S. Dist.
LEXIS 1838 (M.D. Fla. Jan. 9, 2006) (involving alleged submission of request for reimbursement of non-
reimbursable expenses under federal contracts to provide cocaine eradication assistance); United States v. Merck-
Medco Managed Care, L.L.C., 336 F. Supp. 2d 430 (E.D. Pa. 2004) (involving a fraudulent inducement of
physicians to bill for services not rendered); United States v. Rachel, 289 F.Supp. 2d 688 (D. Md. 2003) (involving a
markup scheme inflating costs for the repair of government laptop computers).

In a law review article Joan H. Krause, Health Care Providers and the Public Fisc: *Paradigms of Government Harm
Under the Civil False Claims Act*, 36 Ga. L. Rev. 121, 184-86 (2001),  the author opines:

> Given these different approaches, as well as the challenges posed by comparing cases decided
> under evolving versions of the statute, it is difficult to discern a coherent judicial approach to the
> role of fiscal harm under the FCA.  Notwithstanding certain statements to the contrary, it appears
> that the falsity or fraud must at least have the potential for causing fiscal harm to the government.
> Yet the standard is not very demanding: the government need not wait until a claim has been paid
> to bring suit, nor must the claim result in a net loss. Instead, it appears to suffice if the claim
> induces the government to part with its money or property, even if the same payment would have
> been made to an "innocent" provider for identical services.  Thus, where a regulatory violation
> induces the government to pay a person whom it did not intend to benefit-such as a physician who
> violates the anti-referral laws-the government may have suffered the requisite harm even if it paid
> no more than it would have paid someone else for the same services.

Krause, 36 Ga. L. Rev. 121, 186.

[15] In Douglas, the Court held that the alleged false claim in the case was "ultimately borne by the Treasury" because
"the government not only received less than it was entitled to under the contract, [but also] it performed services and
expended funds (for flight fuel, etc.) for which it was not reimbursed. As a result, the government suffered

United States v. Neifert-White Co., 390 U.S. 228, 232 (1968) (evaluating the legislative history of the FCA and concluding that "the Act was intended to reach all types of fraud, without qualification, that might result in financial loss to the Government"); Smith v. United States, 287 F.2d 299, 304 (5th Cir. 1961) (FCA applies where as a result of a fraudulent statement, "expenses [are] ultimately borne by the United States Treasury");[16] Peterson v. Weinberger, 508 F.2d 45, 52 (5th Cir. 1975) (finding that the term "claim" is within purview of FCA if it is grounded in fraud which might result in financial loss to government).

In this case, it is not disputed that the contracts for the projects each required Defendant to pay the prevailing wages to its employees pursuant to the DBA.  Id. at ¶ 30. Plaintiff alleges that it conducted an independent investigation of Defendant's bidding and payment practices on the projects, which revealed that Defendant "purposefully and systematically misclassified a significant number of its workers on the projects for the purpose of paying these workers at a lower rate than required."  Doc. No. 41 at 2. This alleged scheme allowed Defendant to underbid competitors and win the public works contracts.  Id. at 25.  Defendant then went on to misclassify workers and pay them less, in

---

'immediate financial detriment.'" 626 F. Supp. at 628 (citing United States v. McNinch, 356 U.S. 595, 599 (1958); Neifert-White, 390 U.S. at 232).

[16] In Smith v. United States, 287 F.2d 299 (5th Cir. 1961), the court found that a false statement presented a cognizable claim under the FCA.  "In Smith, the defendant was the lessee of a government-owned apartment complex.  Under the lease arrangement the lessee paid a specific percentage of rent receipts to the government and the government also agreed to advance funds to cover any operating deficits. The United States alleged that the defendant overstated certain expenses, causing it to underpay rent in one period and to receive funds to cover operating deficits in another."  United States v. Douglas, 626 F. Supp. 621, 628 (E.D. Va. 1985) (citing Smith v. United States, 287 F.2d 299 (5th Cir. 1961)).  The Smith Court stated that the false reports violated the FCA because "the inclusion of the items [in the reports] had a direct and immediate impact on the Treasury."  Id. at 300. The court held that it did not matter whether the false statements caused the government to pay out too much as opposed to receiving less than it deserved, so long as the "expenses were . . . ultimately borne by the United States Treasury."  Id. (citing Smith at 287 F.2d at 304).

violation of the DBA, to comply with the low contract price.  However, violations of the DBA do not necessarily constitute false claims against the government within the meaning of the FCA.

Defendant contends that the FCA does not apply to the contracts at issue here, because the contracts were not between the Defendant and the United States government, but rather between the Defendant and state transportation agencies for projects that were partially funded by federal grants to the state transportation agencies.  In support of its contention, Defendant relies primarily on the Supreme Court's decision in Allison Engine Co. Inc. v. United States ex rel. Sanders, 553 U.S. 662, 128 S. Ct. 2123 (2008), and asserts that the Supreme Court "determined that the FCA did not apply to claims that were not made directly to the federal government, such as the ones at issue here."[17]

A party can be subject to FCA liability even where the government suffers no monetary injury.  See Varljen v. Cleveland Gear Co., Inc., 250 F.3d 426, 429 (6th Cir. 2001)).  This is so, for example, where the government discovers that a claim is false before it makes payment, see Rex Trailer Co. v. United States, 350 U.S. 148, 153 n.5, 76 S. Ct. 219, 100 L. Ed. 149 (1956), or where the government in essence passes on the cost of the false claim to a third party, see United States ex rel. Hayes v. CMC Electronics

---

[17] Defendant's interpretation of the Allison Engine case is incorrect.  The Supreme Court's holding was designed to ensure that "a defendant is not answerable for anything beyond the natural, ordinary and reasonable consequences of his conduct." Id. at 2130 (citation omitted).  Thus, so long as a defendant makes a false statement that is material to the Federal Government's payment of funds and the defendant is aware that the government would potentially rely upon defendant's statement, a fact finder may find that the statement was made with the purpose of inducing payment of a false claim by the government, even if defendant does not submit the claim directly to the Federal Government.  See Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 184 (3d Cir. 2001) (holding that inflated bills submitted to a bankruptcy court by the law firm would be paid out of the assets of the bankrupt entity and not from the Federal Treasury therefore no claim was made against the government and the claim was not within the purview of the FCA).

Inc., 297 F. Supp. 2d 734, 737-39 (D.N.J. 2003) (holding that relator stated a claim under FCA where defendant allegedly inflated price of military equipment sold to the federal government, notwithstanding fact that the government subsequently resold the equipment at that inflated price).

Additionally, as discussed above, Hutchins v. Wilentz, Goldman & Spitzer, 253 F.3d 176, 184 (3d Cir. 2001),  held that "submission of false claims to the United States government for approval which do not or would not cause financial loss to the government are not within the purview of the False Claims Act."  Hutchins could be distinguished from this case because the inflated bills submitted to a bankruptcy court by the law firm would be paid out of the assets of the bankrupt entity and not from the Federal Treasury, hence no claim was made against the government.  Id. at 183-84.  In this case, even though the government paid less than it would have had it paid the fair market value, the Federal Treasury still paid the amount, which could be considered a "loss."  Additionally, although not the exact application discussed in United States ex rel. Hayes v. CMC Electronics Inc., 297 F. Supp. 2d at 737-39, this cost could potentially be seen as "passed on" to a third party – the underpaid workers.

