## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, *ex rel.* | : | |
| INTERNATIONAL BROTHERHOOD OF | : | CIVIL ACTION |
| ELECTRICAL WORKERS, LOCAL UNION NO. 98, | : | |
| | : | No. 09-4230 |
| Plaintiff/Relator, | : | |
| | : | |
| v. | : | |
| | : | |
| THE FARFIELD COMPANY, | : | |
| | : | |
| Defendant. | : | |
| | : | |

### REPORT AND RECOMMENDATION OF THE SPECIAL MASTER

Pursuant to the Court's September 4, 2019 Order (ECF Doc. No. 199), as amended by the Court's October 21, 2019 Order (ECF Doc. No. 213), the Special Master files this Report and Recommendation with findings of fact and conclusions of law and a proposed order.

### BACKGROUND

This action under the False Claims Act, 31 U.S.C. §§ 3729-3733, was brought by plaintiff/relator International Brotherhood of Electrical Workers, Local Union No. 98 ("Local 98"), against The Farfield Company ("Farfield"), in September 2009, and unsealed about two years later, after the United States declined to intervene. *See* ECF Doc. Nos. 1, 16, 17.

Local 98 alleges that Farfield falsely certified in payroll forms submitted to the Southeastern Pennsylvania Transportation Authority ("SEPTA") in connection with a rail-improvement project partially funded by the federal government ("Wayne Junction Project") that Farfield was paying its workers the prevailing wages appropriate for the classification of work they were performing. Local 98 contends that a number of workers on the Project who were classified as groundmen or laborers, and paid accordingly, performed work that should have been classified and paid as journeyman electrician or journeyman lineman work.[1] Farfield contends, among other things, that all of the work was classified and paid appropriately and that, even if some workers were paid under the wrong classification, Farfield did not knowingly misclassify its workers, as is required for False Claims Act liability.

In July 2013, the Court denied Farfield's motion to dismiss the first amended complaint. *See* ECF Doc. Nos. 47, 48. Following extensive discovery and a referral to the United States Department of Labor ("USDOL") that failed to resolve this dispute, *see* ECF Doc. No. 160, the Court denied Farfield's motion for summary judgment in August 2019, *see* ECF Doc. Nos. 192, 193. In its summary judgment opinion, the Court held that: (1) a "claim under the False Claims Act may be predicated on an alleged violation of the

---

[1] As the Court has noted, the parties refer to a "dizzying array of positions" on the Wayne Junction Project. ECF Doc. No. 192 at 3. The three most relevant positions are groundman, laborer, and journeyman, with the last category a shorthand reference to numerous positions, including journeyman electrician, journeyman lineman, and foreman. As relevant here, groundman is the lowest paid of these positions and journeyman is the highest, with laborer in between.

Davis-Bacon Act,"[2] ECF Doc. No. 192 at 5; (2) "the False Claims Act as amended by

FERA[3] applies to Local 98's case," and thus, Farfield can be liable for false statements

made to SEPTA, *id.* at 5-10; (3) none of Local 98's claims are barred by the statute of

limitations, *id.* at 10-11; (4) "there is a genuine issue of material fact regarding the type

of work groundmen performed," *id.* at 11-13; and (5) there are disputed fact issues "on

whether Farfield knew claims presented for payment were false or fraudulent," *id.* at

13-14.

    Although this matter originally was scheduled for a non-jury trial in September

2019, at the Court's suggestion (ECF Doc. No. 194), the parties agreed to have the case

heard by a Special Master. In the parties' pre-trial memoranda, they indicated their

agreement on appointment of Bruce Merenstein, who previously had served as a special

discovery master in this case, as a Special Master under Rule 53(a)(1)(B). *See* ECF Doc.

Nos. 195, 197. The Court subsequently entered an Order appointing Mr. Merenstein as

Special Master to hear evidence and submit a Report and Recommendation with

findings of fact, conclusions of law, and a proposed order regarding the parties'

dispute. *See* ECF Doc. No. 199.

    The Court provided further guidance to the Special Master and the parties in an

October 15, 2019 opinion addressing the parties' burdens of proving or refuting the

extent and amount of any misclassifications of workers on the Wayne Junction Project.

---

[2] 40 U.S.C. §§ 3141-3148.

[3] The Fraud Enforcement Recovery Act of 2009, Pub. L. No. 111-21, 123 Stat. 1617 (2009).

*See* ECF Doc. Nos. 210, 211. In its opinion, the Court held that "Local 98 meets its burden to prove a violation of the Davis-Bacon Act if it proves the groundmen and laborers 'in fact performed work for which [the groundmen and laborers were] improperly compensated and if it produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" ECF Doc. No. 210 at 15 (quoting *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). The Court explained that, if Local 98 meets this burden, Farfield must come "'forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* (quoting *Mt. Clemens*, 328 U.S. at 687) (alteration in original). The Court noted that the Special Master "must assess the evidence and determine whether a party met its burden," *id.*, and if Local 98 meets its burden and Farfield fails to "sufficiently impeach this evidence . . ., the Special Master may evaluate an award of damages owed to the United States for the forty-two misclassified workers 'even though the result be only approximate,'" *id.* at 2 (quoting *Mt. Clemens*, 328 U.S. at 687-88).

An evidentiary hearing was held before the Special Master on eight days (October 2, 3, 4, 7, 18, 21, 22, and 23, 2019), at which the parties presented testimony from twenty live witnesses, as well as deposition testimony excerpts from two additional witnesses, and admitted into evidence eighty-seven exhibits encompassing close to 14,000 pages of documents, dozens of photos of the worksite, and detailed spreadsheets. All of the proceedings, including a post-hearing argument held on November 21, 2019, were transcribed. The parties submitted post-hearing briefs with proposed findings of fact

and conclusions of law on November 13, 2019. Having carefully reviewed the testimony and exhibits presented at the eight-day hearing, weighed the credibility of the witnesses, considered the written and oral arguments of the parties, incorporated the Court's prior rulings in this matter, and evaluated the additional disputed legal issues, the Special Master now submits to the Court this Report and Recommendation, with findings of fact, conclusions of law, and a proposed order.

### SUMMARY OF FINDINGS, CONCLUSIONS, AND ANALYSIS

*Recommendation*

The Special Master recommends that the Court enter judgment for Local 98, as relator for the United States, and against Farfield. The proposed order accompanying this Report and Recommendation recommends that judgment be entered for the United States in the amount of $738,724.43 and for Local 98 in the amount of $316,596.19 (30 percent of the total judgment). Although there are a number of close questions of fact and law, the Special Master concludes that Local 98 has met its burden of proving that Farfield violated the False Claims Act.

*Disputed Issues.* The key disputed issues in this matter include:

- *What work* did groundmen and laborers do on the Wayne Junction Project?
- Based on local area practices, *which of the work* done by groundmen and laborers, if any, should have been classified and paid as journeyman work?
- *How much of the work* done by groundmen and laborers, if any, should have been classified and paid as journeyman work?
- If any work done by groundmen and laborers should have been classified and paid as journeyman work, did Farfield *knowingly misclassify this work*?
- If Farfield knowingly misclassified some of the work done by groundmen and laborers, what is the *proper amount of civil penalties and damages*?

The parties have diametrically opposing views on many of these issues and, at the hearing, often presented irreconcilably conflicting versions of what occurred on a day-to-day basis on the Wayne Junction Project. The Special Master has endeavored to resolve these disputed issues and, as set forth in more detail below and as supported by the specific findings of fact and conclusions of law, finds:

- Groundmen and laborers did many of the same tasks on the Wayne Junction Project as journeymen did, largely because Farfield allowed its foremen to determine which workers did which tasks, without regard for the workers' classifications.

- Certain work done by groundmen and laborers on the Project, particularly installing electrical conduit, pulling electrical wires, and performing electrical terminations, constituted journeyman work and therefore should have been classified and paid as journeyman work.

- Based on the evidence presented at the hearing, particularly the phase codes used by Farfield to track work done on the Wayne Junction Project, but also daily foreman reports, photographs of the worksite, other documents, and witness testimony, the amount and extent of work that was misclassified as groundman or laborer work can be determined by reasonable inference.

- Although the evidence does not demonstrate that Farfield intentionally submitted false statements regarding the work performed by its employees on the Wayne Junction Project, it acted in reckless disregard of the truth or falsity of this information, largely by allowing its foremen to determine which workers did which tasks, without regard for the workers' classifications, despite Farfield's awareness of its prevailing wage obligations.

- On the basis of information from Farfield's records, including certified payrolls and phase code timesheets, it is possible to approximate the amount and extent of underpayments due to the misclassifications, and thus calculate the proper amount of civil penalties and damages.

### *Summary of Analysis*

The Special Master concludes that, for the most part, all classifications of employees on the Wayne Junction Project performed all of the tasks on the Project. While the vast majority of the work on the Project did not require the skills of a journeyman, a small

portion of the work (about 30%, according to Local 98; less than 5%, according to Farfield; approximately 13%, according to the Special Master's findings) should have been classified as journeyman work, based on the local area practices that govern the classification and pay for work under the Davis-Bacon Act.

Local 98 relied on the testimony of a number of workers and foremen to support its contention that, for the most part, all workers on the Project did the same work, while it presented testimony from a long-time union official from another IBEW local regarding the local area practices for the classification and assigning of the type of work at issue here. Farfield presented testimony from a number of its managers and executives in support of its contention that all of the work on the Project was appropriately classified as groundman work. It further argued that, in any event, any journeyman work was performed exclusively by journeymen. Farfield also presented testimony that a substantial portion of each day was taken up by tasks such as meetings, gathering tools and material, traveling to and from the worksite, and standing idle while trains ran on the tracks, none of which, it argued, should be classified and paid as journeyman work.

In an attempt to quantify the amount of work it contended was journeyman work and meet its burden under *Mt. Clemens* of showing "the amount and extent of that work as a matter of just and reasonable inference," 328 U.S. at 687, Local 98 relied heavily on the phase codes that Farfield used on the Project to classify the work that its employees were doing. According to Local 98, twelve phase codes represent "electrical" work that should only have been performed by journeymen, and, to the extent that groundmen and laborers did such work, they were misclassified and underpaid. For its part,

Farfield contended that the phase codes were simply an internal accounting tool for use in tracking expenses. It denied that the phase codes accurately represent the specific work performed by employees and disclaimed reliance on the phase codes as a means of classifying the work done by employees.

On the basis of the testimony and exhibits presented at the hearing, the Special Master concludes that six of the twelve phase codes identified by Local 98 are reasonably accurate proxies for "electrical" work that should have been performed by journeymen. To the extent that this work was done by groundmen or laborers, these workers were misclassified and underpaid, and Farfield's statements on its certified payrolls that each of its workers' classifications "conform with the work he performed" were false.

The Special Master concludes that the record is clear that a small portion of the work at issue—specifically, high-voltage terminations and signal and switch terminations—was journeyman work and thus, any groundmen or laborers who did this work were misclassified and underpaid. The Special Master concludes that the bulk of the work in dispute—installing electrical conduit and pulling electrical wires—also was journeyman work but this is a closer question. As a result, for the benefit of the Court, the Special Master makes factual findings and conclusions of law on the basis of the Special Master's conclusion that this work was journeyman work *and* on the basis of the alternative that this work was both laborer and journeyman work and thus, only groundmen were misclassified and underpaid to the extent they did this work.

The Special Master also concludes that Farfield proved that at least 1.5 hours of each 8-hour day was taken up with routine, non-journeyman work, even if groundmen and laborers spent the remainder of those days doing work under one of the phase codes representing journeyman work. This included time in meetings, gathering tools and materials at the Project's staging area ("Olney Yard"), traveling to the worksite, waiting for trains to pass, gathering tools and materials and cleaning up at the end of the workday, and traveling back to the Olney Yard from the worksite. While the Special Master did not credit all of Farfield's evidence regarding this issue, there was no dispute that most of these activities occurred almost every day, and the evidence was sufficient to rebut any inference that, for any workday in which a groundman or laborer performed journeyman work, he was actually performing journeyman work for that entire day. As a result, the Special Master has reduced the hours worked under the relevant phase codes by 18.75% (1.5 hours out of every 8-hour day) in calculating the number of misclassified and underpaid hours worked on the Project.