In United States v. Silver, 384 F. Supp. 617 (E.D.N.Y. 1974), aff'd without op., 515 F.2d 505 (2d Cir. 1975), the defendant was accused of cashing checks for his bankrupt company that should have been delivered directly to the bank.  Because the defendant ultimately paid the subcontractors on whose behalf the payments were made, the government conceded that the United States had not suffered any actual damages.  Id. at 618.  The district court nonetheless found that Silver's actions fell within the FCA,

noting that "any actions which have the purpose and effect of causing the Government to immediately pay out money are clearly 'claims' within the purpose of the Act." Id. at 620.

Additionally, FCA actions may be sustained under a theory of "false certification."[18] United States v. Hibbs, 568 F.2d 347 (3d Cir. 1977). In these actions, the false certification of compliance creates liability when certification is a prerequisite to obtaining a government benefit.[19] As in this case in order to qualify for federal construction projects subject to DBA and related acts, contractors must "certify" that each laborer or mechanic has been paid not less than the applicable wage rates. 29 CFR § 5.5(a)(3)(B)(3); United States ex rel. Hopper v. Anton, 91 F.3d 1261, 266 (9th Cir. 1996) (finding that if a contractor submits a false certification pursuant to this requirement he *may* be liable under the FCA) (*emphasis added*). To recover damages under this theory, the Plaintiff must show that the government has paid a "claim" based on a certificate containing false information "which has resulted in damages sustained 'by reason of the doing or committing the act." Hibbs, 568 F.2d at 350; United States v. Educ. Mgmt. Corp., 2012 U.S. Dist. LEXIS 67103 (W.D. Pa. May 11, 2012) (stating that "a causal link between a false claim and economic harm must be possible, plausible, and pleaded … a

---

[18]See also United States ex rel. Wall v. Circle C. Constr., L.L.C., 2012 U.S. App. LEXIS 20433, 19-20 (6th Cir. Tenn. 2012) ("Cases brought pursuant to the [False Claims] Act under the so-called false 'certification theory' of liability necessarily implicate, to some degree, agency knowledge.") (citing United States ex rel. Taylor v. Gabelli, 345 F. Supp. 2d 340, 353 (S.D.N.Y. 2004)).

[19] United States ex rel. Wilkins v. United Health Group, Inc., 659 F.3d 295, 311-12 (3d Cir. 2011) (stating that the Third Circuit has held that because a certificate of compliance with federal health care law is a prerequisite to eligibility under the Medicare program "[f]alsely certifying compliance with the . . . Anti-Kickback Act[] in connection with a claim submitted to a federally funded insurance program is actionable under the FCA.") (citing United States ex rel. Kosenske v. Carlisle HMA, Inc., 554 F.3d 88, 94 (3d Cir. 2009)).

14

complaint must allege that, at the very least, the Government could have been harmed") (quoting United States v. Merck-Medco Managed Care, L.L.C., 336 F. Supp.2d 430, 441-42 (E.D. Pa. 2004)).  Therefore, I find that Plaintiffs have stated a claim under the FCA and at this stage of the pleadings Plaintiffs have withstood Defendant's motion to dismiss on this ground.

### B.  Whether the Court Has Subject Matter Jurisdiction Over Plaintiff's Claims

The issue as to whether this Court has jurisdiction over Plaintiff's claims concerns whether the claims' false or fraudulent nature would require the court to decide a matter committed to the discretion of an administrative agency.[20]  The DBA requires that government construction contracts contain a provision stating "the minimum wages to be paid to various classes of laborers and mechanics . . .shall be based on the wages the

---

[20] FCA suits may be preempted in cases involving specific factual issues that are reserved for agency discretion, or an underlying regulatory scheme that addresses identical fraudulent activity.  For example, the DBA requires government contracts to set wages for various classes of laborers.  Some courts have rejected FCA suits based on alleged DBA violations when the assessment of falsity turns on whether the defendant misclassified its employees-a factual determination that is reserved for the Department of Labor.  See e.g., Dyncorp, Inc., 895 F. Supp. at 851; Found. for Fair Contr., Ltd. v. G&M E. Contr., Inc., 259 F. Supp. 2d 329 (D.N.J. 2003); United States ex rel. Wall v. Circle C. Constr., L.L.C., 2012 U.S. App. LEXIS 20433 (6th Cir. Tenn. 2012).

Specifically, in United States ex rel. Windsor v. DynCorp, Inc., the gravamen of the plaintiff's FCA claim was that the defendant submitted false claims because it misclassified workers and the wages paid to them in violation of the Davis-Bacon Act.  The Court explained:

> Where the contractor's statement may be determined to be false without regard to complex Davis-Bacon Act classification regulations, then a Davis-Bacon Act violation may form the basis of an FCA suit. That is, where the "falsity" of the false statement is not dependent on interpretation and application of those regulations, the current obstacle to FCA liability disappears. For example, if … a contractor misrepresents the wages actually paid to its employees, or lies about the frequency with which they receive paychecks, an FCA action may be viable. In that circumstance, the jury could make a finding regarding the falsity of the false claim through standard fact[-]finding techniques, and with no intrusion into the province of the [DOL].  Accordingly, the Davis-Bacon Act by no means precludes or preempts all FCA suits for false claims that happen also to be Davis-Bacon Act violations. It is worth emphasizing in this regard that [the plaintiff] claims not that DynCorp misrepresented the amount its workers were actually paid, but rather that its classification of certain workers was erroneous.  Such disputes are appropriately relegated to the [DOL].

Id. at 852-53.

Secretary of Labor determines to be prevailing" in the locality.  Id. at § 3142(a)-(b).  This

is based on the tasks the workers perform.  Tele- Sentry Sec., Inc. v. Secretary of Labor,

Case No. 90-0912, 1991 WL 178135, at *4 (D.D.C. Aug. 30, 1991).  Therefore, the

Secretary of the Department of Labor has exclusive authority to establish minimum

wages for particular classifications of laborers and mechanics in particular localities and

to define the work that is included within each classification where there is any

ambiguity.

        The primary jurisdiction doctrine "allows courts to refer a matter to the relevant

agency whenever enforcement of the claim requires the resolution of issues which have

been placed within the special competence of an administrative body."  Charvat v.

Echostar Satellite, LLC, 630 F.3d 459, 466 (6th Cir. 2010).  Under the doctrine, a court

may defer adjudication until the state administrative agency has made a designated

determination.  Padgett v. Stein 406 F. Supp. 287, 302 (M.D. Pa. 1975).  See also Fieger

v. United States Att'y Gen., 542 F.3d 1111, 1121 (6th Cir. 2008) ("[Under] the doctrine

of primary jurisdiction, . . . federal courts are to abstain from hearing certain

administrative-related matters until the appropriate agency has had the opportunity to

interpret unanswered technical and factual issues.").  When the doctrine is applicable,

court proceedings are stayed in order to give the parties reasonable opportunity to refer

the matter to an agency seeking an administrative ruling.  United States ex rel. Wall v.