As noted, Farfield also contended that the phase codes are not sufficient to demonstrate that work done under any particular phase code was exclusively (or at all) journeyman work. Yet an employer bears the risk of imprecision from the absence of records identifying the amount and extent of work an employee performed under different classifications with different prevailing wage rates. *See, e.g.*, *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991). Thus, to the extent the Special Master finds that a meaningful proportion of work done under a particular phase code is "electrical" work that should have been classified and paid as journeyman work, Farfield must pay

the price for the inability to separate this journeyman work from non-journeyman work under the same phase code (other than the 1.5 hours of non-production time in each 8-hour day, which was adequately established at the hearing).

Liability under the False Claims Act provision at issue here requires proof that a defendant *knowingly* made a false statement that was material to a claim. 31 U.S.C. § 3729(a)(1)(B). The statute defines *knowingly* as, among other things, acting *in reckless disregard* of the truth or falsity of the information presented. *Id.* § 3729(b)(1)(A)(iii). The Special Master concludes that Local 98 proved that Farfield acted in reckless disregard of the truth of the information in the certified payrolls it submitted to SEPTA.

The evidence demonstrates that Farfield's executives and managers were well aware of the requirements of Davis-Bacon and the SEPTA contract, which imposed prevailing wage requirements on Farfield based on the USDOL-determined prevailing wages in the local area for groundmen, laborers, and journeymen. Farfield presented extensive testimony about its awareness of these requirements and its concern that any violations could prove disastrous for the company, given its reliance on public-works contracts for its business. Yet the evidence also established that Farfield delegated responsibility almost entirely to one person, Joseph McGee, Sr., the vice president of its transit division at the time of the Wayne Junction Project, to determine how to classify employees working on the Project. And McGee in turn left it to the company's foremen to determine how to use its employees at the worksite on a day-to-day basis.

Farfield may have believed that, because most of the work on the project was groundman work, it could ignore worker classifications and leave it to worksite

supervisors to ensure that workers were classified and paid appropriately for the work they were performing. But, as its witnesses readily acknowledged, its contract with SEPTA imposed prevailing wage obligations that precluded it from disregarding the possibility that *some* of the work (again, approximately 13%, based on the Special Master's findings) was journeyman work and that not all of this work was being done by workers classified and paid as journeymen. The Special Master finds that the facts established at the hearing demonstrate that Farfield recklessly disregarded the truth or falsity of its certified statements to SEPTA that the classifications set forth on its payrolls (and forming the basis for the workers' pay) "conform with the work [each worker] performed."

A defendant that violates the False Claims Act is liable to the United States for a civil penalty of between $5,500 and $11,000, plus three times the amount of damages the government sustains for the violation. *See* 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9). Local 98 presented at the hearing a spreadsheet containing information from Farfield's records, including phase code timesheets and certified payrolls, that identified for each worker on the Wayne Junction Project, among other things, the phase code (or phase codes) that a foreman used to categorize an employee's work each day, as well as the worker's hourly pay rate and classification. Using this information and comparing it to the prevailing rates in Farfield's contract with SEPTA for the Project, it is possible to determine both the number of certified payrolls that contained false statements and the amount by which Farfield underpaid workers who were misclassified as either groundmen or laborers when they performed journeyman work. Using this spreadsheet

(Exhibit P-12), the Special Master calculated the number of weeks in which certified payrolls contained false statements as 105 and the total underpayment as $159,273.54. If the Court were to impose the minimum civil penalty of $5,500 for each of the 105 violations, this would total $577,500.00. The damages from the underpayment, once tripled, would total $477,820.62. The total recommended judgment therefore is $1,055,320.62.

**FINDINGS OF FACT**

## I.  Background Facts

### *The Evidentiary Hearing*

1.    The parties presented evidence before the Special Master over eight days, on October 2, 3, 4, 7, 18, 21, 22, and 23, 2019.

2.    Plaintiff presented testimony from the following witnesses: Timothy Browne, Robert Lee Jackson, David Hale, Adrian Lauria, Ryan Franchetti, Kevin Redmond, Thomas Leach, Nathan Foley, Jacquelyn Coyle, James Thomas Dollard, Jr., Dennis Pierce, Joseph W. Reed, and Christopher DeLuca.

3.    Defendant presented testimony from the following witnesses: John Kleimo, Frank DiGiacomo, Christopher Michael Derr, David Fishel, Robert David Pennington, Frederick Thomas Cuthbert, Robert Lee Jackson, and Edward Paul Nescot.

4.    Six joint exhibits were entered into evidence, two of which were transcript excerpts from the depositions of Joseph McGee, Sr. and Scott Anton. Twenty-five

plaintiff exhibits were entered into evidence and fifty-eight defendant exhibits were entered into evidence.

### General Background

5.  The Farfield Company ("Farfield") is a construction contractor with principal offices in Lititz, Pennsylvania. Tr. 7:3-5 (Stipulation 1).

6.  Farfield began as an electrical contractor in 1967 and, in the 1970s, added mechanical work. Since that time, it has focused on large commercial mechanical and electrical construction. Tr. 1114:7-1115:10 (Pierce).

7.  The International Brotherhood of Electrical Workers Local Union 98 ("Local 98") is a union that represents certain electrical workers performing "inside" work in the Philadelphia area, meaning primarily electrical work done inside a property line. Tr. 7:6-10 (Stipulation 2); 48:5-49:6 (Browne).

8.  The International Brotherhood of Electrical Workers Local Union 126 ("Local 126") is a union that represents certain electrical workers performing "outside" work in the Philadelphia area, meaning electrical work done outside a property line. Tr. 7:11-15 (Stipulation 3); 55:1-5, 55:20-56:10 (Browne).

9.  "Outdoor" work in the railroad track area is claimed by Local 126. Tr. 13:24-14:1 (Stipulation 42).

10.  Groundman and lineman are classifications of Local 126. Tr. 7:16-18 (Stipulation 4).

11.  Groundman and lineman are not classifications of Local 98. Tr. 7:19-21 (Stipulation 5).

*The Wayne Junction Project*

12.   The Southeastern Pennsylvania Transportation Authority ("SEPTA") is a Pennsylvania municipal authority that operates transit and rail services in the Philadelphia and surrounding suburban metropolitan area. Tr. 7:22-8:2 (Stipulation 6).

13.   Farfield entered into a contract with SEPTA ("SEPTA contract") for a track and signal improvement project in an approximately seven and one-half mile stretch of railroad track, from the Wayne Junction station to the Glenside station ("Wayne Junction Project") in 2002. Tr. 8:3-5, 8:12-16 (Stipulations 7, 10).

14.   The SEPTA contract is dated March 15, 2002. Tr. 8:6-8 (Stipulation 8).

15.   The SEPTA contract was for the amount of $54,700,000, before change orders. Tr. 8:9-11 (Stipulation 9).

16.   SEPTA paid Farfield in full all the money that Farfield was due under the SEPTA contract. Tr. 1209:23-1210:3 (Pierce).

17.   SEPTA never raised any issues with Farfield regarding Farfield's compliance with any statutes in relation to the Wayne Junction Project. Tr. 1541:24-1542:1 (DiGiacomo).

18.   Farfield submitted bills to SEPTA for the Wayne Junction Project to get SEPTA to pay the bills; Farfield did not submit its bills to any other entity or body or the United States Government. Tr. 30:16-19 (Stipulation 177).

19.   Farfield's final bill for the Wayne Junction Project, which Farfield submitted to SEPTA, was dated September 18, 2007. Tr. 30:9-11, 30:14-15 (Stipulations 174, 176).

20.  SEPTA's final payment to Farfield for the project was received December 6, 2007. Tr. 30:12-13 (Stipulation 175).

21.  At the time of the Wayne Junction Project, Dennis Pierce was in charge of all production for Farfield. Tr. 1108:6-1109:7 (Pierce).

22.  A few years before the Wayne Junction Project, Farfield formed a transit division to seek work on rail projects. Tr. 1109:20-1111:18 (Pierce).

23.  Joseph McGee, Sr. was Farfield's divisional vice president for the transit division at the time of the Wayne Junction Project. Tr. 192:3-8 (Jackson); 1111:21-1112:4 (Pierce); Exh. J-5 (Aug. 9) at 71:4-9 (McGee).[4]

24.  Dennis Pierce recruited McGee to work at Farfield around the time that Farfield formed its transit division because of McGee's experience working on transit projects at a previous employer. Tr. 1134:13-1135:8 (Pierce); 1470:2-5, 1470:24-1471:5 (Kleimo).

25.  McGee was responsible for all transit projects at Farfield, including the Wayne Junction Project, and was Farfield's expert when it came to rail work. Exh. J-5 (Aug. 9) at 129:24-130:2, 134:9-12, 195:8-12 (McGee); 1469:12-17 (Kleimo).

26.  McGee had certain skills and knowledge regarding rail projects that nobody else at Farfield possessed at the time of McGee's hiring, including experience working with linemen and groundmen. Tr. 1184:4-1185:8 (Pierce).

---

[4] Exhibit J-5 includes excerpts from both volumes of Joseph McGee, Sr.'s deposition. To distinguish between the two volumes, references to excerpts from McGee's deposition are identified by the date of the volume.

27.   As a result, Farfield executives, including John Kleimo, Farfield's vice president at the time of the Wayne Junction Project, relied on McGee with regard to the classification of workers and the work that different classifications of workers could perform on the Project. Tr. 1399:24-1400:3, 1472:8-1473:16 (Kleimo).

### The SEPTA Contract

28.   The SEPTA contract provided that "All laborers and mechanics employed or working upon the site of the work … will be paid … at rates not less than those contained in the wage determination …." Exh. P-25A at 243589.[5]

29.   The SEPTA contract did not require any employee to have any specific level of skill. Tr. 17:3-5 (Stipulation 64).

30.   In the SEPTA contract, there was no requirement that an employee who was performing "journeyman" work actually be a journeyman—only that he or she be paid at the journeyman rate. Tr. 17:6-9 (Stipulation 65).

31.   In the SEPTA contract, offsite work was not required to be paid at the prevailing minimum wage rate, as the prevailing wage requirement only applied to laborers and mechanics working upon the site of the work. Tr. 17:10-13 (Stipulation 66).

---

[5] Exhibit P-25 is a fully signed copy of the SEPTA contract, while Exhibit P-25A is a partially signed copy, but Exhibit P-25 is missing certain pages. Both versions were admitted into evidence without objection. Tr. 1559:11-1560:12.

32.   The SEPTA contract required that workers "be paid the appropriate wage rate and fringe benefits on the wage determination for the classification of work actually performed, without regard to skill …." Exh. P-25A at 243589.

33.   The SEPTA contract permitted Farfield to compensate employees "performing work in more than one classification … at the rate specified for each classification for the time actually worked therein: provided, that the employer's payroll records accurately set forth the time spent in each classification in which work is performed." Exh. P-25A at 243589; Tr. 19:20-22 (Stipulation 74).

34.   The SEPTA contract required Farfield to submit to SEPTA for transmission to the Federal Transit Administration ("FTA") a copy of Farfield's payroll on a weekly basis ("certified payroll"), setting out accurately and completely all of the information required to be maintained under 29 C.F.R. § 5.5(a)(3)(i). Exh. P-25A at 243592; Tr. 19:23-20:1 (Stipulation 75).

35.   The certified payrolls showed rates paid by Farfield to its employees who worked on the jobsite, for each day. Tr. 20:2-4 (Stipulation 76).

36.   The SEPTA contract required Farfield to include in each certified payroll a "Statement of Compliance," in which Farfield certified, among other things, that the information in the payroll was correct and complete, and that each worker "has been paid not less than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the Contract." Exh. P-25A at 243592.

37.   In accordance with this requirement in the SEPTA contract, Farfield's treasurer attested in each of the certified payrolls that the payrolls were "correct and complete; that the wage rates for laborers or mechanics contained therein are not less than the applicable wage rates contained in any wage determination incorporated into the contract; [and] that the classifications set forth therein for each laborer or mechanic conform with the work he performed." Exh. J-1 at IBEWT0003411.[6]

38.   Farfield created a certified payroll, to be provided to SEPTA, for each week on the Wayne Junction Project. Tr. 35:1-3 (Stipulation 204).