Circle C. Constr., L.L.C., 2012 U.S. App. LEXIS 20433, 16-17 (6th Cir. 2012); United

States v. Henri, 828 F.2d 526, 528 (9th Cir. 1987) (internal quotations omitted) (reversing

dismissal based on deference to agency under primary jurisdiction doctrine and

remanding with orders to grant the stay stating a stay is proper when "a court suspends

proceedings in order to give preliminary deference to an independent adjudicating body

but further judicial proceedings are contemplated.").

      Therefore, where it "is impossible to determine whether [defendant] submitted a

false claim to the government without first determining whether [defendant] actually

misclassified an employee in a given instance….[,] the responsibility for resolving such

disputes rests not with the courts, but with the Department of Labor." DynCorp., Inc.,

895 F. Supp. at 851.[21]  However, the DBA does not pre-empt the FCA.  Rather, where

there is a determination by the Department of Labor concerning a classification, a district

court may proceed with a case under the FCA.  See United States ex rel. Local Union 217

v. G.E. Chen Constr., Inc., 954 F. Supp. 195, 197 (N.D. Cal. 1997) (holding that to the

extent that the plaintiffs' FCA claims were based on allegations that the defendants

misclassified employees, the court lacked jurisdiction to decide those claims, which were

within the sole jurisdiction of the DOL; however, the court did have jurisdiction to hear

the plaintiffs' additional claim that the defendants submitted false statements and

prepared false payroll certifications, because those allegations did not depend on any

determination of the proper classification of workers – a DOL responsibility); United

States ex rel. Plumbers & Steamfitters Local Union No. 342 v. Dan Caputo Co., 152 F.3d

1060, 1062 (9th Cir. 1998) (per curiam) (holding in FCA suit regarding contractors'

classification of employees for purposes of the DBA, that "deferral to the Department [of

Labor] was proper only with respect to the resolution of how particular types of work

---

[21] The DynCorp Court also held that "a Davis-Bacon Act worker classification dispute, by itself, is not an FCA
claim because such disputes must be resolved by the Department of Labor." 895 F. Supp. at 852.

should be classified but not with respect to whether the Contractors misclassified their employees").

Although the language is somewhat confusing, courts have drawn a distinction between a contractor's misrepresentation of wages and its misclassification of workers. See United States ex rel. Wall v. Circle C. Constr., L.L.C., 2012 U.S. App. LEXIS 20433, *12 (6th Cir. 2012) (citing DynCorp, 895 F. Supp. at 851; 29 C.F.R. §§ 5.5(a)(9), 5.6(a)(3), 5.6(b), 5.11(a)).  In Wall, the district court found that:

> DynCorp involved a Davis-Bacon Act "complex classification" of the jobs at issue on the FCA claim. Here, the undisputed proof is that all of Phase Tech's employees on this project performed electrical work for which Davis-Bacon Act wages were clearly defined by the contract. There are not any complex Davis-Bacon classification regulation[s] in this action and DynCorp is inapplicable.

Wall, 700 F. Supp. 2d at 939.

Plaintiff agrees that the Department of Labor establishes the standards for determining the proper work classifications and the appropriate prevailing minimum wage of the employees within each classification on the public works project.  Id. at ¶ 23. However, Plaintiff argues that this case resembles Wall in that its allegations "do not involve a complex classification dispute." Doc. No. 41 at 7. Plaintiff states that where a prevailing wage practice exists and is undisputed, or where the classification of work is not in question, the courts need not defer to the DOL.  See U.S. v. Dan Caputo Co., 152 F.3d 1060 (9th Cir.1998).  Defendant argues that this case does in fact involve a dispute over the proper classification of workers under the DBA because much like DynCorp it "is impossible to determine whether [defendant] submitted a false claim to the

government without first determining whether [defendant] actually misclassified an employee in a given instance" DynCorp., Inc., 895 F. Supp. at 851.

In Wall, the court found that DynCorp was inapplicable because "the undisputed proof is that all of defendant's employees on this project performed electrical work for which Davis-Bacon Act wages were clearly defined by the contract." The court went on to state defendant's payroll certifications contained false entries because the electrical workers were not paid prevailing wages.[22] United States ex rel. Wall, 700 F. Supp. 2d at 939.

The present facts differ from Wall in that there is no undisputed proof that all of Defendant's employees performed the specific electrical work as defined by the DBA and the contracts. The dispute is, in fact, whether Defendant properly classified its employees for purposes of wage determinations under the DBA. However, these classifications are

---

[22] In Wall, Defendant Circle C signed an agreement with the Army to construct buildings at the Fort Campbell military base. Circle C's agreement included determinations of "hourly wages for electrical workers with a base hourly rate of $19.19, plus fringe benefits of $3.94 an hour." United States ex rel. Wall, 700 F. Supp. 2d at 931. Under the contact, Circle C was obligated to pay electricians according to the wage determinations in the contract, to submit payroll certifications, and to ensure that subcontractors complied with the DBA. Id. Defendant Phase Tech was Circle C's subcontractor on at least 98 percent of the electrical work on the Fort Campbell project, but Circle C did not comply with the terms of the contract regarding Phase Tech as a subcontractor. Id. Phase Tech had eight employees, including Wall, who worked on the Fort Campbell contract, performed electrical and conduit work as electricians. However, Phase Tech submitted false certifications concerning wages for certain employees. For example:

> [I]n the December 2008 payroll certifications, Circle C listed one certified electrician for this project who was paid at the hourly wage of $12 to $16 an hour. Id. The wages on these certifications are below the rates on the Circle C's contract for its subcontractors' electrical workers that required a wage of $19.19 per hour, plus fringe benefits of $3.94 an hour for work in Kentucky. The pay stubs of the original 2004 and 2005 Circle C payroll certifications also reflect the workers' pay between $12 and $16 an hour. Thus, 62 payroll certifications contained non-complying hourly wages for laborers as well as an electrical worker on the payroll, with the exception of one worker who was paid about $17 an hour.

Id. at 932. In other words, the certifications were false because the wages paid to the workers, as they were classified, were less than the required wages under the DBA. Additionally, in some instances, Phase Tech employees were not listed at all. Circle C was then liable as the main contractor for failing to have its subcontractor, Phase Tech, comply. Id. at 939.

not complex and were previously defined by the department of labor with regard to the work performed.  For example, if an individual relator alleged that he operated a dump truck, that the defendant contractor instead paid him at the lower rate for a forklift operator, the case would be actionable under the FCA, despite the fact that the case involved a labor classification.  This is precisely what Plaintiffs allege. [23]

Only when there is not a determination by the Department of Labor may the primary jurisdiction doctrine apply to defer the case to the agency for proper classification.  Framlau Corp. v. Dembling, 360 F. Supp. 806, 809 (E.D. Pa. 1973) (the court discussed the fact that the plaintiff's claim was not subject to judicial review because it concerned an interpretation by the Secretary of Labor of his own prevailing wage determination, i.e., what activities constitute the work of a plumber, electrician, etc., and what phases of the construction activities constitute the work of a laborer and was exclusively within the Secretary of Labor's jurisdiction and that the correctness of his determination of wage rates under the Davis-Bacon Act were not subject to judicial review).