39.   The prevailing wage determination in the SEPTA contract included minimum rates for the following classifications under "ELEC0126D":

|  | Rates | Fringes |
|---|---|---|
| Lineman | $32.23 | 18% + $3.30 |
| Groundman | $19.34 | 18% + $3.30 |
| Truck Driver | $20.95 | 18% + $3.30 |

Tr. 17:14-24 (Stipulation 67); Exh. P-25A at 243613.

40.   The total cash-equivalent prevailing wage rate for journeyman linemen under the SEPTA contract was $41.34 and the prevailing wage rate for overtime work was $57.46.

---

[6] Exhibit J-1 is 1,513 pages and contains all of the certified payrolls from the Wayne Junction Project. Tr. 39:12-40:9. The cited page is from the first certified payroll in Exhibit J-1, but each certified payroll contained this same language.

41.   A groundman was a classification of an electrical worker under the prevailing wage determination applicable to the Wayne Junction Project, under "ELEC0126D." Tr. 18:1-4 (Stipulation 68).

42.   The prevailing wage determination in the SEPTA contract included minimum rates for the following classification under "ELEC0098A":

|  | Rates | Fringes |
|---|---|---|
| Electricians | $32.95 | 42.12% |

Tr. 18:8-14 (Stipulation 70); Exh. P-25A at 243612.

43.   The total cash-equivalent prevailing wage rate for journeyman electricians under the SEPTA contract was $46.83.

44.   The journeyman electrician rate for base rate and fringes was higher than the journeyman lineman rate for base rate and fringes in the prevailing wage determination. Tr. 18:15-18 (Stipulation 71).

45.   The prevailing wage determination in the SEPTA contract included the minimum rates and classification information for the following laborer classifications under "LABO0401A":

|  | Rates | Fringes |
|---|---|---|
| Laborers |  |  |
| Group 2 | $20.25 | $12.45 |
| Group 5 | $20.05 | $12.45 |

Labor Classifications

Group 2: Finished surface asphalt raker; pipelayers; conduit and duct layer; jackhammer operator; paving breaker; experienced pipelayer or caulker (all joints up to within 5 ft of building foundation line)

Group 5: Yard workers; Laborers, scale mixmen; burnermen, dustmen, feeder

Tr. 18:19-19:16 (Stipulation 72); Exh. P-25A at 243619.

46.   The total cash-equivalent prevailing wage rate under the SEPTA contract was $32.70 for Group 2 laborers and $32.50 for Group 5 laborers, and the prevailing wage rate for overtime work for Group 2 laborers was $42.83.

47.   The prevailing wage determination in the SEPTA contract identified "conduit and duct layer" as a laborer classification. Tr. 19:17-19 (Stipulation 73).

### The 2004 U.S. Department of Labor Audit

48.   In September 2004, the United States Department of Labor ("USDOL") audited Farfield on the Wayne Junction Project. Tr. 30:20-24 (Stipulation 178).

49.   Brian Johnson, the wage and hour auditor from the USDOL, visited Farfield's local office, interviewed employees, reviewed documents, and corresponded with Farfield's vice president John Kleimo by email and telephone. Tr. 31:1-6 (Stipulation 179).

50.   Kleimo does not know what documents Johnson reviewed as part of his audit or with which Farfield employees involved in the Wayne Junction Project Johnson spoke. Tr. 1483:11-20, 1491:4-1492:2 (Kleimo).

51.   Johnson appears to have reviewed Farfield's certified payrolls for the Wayne Junction Project, Exh. D-20, but the record does not indicate whether he took any steps

to determine if the classifications and pay of workers on the certified payrolls conformed with the work they were performing.

52.   Johnson sent Kleimo an email asking why certain employees were being paid as group 5 laborers, and followed up with a question as to why these employees were not being paid at the slightly higher group 2 or group 3 laborer classification. Exh. D-20; Tr. 1432:13-23 (Kleimo).

53.   Kleimo forwarded Johnson's email to Joseph McGee, Sr., and asked him to respond to Johnson's questions. Tr. 31:7-9 (Stipulation 180).

54.   McGee responded to Kleimo by email, and this response was then cut and pasted into a reply email from Kleimo to Johnson. Tr. 31:10-12 (Stipulation 181).

55.   The USDOL did not notify Farfield of any violations with Farfield's classification of employees as laborers, groundmen, linemen, and electricians for the Wayne Junction Project. Tr. 31:13-16 (Stipulation 182).

56.   The USDOL found that four carpenters had been paid for a holiday (Labor Day) at the rate they would have been paid for working in the Farfield shop, as opposed to the higher prevailing rate on the Wayne Junction Project. Tr. 31:17-21 (Stipulation 183).

57.   The total underpayment in the Labor Day holiday pay for the four carpenters was $811.52, which Farfield promptly paid. Tr. 31:22-24 (Stipulation 184).

58.   The USDOL did not advise Farfield of any other prevailing wage issues with respect to its payment of Farfield employees on the Wayne Junction Project. Tr. 1446:5-18 (Kleimo).

59.   In addition to the USDOL audit in 2004, on two or three occasions during the Wayne Junction Project, a SEPTA employee met with Farfield workers regarding their work and their pay rate. Exh. J-5 (Aug. 9) at 124:6-126:4 (McGee); Tr. 1735:20-1736:12 (Pennington). No evidence was presented regarding the discussions between the unidentified SEPTA person and Farfield's workers or the results of any investigation.

### Farfield's Phase Codes and Work Documentation

60.   Farfield uses work-related phrases it calls "phase codes" for internal cost accounting of labor, material, insurance, tax, overhead, subcontracting, and other costs of a project. Tr. 24:3-5, 34:22-24 (Stipulations 98, 203); 1223:15-21 (Pierce); 1702:1-9, 1721:22-1722:17 (Fishel); 1948:3-1949:2 (Jackson); 2168:7-16 (Nescot).

61.   The time worked by Farfield's employees on the Wayne Junction Project was tracked by Farfield under phase codes on phase code timesheets. Tr. 33:13-15 (Stipulation 194); 1949:5-1950:1 (Jackson).

62.   The purpose of phase codes is not related to the classification of employees for prevailing wage purposes. Tr. 2170:6-9 (Nescot).

63.   Each phase code contains eight digits, comprised of three groupings, with the first two digits representing the trade or type of work, such as concrete, steel, or electrical; the next three digits representing the task to be performed; and the final three digits representing the location of the task. Tr. 287:19-288:15, 292:11-22 (Jackson); 1169:7-10 (Pierce).

64.   The two-digit "type of work" identifier of "16" reflects electrical work. Tr. 288:5-7 (Jackson); 1168:23-24 (Pierce); 1628:4-7 (Derr).

65.   Some of the middle, three-digit "task" codes represent discrete tasks to be performed on a project while others represent multiple tasks gathered under a single three-digit task code. Tr. 1628:19-1629:10 (Derr).

66.   Farfield used both handwritten phase code timesheets and typed phase code timesheets to record the hours that each employee worked under a particular phase code each day. Tr. 1161:22-1162:4 (Pierce).[7]

67.   The timesheets are the only document containing information that would indicate what work a particular employee performed on the Wayne Junction Project on a particular day. Tr. 1160:10-1161:4 (Pierce).

68.   The phase codes on the timesheets accurately reflect the work that a particular employee performed on the Wayne Junction Project on a particular day. Tr. 299:4-7 (Jackson).

69.   Christopher Derr, Farfield's project supervisor on the Wayne Junction Project, created both types of timesheets. Tr. 1174:15-18 (Pierce); 1650:20-24 (Derr).

70.   Derr prepared the handwritten phase code timesheets for distribution to the foremen each week, using Farfield planning documents to determine what work was expected to be done and therefore what phase codes to pre-print on the timesheet; the timesheets also included a blank space for foremen to write in a phase code not

---

[7] Exhibit J-2 is 5,646 pages and contains most of the typed phase code timesheets completed for the Wayne Junction Project. Exhibit J-3 is 5,670 pages and contains most of the handwritten phase code timesheets from the Project.

included on the pre-printed form. Tr. 1179:21-1181:6 (Pierce); 1653:18-1654:5, 1661:15-1662:19 (Derr).

71.   Farfield's foremen were responsible for completing handwritten phase code timesheets for each worker every week and submitting them to Derr. Tr. 282:7-11, 282:21-283:2 (Jackson); 1162:8-17 (Pierce); 1651:16-1652:11 (Derr).

72.   Using the information on the handwritten phase code timesheets submitted to him, Derr prepared and submitted to Farfield's payroll department typed phase code timesheets for each worker every week. Tr. 299:8-16, 301:17-302:5 (Jackson); 1162:8-17 (Pierce); 1562:21-1563:3, 1625:23-1627:4 (Derr).

73.   Derr chose which phase codes to pre-print on the handwritten phase code timesheets by selecting them from a list created by Farfield's corporate office, not by Derr himself. Tr. 1182:1-22 (Pierce); 1625:4-15, 1637:6-14, 1638:17-1640:2 (Derr); Exh. P-16.

74.   Farfield could have created any phase codes for use on the Wayne Junction Project that it wished. Tr. 2043:3-16, 2046:4-16 (Jackson).

75.   Farfield's foremen were responsible for completing daily foreman reports (sometimes referred to as daily reports) for each day on the job. Tr. 247:10-13, 247:23-248:2 (Jackson); 1154:24-1155:2 (Pierce).[8]

---

[8] Exhibits P-2, P-3, P-7, P-8, P-9, and D-45 through D-60, are a small sample of the thousands of daily reports from the Wayne Junction Project. Tr. 2203:15-17 (Nescot).

76.   The daily foreman reports described the work that was done by that foreman's crew that day, as well as the number of workers in each classification who were part of the crew. Tr. 252:13-23, 254:14-255:3 (Jackson); 1154:18-23, 1155:23-1156:22 (Pierce).

77.   The daily foreman reports generally did not contain the names of crew members, but occasionally, foremen wrote in workers' names. Tr. 255:17-19 (Jackson); 2148:9-16 (Nescot); Exh. D-49.

78.   It is not possible to determine from a daily foreman report which workers on a crew, or which classifications of workers on a crew, performed which tasks listed on a daily foreman report. Tr. 255:4-16 (Jackson); 1159:19-22, 1160:10-15 (Pierce).

79.   Farfield used other documents, including "four week look aheads" and "site specific work plans," for planning purposes on the Wayne Junction Project. Tr. 205:14-206:11, 304:2-6, 305:9-19 (Jackson); Exhs. P-1, P-6.

80.   The "four week look aheads" were prepared weekly and were used as a roadmap for the upcoming work on the Wayne Junction Project, to schedule track outages and determine SEPTA coverage, manpower, tooling, and material needs. Tr. 205:24-206:14 (Jackson).

81.   Worker classifications were not considered at all in preparing the "four week look aheads." Tr. 228:18-229:6 (Jackson); 1669:18-1670:15 (Derr).

82.   The "site specific work plans" were required by SEPTA and were prepared whenever a new task was going to be done on the Wayne Junction Project. Tr. 305:9-24 (Jackson).

83.   Using information from the typed phase code timesheets, as well as daily foreman reports and certified payrolls, Local 98 prepared a summary exhibit containing information on each employee on the Wayne Junction Project, with a listing of each week in which an employee worked and the hours, by phase code, that the employee worked each day that week, as well as his classification and rate of pay for that week. Exh. P-12; Tr. 15:4-9 (Stipulation 52).

84.   Nathan Foley, a paralegal at the law firm of Local 98's counsel, was primarily responsible for putting together Exhibit P-12, and he testified at the hearing regarding the source of the information on the spreadsheet and the identification of the data in the spreadsheet. Tr. 901:9-928:20 (Foley).

85.   Jacqueline Coyle, a partner at the accounting firm Novak Francella, testified at the hearing about her firm's verification of the data contained in Exhibit P-12. Tr. 1002:19-1003:2, 1010:2-10 (Coyle).