This was precisely the case in United States ex rel. Plumbers & Steamfitters Local Union No. 342 v. Dan Caputo Co., 152 F.3d 1060, 1062 (9th Cir. 1998).  The issue in that case was whether the district court should stay the case in order that the DOL could evaluate whether the "steamfitter" classification covered the type of pipe-laying work

---

[23] For example, the Amended Complaint alleges "Farfield consistently and deliberately falsified certified payroll documents that it submitted…even though it knew that some of its employees were not properly classified." Amend. Compl ¶ 35.  Additionally, Plaintiffs claim, "While preparing Farfield's bids on projects, [Defendants] manipulated the number of workers they assigned to each classification, intentionally allocating workers to the laborer and groundsman classification although they knew that some of those workers would be in fact performing work properly classified as electrical work."  Amend. Compl. ¶ 36(d).

that plaintiff claimed was performed.  This classification was a question of first

impression for the DOL. The district court in <u>Dan Caputo</u> issued a short order granting

defendants' motion to dismiss the case pending referral to the DOL for a ruling as to

whether the "defendants misclassified their employees for the purposes of the Davis-

Bacon Act."  In a two-page opinion, the Ninth Circuit directed the district court to stay

the action until the DOL decided the issue of how particular types of work should be

classified.  <u>See</u> <u>Dan Caputo</u>, 152 F.3d at 1062.

Although very muddled, the dispute here is simply whether the Defendant

misclassified the workers into categories, for which the DOL has previously determined

the type of work within each classification.  This misclassification allegedly resulted in

the underpayment of workers.  The parties dispute the appropriate payment for the

classifications; however, I find that the alleged falsity of the false statement "is not

dependent on interpretation" of classifications and wage determinations.  Therefore,

jurisdiction is appropriate in the court system.

    C.  <u>Whether the All Five Contracts at Issue are Actionable Under Section</u>

        <u>3729(a)(2) of the FCA</u>

In May 2009, Congress amended the FCA and revised the liability provisions,

among other things.  The revisions to the liability provision set forth in § 3729(a)(2)

became effective "as if enacted on June 7, 2008, and apply to all claims under the [FCA]

that are pending on or after that date."  Fraud Enforcement and Recovery Act (FERA), S.

386, 111th Cong. § 4(f) (2009) (enacted).  Defendant argues that a number of courts have

refused to apply the changes to § 3729(a)(2) retroactively on the ground that it would

violate the Ex Post Facto Clause of the Constitution.[24]  I disagree and I will deny

Defendant's motion on the grounds that the § 3729(a)(2) does not apply to the contracts

at issue.  Additionally, for the reasons set forth below, I find that § 3729(a)(2) of the FCA

does not require false claims to be submitted directly to the federal government.

Before FERA, the liability provisions of the FCA were codified at 31 U.S.C. §

3729 (a)(1) through (a)(7).  However, this case is concerned with liability under

§3729(a)(2).[25]  As background, subsection (a)(1) attached liability for anyone who

"knowingly present[ed], or cause[d] to be presented, to an officer or employee of the

United States Government or a member of the Armed Forces of the United States a false

or fraudulent claim for payment or approval."  This required "presentment" of a claim to

the *federal government*.  See United States ex rel. Totten v. Bombardier Corp., 380 F.3d

488, 492 (D.C. Cir. 2004) (emphasis added).  Prior to the adoption of FERA, merely

submitting a false claim to a recipient of federal funds, such as a federal contractor or

---

[24] With regard to the retroactivity argument made by the Defendant, I am in agreement with the Department of
Justice's position that the revisions to this section 3729(a)(2) apply to all pending cases arising under the FCA that
were pending on or after June 7, 2008.  See S. 386, 111th Cong. § 4(f) (2009) (enacted).  Other courts agree.  See
United States ex rel. Yannacopoulos v. General Dynamics, 652 F.3d 818, n.2 (7th Cir. 2011) (defining "claim" as
cause of action); United States ex rel. Steury v. Cardinal Health, Inc., 625 F.3d 262, n.1 (5th Cir. 2010)(same);
United States ex rel. Kirk v. Schindler Elev. Corp., 601 F.3d 94, 113 (2d Cir. 2010), re'vd on other grounds, 131
S.Ct. 1885 (2011); United States ex rel. Walner v. Northshore University Healthsystem, 660 F. Supp. 2d 891, n.3
(N.D. Ill. 2009); see also United States ex rel. Drake v. Norden Systems, Inc., 736 F.Supp. 2d 489 (D. Conn. 2010)
(applying changes to 3729(a)(2) retroactively and holding that FCA "is not sufficiently punitive in nature and effect
so as to warrant application of the Ex Post Facto Clause.").  In addition, in the context of a challenge to the
retroactive application of FERA's new relation back provision, the D.C. Circuit expressly rejected a defendant's
argument that the FCA is subject to the Ex Post Facto Clause.  United States ex rel. Miller v. Bill Harbert Int'l
Constr., Inc., 608 F.3d 871, 878-79 (D.C. Cir. 2010) ("The Ex Post Facto Clause of the Constitution applies only to
penal legislation. . . . The FCA is not penal.") (citations omitted).  Thus, the amended liability provision applies to
this case.

[25]  FERA recodifies those sections at 31 U.S.C. § 3729(a)(1)(A-G).

grantee, did not violate subsection (a)(1), even if the contractor or grantee paid the claim using government funds.  See id.

Subsection (a)(2) applied to anyone using "a false record or statement to get a false or fraudulent claim paid or approved by the Government."  Unlike subsection (a)(1), (a)(2) does not contain a "presentment" requirement, but the court still had to find that the false record or statement was meant to induce payment by the government.  See Allison Engine Co. v. United States ex rel. Sanders, 128 S.Ct. 2123, 2129-30 (2008).  "Intent" meant that there must be some evidence of a claimant's intent to receive payment from the government, regardless of whether the federal grantee used federal funds to pay the claim.[26]  Id.  The difference is between "getting a false claim paid by the Government" and "getting a false claim paid using 'government funds.'"  Id. at 2128.  Pre FERA, "a defendant must intend that the Government itself pay the claim."  Id.

FERA expands the grounds for liability under the FCA, by "clarifying" that the FCA covers false claims for government money or property: (1) whether or not the claim was presented to a government employee or official; (2) whether or not the government has custody of the money or property; and (3) whether or not the person or entity specifically intended to defraud the government.[27]

---

[26] In other words, where "a subcontractor makes a false statement to a private entity but does not intend for the Government to rely on the statement as a condition of payment, the direct link between the statement and the Government's decision to pay or approve a false claim is too attenuated to establish liability."  Allison Engine, at 2130.