86.   Coyle explained that her firm compared all of the source data (handwritten phase code timesheets, typed phase code timesheets, and certified payrolls) against the information in Exhibit P-12 and identified a very small number of errors (in about 0.2% of the cells). Tr. 1011:18-1012:18, 1013:18-22, 1014:10-1016:23, 1021:16-1022:3 (Coyle).

87.   The Special Master finds that, while Exhibit P-12 may contain minor errors and some missing information, it is the best mechanism for determining the specific days worked by each employee on the Wayne Junction Project, as well as the total hours each employee worked on each of those days, the phase code or phase codes under which each employee's work was categorized each day, and each employee's classification

and pay rate each day. Exhibit P-12 was admitted into evidence without objection by Farfield. Tr. 1559:1-6, 1560:5-12.

**Local 98's Investigation**

88.   During the time of the Wayne Junction Project, as well as throughout the period of this litigation, Timothy Browne was Local 98's head of organizing and assistant business manager. Tr. 42:2-15 (Browne).

89.   Browne conducted Local 98's initial investigation of Farfield's work on the Wayne Junction Project, including by requesting copies of Farfield's certified payrolls for the Project. Tr. 74:21-75:18, 76:21-77:8 (Browne).

90.   After reviewing the certified payrolls, Browne was concerned about how Farfield was using laborers on the Wayne Junction Project and contacted someone at Local 126 to discuss his concerns. Tr. 77:9-78:3, 79:12-15 (Browne).

91.   Browne continued to investigate Farfield's practices on the Wayne Junction Project and attempted to meet with Farfield's employees working on the Project. Tr. 81:16-82:12 (Browne).

92.   Browne made contact with one Farfield employee, and then, near the end of the Wayne Junction Project, Browne was contacted by Joseph McGee, Sr. Tr. 82:10-17, 86:21-87:4, 91:4-11 (Browne).

93.   McGee assisted Browne in contacting eight other Farfield employees from the Wayne Junction Project, whom Browne eventually called and met with regarding the classification issues Local 98 was investigating. Tr. 105:8-107:22 (Browne).

94.    Browne shared the information he obtained from these Farfield employees with Local 98's attorneys, who then met with the employees. Tr. 109:23-112:6 (Browne).

95.    Local 98 filed a complaint in this matter on September 17, 2009. ECF Doc. No. 1.

96.    The United States filed its notice of election not to intervene on September 21, 2011. ECF Doc. No. 16.

97.    The official of the United States charged with responsibility to act in the circumstances of this matter knew or reasonably should have known facts material to the right of action as of September 21, 2011. Tr. 32:14-18 (Stipulation 190).

98.    Local 98 originally asserted three theories of liability against Farfield, but after the hearing before the Special Master, it abandoned the first two theories. Tr. Arg. 37:16-38:4.[9]

99.    Local 98's remaining theory is that certain tasks performed by Farfield workers classified as groundmen and laborers should have been performed only by workers classified and paid as journeymen. Tr. 10:3-7 (Stipulation 16).

---

[9] The transcripts from the eight hearing days are consecutively paginated and therefore are cited simply as "Tr." with a page and line number; the transcript of the post-hearing argument was separately paginated and therefore is cited as "Tr. Arg."

## II. Facts Related to False Claims Act

### The Work Done on the Wayne Junction Project

100.  The Special Master finds that groundmen and laborers performed many of the same tasks on the Wayne Junction Project that journeymen did, including installation of electrical conduit, laying of wire or cable, and electrical terminations.

101.  In broad terms, the Wayne Junction Project included track work; installation of new interlockings, overhead catenary, and signaling; power distribution; removing old signaling; and civil work. Tr. 188:15-20 (Jackson); Exh. J-5 (Aug. 9) at 173:6-17 (McGee).

102.  The civil work included work on duct banks, manholes, signal mass foundations, signal bridge foundations, as well as repairs to aerial structures and rerouting of a stream for repair of a small bridge. Exh. J-5 (Aug. 9) at 174:9-20 (McGee).

103.  Since the work was in the operating commuter rail track, much of the civil work had to be done by hand, rather than with large earth-moving machinery. Tr. 8:23-9:2 (Stipulation 12).

104.  Farfield's employees performed this work, which included hand digging and hand shoveling. Tr. 9:3-5 (Stipulation 13).

105.  A number of photographs admitted into evidence at the hearing show Farfield workers hand digging and hand shoveling. Exh. D-43 at FARFIELD006698, 006822, 007463, 007464, 007467, 012603, 012604, 012679, 012682, 012684, 013049, 015215, 015221, 015223, 015226, 015292, 015293, 015380, 015481.

106.  The photographs admitted into evidence at the hearing were only a small portion of the approximately 7,000 photographs of the Wayne Junction Project taken by

Dave Pennington, Farfield's project supervisor/safety officer on the Project. Tr. 1731:24-1732:2, 1733:3-10, 1772:8-12 (Pennington).

107. Farfield subcontracted out overhead catenary work on the Wayne Junction Project to a subcontractor who was a union signatory with Local 126. Tr. 23:23-24:2 (Stipulation 97).

108. Much of the work performed by Farfield's employees on the Wayne Junction Project involved clearing and grubbing landscaping and brush along the track, digging and back filling trenches along the tracks, laying plywood to support or "shore" the trenches, installing electrical conduit, and pulling electrical wires through the conduit. Tr. 8:17-22 (Stipulation 11); 341:7-13 (Hale).

109. The Wayne Junction Project also included some work performing splices and terminations. Tr. 377:2-21 (Hale).

110. Electrical conduit, which comes in ten-feet sections, is typically either PVC material or rigid metal pipe and is used to protect electrical wiring or cable that is installed underground. Tr. 343:11-18 (Hale); 517:23-518:8 (Lauria).

111. The cable being installed in the Wayne Junction Project was primarily for powering new signals along the track. Tr. 343:19-344:8 (Hale).

112. The cable included high-voltage (or 5 kV) cables; lower voltage power cables; and fiber optic cables for communications. Tr. 358:19-359:14, 381:11-382:1 (Hale); 530:13-531:5 (Lauria).

113. As part of the work installing conduit, Farfield's employees would set up plywood, shore the trench with plywood, lay tarps on both sides of where they would

clear the ballast (stones), hand shovel the ballast in and alongside the railroad tracks and place it on the tarps, hand dig the trenches with shovels, spread the ties on either side to have enough room to run the conduit, lay the conduit, pour concrete over the conduit, refill and hand shovel dirt to cover the trench, back fill and tamp, and hand shovel the stone ballast back on top. Tr. 9:7-18 (Stipulation 14).

114.  The installation or laying of conduit included a number of tasks, including bending conduit so that it could go around bends or obstacles, setting "chairs" to keep the conduit off the ground, preparing conduit by, for example, gluing or otherwise connecting multiple pieces of conduit together, physically laying the conduit in the ground, and coring manholes to connect conduit. Tr. 341:24-342:15, 345:17-346:8, 349:9-350:20, 352:19-354:21, 355:11-19 (Hale); 518:6-19, 520:24-521:9, 521:21-522:20, 525:4-22 (Lauria); 660:6-661:2, 661:12-662:10, 663:18-665:10 (Redmond).

115.  The wire or cable pulls included a number of tasks, including clearing conduit to ensure the cable could be pulled through it, pulling string and bull ropes through the conduit for use in pulling the cable, attaching bull ropes to the cable and to a tugger—a machine used to pull the cable through the conduit—operating the tugger, and monitoring the tension during a pull to ensure that the cable is pulled and the rope does not break. Tr. 350:21-352:18, 357:6-360:2, 360:9-22, 363:4-364:17 (Hale); 523:21-525:2, 529:11-531:16, 533:5-534:5 (Lauria); 668:16-671:15 (Redmond).

116.  Many cable pulls through electrical conduit were hundreds of feet long, as much as 2,000 or 3,000 feet in some instances, requiring the involvement of many

workers in several manholes at the same time. Tr. 234:18-235:3, 1973:20-1974:9 (Jackson); 362:23-363:3 (Hale); 531:20-533:4 (Lauria).

117.  As part of the Wayne Junction Project, workers also installed innerduct, which worked similarly to the cables, but contained fiber optic cable and often had a rope for pulling through the conduit already attached. In addition, as many as three innerducts could be pulled in a four-inch conduit because the innerducts were so small. Tr. 381:11-383:12 (Hale); 527:12-528:3 (Lauria).

118.  Terminations involved connecting one end of a wire that had been pulled through conduit to a transformer or signal house and the other end to an item to be powered, such as a switch or signal. Tr. 375:15-376:17 (Hale); 541:23-542:4 (Lauria); 619:10-13 (Franchetti); 672:24-673:12 (Redmond); 783:21-784:4 (Leach).

119.  High-voltage terminations were performed only by Christopher DeLuca, David Hale, and Adrian Lauria, as part of the night crew for which Hale was the foreman. Tr. 374:7-15, 396:5-11, 402:1-5 (Hale); 1999:23-2000:9 (Jackson).

120.  High-voltage terminations entailed connecting one end of a 5 kV cable to a manhole or stress cone and the other to a transformer. Tr. 377:2-5 (Hale); 541:23-542:22 (Lauria); 2000:22-2001:9 (Jackson).

121.  The workers who performed the high-voltage terminations also handled splices of the high-voltage cable, in which two high-voltage cables needed to be connected in a manhole. Tr. 377:6-21 (Hale).

122. Switch and signal terminations were performed only by Joseph McGee, Jr., James Bender, Kevin Redmond, and Ryan Franchetti, as part of a crew initially led by

foreman Derek Dunn, and then by the same individuals as part of a crew (other than Dunn) led by foreman Joseph McGee, Jr. Tr. 672:10-13, 674:14-16 (Redmond); 1992:22-1993:23, 1996:18-1997:2, 1997:14-19, 1998:16-20 (Jackson).

123. Switch and signal terminations entailed pulling the ends of wires that had been pulled through conduit into signal houses to be terminated, and terminating them on the other end at switches and signals. Tr. 672:14-673:12 (Redmond).

124. The Wayne Junction Project included a small amount of "signal bridge work," which is by its nature aerial work. Tr. 24:9-14 (Stipulations 100-101).

125. The Wayne Junction Project also included the installation of transformers and electrical houses, which entailed the physical placement of the structures and not any work with electricity or wires. Tr. 403:17-22, 406:22-407:4, 458:21-459:14 (Hale).

126. The Farfield divisional vice president in charge of a particular project was responsible for classifying field construction employees upon hire for that project. Tr. 34:9-11 (Stipulation 199).

127. As noted, on the Wayne Junction Project, this divisional vice president was Joseph McGee, Sr. Tr. 192:3-8 (Jackson); 1111:21-1112:4 (Pierce); Exh. J-5 (Aug. 9) at 71:4-9 (McGee).

128. McGee therefore had responsibility and the final word on the classification of workers hired for the Wayne Junction Project. Tr. 200:23-201:6, 2027:20-23 (Jackson); 1147:21-24 (Pierce).

129. Farfield did not have any guideline or policy or structure that McGee followed to determine a worker's classification. Tr. 1149:8-16; 1153:4-11 (Pierce).

130. Farfield's policy was that divisional vice presidents were responsible for monitoring the classifications of employees, with the assistance of superintendents and foremen who were able to monitor employees' daily tasks while working. Tr. 34:12-17 (Stipulation 200).

131. Any changes in an employee's classification on the Wayne Junction Project had to be approved by McGee and accomplished through his submission of a change notice to Farfield's human resources department. Tr. 34:18-19 (Stipulation 201); 203:6-204:2, 2027:24-2028:3 (Jackson).

132. Work on the Wayne Junction Project was done by "crews" of workers, each of which was led by a foreman and which varied in size from about six to twenty workers. Tr. 235:5-236:1 (Jackson).

133. Farfield did not have a formal process for selecting workers for various crews based on their classifications, and those classifications did not play any role in the selection of crew members. Tr. 244:7-245:3 (Jackson).

134. The foremen were primarily responsible for selecting the members of their crews. Tr. 240:16-241:22, 242:10-243:5 (Jackson).

135. At certain times during the Wayne Junction Project, there were crews that specialized in particular types of work, including a signal termination crew and a civil crew, but most crews were not limited in the work they performed on the Project. Tr. 237:17-240:14 (Jackson).