[27] Before FERA, and under Allison Engine, liability under the FCA was generally dependent upon either the presentment of a false claim to the federal government or a false statement made with the intent of inducing the federal government to pay a claim.  Under the new provisions, liability exists under a much lower standard: if the subcontractor's statement had a natural tendency to influence, or was capable of influencing, payment or receipt of money.  As a result, "claim" now  includes "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property."  This definition of

However, even before FERA, subcontractors faced liability for false claims submitted to prime contractors when those claims were passed on to the government or caused the prime contractor to submit a false claim to the government.  In Totten, defendants submitted claims to Amtrak, a recipient of government subsidies, not a government contractor.  See United States ex rel. Totten v. Bombardier Corp., 380 F.3d 488, 492 (D.C. Cir. 2004).  In Allison Engine, the Court was concerned with subsections (a)(2) and (a)(3) because they lacked a presentment requirement and could, therefore, be construed to encompass fraud directed solely at private parties.  Id. at 2130.  To guard against such a result, the Supreme Court interpreted these subsections to require proof that the defendant intended its conduct to affect the government's payment decision.  Id. ("If a subcontractor or another defendant makes a false statement to a private entity and does not intend the Government to rely on that false statement as a condition of payment, the statement is not made with the purpose of inducing payment of a false claim by the Government.").[28]  Although Allison Engine opted to assert claims under subsection (a)(2), the relators could have alleged liability under subsection (a)(1) even if the defendant presented no false statements or claims directly to the government by alleging that the false statements that the defendant allegedly made to the prime contractor caused

---

"claim" includes any request or demand presented to the United States or "made to a contractor, grantee, or other recipient" if "the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest" and the United States provides or reimburses any portion of the money or property

[28] The Supreme Court explained that its use of the term "intent" referred to the defendant's awareness that its statement would be material to the government's payment decision and would be potentially relied upon by the government, as opposed to a private party.  See Allison Engine at 2130, n.2 (distinguishing intent requirement in § 3729(a)(2) from FCA's knowledge requirement).

the prime contractor to submit false claims to the government.[29]  Allison Engine, 128

S.Ct. 2123, 2129 n.1 (holding that there may be liability where the claim "was originally

'made to' a contractor, grantee, or other recipient of federal and then forwarded to the

Government.").  Therefore, I find that the FCA does apply to the contracts at issue in this

case and I will deny the Defendant's motion to dismiss on that ground.

    D.  31 U.S.C. §3730(e)(3) – (e)(4) Jurisdiction Bar

    A *qui tam* plaintiff bears the burden of establishing subject matter jurisdiction by a

preponderance of the evidence.  See, e.g., United States ex rel. Biddle v. Bd. of Trustees

of the Leland Stanford Jr. University, 161 F.3d 533, 540 (9th Cir. 1998), cert. denied, 526

U.S. 1066 (1999).  To defend a motion to dismiss, a plaintiff must make a prima facie

showing of jurisdictional facts.  Lake v. Lake, 817 F.2d 1416, 1420 (9th Cir. 1986).  The

FCA eliminates a court's subject matter jurisdiction in certain circumstances.[30]  31 U.S.C.

---

[29] The subcontractor was not liable under (a)(2) because the relators did not put forth any evidence that any false claims were ever submitted to or paid by the government, not because of any "loophole" in the statute.

[30] The exact text of the statute reads as follows:

    (e) Certain actions barred.

     (1) No court shall have jurisdiction over an action brought by a former or present member of the armed forces under subsection (b) of this section against a member of the armed forces arising out of such person's service in the armed forces.

     (2) (A) No court shall have jurisdiction over an action brought under subsection (b) against a Member of Congress, a member of the judiciary, or a senior executive branch official if the action is based on evidence or information known to the Government when the action was brought.

      (B) For purposes of this paragraph, "senior executive branch official" means any officer or employee listed in paragraphs (1) through (8) of section 101(f) of the Ethics in Government Act of 1978 (5 U.S.C. App.).

     (3) In no event may a person bring an action under subsection (b) which is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party.

     (4) (A) The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed--

      (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;

§3730(e)(3)  may preclude an action under the FCA where the suit "is based upon allegations or transactions which are the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."  31 U.S.C. §3730(e)(3).[31]  See, e.g., Costner v. Urs Consultants, 153 F.3d 667, 676 (8th Cir. 1998); S. Prawer & Co., 24 F.3d at 327-28; United States ex rel. Alexander v. Dyncorp, Inc., 924 F. Supp. 292, 302 (D.D.C. 1996); Hyatt v. Northrop Corp., 1989 U.S. Dist. LEXIS 18941, *2, No. 87-6892-KN (C.D. Cal. Dec. 27, 1989).  This section will typically bar only a *qui tam* action based upon allegations or transactions pleaded by the government . . . ." Costner, 153 F.3d at 676.  Additionally, 31 U.S.C. § 3730(e)(4) prohibits an action based upon the public disclosure of allegations or transactions in a "criminal, civil, or administrative or Government Accounting Office report, hearing, audit, or investigations, or from the news media." Id.  The exception to this occurs if the action is brought by the attorney general or the person bringing suit is an "original source."  Id.

"The [False Claim] Act's jurisdictional scheme is designed to promote private citizen involvement in exposing fraud against the government, while at the same time

---

(ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
(iii) from the news media,
unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.
(B) For purposes of this paragraph, "original source" means an individual who either (i) prior to a public disclosure under subsection (e)(4)(a), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (2) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

[31] Subsection (e)(3) precludes private plaintiffs from bringing suits based on information or allegations that are the subject of a suit in which the government is a party, but it, unlike subsection (e)(4), applies that preclusion even if the private plaintiff was the original source of the information ("In no event may a person bring an action . . .").  United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Prudential Ins. Co., 944 F.2d 1149, 1156 (3d Cir. 1991).

prevent parasitic suits by opportunistic late-comers who add nothing to the exposure of the fraud." Costner v. URS Consultants, Inc., 153 F.3d at 675-76 (quoting United States ex rel. Rabushka v. Crane Co., 40 F.3d 1509, 1511 (8th Cir. 1994), cert. denied, 515 U.S. 1142 (1995)).

Defendant argues that the action is barred under subsection (e)(3) because of the 2004 audit.[32]  There is no Third Circuit case that elaborates on what constitutes an administrative civil money penalty proceeding for purposes of subsection (e)(3).  Plaintiff notes that subsection (e)(4) separately identifies an "administrative hearing" and an "audit":

> (4)(A) The court shall dismiss an action or claim under this section…if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed –
> (i) in a Federal criminal, civil or *administrative hearing* in which the Government or its agent is a party;
> (ii) … other Federal report, hearing, *audit* or investigation; or

Plaintiff asserts that this "identifies an 'administrative hearing' as distinct and apart from an 'audit.'"[33]

Plaintiff also rely on United States ex rel. Johnson v. Shell Oil Co., 26 F. Supp. 2d 923 (E.D. Tex. 1998).  In that case, the Minerals Management Service audited defendant

---

[32] Although the parties do not directly address subsection (e)(4), I find it necessary to do so, as the argument implicates whether this court has subject matter jurisdiction.