136. Foremen and superintendents on the Wayne Junction Project were responsible for assigning and monitoring the work on the Project. Tr. 34:20-21 (Stipulation 202);

1150:23-1151:19 (Pierce); 1285:24-1286:14 (Reed); Exh. J-5 (Aug. 9) at 266:18-23, 267:13-17 (McGee).

137.  Foremen had the ultimate responsibility for determining which workers on their crews did which tasks. Tr. 393:4-8, 394:13-16, 402:1-3 (Hale); 1151:8-14 (Pierce); 1286:15-21, 1287:13-16 (Reed); 1916:14-21 (Cuthbert); 2062:21-2063:23 (Jackson).

138.  Foremen did not receive any training or instruction from Farfield on how to assign workers of different classifications to different tasks on the Wayne Junction Project. Tr. 396:15-18, 398:3-10 (Hale); 1287:24-1288:6 (Reed); 2063:5-14 (Jackson).

139.  Although the foremen may have been informed of a worker's classification when he was hired, these classifications played either no role or only a minor role in the assignment of work to members of a crew. Tr. 1287:18-1288:6 (Reed); 394:23-395:4 (Hale); Exh. J-5 (Aug. 9) at 145:17-146:12 (McGee); Exh. J-5 (Aug. 10) at 46:4-14 (McGee).

140.  The tasks described above as part of installing conduit and pulling wire were not performed by any particular classification on the Wayne Junction Project; all workers on a crew performed all of these tasks at various times. Tr. 347:13-23, 360:18-361:20, 362:11-16, 407:5-17, 410:1-9 (Hale); 515:5-16, 518:20-519:13, 519:17-24, 525:24-526:9, 528:1-8 (Lauria); 610:22-611:8, 614:4-7 (Franchetti); 667:2-15, 671:16-672:1 (Redmond).

141.  Many Farfield managers believed that all or virtually all of the work on the Wayne Junction Project was groundman work and therefore, any worker could do any task. Tr. 274:14-275:19, 1941:17-1942:3, 2014:14-21 (Jackson); 1581:16-1582:10, 1589:9-1590:12, 1623:3-7, 1681:9-14 (Derr); 1822:17-1823:5 (Pennington).

142.  As a result, they did not concern themselves with monitoring worker classifications for purposes of compliance with Farfield's prevailing wage obligations. Tr. 1624:15-21 (Derr).

143.  The evidence does not support a finding that any of the workers who were groundmen or laborers were simply "helping" journeymen with the installation of conduit and pulling of wire; to the contrary, the testimony cited above demonstrates that many of the groundmen and laborers on the Wayne Junction Project actually performed all of the tasks associated with these components of the Project.

144.  The Special Master does not find credible the testimony of Farfield's witnesses that only journeymen performed the tasks involved in installing electrical conduit and pulling electrical wire or cable. Tr. 1960:6-20, 1970:16-1972:4, 1974:19-1975:24, 1979:18-1981:18, 2026:19-2027:19, 2046:17-2047:12, 2059:24-2061:21 (Jackson). Among other things, this testimony was contradicted by credible testimony that these tasks were performed by workers on the Wayne Junction Project who were classified and paid below the journeyman classification and rate, as well as undisputed evidence that some workers classified and paid below the journeyman classification and rate performed electrical terminations. In addition, Farfield's evidence is inconsistent with its own witnesses' testimony that, because all work on the Wayne Junction Project was groundman work, there was no need to monitor which classification of worker did which tasks, as well as the undisputed evidence that foremen were given full discretion and responsibility to assign work as they saw fit.

145. David Hale was classified as a groundman from the beginning of his work on the Wayne Junction Project on May 12, 2003 through November 9, 2003; as a laborer from November 10, 2003 through May 29, 2005; and as a journeyman lineman or higher classification from May 30, 2005 through December 31, 2006. Exh. P-12.

146. Adrian Lauria was classified as a groundman from the beginning of his work on the Wayne Junction Project on September 30, 2002 through November 9, 2003; and as a laborer from November 10, 2003 through January 7, 2007, although his wage rate increased to that of an apprentice (but lower than that of a journeyman lineman) beginning July 4, 2005. Exh. P-12.

147. Christopher DeLuca was classified as a groundman from the beginning of his work on the Wayne Junction Project on September 30, 2002 through November 9, 2003; and as a laborer from November 10, 2003 through January 7, 2007, although his wage rate increased to that of an apprentice (but lower than that of a journeyman lineman) beginning July 4, 2005. Exh. P-12.

148. Ryan Franchetti was classified as a groundman from the beginning of his work on the Wayne Junction Project on September 30, 2002 through November 9, 2003; and as a laborer from November 10, 2003 through November 26, 2006, although his wage rate increased to that of an apprentice (but lower than that of a journeyman lineman) beginning July 4, 2005. Exh. P-12.

149. Kevin Redmond was classified as a groundman from the beginning of his work on the Wayne Junction Project on May 12, 2003 through September 26, 2004; and as a laborer from September 27, 2004 through November 26, 2006, although his wage rate

increased to that of an apprentice (but lower than that of a journeyman lineman)
beginning July 4, 2005. Exh. P-12.

### Local Area Practices Regarding Classification of Work

150.  The Special Master finds that, pursuant to local area practices, certain work
done by groundmen and laborers on the Wayne Junction Project, particularly installing
electrical conduit, pulling wires or cables, and performing electrical terminations,
constituted journeyman work and therefore should have been classified and paid as
journeyman work.

151. Groundmen may be hired by Farfield simply after filling out an application. Tr.
33:16-21 (Stipulation 195).

152. Journeyman linemen receive 7,000 hours of training in the field as an apprentice
before becoming a journeyman. Tr. 739:21-740:1 (Leach).

153.  The lineman apprentice training includes many aspects of conduit installation,
electrical wire pulls, splices, and terminations. Tr. 753:15-754:16, 756:14-22, 761:20-762:1,
766:1-8, 766:18-767:10, 769:7-11, 771:16-772:1, 781:1-11, 783:15-20, 784:11-785:13, 787:11-
788:5 (Leach).

154. Groundmen receive none of the foregoing electrical training and do not have an
apprenticeship program. Tr. 33:16-21 (Stipulation 195); 726:4-17 (Leach).

155. Groundmen can do the following work, according to local area practices: dig to
bury innerduct; dig a trench; fill in a trench by shovel; use a shovel, pick axe, or steel
digging bar; shovel ballast, including on a track bed; move ballast; pour concrete;
oversee the pouring of concrete over conduit; lay tarps and plywood on the ground;

help move equipment and materials, including an air compressor, a jackhammer, plywood, and stones; hand shovel stones; sweep stones; sweep alongside the tracks; act as a watchman to see if a train is coming; act as a flag person for trains if certified to do so; load and unload material and tools; clear rock, weeds, landscaping material, and other debris; grub; tamp down dirt; demolish small fiber optic cable and anything that is safely de-energized; dispose of cable, including lead-jacketed signal-power cable; carry out or cut up lead-jacketed signal-power cable; carry electrical materials, wire (including big reels if they are not too heavy), tarps, shovels, other tools, jack stands and spindles for reels of wire; carry tools and material from one part of a jobsite to another; carry tools out to a worksite and back to the headquarters or project yard; handle material; move or raise a manhole; move a large de-energized object; clean up at the end of a workday; take equipment and material back to the project yard; soap a wire in a manhole to reduce friction, as long as a journeyman ensures that the soap is applied properly and uniformly; send material up a pole or hand it to a journeyman in a ditch; assist linemen, journeymen, and apprentices; assist, from the ground, a journeyman in the air; assist with fitting and framing of poles, tower or structures at the point of erection on new construction; and assist in connecting wire, putting a ten-foot piece of plastic pipe in a trench, laying conduit, laying security cable innerduct in the ground, pulling wire, bending conduit, threading conduit, setting poles, cable pulls, and conduit raceway signal work. Tr. 24:23-30:8, 33:22-34:1 (Stipulations 105-173, 196); 725:23-726:3, 726:18-728:17, 762:5-19 (Leach).

156. Groundmen can participate in wire pulls that are done by hand, if supervised by a journeyman. Tr. 863:12-22 (Leach).

157. Thomas Leach was qualified at the hearing as an expert in the field of electrical construction within the trade jurisdiction of Local 126. Tr. 722:10-14, 724:15-22.

158. Leach was the business manager and financial secretary of Local 126 from 1991 to 2010, and earlier in his career, a journeyman lineman. Tr. 698:19-699:3, 699:18-700:22, 714:13-22 (Leach).

159. Leach was not aware of any documents describing what, under local area practices, a journeyman lineman could do that a groundman could not do. Tr. 794:21-795:21-24, 885:14-17 (Leach).

160. Leach's opinion regarding the local area practices establishing what work a groundman could do and what work must be done by a journeyman was based on his forty-eight years as a journeyman lineman, a safety director, and Local 126 union official. Tr. 730:9-18 (Leach).

161. Local 126 was signatory to a series of materially similar collective bargaining agreements with the Penn – Del – Jersey Chapter of the National Electrical Contractors Association, Inc. that covered the time period and the geographic area of the Wayne Junction Project, all of which collective bargaining agreements Leach negotiated and signed on behalf of Local 126. Exhs. D-11, D-12, D-13, D-14; Tr. 811:3-15, 813:15-814:8, 841:4-842:20, 846:18-847:9, 851:14-852:8, 885:18-886:8 (Leach).

162. The Local 126 collective bargaining agreements did not contain any express limitations on the work that groundmen could do, other than to limit live wire or

equipment work and hot stick work to certain employees and to prohibit groundmen

from working from ladders or mechanical lift equipment. Tr. 885:18-886:8 (Leach); Exh.

D-11 at 12-14; Exh. D-12 at 13-14; Exh. D-13 at 13-14; Exh. D-14 at 13-15.

163. The Local 126 collective bargaining agreements did not contain express

prohibitions on groundmen installing electrical conduit, pulling electrical wire, or

performing splices or terminations. Tr. 885:18-886:8 (Leach).

164. The Local 126 collective bargaining agreements contained a clause (§ 3:12) that

read:

> The Union understands the Employer is responsible to perform the work
> required by the owner. The Employer shall, therefore, have no restrictions, except
> those specifically provided for in the collective bargaining agreement, in planning,
> directing and controlling the operation of all his work, in deciding the number and
> kind of Employees to properly perform the work, in hiring and laying off
> Employees, in transferring Employees from job to job within the Local Union's
> geographical jurisdiction, in determining the need and number as well as the person
> who will act as Foreman, in requiring all Employees to observe the Employer's
> and/or owner's rules and regulations not inconsistent with this Agreement, in
> requiring all Employees to observe all safety regulations, and in discharging
> Employees for proper cause.

Exh. D-11 at 5; Exh. D-12 at 5; Exh. D-13 at 5; Exh. D-14 at 5.

165. The Special Master finds that this clause providing that there are no restrictions,

other than those in the collective bargaining agreement, on a signatory employer's right

to choose "the number and kind of Employees to properly perform the work" on a

project is not in conflict with the local area practices regarding the work a groundman

can do and what work must be done by a journeyman. An employer's *right* to choose

which workers will do which work on a project is not the same thing as the established

area *practice* regarding which workers should do which work. Similarly, the fact that a

collective bargaining agreement may not *prohibit* an employer from using groundmen (rather than journeymen) to perform particular tasks does not mean that using them in this manner is consistent with the actual *practice* in that area.

166.  The Special Master finds that local area practices not expressly contained in the Local 126 collective bargaining agreement preclude groundmen from installing electrical conduit, pulling electrical wire, or performing splices or terminations. Tr. 754:17-755:5, 757:10-22, 759:2-760:1, 760:15-761:6, 762:20-764:5, 766:18-767:7, 767:15-17, 769:15-19, 786:22-787:10, 796:21-797:13, 798:8-799:12 (Leach).

167.  According to local area practices, no classifications other than journeyman can perform splices or terminations. Tr. 790:8-11, 791:7-20, 798:15-21, 799:5-12 (Leach).