[33] In United States ex rel. Capella v. United Techs. Corp., 1999 U.S. Dist. LEXIS 10520 (D. Conn. June 3, 1999), the court took a strict reading of the last phrase "in which the government is already a party." The court concluded that the government may not be a "party" pursuant to section 3730(e)(3) unless it brings the prior action itself or formally intervenes.  See Golatte v. Mathews, 394 F. Supp. 1203, 1207 n.5 (M.D. Ala. 1975) (stating that the term "party" refers to those by or against whom a legal suit is brought; all others who may be affected by the suit, indirectly or consequently, are persons interested but not parties); M & A Elec. Power Coop. v. True, 480 S.W.2d 310, 314 (Mo. Ct. App. 1972) (declaring that "[a] 'party' to an action  is a person [or entity] whose name is designated on record as plaintiff or defendant"); Black's Law Dictionary 1122 (6th ed. 1990) (citing the above cases).

oil company's royalties practices resulting in a demand for underpayment of

$3,393,796.69.  The court found that this did not constitute "civil money penalty

proceedings" that would bar *qui tam* suit pursuant to 31 U.S.C. § 3730(e)(3) against the

defendant for fraudulent underpayment of royalties, where payment demands did not

assert knowing underpayment of royalties and did not seek civil monetary penalties, and

no notice of noncompliance or penalty notices for underpayment of royalties were issued

by Minerals Management Service.  Id. at 928.  The court went on to discuss that the

orders to pay owed royalties did not assert that the defendant knowingly underpaid

royalties and did not seek civil monetary penalties.  Id. CFR § 241.51(a)(c) indicates that

a civil penalty proceeding can be initiated by a "notice of noncompliance."  Id.  See also

United States ex rel. McDermott v. Genentech, Inc., 2006 U.S. Dist. LEXIS 90586, *20

(D. Me. Dec. 14, 2006) (finding that section 3730(e)(3) "speaks only of 'a civil suit' or

'an administrative civil money penalty proceeding' and did not include an ongoing

government investigation).

In United States ex rel. Found. for Fair Contr., Ltd. v. G&M E. Contr., Inc., 259 F.

Supp. 2d 329, 331-34 (D.N.J. 2003) the United States Department of Labor conducted an

investigation of alleged violations of the DBA by the defendants which began before the

plaintiff/relator filed its qui tam action.  Id.  Approximately one year after the court action

was filed, the Department concluded its investigation and the defendants paid back wages

found by the Department to be due.  Id. at 334, 337.  The court held that "to allow

plaintiffs *qui tam* suit to proceed, even though it is based on the same facts underlying the

DOL investigation, would provide for a second recovery by another entity despite the

resolution of the government's investigation into the very same transactions, in

contravention of the statutory purpose."

Defendants rely solely on <u>Foundation for Fair Contracting, Ltd.</u>, 259 F. Supp. 2d

329 (D.N.J. 2003) to support the conclusion that the audit constitutes "an administrative

civil money penalty proceeding in which the Government is already a party."  In that

case, the investigation by the DOL was based on the exact same complaints as the *qui*

*tam* action - inaccurate reporting of the same employee hours, inaccurate reporting of

employee numbers, and wage misclassifications.  <u>Id.</u> at 337-38.  Furthermore, in

<u>Foundation</u>, the DOL had already recovered money for the violations.[34]

In <u>United States ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. Pilot Life</u>

<u>Ins. Co.</u>, 1991 U.S. Dist. LEXIS 14483 (M.D.N.C. June 6, 1991) the court took on the

statutory context of section 3730(e).  Finding the legislative history unhelpful, the court

held that the fact that Congress used the words "litigation," "suit," and "proceeding" in

addressing the rights and awards to qui tam plaintiffs in sections 3730(c) & (d), shows

that "when Congress wished to cover an area broadly, it knew how to do so."  <u>Id.</u> at *24-

25.  <u>See also</u>, <u>United States v. Smith</u>, 760 F. Supp. 72, 74 (E.D. Pa. 1991) (finding that

based on the number of limitation provided by Congress, it may be assumed that

Congress enacted appropriate limitations for the FCA and that courts do their duty by

---

[34] In <u>Foundation</u>, the DOL investigation found that two rates within the wage determination specified in the contract were incorrect.  <u>Found. for Fair Contr., Ltd.</u>, 259 F. Supp. 2d at 337.  The investigator further found that certain employees of Double E were classified as laborers though they were engaged in carpenter duties, and that employees' time records of hours worked did not match the employers' payroll certifications.  <u>Id.</u>  The investigation thus concluded that back wages from Double E were owed in the amount of $28,330.27 for miscalculations in the wages of certain employees.  <u>Id.</u>

construing the statute so as to recognize Congress' purpose to increase citizen involvement in FCA cases).

Whether the audit can be considered a civil money penalty, there is still the issue of similarity in allegations.  It is the burden of the movant, Defendant, to show that the allegations or transactions which form the basis of the FCA suit are the same as those which are "the subject of a civil suit or an administrative civil money penalty proceeding in which the Government is already a party."  To determine whether the a *qui tam* action is "based upon transactions or allegations which are the subject of another . . . proceeding in which the government is a party, . . . a court should look first to whether the two cases can properly be viewed as having the qualities of a host/parasite relationship."  United States ex rel. S. Prawer & Co. v. Fleet Bank of Maine, 24 F.3d 320, 327 (1st Cir. 1994) (internal quotes omitted).  Such a relationship exists when "the *qui tam* case is receiving support, advantage, or the like from the host case (in which the government is a party) without giving any useful or proper return to the government (or at least having the potential to do so)."  Id. at 327-28.

The Plaintiff argues that Defendant has not alleged that the DOL auditors reviewed the work history and classifications of the individuals Plaintiff identified in the Amended Complaint, the scheme to intentionally misclassify workers, or for that matter, any of the misclassifications at issue.  Defendant argues that the audit included visiting Defendant's local project office, interviewing employees, and reviewing documents.  The investigator specifically questioned why employees were listed as "Laborers" and requested clarification about their Class determinations.  Defendant maintains that the

only violation found was that Defendant had paid four employees performing carpenter work for the Labor Day holiday at the shop rate instead of at the project rate, for a total amount due of less than $812.  (Doc. 45 at 3; Kleimo Aff. ¶¶ 12 – 15).

In <u>United States ex rel. McDermott v. Genentech, Inc</u>., 2006 U.S. Dist. LEXIS 90586, *19 (D. Me. Dec. 14, 2006) defendant argued that the action was "plainly based upon the allegations or transactions that are the subject of the ongoing Government investigation" because the government investigation focused on the same issues as those in the case, specifically whether defendant improperly promoted a prescription drug for off-label uses including rheumatoid arthritis.  <u>Id</u>.  In support of this assertion, defendant cited the subpoena served by the USDOJ, requiring defendant to produce any documents related to the marketing or promotion of the prescription drug.  <u>Id</u>.  The court discussed that it was "impossible to tell from the subpoena, which [wa]s written in extremely broad terms, whether the issue in the *qui tam* action was the "focus" of the investigation in furtherance of which the subpoena was apparently served.  <u>Id</u>.  Therefore, the court found that there was not sufficient identity between the basis of the *qui tam* action and the subject of the other suit or proceeding to bar the *qui tam* action.  Moreover, the court held that there was nothing but defendant's speculation to suggest that the government would obtain redress through its investigation for the wrongs alleged by the plaintiff.  <u>Id</u>. at 22.