168.  Leach initially testified that, although journeyman linemen object to it, laborers install conduit and pull wires, but he later explained that, on Local 126 jobs, laborers do not pull wires. Tr. 789:3-790:3, 862:13-22, 863:4-11 (Leach).

169.  At the time of the Wayne Junction Project, both Joseph McGee, Sr., the executive overseeing the Project, and John Kleimo, Farfield's vice president at the time of the Project, believed that, under local area practices, only journeymen, and not laborers, could install conduit on transit projects. Exh. D-22 (email from McGee to Kleimo, explaining that, on Pennsylvania rail projects, linemen have always been awarded conduit installation work); Exh. D-23 (email from Kleimo to USDOL auditor, forwarding McGee's email and indicating Kleimo's understanding that, on the Wayne Junction Project, "the actual laying of conduit is done by linemen"); Tr. 1493:22-1497:9 (Kleimo).

170. The Special Master finds that, under local area practices in the Philadelphia area, only journeymen may perform the tasks associated with installing electrical conduit, including such tasks as bending conduit, setting "chairs," preparing conduit for installation, physically laying the conduit, and coring manholes.

171. The Special Master finds that, under local area practices in the Philadelphia area, only journeymen may perform the tasks associated with pulling electrical wires or cable, including clearing conduit, pulling string and bull ropes, attaching bull ropes to the cable and to a tugger, operating the tugger, and monitoring the tension during a pull.

172. The Special Master finds that, under local area practices in the Philadelphia area, only journeymen may perform electrical terminations, including high-voltage terminations and signal and switch terminations.

173. The Special Master finds that, as a result of, among other things, Farfield's delegation of responsibility for assignments to its foremen, as well as some Farfield managers' belief that groundmen could do all tasks on the Wayne Junction Project, groundmen and laborers performed tasks that should have been classified and paid as journeyman work, including installing electrical conduit, pulling electrical wires or cable, and performing electrical terminations.

*Quantity of Journeyman Work Done by Groundmen and Laborers*

174. The Special Master finds, as further detailed below, on the basis of the phase codes used by Farfield to track work done on the Wayne Junction Project, as well as daily foreman reports, photographs of the worksite, other exhibits admitted at the

hearing, and witness testimony, that the amount and extent of work that was misclassified as groundman or laborer work can be determined by reasonable inference.

175.  As noted, Local 98 abandoned the first two of its three theories for proving the extent of alleged misclassification of groundmen and laborers on the Wayne Junction Project following the hearing before the Special Master. Tr. Arg. 37:16-38:4.

176.  Under its remaining theory, Local 98 contends that, using phase codes, it can be determined the extent to which groundmen and laborers did work that should have been classified and paid as journeyman work. Tr. 1030:24-1033:4 (Coyle).

177.  According to Local 98, the following task codes (the third, fourth, and fifth digits of the eight-digit phase codes) represent journeyman work: 050, 056, 060, 105, 120, 124, 128, 129, 301, 325, 394, and 902. Exh. P-13; Tr. 941:20-943:22 (Foley).

178.  Task code 060 is labeled "temporary electric." Exh. P-16. An April 15, 2005 daily report describes some of the work that day as wire pulls, including "pulled in temp cable." Exh. D-54; Tr. 2155:1-22 (Nescot). Exhibit P-12 shows some workers that day working under task code 060. The workers shown in Exhibit D-43 at FAIRFIELD013594 are listed in Exhibit P-12 on October 15, 2005 as working under task code 060. One of the workers shown in Exhibit D-43 at FAIRFIELD015408, 015409, and 015410 is listed in Exhibit P-12 on July 8, 2005 as working under task code 060.

179. Task code 120 is labeled "conductors," "conductors signal," or "conductors / in[n]erduct." Exh. P-16. This task code is used for the cable or wire pull associated with the raceway signal. Tr. 1691:19-1692:6 (Derr); 2139:5-2140:3 (Nescot). A September 14, 2005 daily report shows David Hale as the foreman and describes some of the work that

day as pulling signal wires. Exh. P-8; Tr. 421:13-423:8 (Hale). Exhibit P-12 shows

workers on David Hale's crew that day working under task code 120. A December 13,

2005 daily report shows David Hale as the foreman and describes some of the work that

day as pulling wires. Exh. D-45; Tr. 2136:2-2140:3 (Nescot). Exhibit P-12 shows workers

on David Hale's crew that day working under task code 120. The workers shown in

Exhibit D-43 at FAIRFIELD015271 are listed in Exhibit P-12 on March 14, 2005 as

working under task code 120.

180.  Task code 128 is labeled "specialty cable signal" or "specialty cable /

in[n]erduct." Exh. P-16. It is used for the task of pulling cable through the conduit in the

ductbanks. Tr. 1691:7-18 (Derr); 1973:20-24 (Jackson). An April 25-27, 2005 site specific

work plan describes the work planned for those three days primarily as a wire pull.

Exh. P-6. Exhibit P-12 shows many workers those days working under task code 128.

181.  Task code 129 is labeled "fiber optic cable." Exh. P-16; Tr. 1989:13-16 (Jackson).

Robert Jackson, a Farfield manager on the Wayne Junction Project, testified that task

code 129 "should have been the terminations of the fiberoptic cable," and that only two

journeymen, TJ Atkins and Michael Bates, performed those terminations, but he

conceded that he did not know if task code 129 also included fiber optic cable pulls, and

Exhibit P-12 lists more than 2,600 hours of work under task code 129, about 82% of the

total, for workers other than Atkins and Bates. Tr. 190:9-191:15, 1989:20-1991:3 (Jackson);

Exh. P-12. A September 22, 2005 daily report shows Chad Weaver as the foreman and

describes some of the work that day as pulling fiber cable. Exh. P-3 at IBEWT0006847.

Exhibit P-12 shows a number of workers on Chad Weaver's crew that day working under task code 129.

182.  Task code 301 is labeled "high voltage cable and terminations." Exh. P-16. It is used for high-voltage cable installation, including preparing the cable pull, delivering the high-voltage wire to the worksite, installing the cable, and splicing or terminating the cable. Tr. 1631:16-1633:6 (Derr); 2000:2-9 (Jackson); 2142:14-2143:6, 2202:1-7 (Nescot). A September 26, 2005 daily report describes some of the work that day as pulling and terminating high-voltage cable. Exh. D-46; Tr. 2145:3-21 (Nescot). Exhibit P-12 shows a number of workers that day working under task code 301. A February 15, 2005 daily report describes some of the work that day as pulling high-voltage cable. Exh. D-50; Tr. 2149:4-14 (Nescot). Exhibit P-12 shows a number of workers that day working under task code 301. A February 23, 2005 daily report shows Derek Dunn as the foreman and describes some of the work that day as preparing for a high-voltage cable pull. Exh. D-51; Tr. 2149:20-2151:14 (Nescot). Exhibit P-12 shows a number of workers on Derek Dunn's crew that day working under task code 301. An April 5, 2005 daily report shows Derek Dunn as the foreman and describes some of the work that day as pulling high-voltage cable. Exh. D-52; Tr. 2151:20-2152:20 (Nescot). Exhibit P-12 shows a number of workers on Derek Dunn's crew that day working under task code 301. An April 6, 2005 daily report shows Derek Dunn as the foreman and describes some of the work that day as pulling cable. Exh. D-53; Tr. 2153:9-2154:19 (Nescot). Exhibit P-12 shows a number of workers on Derek Dunn's crew that day working under task code 301. The workers shown in Exhibit D-43 at FAIRFIELD007382 are listed in Exhibit P-12 on November 28,

2005 as working under task code 301. *See also* Exhs. D-54, D-55, D-56, D-57, D-58, D-59, D-60; Tr. 2155:1-2157:10, 2160:14-2162:18, 2165:15-2167:18 (Nescot).

183.  Task code 325 is labeled "RR communication / signal." Exh. P-16. It is used for railroad communication signal installation, including installing the cable, terminating it, and testing it. Tr. 1633:7-1635:1 (Derr). An April 26, 2005 daily report shows Derek Dunn as the foreman and describes some of the work that day as pulling cable. Exh. P-7. Exhibit P-12 shows a number of workers on Derek Dunn's crew that day working under task code 325. The workers shown in Exhibit D-43 at FAIRFIELD006759 are listed in Exhibit P-12 on April 23, 2006 as working under task code 325.

184.  The Special Master finds that a reasonable inference can be made that work done under task codes 060, 120, 128, 129, 301, and 325, under the two-digit "type of work" code of 16, constitutes journeyman work, including installing electrical conduit, pulling electrical wires or cable, and performing terminations. These six task codes are referred to below as "journeyman task codes."

185.  The Special Master's finding that these phase codes represent journeyman work is supported by the testimony, photographs, daily foreman reports, and other documents presented at the hearing.

186.  Farfield did not present sufficient evidence to negate the reasonableness of the inference that work under the journeyman task codes was journeyman work, including installing electrical conduit, pulling electrical wires or cable, and performing terminations.

- 47 -

187.  Local 98 did not present sufficient evidence to prove that work done under the remaining task codes on which it relied for its claim (050, 056, 105, 124, 394, and 902) represents journeyman work. Tr. 1644:20-1647:12, 1648:4-1649:18, 1682:24-1684:1, 1690:9-12, 1691:19-1692:6 (Derr); 1961:4-1963:21, 1985:15-1989:12, 1991:4-1992:21 (Jackson).

188.  As noted, certain photographs moved into evidence at the hearing by Farfield show workers digging or shoveling on the Wayne Junction Project. Exh. D-43 at FARFIELD006698, 006822, 007463, 007464, 007467, 012603, 012604, 012679, 012682, 012684, 013049, 015215, 015221, 015223, 015226, 015292, 015293, 015380, 015481. Many of these photographs identify one or more workers in the photograph and can be compared to the phase code information in Exhibit P-12 for the date listed on the photograph. None of the photographs for which such information is available show workers engaging in work under the journeyman task codes. Exh. D-43 at FARFIELD006822, 012679, 012682, 012684, 013049, 015215, 015221, 015223, 015226, 015292, 015293, 015380.

189.  Among the remaining photographs that identify one or more workers in the photograph and contain information in Exhibit P-12 for the date listed on the photograph, the vast majority do not show workers engaging in work under the journeyman task codes. Exh. D-43 at FARFIELD006815, 006822, 006828, 007391, 007446, 012693, 012697, 013601, 015300, 015373, 015475.

190. Only six of the photographs that identify one or more workers in the photograph and contain information in Exhibit P-12 for the date listed on the photograph show workers engaging in work under the journeyman task codes. Exh. D-

43 at FARFIELD006759, 007382, 013594, 015271, 015408, 015410. *See also* Findings of Fact, ¶¶ 178-179, 182-183.

191. Farfield presented evidence that some workers spent at least their first six months on the Wayne Junction Project locating manholes, cleaning out manholes, clearing brush, and digging trenches. Tr. 1361:15-1364:11, 1365:13-1366:18 (DeLuca). Exhibit P-12 confirms that no significant work was done under the journeyman task codes until November 2003, more than a year after the Wayne Junction Project began, and that Christopher DeLuca did not perform any work under the journeyman task codes for the first fourteen months that he worked on the Project. Exh. P-12.

192. High-voltage terminations, which were part of task code 301, were performed only by Christopher DeLuca, David Hale, and Adrian Lauria, as part of the night crew for which Hale was the foreman. Tr. 374:7-15, 396:5-11, 402:1-5 (Hale); 1999:23-2000:9 (Jackson).

193. Based on the information in Exhibit P-12, it is possible to make a reasonable inference of the time these workers spent doing high-voltage terminations by limiting the hours listed for DeLuca, Hale, and Lauria under task code 301 to the period when Hale was the foreman of the night crew. Exh. P-12.

194. Switch and signal terminations, which were part of task code 325, were performed only by Joseph McGee, Jr., James Bender, Kevin Redmond, and Ryan Franchetti, as part of a crew initially led by foreman Derek Dunn, and then by the same individuals (other than Dunn) as part of a crew led by foreman Joseph McGee, Jr. Tr. 672:10-13 (Redmond); 1992:22-1993:23, 1996:18-1997:2, 1997:14-19, 1998:16-20 (Jackson).