In <u>United States ex rel. S. Prawer</u>, the court determined that § 3730(e)(3) did not apply to a *qui tam* claim that involved a transaction already being litigated by the government.  <u>Id</u>. at 328.  In the "host" case, the government did not pursue a fraud claim.  <u>Id</u>. In the *qui tam* case, the relator did.  <u>Id</u>.  Similarly, in <u>United States ex rel. Herndon v.</u>

Appalachian Reg'l Cmty. Head Start, Inc., 2009 U.S. Dist. LEXIS 7411 (W.D. Va. Feb. 3, 2009), Health and Human Services did not impose a "penalty" on defendant for fraud. Rather, it sought payment for what it classified as disallowed costs or unauthorized expenditures.  In his complaint, the relator alleged that one of the defendant's directors fraudulently made expenditures with knowledge that the expenditures violated federally funded program regulations.  The court found that the investigation and the *qui tam* claim did not share a "host/parasite relationship."  Id. at *6-7.  Accordingly, § 3730(e)(3) did not bar the relator's *qui tam* claim.  Id.

I find this case to be distinguishable from Foundation.  Like the government in United States ex rel. S. Prawer, and Health and Human Services in Herndon v. Appalachian Reg'l Cmty. Head Start, Inc., the government did not impose a "penalty" on defendants for fraud.  Rather, it sought payment for underpayment of holiday wages not properly paid to employees.  Because Plaintiff's *qui tam* action alleges fraud, allowing the suit to proceed would not provide for a "second recovery" in contravention of the statutory purpose of subsection (e)(3).  Although some of the underlying facts are similar to the DOL investigation, the Defendant has not paid any penalty with regard to the misclassification or fraud that Plaintiff has alleged violates the DBA.

Further, with regard to the "host/parasitic" relationship between the investigation and the *qui tam* action articulated in Prawer, I find that the Relator has sufficiently shown that the allegations made in this action were not derived from that proceeding.  See Prawer, 24 F.3d at 328.  See also United States ex rel. Stone v. AmWest Sav. Ass'n, 999 F. Supp. 852, 853 (N.D. Tex. 1997) ("If the *qui tam* action receives support from the

earlier case without giving the government any useful return (other than the potential for monetary recovery), the basis and the subject of the lawsuits are the same").  As the definition for "civil money penalty" remains completely ambiguous, it is possible that the DOL investigation in this case might qualify as an "administrative civil money penalty proceeding," under 31 U.S.C.A. § 3730(e)(3).

There is no indication that Plaintiff's *qui tam* case is receiving support or advantage from the investigation.  The Amended Complaint does not rely on the same facts and evidence included in the DOL's investigation.  See Prawer, 24 F.3d at 328 ("because this case is seeking to remedy fraud that the government has not yet attempted to remedy, it is, as a threshold matter, wholly unlike the one the drafters of § 3730(e)(3). . . had in mind . . . .").  The requests made by the investigator were broad requests that returned no determination either way on the basis of classification of workers.  Thus, Plaintiff cannot rely on anything derived from the investigation.  Further, the purpose of Section 3730(e)(3) is to prohibit "piggybacking" by private parties where an investigation was conducted and disclosed either by the government or other public sources.  The jurisdictional bar is in place in order to (1) encourage private citizens with first-hand knowledge to expose fraud and (2) to avoid civil actions by opportunists who do not seriously contribute to the disclosure of the fraud."  United States ex rel. Precision Co. v. Koch Indus., Inc., 971 F.2d 548, 552 (10th Cir. 1992).  Here, I find that the first goal is met and the second goal is simply not at issue; therefore, I will deny Defendant's motion based on Section 3730(e)(3)'s jurisdictional bar.

E.  12(b)(6) Standard of Review

Except in certain specified cases, a plaintiff's complaint need only satisfy the "simplified pleading standard" of Rule 8(a), <u>Swierkiewicz v. Sorema N.A.</u>, 534 U.S. 506, 513, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002),  which requires a "short and plain statement of the claim showing that the pleader is entitled to relief."  Fed.R.Civ.P. 8(a)(2). Nevertheless, "Rule 8(a)(2) still requires a 'showing,' rather than a blanket assertion, of entitlement to relief."  <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 n.3 (2007); <u>Ashcroft v. Iqbal</u>, 129 S.Ct. 1937, 1949 (2009).

To state a claim under the FCA, a plaintiff must show that there was (1) a false statement or fraudulent course of conduct; (2) made or carried out with the requisite scienter; (3) that was material; and (4) that caused the government to pay out money or to forfeit moneys due (i.e. that involved a 'claim').  To succeed on a § 3729(a)(2) claim, a plaintiff must prove that a defendant made a false record or statement and that it was used to get a false or fraudulent claim paid or approved by the government.  Thus, a plaintiff must prove a prima facie case of a § 3729(a)(1) violation in addition to proving that a defendant made and used a false record.  In other words, comparing the two sections indicates that a plaintiff can bring a claim under the FCA even without evidence that a claimant for Government funds made an express false statement in order to obtain those funds.  <u>United States ex rel. Wilkins v. United Health Group, Inc.</u>, 659 F.3d 295, 306-307 (3d Cir. N.J. 2011); <u>United States ex rel. Oliver v. Parsons Corp.</u>, 498 F.Supp.2d 1260, 1278 n.20 (C.D.Cal. 2006).

Because Plaintiff alleges that Defendant engaged in fraud, the claims are subject to the heightened pleading standard under  Fed.R.Civ.P. 9(b).  Rule 9(b) states that "in all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity.  Defendant argues Plaintiff has failed to meet the heightened requirement specifically with regard to the date range provided in the Amended Complaint, which it claims was changed to "evade the Allison Engine issues." Defendant argues that Plaintiff should be required to submit the dates for the claims on each project, the names and alleged misclassification and proper classification of any employees at issue and the date on which the worked was performed.  I disagree.

The purpose of Rule 9(b) is to provide the defendant with sufficient notice of the basis for the plaintiff's claim, protect the defendant against frivolous suits, eliminate fraud actions where all of the facts are learned only after discovery, and safeguard the defendant's reputation.  Seville Industrial Machinery Corp. v. Southmost Machinery Corp., 742 F.2d 786, 791 (3d Cir. 1984), cert. denied, 469 U.S. 1211 (1985). Additionally, the Third Circuit has stated that "[d]espite Rule 9(b)'s stringent requirements . . . 'courts should be "sensitive" to the fact that application of the Rule prior to discovery "may permit sophisticated defrauders to successfully conceal the details of their fraud.""[35]  In re Burlington Coat Factory Secs. Litig., 114 F.3d 1410, 1418 (3d Cir. 1997) (citing Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992) (internal citation omitted)).

---

[35] Plaintiff argued that Defendant has sole possession of the facts it argues Plaintiff is required to plead to satisfy the particularity requirement.