195.  Based on the information in Exhibit P-12, it is possible to make a reasonable inference of the time these workers spent doing signal terminations by limiting the hours listed for McGee, Bender, Redmond, and Franchetti under task code 325 to the periods when Dunn or McGee was the foreman of their crew. Exh. P-12.

196.  Although Farfield did not use separate phase codes to identify time its workers spent on the clock before arriving at the Wayne Junction Project worksite (*i.e.*, the track area) or after leaving the worksite, the evidence was undisputed that workers spent a substantial amount of time in a daily morning meeting (unless they were on the night crew), gathering tools and materials at the Project's staging area ("Olney Yard"), traveling to the track-area worksite, waiting for trains to pass, gathering tools and materials and cleaning up at the end of the workday, and traveling back to the Olney Yard from the worksite. Tr. 459:15-468:2 (Hale); 1573:16-1574:9, 1676:1-12, 1679:7-1681:1 (Derr); 1739:9-1744:1, 1745:1-1748:20, 1750:6-1766:8 (Pennington); 1887:24-1896:16 (Cuthbert); 1951:13-1952:17, 2026:4-8 (Jackson).

197.  The Special Master does not find credible some of Farfield's evidence regarding the amount of time taken up by these non-production activities. *See, e.g.*, Tr. 1898:12-1899:20 (Cuthbert) (travel time each way between Olney Yard and Glenside was typically one hour).

198.  Farfield could have tracked the time its employees spent on non-production activities separately from the time spent on production activities, but did not do so. Tr. 1887:20-23, 1897:17-1898:11 (Cuthbert); 1951:9-1952:17, 1961:17-23, 1968:24-1969:9, 1985:21-1986:1, 1991:8-20 (Jackson).

199. Farfield presented sufficient evidence to negate the reasonableness of the inference that *all hours* assigned to the journeyman task codes actually constituted journeyman work.

200. Farfield presented sufficient evidence that, on average, at least 1.5 hours of each 8-hour day (or 18.75% of the time) constituted non-production time for which a worker would not be misclassified or underpaid if he was paid the prevailing rate for his nominal classification. Findings of Fact ¶ 196; Tr. 468:3-18 (Hale).

201. Although it is possible that, even after subtracting 18.75% of the time under the journeyman task codes, some of the remaining time spent working under these task codes was not journeyman work, Farfield did not present sufficient evidence to negate the reasonableness of the inference that all of the remaining work under these task codes was journeyman work that should have been classified and paid at the journeyman rate.

202. After subtracting 18.75% of the time from the journeyman task codes, the total hours that all workers spent working on the Wayne Junction Project under these task codes is approximately 28,237, or 13.5% of the total of about 209,475 working hours on the Project. Exh. P-12. Thus, the Special Master finds that almost 87% of the work on the Wayne Junction Project was *not* work that, according to local area practices, should have been classified and paid as journeyman work.

203. Groundmen worked approximately 6,426 hours under the journeyman task codes, out of a total of about 63,696 working hours on the Wayne Junction Project. Thus, approximately 90% of the work done by groundmen on the Wayne Junction Project was

*not* work that, according to local area practices, should have been classified and paid as journeyman work.

### *Farfield's Scienter Regarding Its Certified Statements*

204. The Special Master finds that the evidence does not demonstrate that Farfield intentionally submitted false statements regarding the work performed by its employees on the Wayne Junction Project, but that it acted in reckless disregard of the truth or falsity of this information, largely by allowing its foremen to determine which workers did which tasks, without regard for the workers' classifications.

205. Farfield delegated to its foremen the responsibility for determining exactly which tasks each worker on a crew would do each day. Findings of Fact ¶¶ 132-134, 136-137.

206. Farfield did not instruct its foremen to assign specific tasks to workers on a crew on the basis of the workers' classifications or provide any guidance to its foremen on how to assign work tasks. Findings of Fact ¶¶ 138-139.

207. Some Farfield managers believed that all of the work on the Wayne Junction Project could be done by groundmen, the lowest paid classification under the applicable wage determination, and therefore did not see a need to monitor whether workers were being classified and paid properly according to the classification of work they were actually performing. Findings of Fact ¶¶ 141-142.

208. The Special Master finds that, although the 2004 USDOL audit did not raise any issues regarding the classification of groundmen, laborers, and journeymen on the Wayne Junction Project, this does not affect the conclusion that Farfield acted in reckless

disregard of its prevailing wage obligations by delegating complete authority for assigning tasks at the worksite to its foremen, without regard to worker classifications and without providing guidance or instructions to the foremen regarding the proper use of groundmen and laborers. This is particularly so, given the absence of evidence that the USDOL auditor obtained or reviewed information regarding the actual work that groundmen and laborers were doing on the Wayne Junction Project.

209.  Farfield was well aware of its obligation under the SEPTA contract, which incorporated statutory prevailing wage requirements, to ensure that its workers' wages conformed to the prevailing wage rate for the work they were actually performing on the Wayne Junction Project. Tr. 1219:9-22 (Pierce); 1457:19-1458:17, 1459:7-10 (Kleimo); 1588:10-1589:8 (Derr).

210.  Joseph McGee, Sr., who was responsible for overseeing the Wayne Junction Project as head of Farfield's transit division, was aware of Farfield's "concern" that it comply with applicable laws, such as prevailing wage laws, because of past problems and the danger of debarment from public-works projects. Exh. J-5 (Aug. 9) at 115:6-116:15 (McGee).

211.  While Farfield undertook steps to ensure that it was complying with its prevailing wage obligations under the SEPTA contract, these steps disregarded the strong possibility that by allowing foremen full discretion to assign workers to tasks as they saw fit, workers would be paid the prevailing wage rate for their nominal classification but would not be paid the prevailing wage rate for the classification of work they were actually performing. Tr. 1219:9-22, 1235:16-1236:8, 1248:16-24, 1249:20-

1250:11, 1252:5-16 (Pierce); 1404:10-1405:24, 1488:17-1489:17 (Kleimo); 1589:9-1590:16 (Derr); 1704:21-1712:9, 1729:8-1731:6 (Fishel).

212.  The evidence does not support a finding that Farfield set out at the beginning of the Wayne Junction Project to intentionally use groundmen or laborers to do journeyman work.

213.  The Special Master finds, however, that, in the manner Farfield assigned tasks to its workers on the Wayne Junction Project, it recklessly disregarded its known obligation to pay its workers the prevailing wage for the classification of work they were actually performing.

### *Misclassification Underpayments*

214.  The Special Master finds, as further detailed below, on the basis of information from Farfield's records, including certified payrolls and phase code timesheets, that it is possible to approximate the amount and extent of underpayments due to the misclassifications, and thus calculate the proper amount of civil penalties and damages.

215.  As noted above, the Special Master finds that six task codes (060, 120, 128, 129, 301, and 325) include work that should have been classified and paid as journeyman work. Findings of Fact ¶¶ 178-185. Using Exhibit P-12, it is possible to identify the hours worked and actual wage rate for workers who performed work under these six task codes and were classified as either groundmen or laborers. Findings of Fact ¶¶ 83-87. The underpayment for misclassifying these workers (*i.e.*, paying them less than the journeyman rate for journeyman work) can be determined by multiplying 81.25% of the hours worked by groundmen and laborers under the journeyman task codes by the

difference between the actual wage rate paid to these workers and the prevailing wage rate for journeyman linemen in the SEPTA contract.[10]

216. For its damages calculation, Local 98 did not use the actual wage rates that Farfield paid its workers; rather, it calculated the difference between the prevailing wage rate for the employee's classification and the prevailing wage rate for journeyman linemen for those hours that Local 98 contended a groundman or laborer should have been compensated as a journeyman. Tr. 1046:10-21 (Coyle).

217. Some Farfield employees, however, were paid a higher rate than the prevailing wage rate for their classification but still below a journeyman rate. Exh. J-5 (Aug. 9) at 214:2-23, 231:14-235:11 (McGee). For example, Christopher DeLuca, Adrian Lauria, Ryan Franchetti, and Kevin Redmond each was classified as a laborer at some point while working on the Wayne Junction Project, but was paid a higher rate than the prevailing rate for a laborer for a portion of the time in which he was classified as a laborer. Findings of Fact ¶¶ 146-149.

218. The Special Master finds that using a worker's actual wage rate rather than the prevailing rate for his classification is a more appropriate manner of calculating underpayments than that proposed by Local 98.

---

[10] The underpayment is multiplied by 81.25% of the hours because of the reduction for non-production time of 1.5 hours of every 8-hour day. Findings of Fact ¶¶ 199-200.

219. Using Exhibit P-12, it also is possible to determine how many of the weekly certified payrolls contained false statements that each worker on the payroll was paid the prevailing wage rate that conformed to the work he performed.

220. Although the Special Master finds that, under local area practices, installing electrical conduit and pulling wire or cable are journeyman work, Exhibit P-12 also can be used to calculate the underpayment if this work were considered *both* laborer and journeyman work. In that case, the underpayment would constitute the sum of: (1) multiplying 81.25% of the hours worked by groundmen under the journeyman task codes by the difference between the actual wage rate paid to these groundmen and the prevailing wage rate for laborers in the SEPTA contract; and (2) multiplying 81.25% of the hours worked by groundmen or laborers on either of the crews performing terminations by the difference between the actual wage rate paid to these groundmen or laborers and the prevailing wage rate for journeyman linemen in the SEPTA contract.

CONCLUSIONS OF LAW

*Prevailing Wage Requirements*

1.     The SEPTA contract incorporated federal prevailing wage requirements that required Farfield to pay its workers on the Wayne Junction Project in conformity with the classification of work actually performed. Exh. P-25A at 243555, 243589, 243595; *see also* 29 C.F.R. § 5.5(a)(1)(i) (requiring employer to, among other things, pay employees "the appropriate wage rate and fringe benefits on the wage determination for the classification of work actually performed, without regard to skill").

2.      The SEPTA contract specifically incorporated USDOL wage determinations that established the minimum prevailing wage rate that Farfield was required to pay employees on the basis of the work the employees actually performed. Exh. P-25A at 243589, 243611-243622.

3.      The SEPTA contract required Farfield to submit weekly payrolls for transmission to the FTA, which were required to accurately and completely set forth the information required by 29 C.F.R. § 5.5(a)(3)(i), including each employee's correct classification. Exh. P-25A at 243592.

4.      The weekly payrolls also were required to include a certification that, among other things, each worker was paid not less than the prevailing rate in the applicable wage determination "for the classification of work performed." Exh. P-25A at 243592.

5.      The SEPTA contract permitted Farfield to pay employees performing work in more than one classification the prevailing rate specified for each classification for the time actually worked in each classification—for example, it could pay groundmen or laborers the journeyman rate for journeyman work installing electrical conduit or pulling wire or cable and the groundman or laborer rate for non-journeyman work associated with those tasks—*provided* Farfield's "payroll records accurately set forth the time spent in each classification in which work is performed." Exh. P-25A at 243589.

6.      It is well-established that where union contracts are the basis for a prevailing wage determination, as they are here, local union area practices on classifications determine what work falls under which trade classifications. As a leading case explained, "where a wage determination is based on a collective bargaining agreement,

the proper classification of employees is determined exclusively by the practices of the

signatory unions." *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059-62 (D.C. Cir. 2007)

(citing *Fry Bros. Corp.*, 123 WAB No. 76-06 (June 14, 1977)); *see also United States ex rel.*

*Plumbers & Steamfitters Local Union No. 38 v. C. W. Roen Constr. Co.*, 183 F.3d 1088, 1093-

94 (9th Cir. 1999).

7.     While collective bargaining agreements governing the work at issue are the first

place to look when union practices determine the local area practices for classification of

work, "the industrial common law—the practices of the industry and the shop—is

equally a part of the collective bargaining agreement although not expressed in it."