I find that Plaintiff adequately alleges the "who, what, when, where, and how" of a Section 3729(a)(2) claim.[36] <u>In re Rockefeller Cntr.</u>, 311 F.3d at 217. Plaintiff establishes the "what" and "how" elements of fraud by alleging that Defendant "submitted fraudulent certified payrolls and Certificates of Compliance with the intention that the false documents be material to the government's decision to pay or approve its false claims." (Amend. Compl. at ¶ 40). <u>Schmidt v. Zimmer, Inc.</u>, 386 F.3d 235, 242 (3d Cir. 2004). The Amended Complaint also specifically alleges that Defendant knew that the claims would be ultimately be paid by the government. <u>Id.</u> ¶ 36cc. The Amended Complaint provides specific examples of this conduct. (<u>See, e.g.</u>, <u>id.</u> ¶¶ 36c, 36d, 36g, 36k, 36n, and 36p). Although Plaintiff does not provide many specific dates in the Amended Complaint, the "when" is adequately alleged the FCA violations occurred. These violations occurred from 2001 to 2009. <u>Id.</u> ¶ 41; <u>see</u> <u>United States ex rel. Hunt v. Merck-Medco Managed Care, L.L.C.</u>, 336 F. Supp. 2d 430, 437 (E.D. Pa. 2004) (denying motion to dismiss on Rule 9(b) grounds and finding that although "[t]he scope of the complained-of conduct is vast, and occurred over a long period of time," the complaints specified the "general time frame" over which the fraudulent conduct allegedly occurred). Plaintiff alleges the "where" by identifying that the fraud took place during specific

---

[36] Several cases have described Rule 9(b)'s "requirements in the context of the FCA. For example, where the defendant is a corporate entity, Rule 9(b) requires the Plaintiff to name the individuals involved in the allegedly fraudulent conduct. <u>See, e.g.</u>, <u>United States ex rel. Robinson v. Northrop Corp.</u>, 149 F.R.D. 142, 145 (N.D.Ill. 1993) (stating Rule 9(b) requires a plaintiff asserting a FCA claim against a corporate defendant to specify the "identity and/or role of the individual employee involved in the alleged fraud."). Plaintiff must also show a link between allegedly wrongful conduct and a claim for payment actually submitted to the government. <u>See, e.g.</u>, <u>United States ex rel. Clausen v. Laboratory Corp. of America, Inc.</u>, 290 F.3d 1301, 1311 (11th Cir. 2002), cert. denied, 537 U.S. 1105, 123 S. Ct. 870, 154 L. Ed. 2d 774 (2003) (noting Rule 9(b) "does not permit a False Claims Act plaintiff merely to describe a private scheme in detail but then to allege simply and without any stated reason for his belief that claims requesting illegal payments must have been submitted, were likely submitted or should have been submitted to the Government.").

government projects including Wayne Junction, Smart Station, PATCO, and Girard

Project.  Relator alleges the "who" of the FCA violation.  Plaintiff alleges that officers

and senior level management employees, including Dennis Pierce, Joseph McGee, Scott

Anton, Christopher Derr, and John Kleimo.  Moreover, Plaintiff states the names of some

of the specific workers they identified as being misclassified and the projects for which

the individuals were employed.  Id. ¶¶ 36cc - i-ix, 36gg).

Such allegations are sufficient to withstand a motion to dismiss on grounds of

failure to plead with particularity.  See Gibbons v. Kvaerner Phila. Shipyard, Inc., No.

05-685, 2006 U.S. Dist. LEXIS 5172, 2006 WL 328362, at *6-7 (E.D. Pa. Feb. 10, 2006)

(denying motion to dismiss because plaintiff sufficiently pleaded the "essential factual

background" to support her FCA claim); see also United States v. Torkelsen, No. 06-

5674, 2007 U.S. Dist. LEXIS 88955, 2007 WL 4245736, at *7 (E.D. Pa. Dec. 3, 2007)

(denying motion to dismiss because plaintiff alleged complex scheme and when

complaint was read in light most favorable to plaintiff, fraud could be reasonably

inferred); United States ex rel. Drescher v. Highmark, Inc., 305 F. Supp. 2d 451, 461

(E.D. Pa. 2004) (denying motion to dismiss because of "the potential existence of sets of

facts under which [defendant] may, in fact, be liable under the FCA"); United States ex

rel. Givler v. Smith, 775 F. Supp. 172, 181-82 (E.D. Pa. 1991) (denying motion to

dismiss because in the complaint, relator identified the fraudulent acts and the party

allegedly defrauded).

Moreover, the Third Circuit has not directly addressed how Rule 9(b) interacts

with the elements of claims under Section 3729(a).  Cf. Wilkins, 659 F.3d at 308 ("[T]o

our knowledge we never have held that a plaintiff must identify a specific claim for

payment at the pleading stage of the case to state a claim for relief.").  The Third Circuit

held in United States ex rel. Quinn v. Omnicare, 382 F.3d 432, 440 (3d Cir. 2004), that an

FCA action requires the identification of at least one specific claim, and that a relator's

theory that false claims "must have been" submitted could not survive summary

judgment.  The Quinn court stated that an FCA relator must come to court with a "claim

in hand."  Id.  However, Quinn was decided at the summary judgment stage following

factual discovery.  See Wilkins, 659 F.3d at 308 (noting that Quinn was decided on a

summary judgment motion).  Courts have distinguished Quinn, noting that the decision

upheld a grant of summary judgment, as opposed to a motion to dismiss, and included

criticisms of Clausen.  See, e.g., United States ex rel. Singh v. Bradford Reg'l Med. Ctr.,

No. 04-186, 2006 U.S. Dist. LEXIS 65268, 2006 WL 2642518, at *7 (W.D. Pa. Sept. 13,

2006); United States ex rel. Landsberg v. Levinson, No. 03-1429, 2008 U.S. Dist. LEXIS

42794, 2008 WL 2246308, at *1 (W.D. Pa. May 29, 2008).  For example, in Singh, the

court held that requiring the pleading of particularized evidence of a false claim

contravenes the Third Circuit's "flexible" interpretation of Rule 9(b) and "would

effectively negate the Third Circuit's instruction that 'Plaintiffs are free to use alternative

means of injecting precision and some measure of substantiation into their allegations of

fraud.'"  2006 U.S. Dist. LEXIS 65268, 2006 WL 2642518, at *7 (citing Seville, 742

F.2d at 791).

        I find that the factual averments in the Plaintiff's Amended Complaint have

sufficiently placed Defendant in a position to answer and defend against the alleged

claims.  Relator alleges that Defendant fraudulently "submitted certified payrolls and

Certificates of Compliance" intending to induce the government to pay the false claims

for certain projects between Defendant and the government.  Amend. Compl. ¶ 40.  This

allegation, along with the names and dates provided, is a sufficient description of the

scheme.  See United States ex rel. Derwood v. Genentech, Inc., 720 F. Supp. 2d 671, 680

(E.D. Pa. 2010) (finding allegation of scheme, supported by details, sufficiently informed

defendant of the "precise misconduct" charged); Singh, 2006 U.S. Dist. LEXIS 65268,

2006 WL 2642518, at *7 (finding that it was unnecessary for relator to provide a single

claim example because "[t]he addition of specific identifying information of each claim

adds little to complete the description of the scheme since the fraudulent conduct at issue

does not rely on any specific claim"); see also Merck-Medco, 336 F. Supp. 2d at 439

(noting that plaintiffs could not be expected to allege every single false statement that

was created as a result of the alleged scheme and holding that plaintiffs' description of

defendant's system of creating false records and statements sufficient). The Amended

Complaint sufficiently alerts Defendants of the alleged wrongdoing.  Therefore, Relator

has properly alleged Defendant's involvement in a scheme to defraud the Government.

Accordingly, Relator's Section 3729(a)(2) claim against Defendant will not be dismissed.

## V.   Conclusion

For the reasons discussed above, I will deny Defendant's motion to dismiss.

An appropriate Order follows.