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-82 (1960); *see*

*also Conrail v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 311 (1989) ("it is well

established that the parties' 'practice, usage and custom' is of significance in

interpreting their agreement." (citation omitted)). "Under longstanding labor law

principles, the scope and meaning of a collective bargaining agreement is not limited to

the text of the agreement." *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1046

(9th Cir. 2016). "The essence of the CBA is derived not only from its express provisions,

but also from the industrial common law." *NFL Players Ass'n v. NFL*, 831 F.3d 985, 993

(8th Cir. 2016) (citation omitted). "Clear and long-standing practices of the parties—in

other words, 'past practices'—can establish terms of the agreement that are as binding

as any specific written provision." *Muller v. GPO*, 809 F.3d 1375, 1383 (Fed. Cir. 2016)

(citation omitted); *see also Abhe & Svoboda*, 508 F.3d at 1059 (noting that it is the *practices*

of the relevant local union that govern classifications).

8.    The Third Circuit has noted that it "is well established that industry or shop practices form part of the collective bargaining agreement." *Connors v. Consolidation Coal Co.*, 866 F.2d 599, 603 (3d Cir. 1989); *see also Rosano v. Township of Teaneck*, 754 F.3d 177, 190-91 (3d Cir. 2014) (holding that "practice, usage and custom" must be considered in interpreting obligations under a collective bargaining agreement).

9.    Following these principles, a district court in this district rejected an employer's arguments that an arbitrator's awarding of work to a particular class of employees was not derived from the language of the contract and was contrary to the management rights clause of the contract, noting that "custom and past practice (the so-called 'law of shop') also play a fundamental role in the interpretation" of collective bargaining agreements. *PPL Servs. Corp. v. IBEW, Local 1600*, No. 11-3273, 2012 U.S. Dist. LEXIS 170075, at *14-*18 (E.D. Pa. Nov. 29, 2012); *see also id.* at *26 ("it is [a] violation of its CBA with IBEW for PPL to assign overtime work to one classification of employee over another classification of employee when that work has *usually and customarily* been performed by the other classification" (emphasis in original)).

10.   Where a classification practice may be "identifiable" in a local area, but is not the "prevailing" practice, it should not govern classification determinations. *See, e.g.*, *Building & Constr. Trades' Dep't v. Donovan*, 712 F.2d 611, 624-26 (D.C. Cir. 1983). Thus, whereas laborers may in some circumstances and in some areas install conduit and pull wires, this is not the local area practice in the Philadelphia area and does not govern the classification of this work on the Wayne Junction Project.

11.   Farfield did not adhere to local area practices regarding which classifications of workers could install electrical conduit, pull wires or cables, and perform electrical terminations.

### *False Claims Act Violations*

12.   A defendant violates the False Claims Act if it "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). "A False Claims Act violation includes four elements: falsity, causation, knowledge, and materiality." *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017).

13.   Farfield's statement on weekly certified payrolls that the wage rate for each employee was not less than the prevailing rate in the applicable wage determination for the work each employee actually performed was false for any week in which a groundman or laborer performed work that should have been classified and paid as journeyman work. *See, e.g.*, *United States ex rel. Wall v. Circle C. Constr., LLC*, 697 F.3d 345, 357 (6th Cir. 2012).

14.   A defendant acts knowingly if, with respect to information, it "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). To be liable, a defendant need not have a "specific intent to defraud." *Id.* § 3729(b)(1)(B).

15.   The standard of reckless disregard represents "an intent to hold liable '[o]nly those who act in gross negligence,' that is, those who failed 'to make such inquiry as

would be reasonable and prudent to conduct under the circumstances.'" *United States v. King-Vassel*, 728 F.3d 707, 712-13 (7th Cir. 2013) (quoting S. Rep. No. 99-345, at 20, reprinted in 1986 U.S.C.C.A.N. 5266, 5285). While an honest mistake or even simple negligence is not sufficient to demonstrate reckless disregard, *United States ex rel. Hill v. University of Med. & Dentistry*, 448 F. App'x 314, 317 (3d Cir. 2011), liability can be based on "mere passive disregard that the [finder of fact] finds to have been reckless," *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245 n.12 (3d Cir. 2004).

16.   In other contexts, the Supreme Court has noted that reckless disregard is the failure to take steps to prevent something from happening when the defendant knows or, because it is so obvious, should have known that there is an unjustifiably high risk of it happening. *See Farmer v. Brennan*, 511 U.S. 825, 836 (1994); *see also Bedrosian v. United States*, 912 F.3d 144, 153 (3d Cir. 2018) (noting that recklessness with regard to a filing requirement exists where a filer clearly ought to have known that there was a grave risk of non-compliance and the filer was in a position to determine if there was compliance).

17.   Farfield's delegation of full discretion and responsibility to its foremen to use workers on their crews as they saw fit, at the same time that Farfield was well aware of its obligations under the SEPTA contract and federal prevailing wage laws to ensure that employees were paid the appropriate prevailing wage rate for the classification of *the work they actually performed*, constituted reckless disregard of the truth or falsity of the statements in the weekly certified payrolls that Farfield *was* paying all of its employees the appropriate wage for the work they actually performed.

18.    Under the False Claims Act, "'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

19.    "What matters is not the label the Government attaches to a requirement, but whether the defendant knowingly violated a requirement that the defendant knows is material to the Government's payment decision." *Universal Health Servs. v. United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016). As the Supreme Court explained in *Escobar*:

> In sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material.

*Id.* at 2003-04 (footnote omitted)

20.    "The Supreme Court in *Escobar* instructed courts making a materiality inquiry to ascertain whether the matter at issue was capable of influencing the government's payment decision." *United States ex rel. Freedom Unlimited Inc. v. City of Pittsburgh*, 728 F. App'x 101, 105 (3d Cir. 2018).

21.    Farfield's statements of compliance with the SEPTA contract and federal prevailing wage laws in its certified payrolls were hardly immaterial. Under the SEPTA contract, payments to Farfield could have been withheld or suspended if Farfield failed

to pay prevailing wages, Exh. P-25A at 243591, and Farfield's contract could have been terminated or the company debarred from obtaining future government contracts if it violated federal prevailing wage laws, *id.* at 243595.

22.   Certified payrolls containing required statements of compliance with prevailing wage requirements are submitted in order to obtain government payments and therefore those statements are material. *United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Invs., LLC*, 828 F.3d 587, 592 (7th Cir. 2016).

23.   Because the truth or falsity of the statements was important to the determinations whether Farfield would continue to be paid, whether the contract would not be suspended, and whether Farfield would remain eligible for government contracts, the statements suffice to demonstrate both materiality and causation. *See United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 318 (3d Cir. 2019).

24.   Farfield violated the False Claims Act by falsely certifying in its weekly payrolls that it had paid all of its employees the prevailing wage for the classification of work they actually performed, when it did not pay groundmen and laborers the prevailing wage rate for journeyman linemen work they performed.

### Civil Penalties and Damages

25.   A defendant that violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than [$5,500] and not more than [$11,000], … plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

26.   Where a False Claims Act violation is predicated on false statements regarding compliance with prevailing wage requirements, the appropriate measure of damages is the difference between the wages actually paid and the wages that would have been paid according to the prevailing wage rates. *See United States ex rel. Wall v. Circle C Constr., LLC*, 813 F.3d 616, 617-18 (6th Cir. 2016).

27.   Farfield contends that it cannot be found liable for violating the False Claims Act on the basis of misclassifications of workers who did not testify at the hearing. But this is not a prevailing wage case in which compensation is sought for individual workers who were underpaid; it is a case involving a claim for violation of the False Claims Act through the making of false statements.

28.   As to the measure of damages, applying *Mt. Clemens*, the Third Circuit recently reiterated that "compensation calculations featuring imprecisions arising from recordkeeping failures do not defeat recovery. Calculations based on mere speculation, however, do not provide a basis for relief." *Secretary United States DOL v. Central Laundry Inc.*, No. 18-3007, 2019 U.S. App. LEXIS 30522, at *5 (3d Cir. Oct. 11, 2019) (internal quotation, alterations, and citation omitted). The Special Master's calculation of damages is not based on speculation, but on Farfield's phase code timesheets, certified payrolls, and the testimony presented at trial, all of which support the conclusions regarding the amount and extent of misclassifications and underpayments. As the court explained in *Central Laundry*, every underpaid employee in a wage-payment case need not testify; rather, work records and testimony of co-workers can suffice as proof of underpayments. *Id.* at *6-*9 & nn.7-8.

29.   To the extent that Farfield challenges the use of its own phase code system and its phase code timesheets as evidence of the amount, extent, and type of work its employees performed on the Wayne Junction Project, Farfield must bear the "burden of any consequent imprecision from the absence of [its] records." *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991). "It is not necessary for every single affected employee to testify in order to prove violations or to recoup back wages." *Id.* at 1298.

30.   The Special Master's calculation of underpayments appropriately reduced the total hours of misclassification by 18.75% (1.5 hours of each 8-hour day) for the non-production time before and after actual work was done at the worksite, as the evidence supported a reduction of at least this much. *See Martin*, 949 F.2d at 1298 (noting that, where an employee acknowledged the number of hours he worked per week, the trial court erred in relying on other evidence to conclude that the employee worked fifteen more hours per week).

31.   Farfield offers no support for its contention that its underpayments of some employees for the work they actually performed and its false statement on certified payrolls that it paid employees the prevailing rate for the classification of work actually performed can be offset by Farfield's alleged overpayment of those employees by paying them at a higher classification than required under the SEPTA contract for other work.

32.   As noted above, Farfield's underpayment for misclassifying some workers can be determined by multiplying 81.25% of the hours worked by groundmen and laborers under the journeyman task codes by the difference between the actual wage rate paid to

these workers for this work and the prevailing wage rate for journeyman linemen in the SEPTA contract.

33.    The foregoing calculation results in an underpayment of $159,273.54, for 14,508 hours of work, during 105 separate weeks of the Wayne Junction Project.

34.    The damages under 31 U.S.C. § 3729(a)(1) are $477,820.62, or three times the underpayment.

35.    The plain language of the False Claims Act appears to render the civil penalty component of a judgment mandatory. *See, e.g.*, *United States ex rel. Greenfield v. Medco Health Sys., Inc.*, 223 F. Supp. 3d 222, 229 (D.N.J. 2016) ("The legislative history of the 1986 amendments to the [False Claims Act] makes clear that civil penalties are 'automatic and mandatory for each claim which is false.'"), *aff'd*, 880 F.3d 89 (3d Cir. 2018). *But see United States ex rel. Wall v. Circle C Constr., LLC*, 813 F.3d 616, 618 (6th Cir. 2016) (remanding for imposition of judgment of three times difference between wages paid and prevailing wage rate, without any mention of civil penalties).

36.    On the assumption that civil penalties are mandatory under the False Claims Act, the Special Master recommends imposition of the minimum penalty of $5,500 per violation, because Farfield did not intend to make a false statement, but did so recklessly, and because imposition of a penalty for each of the 105 violations, when added to the treble damages, is already more than sufficient to compensate the government (which declined both to intervene and to exercise jurisdiction when this matter was later referred to the USDOL) for any violation of the False Claims Act. At $5,500 per violation, the civil penalty is $577,500.

37.   The total recommended judgment is $1,055,320.62.

38.   When the United States does not intervene in a False Claims Act case, a relator is entitled to between 25 and 30% of the judgment. 31 U.S.C. § 3730(d)(2). The Special Master recommends that Local 98 be awarded 30% of the total judgment, or $316,596.19.

39.   As noted, it is possible to determine the underpayment from misclassifications if, contrary to the Special Master's finding, installing electrical conduit and pulling wire or cable are *both* laborer and journeyman work. In that case, the underpayment to groundmen for doing this work while not classified and paid at the prevailing wage rate for laborers, together with the underpayment of workers from the termination crews who were not paid the prevailing wage rate for journeyman linemen, would be $52,521.77, for 8,198 hours of work, during 99 separate weeks of the Wayne Junction Project. The damages would be $157,565.31, or three times the underpayment, while the civil penalty would be $544,500, at $5,500 per violation, for a total judgment of $702,065.31.

Respectfully submitted,


/s/ Bruce P. Merenstein
Bruce P. Merenstein, Special Master
Pennsylvania Bar No. 82609
SCHNADER HARRISON SEGAL & LEWIS LLP
1600 Market Street, Suite 3600
Philadelphia, Pennsylvania 19103
(215) 751-2249
(215) 972-7266 (facsimile)

Dated: November 29, 2019