UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br>ex rel.<br>INTERNATIONAL BROTHERHOOD<br>OF ELECTRICAL WORKERS,<br>LOCAL UNION NO. 98.<br><br>Relators/Plaintiffs,<br><br>v.<br><br>THE FARFIELD COMPANY.<br><br>Defendant. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:    CIVIL ACTION NO. 09-4230 |

**DEFENDANT THE FARFIELD COMPANY'S**
**OBJECTIONS AND PROPOSED MODIFICATIONS TO THE**
**REPORT AND RECOMMENDATIONS OF THE SPECIAL MASTER**

Respectfully submitted,

STEVENS & LEE

 /s/ Susan R. Friedman
Susan R. Friedman, Esquire
Attorney I.D. No. 23741
51 South Duke Street
Lancaster, Pennsylvania  17602
(717) 399-6625

Harry A. Horwitz, Esquire
Attorney I.D. No. 31292
1818 Market Street, 29th Floor
Philadelphia, PA  19103-1702
Tel:  (215) 751-1952
Fax:  (610) 371-7386
hah@stevenslee.com

*Attorneys for Defendant The Farfield Company*

TABLE OF CONTENTS

I.   PLAINTIFF IBEW LOCAL 98 FAILED TO SUSTAIN ITS BURDEN OF PROOF THAT
     FARFIELD ACTED IN RECKLESS DISREGARD AND FAILED TO PROVE THE
     SCIENTER REQUIRED FOR FALSE CLAIMS ACT LIABILITY ....................................6

     A.  Farfield's Managers and Supervisors Believed That They were Acting in Accordance
         with the Davis-Bacon Act..................................................................................................9

     B.  The USDOL Audit Negates Any Possible Conclusion that Farfield Acted in Reckless
         Disregard of its Obligations Under the Davis-Bacon Act. ............................................14

     C.  Farfield Acted in Accordance with IBEW Local 126's Collective Bargaining
         Agreement, and Thus Cannot be Held to Have Acted in Reckless Disregard of the
         False Claims Act............................................................................................................18

     D.  Farfield was Aware of SEPTA Discussions with Employees. ......................................35

     E.  The Other Five Projects in the Original and Amended Complaints were Dismissed
         with Prejudice, Demonstrating that Farfield does not Recklessly Disregard the
         Davis-Bacon Act............................................................................................................36

     F.  "Close Questions of Fact and Law" Do Not Equal Reckless Disregard .......................36

     G.  Farfield Paid its Employees More Than Required Under the Prevailing Wage
         Determination, in Total Amounts Much Greater Than the Underpayments in the
         Special Master's Report.................................................................................................37

     H.  IBEW Local 98 Did Not Prove That a Farfield Employee Acted Knowingly. .............39

II.  IBEW LOCAL 98 DID NOT PROVE THE MATERIALITY OF THE ALLEGED FALSE
     RECORD OR STATEMENT................................................................................................39

III. CERTIFIED PAYROLLS ARE NOT CLAIMS UNDER THE FALSE CLAIMS ACT.....46

IV.  PLAINTIFF'S EVIDENCE WAS NOT REPRESENTATIVE, AND BURDEN SHIFTING
     IS NOT JUSTIFIED. ..........................................................................................................52

     A.  Plaintiff Did Not Prove That Its Limited Evidence Was Representative Of All
         Groundmen and Laborers On The Wayne Junction Project...........................................53

     B.  The *Mt. Clemens* Standard..............................................................................................57

V.   FARFIELD DID NOT MISCLASSIFY ITS EMPLOYEES ON THE WAYNE
     JUNCTION PROJECT.........................................................................................................60

VI.  ADDITIONAL OBJECTIONS.............................................................................................61

VII. THE FARFIELD COMPANY DID NOT VIOLATE THE FALSE CLAIMS ACT...........64

i

# TABLE OF AUTHORITIES

## CASES

*Abhe & Svoboda, Inc. v. Chao*,
   508 F.3d 1052 (D.C. Cir. 2007) ................................................................................21, 23, 27

*Allison Engine Co. v. United States*,
   553 U.S. 662, 672 (2008) ....................................................................................................44

*Anderson v. Mt. Clemens Pottery Co.*,
   328 U.S. 680 (1946) .................................................................................52, 55, 56, 57, 58, 59

*BASF Wyandotte Corp.*,
   84 BNA LA 1055 (1985) .....................................................................................................20

*Bedrosian v. U.S.A., Dept. of the Treasury*,
   912 F.3d 144 (3d Cir. 2018) ................................................................................................13

*Brennan v. General Motors Acceptance Corp.*,
   482 F.2d 825 (5th Cir. 1973) (76%) ....................................................................................54

*Building & Constr. Trades' Dep't v. Donovan*,
   712 F.2d 611 (D.C. Cir. 1983) .......................................................................................30, 32

*Cantrell v. New York Univ.*,
   326 F. Supp. 2d 468, 470 (S.D.N.Y. 2004) ........................................................................50

*Connors v. Consolidation Coal Co.*,
   866 F.2d 599 (3d Cir. 1989) ................................................................................................27

*Conrail v. Railway Labor Executives' Ass'n*,
   491 U.S. 299 (1989) .................................................................................................23, 24, 25

*Donovan v. Williams Oil*,
   717 F.2d 503 (10 Cir. 1983) (59%) .....................................................................................54

*Espenscheid v. DirectSat USA, LLC*,
   705 F.3d 770 (7th Cir. 2013) .........................................................................................54, 55

*Farmer v. Brennan*,
   511 U.S. 825 (1994) ........................................................................................................13, 14

*Fry Bros. Corp.*,
   123 WAB No. 76 06 (June 14, 1977) ..................................................................................21

*Hertz Corp.*,
   98 BNA LA 258 (1991) .......................................................................................................20

1

*Hoteles Condado Beach v. Union De Tronquistas Local 901,*
    763 F.2d 34(1985)....................................................................................................................20

*Hutchins v. Wilentz, Goldman & Spitzer,*
    253 F.3d 176 (3d Cir. 2001), *cert. denied*, 536 U.S. 906 (2002)............................................48

*United States ex rel. Kerr-McGee Oil & Gas Corp.,*
    2010 WL 3730894 (D. Colo. 2010)........................................................................................51

*Knudsen v. Sprint Communications Co.,*
    2016 WL 4548924 (N.D. Cal. 2016) .........................................................................................8

*Kobold v. Good Samaritan Reg'l Med. Ctr.,*
    832 F.3d 1024 (9th Cir. 2016) ...................................................................................23, 25, 26

*Muller v. GPO,*
    809 F.3d 1375 (Fed. Cir. 2016).......................................................................................23, 27

*NFL Players Ass'n. v. NFL,*
    831 F.3d 985 (8th Cir. 2016) ..........................................................................................23, 26

*Peabody Coal Co.,*
    99 BNA LA 390 (1992)............................................................................................................20

*Phelps Dodge Copper Products Corp.,*
    18 BNA LA 229 (1951)............................................................................................................20

*PPL Servs. Corp. v. IBEW, Local 1600,*
    No. 11 3273, 2012 U.S. Dist. LEXIS 170075 (E.D. Pa. Nov. 29, 2012)...........................29, 30

*Matter of Pythagoras Gen. Contr.,*
    2011 WL 729638 (DOL Adm. Rev. Bd. 2011) ......................................................................58

*Rosano v. Township of Teaneck,*
    754 F.3d 177 (3d Cir. 2014)......................................................................................27, 28, 57

*Savannah Symphony Society,*
    102 BNA LA 575 (1994)..........................................................................................................20

*Smith v. Carolina Medical Center,*
    274 F.Supp.3d 300 (E.D. Pa. 2017).......................................................................................50

*Spartan Stores Inc.,*
    BNA LA 549 (1995).................................................................................................................20

*Swanson Plating Co.,*
    111 BNA LA 373 (1998)..........................................................................................................20

2

*U.S. ex rel. Arnold v. CMC Engineering, Inc.*,
   947 F. Supp.2d 537 (W.D. Pa. 2013)..........................................................................................9

*U.S. ex rel. Schmidt v. Zimmer*,
   386 F.3d 235 (3d Cir. 2004)....................................................................................................13

*United States ex rel. Bahnsen v. Boston Scientific Neuromodulation Corp.*,
   2018 WL 4604307 (D. N.J. 2018) ......................................................................................50, 51

*United States ex rel. Cressman v. Solid Waste Services, Inc.*,
   2018 WL 1693349 (E.D. Pa. 2018) ....................................................................................44, 45

*United States ex rel. Doe v. Heart Solution, PC*,
   923 F.3d 308 (3d Cir. 2019).....................................................................................................41

*United States ex rel. Emanuele v. Medicor Associates*,
   242 F.Supp.3d 409, 427 (W.D. Pa. 2017)...........................................................................9, 14

*U.S. ex rel. Hill v. University of Medicine & Dentistry of New* Jersey,
   448 Fed. Appx. 314 (3d Cir. 2011).........................................................................................13

*United States ex rel. Howard v. KBR, Inc.*,
   139 F.Supp.3d 917, 945 (C.D. Ill. 2015), *leave to appeal denied*, 2016 WL
   9776138 (C.D. Ill. 2016)..........................................................................................................52

*United States ex rel. Landis v. Tailwind Sports Corp.*,
   234 F.Supp.3d 180 (D. D.C. 2017).........................................................................................51

*United States ex rel. Petratos v. Genentech Inc.*,
   855 F.3d 481 (3d Cir. 2017).....................................................................................................44

*United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. C. W. Roen
   Constr. Co.*,
   183 F.3d 1088 (9th Cir. 1999) ...........................................................................................21, 22

*United States ex rel. Rueter v. Sparks*,
   939 F. Supp. 636 (C.D. Ill. 1996), *affirmed*, 111 F.3d 133 (7th Cir. 1997).......................14, 17

*United States ex rel. Schimelpfenig v. Dr. Reddy's Laboratories Limited*,
   2017 WL 1133956 (E.D. Pa. 2017) .........................................................................................44

*United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning
   Invs.*,
   LLC, 828 F.3d 587 (7th Cir. 2016).....................................................................................40, 41

*United States ex rel. Watkins v. KBR, Inc.*,
   106 F.Supp.3d 946 (C.D. Ill. 2015) .......................................................................................52

3

*United States ex rel. Wall v. Circle C. Constr., LLC*,
  697 F.3d 345, 357 (6th Cir. 2012) ..........................................................................................61

*United States v. Bornstein*,
  423 U.S. 303 (1976)................................................................................................47, 48, 51

*United States v. Ehrlich*,
  643 F.2d 634 (9th Cir. 1981), *cert. denied*, 454 U.S. 940 (1981)............................................49

*United States v. Fadul*,
  2013 WL 781614 (D. Md. 2013) ............................................................................................39

*United States v. King-Vassel*,
  728 F.3d 707 (7th Cir. 2013) ............................................................................................11, 12

*United States v. Krizek*,
  111 F.3d 934 (D.C. Cir. 1997)..............................................................................48, 49, 50, 51

*United States v. McNinch*,
  356 U.S. 595 (1958)................................................................................................................48

*United States v. Science Applications International Corporation*,
  626 F.3d 1257 (D.C. Cir. 2010)................................................................................................9

*United States v. Speqtrum, Inc.,*,
  No. 10-2111, 2016 WL 5349196 (D.D.C. Sept. 23, 2016)......................................................50

*United States v. Tieger,*
  234 F.2d 589 (3d Cir. 1956)....................................................................................................48

*United States v. Vista Hospice Care, Inc.,*
  2016 WL 3449833 (N.D. TX. 2016)........................................................................................54

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
  363 U.S. 574 (1960)................................................................................................................23

*Universal Health Services, Inc. v. United States ex rel. Escobar*,
  *136 S. Ct. 1989 (2016)*...................................................................................40, 42, 43, 44

## STATUTES, RULES & REGULATIONS

29 C.F.R. §1.1 ..............................................................................................................................32

29 CFR 5.5 ...................................................................................................................................39

31 U.S.C. § 3729(a)(1)(B) ...........................................................................................................52

4

31 U.S.C. § 3729(b)(2) ...........................................................................................................47, 50

31 U.S.C. § 3729(c) ...................................................................................................................47

**OTHER AUTHORITIES**

S. Rep. 99-345, 99th Cong., 2nd Sess. 1986..................................................................................12

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA <br> ex rel. <br> INTERNATIONAL BROTHERHOOD <br> OF ELECTRICAL WORKERS, <br> LOCAL UNION NO. 98. | : <br> : <br> : <br> : <br> : | CIVIL ACTION NO. 09-4230 |
| Relators/Plaintiffs, | : <br> : <br> : | |
| v. | : <br> : | |
| THE FARFIELD COMPANY. | : <br> : | |
| Defendant. | : <br> : | |

## DEFENDANT THE FARFIELD COMPANY'S
## OBJECTIONS AND PROPOSED MODIFICATIONS TO THE
## REPORT AND RECOMMENDATION OF THE SPECIAL MASTER

Defendant, The Farfield Company ("Farfield"), files these Objections and Proposed

Modifications to the Report and Recommendation of the Special Master ("Special Master's

Report").

## I.   PLAINTIFF IBEW LOCAL 98 FAILED TO SUSTAIN ITS BURDEN OF PROOF THAT FARFIELD ACTED IN RECKLESS DISREGARD AND FAILED TO PROVE THE SCIENTER REQUIRED FOR FALSE CLAIMS ACT LIABILITY

The Special Master erroneously recommended that this Court conclude that Farfield

acted in reckless disregard and therefore violated the False Claims Act ("FCA") on the Wayne

Junction Project ("Project").  The record evidence does not in any manner support a conclusion

of reckless disregard.  The Special Master found reckless disregard because of "Farfield's

delegation of full discretion and responsibility to its foremen to use workers on their crews as

they saw fit, at the same time that Farfield was well aware of its obligations under the SEPTA

contract and federal prevailing wage laws to ensure that employees were paid the appropriate

6

prevailing wage rate for the classification of *the work they actually performed*."  Conclusion of Law 17.[1]

This conclusion ignores all of the following:

- The Special Master found that none of Farfield's managers or supervisors intentionally violated the False Claims Act or the Davis Bacon Act.  Finding of Fact 204.  The Special Master found that Farfield's managers and supervisors believed that groundmen could do whatever a lineman could do on the Wayne Junction Project.  Finding of Fact 141.

- The USDOL conducted an audit of Farfield's pay and classification practices on the Wayne Junction Project under the Davis-Bacon Act, the Fair Labor Standards Act, and the Contract Work Hours and Safety Standards Act, starting in September, 2004, half-way through the four and one-half year project.  The USDOL reviewed certified payrolls, other documents, and interviewed Farfield workers.  The audit included correspondence specifically discussing the payment of groundmen and laborers.  At the end of the audit, the USDOL told Farfield that the only issue with its pay and classification practices under the Davis Bacon Act was Farfield's failure to pay four carpenters for the Labor Day Holiday at the prevailing wage rate instead of the company's shop rate, for a total underpayment of $811.52, which Farfield promptly paid.  As a result of this USDOL audit, Farfield continued and did not modify its pay and classification practices on the Project.

- Farfield's pay and classification of groundmen is totally consistent with IBEW Local 126's collective bargaining agreements.

---

[1] References to the Findings of Fact and Conclusions of Law in the Report and Recommendation of the Special Master will be cited as "Finding of Fact" and "Conclusion of Law" with the appropriate number.

- SEPTA performed its own audits and interviewed employees about the work they were performing and the rates they were being paid during the Project, and never advised Farfield of any issues, nor did SEPTA at any time fail to pay Farfield in full for its work on the Project, and SEPTA has continued to do business with Farfield through the trial of this case in 2019, more than 15 years later.

- The other five projects in the Complaint were dismissed with prejudice without any findings of any misclassification of any workers.

- The Special Master said there were a number of close questions of fact and law whether Laborers union workers could perform the bulk of the work in question, and provided an alternate damage calculation, thus proving that it is not necessary for a journeyman from the electrical workers union to safely and properly perform the work.

- Farfield paid its employees at wage rates higher than required under the prevailing wage determination, in total amounts much greater than the underpayments in the Special Master's Report.

Since the managers and supervisors believed that groundmen could do whatever linemen could do, there was no reason for Farfield to direct any of its foremen to limit the groundmen in the tasks they performed.  Based on this understanding, it was totally proper for the foremen to use groundmen as they saw fit.  Thus, the Special Master's findings and conclusions are illogical, and are not supported by the record evidence.

A determination of reckless disregard is a conclusion of law, not a finding of fact.  "The FCA's scienter requirement is satisfied if the defendant:  (1) has actual knowledge that the claim is false, (2) acts in deliberate ignorance of the truth or falsity of the claim; or (3) acts in reckless

8

disregard of the claim's truth or falsity." *U.S. ex rel. Arnold v. CMC Engineering, Inc.*, 947 F. Supp.2d 537, 543 (W.D. Pa. 2013).

"Strict enforcement of the FCA's scienter requirement will … help ensure that ordinary breaches of contract are not converted into FCA liability." *United States v. Science Applications International Corporation*, 626 F.3d 1257, 1271 (D.C. Cir. 2010); *United States ex rel. Emanuele v. Medicor Associates*, 242 F.Supp.3d 409, 427 (W.D. Pa. 2017).  "Congress clearly had no intention to turn the FCA, a law designed to punish and deter fraud, into a vehicle for either 'punish[ing] honest mistakes or incorrect claims submitted through mere negligence' or imposing 'a burdensome obligation' on government contractors rather than a 'limited duty to inquire.' … The resulting statutory language demonstrates the care Congress took to balance competing objectives.  Although Congress defined 'knowingly' to include some forms of constructive knowledge, its definition of that term imposes liability for mistakenly false claims only when the defendant deliberately avoided learning the truth or engaged in aggravated gross negligence." *Id.* at 1274-1275 (citations omitted).

 "A plaintiff cannot "reverse-engineer" scienter by pointing to the defendant's duty to establish compliance programs, which included a duty to periodically review practices, procedures, policies and internal controls.  The court explained, "[t]o accept his argument would turn every bill sent by every entity that has business with the government, and that has a compliance program, into a false claim." *Knudsen v. Sprint Communications Co.,* 2016 WL 4548924, *12 (N.D. Cal. 2016).

## A.   Farfield's Managers and Supervisors Believed That They were Acting in Accordance with the Davis-Bacon Act

The Special Master ignored the fact that Farfield hired Joseph McGee, Sr. to run its Transit Division.  McGee, Sr. had experience working on rail transit projects and working for

9

union contractors.  McGee, Sr. assigned the foremen who assigned work to workers on the crews, and also assigned employees to certain crews.

In Finding of Fact 26 the Special Master acknowledged "McGee [Sr.] had certain skills and knowledge regarding rail projects that nobody else at Farfield possessed at the time of McGee's hiring, including experience working with linemen and groundmen."  But there was more to it than that.  Farfield hired McGee, Sr., when it established the Transit Division. *Jackson,* Tr. 178:14-20; *Pierce,* Tr. 1134:13-1135:4; *Exhibit J-5*, 129:6-23.  McGee, Sr., had experience in doing rail work and as a union contractor when he was hired by Farfield.  *Derr,* Tr. 1614:14-21, 1585:7-14, 1585:7-14, 1614:14-21; *Pennington,* Tr. 1822:22-1823:5; Exhibit J-5 129:24-130;  *Pierce,* Tr. 1136:8-20.  Before McGee, Sr., worked for Farfield, he worked on prevailing wage rail projects for SEPTA, PATCO and WMATA (Washington Metro), and for the SEPTA project, there were inside and outside electrical workers.  *Exhibit J-5,* Tr. 61:14-62:8; Tr. 62:13-63:18.

Farfield relied on McGee, Sr., because of his experience in this type of work; indeed, that experience was why McGee, Sr., was hired by Farfield.  McGee, Sr., told Farfield managers and supervisors that on the Wayne Junction project groundmen could do anything that a journeyman lineman could do.  *Pennington*, Tr. 1822:17-21; *Jackson*, Tr. 274:19-275:9; 1941:17-24; *Derr*, Tr. 1581:16-1582:17.  This made sense to Farfield management because the overwhelming amount of work that Farfield's employees were doing on the Project was clearing and grubbing, digging, shoveling, material handling, shoring, backfilling, tamping, and civil work, with minimal "electrical" work requiring any journeyman knowledge.  Farfield had a journeyman electrician in charge of every crew that was performing any electrical related work.  Groundmen are electrical workers.

10

Jackson asked for a groundman job description because there was nothing in the prevailing wage determination that showed that. Chris Derr, Project Supervisor for Farfield on the Project, researched it on the internet and provided Jackson with a printout. It was consistent with what Farfield employees were doing on the Project. Nothing in it was inconsistent with what Joe McGee, Sr., told him groundmen could do. *Jackson*, Tr. 1943:8-1944:3; *Derr*, Tr. 1562:14-1563:3; 1582:14-17.

Since Farfield management understood that groundmen could do everything a lineman could do for the type of work performed by Farfield employees on the Wayne Junction Project, there was no reason for management to direct the foremen that they needed to limit the groundmen to perform only certain tasks. Indeed, that would be contrary to what they understood was allowed. As noted, groundmen are electrical workers, in the same union as journeymen linemen, and were at all times working with journeymen linemen/electricians. Similarly, there was no need for Farfield to track hours spent by the groundmen on numerous specific tasks, since Farfield believed and understood that the groundmen were being paid appropriately for the work they were performing at the groundman rate, since that equaled or was higher than the rate required to be paid (for example, for travel time which could have been paid at the shop rate). *Derr,* Tr. 1589:9-21; 1681:9-14; *Jackson,* Tr. 274:19-275:9.

Consequently, Farfield lacked the required scienter to, and did not knowingly, violate the False Claims Act.

In his Report, the Special Master cited a number of cases on the issue of what constitutes "reckless disregard." The Special Master cited *United States v. King-Vassel*, 728 F.3d 707 (7th Cir. 2013), an FCA case involving a psychiatrist's off-label prescriptions to a minor patient, for its reference to the Senate Report from the 1986 amendments to the FCA. However, the

11

court in *King-Vassel* paraphrased the language from the Report in a way that changed the spirit

of the language.  The following is the relevant language from the Senate Report:

> While it is clear that actual knowledge of a claim's falsity will confer
> liability, courts have split on defining what type of 'constructive
> knowledge', if any, is rightfully culpable.  In fashioning the appropriate
> standard of knowledge for liability under the civil False Claims Act,
> S. 1562 adopts the concept that individuals and contractors receiving
> public funds **have some duty to make a limited inquiry** so as to be
> reasonably certain they are entitled to the money they seek.  A rigid
> definition of that 'duty', however, would ignore the wide variance of
> circumstances under which the Government funds its programs and the
> correlating variance in sophistication of program recipients.
> Consequently, S. 1562 defines this obligation as **'to make such inquiry
> as would be reasonable and prudent to conduct under the
> circumstances to ascertain the true and accurate basis of the claim.'**
> **Only those who act in 'gross negligence' of this duty will be found
> liable under the False Claims Act.**
>
> The standard in S. 1562 is identical to that in S. 1134, . . .  In both bills,
> the constructive knowledge definition attempts to reach what has become
> known as the 'ostrich' type situation where an individual has 'buried his
> head in the sand' and failed to make simple inquiries which would alert
> him that false claims are being submitted.  **While the Committee intends
> that at least some inquiry be made, the inquiry need only be
> 'reasonable and prudent under the circumstances', which clearly
> recognizes a limited duty to inquire as opposed to a burdensome
> obligation.**  The phrase strikes a balance which was accurately described
> by the Department of Justice as 'designed to assure the skeptical both that
> mere negligence could not be punished by an overzealous agency and that
> artful defense counsel could not urge that the statute actually require some
> form of intent as an essential ingredient of proof.'

S. Rep. 99-345, 99th Cong., 2nd Sess. 1986 at *20 (emphasis added).  In *King-Vassel*, the court

paraphrased the language so "gross negligence" would be defined as the failure to "make such

inquiry as would be reasonable and prudent to conduct under the circumstances."  Instead, the

Senate Report states that those who act in gross negligence of the duty to make a limited inquiry,

such as would be "reasonable and prudent to conduct under the circumstances," will be found

liable under the FCA.  *Id.*  The second paragraph of the Report is also telling:  "While the

Committee intends that at least some inquiry be made, the inquiry need only be 'reasonable and

12

prudent under the circumstances', which clearly recognizes a limited duty to inquire as opposed to a burdensome obligation." *Id.*

Citing *U.S. ex rel. Hill v. University of Medicine & Dentistry of New* Jersey, 448 Fed. Appx. 314 (3d Cir. 2011), the Special Master correctly noted that simple negligence or an honest mistake is insufficient for FCA liability.  The Special Master cited *U.S. ex rel. Schmidt v. Zimmer*, 386 F.3d 235 (3d Cir. 2004), for the proposition that a finder of fact may find a defendant's "passive disregard" to have been reckless and therefore actionable.  Conclusion of Law 15.  Again, the court is not saying that all "passive disregard" is reckless; instead, it is saying that, in a particular set of circumstances, "passive disregard" may be found to be reckless. In *Schmidt*, the court reversed the district court's dismissal of Plaintiff's complaint, finding that the complaint stated claims under both the Stark Act and the FCA.  As that case was at the motion to dismiss stage, the evidence had not been developed.

The Special Master then cited non-FCA cases that discuss, in completely unrelated contexts, what constitutes reckless disregard.  The cases cited involved a transsexual prisoner's *Bivens* suit against prison officials (*Farmer v. Brennan*, 511 U.S. 825 (1994)) and a taxpayer's action to contest the assessment of civil penalties by the IRS for failure to annually file a Report of Foreign Bank and Financial Accounts (*Bedrosian v. U.S.A., Dept. of the Treasury*, 912 F.3d 144 (3d Cir. 2018)).  Conclusion of Law 16.  Obviously, the facts of these cases have nothing in common with the facts of the Farfield case.  Interestingly, the *Farmer* case notes that "the civil law generally calls a person reckless who acts or . . .  fails to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known."  511 U.S. at 836. In the Farfield case, from Farfield's perspective and knowledge, there was no high risk of harm, unjustifiable or otherwise, that was known or so obvious that it should have been known,

13

because it hired Joe McGee, Sr., for the specific reason that he was experienced in rail projects, including working for union contractors.  The *Brennan* case finds recklessness when "there was a grave risk that [the filing requirement was not being met] and if . . . he [or she] was in a position to find out for certain very easily."  912 F.3d at 153.  Again, Farfield hired Joe McGee, Sr., for his experience in all matters related to transit projects, including following the prevailing wage classification requirements of the Davis-Bacon Act.  Thus, Farfield reasonably believed that there was no "grave risk" or any risk at all that they were in non-compliance.

The cases cited by the Special Master all stand for the proposition that a government contractor may not act like an ostrich and bury his head in the sand.  By hiring someone experienced in transit projects, including the classification of employees under the Davis-Bacon Act, Farfield did not act like an ostrich, did not bury its head in the sand, and was not passive.

When viewed objectively, based on what Farfield knew and believed at the time, and without the benefit of hindsight, Farfield lacked the required scienter to, and did not knowingly, violate the False Claims Act.  It must be remembered that "[s]trict enforcement of the FCA's scienter requirement will . . . help ensure that ordinary breaches of contract are not converted into FCA liability."  *Id*. at 1271 (D.C. Cir. 2010); *United States ex rel. Emanuele v. Medicor Associates*, 242 F.Supp.3d 409, 427 (W.D. Pa. 2017).  The Special Master ignored these policy considerations when he determined that Farfield had the requisite scienter under the FCA based on his conclusion of reckless disregard.

## B.   The USDOL Audit Negates Any Possible Conclusion that Farfield Acted in Reckless Disregard of its Obligations Under the Davis-Bacon Act.

In *United States ex rel. Rueter v. Sparks*, 939 F. Supp. 636, 638-39 (C.D. Ill. 1996), *affirmed*, 111 F.3d 133 (7th Cir. 1997), the evidence showed no knowing wrongdoing where the U.S. Department of Labor (USDOL) audited the employer but did not tell the employer that the

14

proper rate was not being paid for maintenance work, and the employer continued to pay the uncriticized amount that the USDOL had reviewed.

The USDOL audited Farfield's pay practices on the Wayne Junction Project.  Although the USDOL required Farfield to pay additional Labor Day holiday pay to four carpenters amounting to a total of $811.52, the USDOL did not tell Farfield that Farfield had misclassified or underpaid any laborers or groundmen, and did not assess Farfield or require Farfield to pay anything to groundmen or laborers.  The audit occurred in late 2004, half-way through the four and one-half year project.  The USDOL reviewed the certified payrolls, time records, and interviewed employees and asked them what tasks they were performing.  Based on the USDOL's audit of Farfield's pay practices for the Wayne Junction Project, with no finding or action against Farfield for Farfield's pay practices relating to laborers and groundmen, Farfield's action was not knowing under the FCA.

On September 20, 2004, the USDOL sent McGee, Sr., a letter announcing it would be auditing Farfield on the Wayne Junction Project.  *Stipulation 178*, Tr. 30:20-24.  The audit commenced more than two years after Farfield began working on the Wayne Junction Project, and approximately half-way through the Project.  *Pierce*, Tr. 1231:5-19; *Exhibit P-12*.

The audit was conducted by Brian Johnson, Compliance Officer of the USDOL  *Exhibit D-17*; *Kleimo*, Tr. 1416:18-1421:3.  Mr. Johnson requested all payroll and daily time records and those records were made available to Mr. Johnson.  *Exhibit D-16; Kleimo*, Tr. 1416:18-1421:3, 1499:9-17, 1500:9-18, 1504:15-24.  Mr. Johnson visited Farfield's local office, interviewed employees, reviewed documents, and corresponded with John Kleimo, of Farfield, by email as well as by telephone.  *Stipulation 179,* Tr. 31:1-6.

15

Among the employees that Mr. Johnson interviewed was Fred Cuthbert. *Cuthbert*, Tr. 1856:9-1857:2. Johnson was surprised to hear that Cuthbert was spending most of his working time digging. *Cuthbert*, Tr. 1857:3-1858:4. Fred Cuthbert was paid at the journeyman electrician's rate for all of his time on the Wayne Junction Project, and after being promoted to foreman was paid at the higher Foreman rate of an additional One Dollar per hour. *Cuthbert*, Tr. 1858:5-21; *Exhibit P-12*.

Johnson corresponded with Kleimo by email and also spoke with Kleimo by telephone. *Kleimo*, Tr. 1492:3-1493:6; *Exhibits D-16 through D-30*. Johnson specifically asked Kleimo about laborers and the laying of conduit. *Kleimo*, Tr. 1432:24-1435:13; *Exhibits D-21 and D-22*.

Kleimo forwarded the emails to Joe McGee, Sr., and asked him to respond to these questions. *Stipulation 180*, Tr. 31:7-9; *Kleimo*, Tr. 1434:11-1435:13; *Exhibits D-21 and D-22*. McGee responded to Kleimo by email, and this response was then copied and pasted into a reply email from Kleimo to Johnson. *Stipulation 181*, Tr. 31:10-12; *Kleimo*, Tr. 1434:11-1436:5; *Exhibits D-22 and D-23*.

Johnson then asked about the Labor Day holiday for the carpenters, had email correspondence and telephone discussions, and then sent wage payment documents detailing Johnson's calculation of the total underpayment due four employees under the Davis-Bacon Act, in the amount of $811.52. *Kleimo*, Tr. 1437:22-1443:16; *Exhibits D-24 through and D-27*.

The USDOL found that four carpenters had been paid for a holiday (Labor Day) at the rate they would have been paid for working in the Farfield shop, as opposed to the higher prevailing rate on the Wayne Junction Project. *Stipulation 183*, Tr. 31:17-21; *Kleimo*, Tr. 1446:5-11; *Exhibits D-29 and D-30*. Farfield promptly paid the $811.52. *Stipulation 184*, Tr. 31:22-24. Labor Day was listed as a paid holiday for carpenters in the Prevailing Wage

16

Determination.  *Stipulation 185*, Tr. 32:1-3.  There were no listed paid holidays for groundmen, linemen, laborers or electricians in the Prevailing Wage Determination.  *Stipulation 186*, Tr. 32:4-6.

After the issue with the carpenters had been addressed, Kleimo asked Johnson if there were other issues.  *Exhibit D-24; Kleimo*, Tr. 1437:22-1441:2.  At the conclusion of the audit, there was a closing conference between Farfield's Kleimo and USDOL's Johnson.  *Kleimo*, Tr. 1444:3-1446:18.  The audit had covered the Fair Labor Standards Act, the Davis-Bacon Act and the Contract Work Hours and Safety Standards Act ("CWHSSA").  Kleimo specifically asked Johnson during the closing conference whether there were any other issues and was told by Johnson that there were no issues under the Fair Labor Standards Act, there were no issues under the CWHSSA, and there were no issues under the Davis-Bacon Act except for the carpenter Labor Day holiday, as shown on the notes Kleimo took during the closing conference. *Kleimo*, Tr. 1446:9-11; *Exhibit D-28*.

Other than owing for the difference between the private rate and the prevailing wage rate for four carpenters for a Labor Day holiday, Mr. Johnson advised Kleimo that there were no other issues with respect to the Davis-Bacon Act.  Mr. Johnson had in correspondence and telephone conversations specifically questioned and received a response concerning the use and pay rates of groundmen and laborers.  *Kleimo*, Tr. 1432:7-1437:13, 1444:3-1446:18; 1476:6-12.

Since at the end of the USDOL audit Johnson identified a carpenter holiday pay problem, but did not tell Farfield that Farfield had misclassified any worker, that supported Farfield's belief that it had properly classified and paid all of its workers, and it continued those same classification and pay practices.  As in *Rueter*, the audit shows that there is no evidence of wrongdoing by Farfield in continuing its pay and classification of groundmen, laborers, and

17

other workers on the Project, and certainly Farfield cannot be held to have acted in reckless disregard of the Davis-Bacon Act on the Wayne Junction Project in light of the fact that the USDOL audited these pay and classification practices and advised Farfield it had found no issues.

### C. Farfield Acted in Accordance with IBEW Local 126's Collective Bargaining Agreement, and Thus Cannot be Held to Have Acted in Reckless Disregard of the False Claims Act.

IBEW Local 98's third theory – that certain tasks may only be performed by a journeyman lineman or journeyman electrician – was disproved by its stipulations, testimony, and the clear language of IBEW Local 126's collective bargaining agreements.

All of IBEW Local 126's collective bargaining agreements in effect during the period of the Wayne Junction Project from 2002 through 2007 contained Section 3:12 which specifically states that the employer *"shall have no restrictions, except those specifically provided for in the collective bargaining agreement, . . . in deciding the number and kind of Employees to properly perform the work . . . ." Exhibits D-11, D-12, D-13 and D-14. (emphasis added).* Thomas Leach, Plaintiff's expert/lay opinion witness, who negotiated and signed all of the collective bargaining agreements, agreed that his trial testimony on local industry practices restricting what a groundman can do *are or could be in conflict with the clear language of Section 3:12 of those collective bargaining agreements.* Defendant's Proposed Finding of Fact 68; *Leach*, Tr. 883:17-885:09. Leach further acknowledged that the local industry practices that are or could be in conflict with Section 3:12 of the collective bargaining agreements are not written down anywhere. Defendant Proposed Finding of Fact 69; *Leach*, Tr. 885:10-17. Leach agreed that with respect to every single item that he testified would be contrary to industry practice, there is nothing in any of the IBEW Local 126 collective bargaining agreements that says a groundman

18

could not do that work, with the sole exceptions of aerial work and energized work.  Findings of Fact 162 and 163.

Leach testified that Section 7:17 (Section 7:16 in Exhibits D-12, D-13 and D-14) of the collective bargaining agreements covers multiple tasks involved in installing underground cables.  Leach also testified that the reference in that Section to "electrical operation" covers everything electrical, including installing conduit, pulling cable, terminating, installing transformers, and everything that's performed by a watch person or a groundman.  Defendant's Proposed Finding of Fact 56; *Leach,* Tr. 832:13-836:23.  Leach testified that under Section 7:17 (Section 7:16 for the later agreements) there could be groundmen on the crew as long as there is not less than one journeyman in each crew.  Defendant's Proposed Finding of Fact 57; *Leach,* Tr. 837:23-838:5.  This is contrary to Leach's testimony about local industry practice for pulling wire and cable, installing conduit, and terminating.

The only restrictions in IBEW Local 126's collective bargaining agreements effective throughout the Wayne Junction Project were that groundmen could not perform "hot" or energized work, hot stick work, or aerial work.  However, groundmen could assist journeymen in aerial work, by for example handing them materials and items from the ground.

Farfield did not perform any hot or energized work, nor hot stick work.  Farfield performed minimal aerial work, and more than 75% of the hours costed to aerial work were paid at a journeyman rate.

Further, the parties stipulated to numerous tasks and activities that groundmen could do, all based on the deposition testimony of Leach and Craig Zemaitatis, the Plaintiff's other expert/lay opinion witness who did not testify at the trial.  Finding of Fact 155, Stipulations 105-173, Tr. 24:23-30:8.

19

Parole evidence and testimony cannot be used to contradict the clear language of a collective bargaining agreement.  Not only is this a rule applicable to general contract interpretation, it has been specifically adopted and applied to labor collective bargaining agreements.  Further, practice cannot change or prevail over the clear language of the collective bargaining agreements.  *Hoteles Condado Beach v. Union De Tronquistas Local 901,* 763 F.2d 34(1985); *Phelps Dodge Copper Products Corp.,* 18 BNA LA 229 (1951); *Hertz Corp.,* 98 BNA LA 258 (1991); *Peabody Coal Co.,* 99 BNA LA 390 (1992); *BASF Wyandotte Corp.,* 84 BNA LA 1055 (1985); *Spartan Stores Inc.,* BNA LA 549 (1995); *Swanson Plating Co.,* 111 BNA LA 373 (1998); *Savannah Symphony Society,* 102 BNA LA 575 (1994).

In his Findings of Fact, the Special Master included findings related to IBEW Local 126's Collective Bargaining Agreements.  See Findings of Fact 161 to 166.  In Finding of Fact 164, he cited to Section 3:12 of the collective bargaining agreements.  In Finding of Fact 165, the Special Master stated:

> The Special Master finds that this clause providing that there are no restrictions, other than those in the collective bargaining agreement, on a signatory employer's right to choose "the number and kind of Employees to properly perform the work" on a project is not in conflict with the local area practices regarding the work a groundman can do and what work must be done by a journeyman.  An employer's *right* to choose which workers will do which work on a project is not the same thing as the established area *practice* regarding which workers should do which work.  Similarly, the fact that a collective bargaining agreement may not *prohibit* an employer from using groundmen (rather than journeymen) to perform particular tasks does not mean that using them in this manner is consistent with the actual *practice* in that area.

In Finding of Fact 166 the Special Master stated:

> The Special Master finds that local area practices not expressly contained in the Local 126 collective bargaining agreement preclude groundmen from installing electrical conduit, pulling electrical wire, or performing splices or terminations.  *(Citations omitted)*

20

Farfield notes that the above are not properly findings of fact but are conclusions of law, to which Farfield objects.

In his Conclusions of Law, the Special Master also discussed collective bargaining agreements and local union area practices.  Farfield objects to Conclusions of Law 6 through 11.

Conclusion of Law 6 states:

> It is well-established that where union contracts are the basis for a prevailing wage determination, as they are here, local union area practices on classifications determine what work falls under which trade classifications.  As a leading case explained, "where a wage determination is based on a collective bargaining agreement, the proper classification of employees is determined exclusively by the practices of the signatory unions."  *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059-62 (D.C. Cir. 2007) (citing *Fry Bros. Corp.*, 123 WAB No. 76-06 (June 14, 1977)); *see also United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. C. W. Roen Constr. Co.*, 183 F.3d 1088, 1093-94 (9th Cir. 1999).

In *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052 (D.C. Cir. 2007), a government contractor for bridge repainting projects filed suit against the Secretary of the Department of Labor, challenging the decision of the ARB that affirmed the decision of the ALJ withholding contract payments based on the contractor's violation of the Davis-Bacon Act by misclassifying employees and thereby paying less than prevailing wages.  This case was not a False Claims Act case.  The court determined that the contractor's claim "that it was arbitrary and capricious and contrary to Department regulations to rely on an area practice survey limited to one segment of the industry" was properly dismissed because "only the practice of the signatory unions was relevant to the Department's investigation."  *Id.* at 1059.  There was no mention in this case of a collective bargaining agreement provision similar to Section 3:12 cited above, nor of any conflict whatsoever with the collective bargaining agreement.

Conclusion of Law 6 inserts a purported fact which the Special Master never found, and for which there was no supporting testimony or Stipulation of the parties.  The first sentence

21

begins:  "It is well-established that where union contracts are the basis for a prevailing wage determination, as they are here. . . ."  That sentence asserts that union contracts are the basis for the wage determination in this case.  There was no testimony stating that.  The parties did not stipulate to that, and not surprisingly, the Special Master did not find that to be a fact in his Report.

IBEW Local 98 never proved that the Wage Determination for the Wayne Junction Project is based on a collective bargaining agreement.  Therefore there is no basis under the precedent cited by the Special Master for "the proper classification of employees to be determined exclusively by the practices of the signatory unions."

In *U.S. ex rel. Plumbers & Steamfitters Local Union No. 38 v. C. W. Roen Construction Co.*, 183 F.3d 1088 (9th Cir. 1999), cert. denied, 530 U.S. 1203 (2000), a union brought a qui tam action alleging that a contractor violated the False Claims Act by falsely certifying that it had paid piping workers on a federally-funded project the applicable prevailing wage as required by the Davis-Bacon Act and related federal laws.  The district court granted summary judgment in favor of the contractor.  The court of appeals reversed, noting that summary judgment was not appropriate where "further factual elucidation" was required:

> Questions regarding the precise manner in which the Department may or must determine prevailing wage rates and job classifications, the effect of the Department's post-hoc repudiation of earlier wage-rate determinations on the question of the falsity of previously submitted wage-rate certifications, the extent to which contractors may be deemed to have knowledge of the Department's actions, the type of certification that is appropriate if the contractor contends that no prevailing wage exists or that the classification issue remains unresolved, and the various other questions the resolution of which may be required before this case can be finally resolved are both difficult and insufficiently developed on the current record to allow for summary judgment.

Id. at 1095.

22

In this case, the court held that "an area practice survey is not a prerequisite to the determination of prevailing wage rates or job classifications."  Id. at 1094.  The court also noted that "there was nothing uncertain about the Department's efforts to establish the relevant wage classifications. . . .  The District Director of the Labor Department's Wage and Hour Division, in . . . letters to Plumber's counsel, made explicit that the 1992 Agreement established the prevailing practices . . . .  The letters could not have been clearer . . . ."  Id. at 1094.  This case does not in any manner hold that area practices supersede specific provisions of the collective bargaining agreement, and in fact holds that the collective bargaining agreement established the prevailing practices.

Conclusion of Law 7 states:

> While collective bargaining agreements governing the work at issue are the first place to look when union practices determine the local area practices for classification of work, "the industrial common law - the practices of the industry and the shop - is equally a part of the collective bargaining agreement although not expressed in it."  *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-82 (1960); *see also Conrail v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 311 (1989) ("it is well established that the parties' 'practice, usage and custom' is of significance in interpreting their agreement."  (citation omitted)).  "Under longstanding labor law principles, the scope and meaning of a collective bargaining agreement is not limited to the text of the agreement."  *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1046 (9th Cir. 2016).  "The essence of the CBA is derived not only from its express provisions, but also from the industrial common law."  *NFL Players Ass'n. v. NFL*, 831 F.3d 985, 993 (8th Cir. 2016) (citation omitted).  "Clear and long-standing practices of the parties — in other words, 'past practices'— can establish terms of the agreement that are as binding as any specific written provision."  *Muller v. GPO*, 809 F.3d 1375, 1383 (Fed. Cir. 2016) (citation omitted); *see also Abhe & Svoboda*, 508 F.3d at 1059 (noting that it is the practices of the relevant local union that govern classifications).

*United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574 (1960), was not about local area practices for classification of work.  In *United Steelworkers,* a union

23

sought to compel arbitration by an employer.  The Supreme Court held that where a collective bargaining agreement provided that if differences or any local trouble of any kind arose, the grievance procedure, including arbitration, should be applicable.  This was so despite the fact that the collective bargaining agreement contained a clause providing that matters that were strictly a function of management should not be subject to arbitration.  The Court determined that a grievance arising because the employer contracted out certain work previously done by its employees was subject to arbitration.  This case was not a False Claims Act case, a Davis-Bacon case or a prevailing wage case.  The quote utilized by the Special Master regarding "the industrial common law" was made in the context of discussing a labor arbitrator's source of law, not which workers should be classified in a particular trade for a construction project.

In Conrail v. Railway Labor Executives' Ass'n, 491 U.S. 299 (1989), Conrail unilaterally changed its employee drug testing requirements.  A union organization representing Conrail's employees opposed the change.  Special dispute resolution rules govern the railway industry under the Railway Labor Act.  The procedure varies depending whether the dispute seeks to create contract rights (called a major dispute) or enforce contract rights (called a minor dispute).  The Supreme Court was required to determine if the opposed unilateral change was a major or minor dispute.  Neither Conrail nor the union relied on any express provision of any collective bargaining agreement and no union contract was of record.  491 U.S. at 311.  Conrail had a history of drug-testing employees for various purposes.  The Court looked at the history of drug testing and concluded that the dispute was a minor one.

The Special Master uses language from the Conrail case in an apparent effort to bolster his argument that Local 126's practice supersedes Local 126's collective bargaining agreement, but Conrail does not do that.  Conrail was not about local area practices for classification of

24

work.  In *Conrail*, there were no express drug-testing terms in a union contract, and the Court had to determine if the dispute was to enforce or to create contract rights, to thus determine which resolution procedure applied.  In *Conrail*, the employer's history of drug testing neither superseded nor varied express language in a collective bargaining agreement, and the Special Master's effort to enable purported local practice to supersede or change the Local 126 contract is unavailing.

There were three consolidated cases in *Kobold v. Good Samaritan Reg'l Med. Ctr.,* 832 F.3d 1024, 1046 (9th Cir. 2016).  One involved a nurse (Allen) who was employed by a health plan that was owned by a parent entity that also owned a physician practice group.  The parent organization had a Manual that addressed credentialing of health care professionals such as the nurse.  The Manual designated board members of the physician practice group as the Credentials Committee.  There were some perceived deficiencies in Allen's performance and she did not cooperate with the Credentials Committee.  The Credentials Committee recommended that the nurse not be re-credentialed, which effectively terminated her employment.  Allen's collective bargaining agreement required just cause for her termination.  Allen's union filed a grievance, which was arbitrated.  The arbitrator found the Credentials Committee violated the just cause standard and concluded that Allen's failure to cooperate with the Committee was excusable because she was on vacation.

The arbitrator reinstated Allen and she then filed a complaint for among other things, the physician group intentionally interfering with her employment, which employment was under the collective bargaining agreement with the health plan.  The issue then became which of her litigation claims were preempted by the federal Labor Management Relations Act, 29 U.S.C. Section 185.  To rule on the preemption argument, the court looked at the dependence of the

25

interference claim on the collective bargaining agreement and the collective bargaining agreement's application by the arbitrator. In reviewing the arbitrator's decision, the court in passing stated that the scope and meaning of a collective bargaining agreement is not limited to the text of the agreement. That language was picked up by the Special Master in his Report. In *Kobold*, the arbitrator of Allen's claim applied the just cause standard and did not rely on any practice that was contrary to the collective bargaining agreement language. The Special Master's conclusion is contrary to *Kobold* and relies on testimony that was contrary to the specific language in IBEW Local 126's collective bargaining agreements in evidence in this case. Consequently, *Kobold* provides no basis for the Special Master's Conclusion of Law.

In *NFL Players Ass'n v. NFL*, 831 F.3d 985 (8th Cir. 2016), the National Football League (NFL) imposed a monetary sanction on Minnesota Viking Adrian Peterson arising from Peterson beating his four-year old son. The NFL's collective bargaining agreement with the players' union authorized the NFL Commissioner to impose discipline for conduct detrimental to professional football. The NFL players union challenged the sanction in arbitration, claiming that the arbitration precedents in effect when Peterson committed the beating were less severe. Although Peterson's sanction was more severe than some in the past, his conduct was egregious and past sanctions had not sufficiently deterred misconduct such as Peterson's. The arbitrator looked at the NFL policy, written communication about it and prior arbitration decisions, and concluded that the discipline on Peterson was appropriate. The Third Circuit affirmed.

In *NFL Players Ass'n*, there was no policy or practice that was contrary to the collective bargaining agreement, and neither the arbitrator nor the court ruled that a union may have a policy or practice that is contrary to the union's collective bargaining agreement.

26

In *Muller v. GPO*, 809 F.3d 1375 (Fed. Cir. 2016), Raymond Muller was demoted in his job with the U.S. Government Printing Office (GPO).  His union filed a grievance under his union collective bargaining agreement with the GPO.  GPO asserted that the grievance should be dismissed because arbitration did not take place fast enough under the terms of the collective bargaining agreement.  The Special Master cites *Muller* for dicta that past practice can establish the terms of an agreement.  The actual decision in *Muller*, however, recognized that there was no pertinent past practice and therefore none contrary to the collective bargaining agreement.  This case does not support a Conclusion that is inconsistent with and contrary to the specific language in IBEW Local 126's collective bargaining agreements.

The Special Master's final citation for Conclusion of Law 7 is *Abhe*, *supra*.  In *Ahbe* there was no evidence that any union practices were inconsistent with any collective bargaining agreement, contrary to this case.

The cases cited by the Special Master in Conclusion of Law 7 dealt primarily with arbitration situations where the arbitrator's source of law was being discussed.  None of them support the conclusion that a party can look to local practice to avoid and supersede explicit provisions of a collective bargaining agreement.

Conclusion of Law 8 states:

> The Third Circuit has noted that it "is well established that industry or shop practices form part of the collective bargaining agreement." *Connors v. Consolidation Coal Co.*, 866 F.2d 599, 603 (3d Cir. 1989); *see also Rosano v. Township of Teaneck*, 754 F.3d 177, 190-91 (3d Cir. 2014) (holding that "practice, usage and custom" must be considered in interpreting obligations under a collective bargaining agreement).

In *Connors v. Consolidation Coal Co.*, 866 F.2d 599 (3d Cir. 1989), Consolidation Coal Company (Consol) was obligated by a collective bargaining agreement to contribute to union benefit funds for its employees.  The payments were based on hours worked.  Under the

27

collective bargaining agreement, employees were paid for a one-half hour lunch period per shift. Sometimes employees worked through their lunch breaks. The funds claimed that Consol owed the funds money for the worked lunch time. Consol claimed it did not have to pay because it already paid into the funds when it paid the employees for the non-worked half hour. The funds asserted that the money sought was for an extra half hour worked that was beyond the employee's normal shift requirement. In reaching its decision to require payment, the court looked at industry practice in which employers paid into the funds when employees worked through their lunch breaks.

In *Rosano v. Township of Teaneck*, 754 F.3d 177 (3d Cir. 2014), police officers sought overtime pay for muster time (meetings and roll call before and after their shifts) and donning and doffing (putting on and removing their uniforms before and after muster time). The court found that the collective bargaining agreement included muster time in the officers' base pay. Since the collective bargaining agreement was silent on donning and doffing the court looked to custom and practice to interpret the collective bargaining agreement. The court found that custom and practice did not require payment for donning and doffing time.

In the cases cited by the Special Master, when the court used custom and practice to interpret a collective bargaining agreement, the custom and practice was not inconsistent with the collective bargaining agreement. The Special Master, however, has not followed those cases. Section 3:12 of IBEW Local 126's collective bargaining agreements states that the employer "shall have no restrictions, except those specifically provided for in the collective bargaining agreement, . . . in deciding the number and kind of Employees to properly perform the work . . . ." *Exhibits D-11, D-12, D-13 and D-14.* Thomas Leach, Plaintiff's witness from IBEW Local 126 testified that custom and practice prohibits groundmen from doing work that

28

they are actually allowed to do by the terms of the IBEW Local 126 collective bargaining agreements.  The cases relied on by the Special Master did not allow custom and practice to contradict the express terms of the collective bargaining agreement, and neither should this Court.

Conclusion of Law 9 states:

> Following these principles, a district court in this district rejected an employer's arguments that an arbitrator's awarding of work to a particular class of employees was not derived from the language of the contract and was contrary to the management rights clause of the contract, noting that "custom and past practice (the so-called 'law of shop') also play a fundamental role in the interpretation" of collective bargaining agreements.  *PPL Servs. Corp. v. IBEW*, Local 1600,  No. 11-3273, 2012 U.S. Dist. LEXIS 170075, at *14 -*18 (E.D. Pa. Nov. 29, 2012); *see also id.* at *26 ("it is [a] violation of its CBA with IBEW for PPL to assign overtime work to one classification of employee over another classification of employee when that work has *usually and customarily* been performed by the other classification" (emphasis in original)).

The Special Master took some liberty in citing to *PPL Servs. Corp.*  What the Special Master quoted did not include the full sentence from the opinion, which opinion uses words different from what the Special Master inserted.  The *PPL Servs. Corp.* court did not include in its opinion "collective bargaining agreement."  Instead the opinion used "arbitration agreements," and the actual sentence in *PPL Servs. Corp.* was:  "In other words, custom and past practice (the so-called "law of shop") also play a fundamental role in the interpretation of arbitration agreements."

*PPL Servcs. Corp.* arose from annual maintenance for a nuclear power facility.  During the maintenance, Steno/Clerks had historically handled the processing of maintenance personnel who accessed the facility.  PPL implemented a bar code scanning system to improve efficiency in the access processing work, but did not provide the brief training Steno/Clerks needed to use the new system.  Instead, during overtime, PPL trained Special Temporary–Clerk/Steno

29

employees for that, and they began access processing.  A Steno/Clerk who claimed the right to do the processing based on past practice filed a grievance and the arbitrator ruled in her favor.

The *PPL Servs. Corp.* court acknowledged:  "If a collective bargaining agreement that is reached between an employer and its employees includes an arbitration clause, it is assumed that having an arbitrator interpret the agreement is the parties bargained for and preferred method of resolving a grievance."  *PPL Servs. Corp. supra* at \*3.  The court further stated:  "As a general rule, district courts must enforce an arbitration award as long as 'it was based on an arguable interpretation and/or application of the collective bargaining agreement, and may only vacate it if there is no support in the record for its determination or if it reflects a manifest disregard of the agreement, totally unsupported by principles of contract construction.'"  *Id.*

In an effort to vacate the arbitration award, PPL argued that the collective bargaining agreement allowed management to introduce new methods to improve efficiency and to determine which employees will be used to perform them.  The court declined to vacate the award and rejected that challenge for two reasons.  First, PPL did not raise this argument before the arbitrator.  Second, the Management Rights Provision was inapplicable because it had nothing to do with PPL's obligations to existing employees like the Steno/Clerks and the assignment of work within the bargaining unit, so the custom and past practice was not contrary to the CBA.  *Id.* at \*9.

Conclusion of Law 10 states:

> Where a classification practice may be "identifiable" in a local area, but is not the "prevailing" practice, it should not govern classification determinations.  *See, e.g., Building & Constr. Trades' Dep't v. Donovan,* 712 F.2d 611, 624-26 (D.C. Cir. 1983).  Thus, whereas laborers may in some circumstances and in some areas install conduit and pull wires, this is not the local area practice in the Philadelphia area and does not govern the classification of this work on the Wayne Junction Project.

30

The Wage Determination that is part of the Wayne Junction Project Contract identifies

the Laborer classifications as prevailing.  Further, Plaintiff's expert Leach testified that the local

union practice in the Philadelphia area was for Laborers to install conduit and pull wire.  Leach

testified as follows:

> Q:  Mr. Leach, you provided some testimony with regard to the conduit process, the laying of conduit, an hour or so ago.
>
> Based upon your personal knowledge, is that work performed by or permitted to be performed by any other trades or unions outside of Local Union Number 126?  In this jurisdiction of course.
>
> A:  Let me answer, other trades do install conduit.  I would not use the term "permitted."  The IBEW has always been very much against other trades installing electrical apparatus, and that includes electrical conduits.
>
> Q:  What about the pulling of wire?  Based upon your knowledge of the industry areas and practices, may that wire pull, as you described the process earlier in your testimony, be performed by any classifications outside of Local 126?
>
> A:  We're adamantly against that.  We think it should be done by electrical workers and signatory electrical contractors.
>
> Q:  I know you don't want it but –
>
> A:  It is done by others.
>
> Q:  In the union industry, in the union industry practices, do any other trades perform that work?
>
> A:  Yes.
>
> Q:  Who?
>
> A:  Laborers.

*Leach*, Tr. 788:24-790:3.

There was no evidence at trial that the prevailing practice in the Philadelphia area was

that Laborers did not install conduit or that Laborers did not pull wire.

31

To the extent the Davis-Bacon or any related act applies, the Department of Labor issues a Wage Determination of "prevailing wages" for the applicable job classifications similar to the contract work in the local areas where such work is to be performed.  29 C.F.R. §1.1.  For the Wayne Junction Project, "Laborer" is a classification in the Wage Determination.  *Exh. P-25, page IBEWT 0020354-0020355.*  The Special Master does not have the authority to erase, ignore or minimize that.

The Special Master cites to *Building & Constr. Trades' Dep't v. Donovan*, 712 F.2d 611 (D.C. Cir. 1983), *cert. denied,* 464 U.S. 1069 (1984), but that case is irrelevant because it stands for the proposition that the Department of Labor cannot create a classification that is not prevailing.  In this case, Farfield never asked the court to create a non-prevailing classification.  The Laborer classification was in the Wage Determination, so it had already been determined to be a prevailing classification.

In *Building & Construction Trades' Dep't, AFL-CIO v. Donovan*, unions brought an action seeking an injunction against implementation of new regulations adopted by the Secretary of Labor under the Davis-Bacon Act and the Copeland Anti-Kickback Act.  The concept mentioned by the Special Master that a classification that is merely "identifiable" in a local area, but not the "prevailing practice," should not govern classification determinations was part of the court's discussion of a proposed regulation regarding semiskilled helpers on federal projects.  The court of appeals affirmed the district court's decision that the provision allowing the use of helpers if that classification is "identifiable" in the area was invalid.  In the present matter, Plaintiff's expert Leach testified that the ***local union practice*** was that the Laborers union also installed and laid conduit and pulled wire, not just IBEW Local 126.

32

Thomas Leach was IBEW Local 98's only expert.  He was allowed to testify as an expert "on electrical construction in the trade jurisdiction by IBEW Local 126."  *Special Master's Ruling,* Tr. *724:15-22.*  He was permitted to testify as an expert only on electrical construction by IBEW Local 126 in its trade jurisdiction.  Leach did not qualify as an expert in prevailing wage or prevailing construction practices in the Philadelphia area.  He did not qualify to testify to prevailing practices at all or to any construction not done by IBEW Local 126.  He testified to what IBEW Local 126 did.  He did not testify as an expert as to what other trades did, and he did not testify as an expert as to prevailing practices of other trades in the Philadelphia area.  He conceded that IBEW Local 126 does not work with laborers, so he provided no basis on which anyone can conclude specific work relevant to this case could not be performed by laborers.  *Leach,* Tr. 862:21-863:11.  Nevertheless, he admitted that the local union practice was that laborers lay conduit and pull wire.  *Leach*, Tr. 788:24-790:3.

Since the determination of prevailing wages, and the practices of the various classifications is made by the USDOL, the USDOL would have been the source for Plaintiff to use.  Plaintiff presented no evidence from the USDOL as to what work classifications were prevailing or what laborers or groundmen were permitted to do on the Wayne Junction Project.

Conclusion of Law 11 states:

> Farfield did not adhere to local area practices regarding which classifications of workers could install electrical conduit, pull wires or cables, and perform electrical terminations.

Farfield objects to Conclusion of Law 11 for the reasons set forth in detail and discussed above.  The record evidence does not support this conclusion of law, and it is directly contrary to the prevailing wage determination set forth in the SEPTA contract, to the explicit and specific

33

language of IBEW Local 126's collective bargaining agreements, or to Leach's testimony admitting that non-journeyman laborers install conduit and pull wires and cable.

Farfield's classification of groundmen on the Wayne Junction Project was in full compliance with the IBEW collective bargaining agreements. Further, every crew had a journeyman as its foreman, who was always present and working with his crew, except for a minimal number of times throughout the four and one half years of the project. Usually there were multiple journeymen on a crew. With the journeyman present with the crew, the use of groundmen to assist the journeyman in all tasks performed on the Project was in total conformity with the IBEW collective bargaining agreements, as well as the numerous stipulations of the parties. Alleged unwritten local practices which directly contradict the clear language of the collective bargaining agreements cannot be credited, nor constitute a misclassification by Farfield of its employees.

If one of the IBEW Local 126 union contractors signatory to the collective bargaining agreements had classified its employees as groundmen and used them for the same tasks that Farfield did, it could not be held to violated the collective bargaining agreement. Farfield cannot be held to a different standard. Certainly, Farfield cannot be held to have recklessly disregarded its obligations under the Davis-Bacon Act when it acted in full conformity with the specific and explicit language of IBEW Local 126's collective bargaining agreements.

According to Leach, IBEW Local 126 is adamantly against anyone other than Local 126 union signatory contractors installing conduit or pulling wire – and that includes the Laborers Union as well as all non-union contractors, such as Farfield. *Leach* Tr. *788:24-790:3.* Obviously, this is not and cannot lawfully be the standard and prevailing practice under the Davis-Bacon Act. Just because IBEW Local 126 is adamantly against it and only wants union

34

contractors who are signatory with IBEW Local 126 to do this work does not and cannot lawfully establish the practice.

Leach admitted that under local union practice laborers also install and lay conduit and pull wire. Laborers do not have any electrical training and do not go through a journeyman electrical apprenticeship program. Thus, under local union practice, according to Plaintiff's expert witness, a worker does not have to be a journeyman electrical worker to install and lay conduit or pull wire. If under local union practice a non-journeyman laborer can install and lay conduit and pull wire, and an electrical worker under IBEW Local 126 can also install and lay conduit and pull wire, then a groundman – who is an electrical worker under IBEW Local 126 - can certainly install and lay conduit and pull wire. A conclusion that either Laborers or only Journeyman under IBEW Local 126 can do so is contrary to the record evidence, to logic, and to the specific language in IBEW Local 126's collective bargaining agreements. Farfield cannot be held to have misclassified its employees or recklessly disregarded the Davis-Bacon Act because groundmen helped install conduit and pull wire with journeymen present and in charge as the foremen on the crews.

### D. Farfield was Aware of SEPTA Discussions with Employees.

In addition to the USDOL audit on the Wayne Junction Project, Farfield managers were aware that SEPTA personnel investigated and questioned Farfield workers about their pay rates and classifications on the Project. SEPTA never raised any issues of improper pay with Farfield, nor did SEPTA at any time withhold payment of any invoices on the Project. SEPTA was also aware of the USDOL audit. This further confirmed Farfield's managers and supervisors belief that they were in compliance with the SEPTA Contract Davis-Bacon Act requirements.

35

**E.    The Other Five Projects in the Original and Amended Complaints were Dismissed with Prejudice, Demonstrating that Farfield does not Recklessly Disregard the Davis-Bacon Act.**

The original Complaint filed by Plaintiff IBEW Local Union 98 alleged that Farfield intentionally violated the False Claims Act by misclassifying employees on six different projects – Washington Metropolitan Area Transit Authority ("WMATA"); Girard Avenue Infrastructure Renewal Project ("Girard Project"); PATCO Egress Lighting Project ("PATCO"); SEPTA Project 5004, Wayne Junction to Glenside and Signal Contract ("Wayne Junction"); and SEPTA Project 5005, Smart Stations Projects I and II ("Smart Stations"). *See ECF 1* (9/17/09). Local 98 deleted the allegations concerning the WMATA project in its Amended Complaint. *ECF 30* (2/3/12).  The allegations and claims concerning the other five projects remained in this case until this Court directed Plaintiff to withdraw with prejudice all except those relating to the Wayne Junction Project, which was not finally accomplished until the Court entered an Order in May 2019. *See ECF 173* (5/21/19).  Three of these projects preceded the Wayne Junction Project, and all were run by McGee, Sr., in the Transit Division.  Farfield would not recklessly disregard its obligations under the Davis-Bacon Act on the Wayne Junction Project while following them on all of its other projects.  As noted above, honest mistakes do not constitute reckless disregard or a violation of the False Claims Act.

**F.    "Close Questions of Fact and Law" Do Not Equal Reckless Disregard**

The Special Master stated:  "there are a number of close questions of fact and law." Special Master's Report, p. 5.  The Special Master concluded that that bulk of the work in question was journeyman work, "but this is a closer question" and as result provided factual findings and conclusions of law on two alternate theories:  1) that this work was journeyman work, and 2) that this work was both laborer and journeyman work. *See* Special Master's Report, p. 8.  If it is such a close question, then the Plaintiff has not sustained its burden of proof.

36

If it is such a close question, and Plaintiff's expert witness Leach admitted that ***the local union industry practice*** is that Laborers union workers could perform the work in question, then this proves that it is not necessary for a journeyman lineman from the electrical workers union to safely and properly perform the work.  To the contrary, it proves that a non-journeyman classification can perform the work – either under the Laborers classification wage rate in the prevailing wage determination, or under the IBEW Local 126 electrical worker Groundman classification wage rate in the prevailing wage determination.

    If it is such a close question, then Farfield cannot be found to have recklessly disregarded the law.

### G.   Farfield Paid its Employees More Than Required Under the Prevailing Wage Determination, in Total Amounts Much Greater Than the Underpayments in the Special Master's Report.

    Farfield paid its employees at wage rates higher than required under the Davis-Bacon Act, as well as for offsite hours that it could have paid at the lower "shop" rate.  Farfield paid various workers including journeymen more than it was required to under the SEPTA contract and the DBA.  Considering that Farfield paid significantly more to its employees than what was required, any misclassification based on limited specific tasks was legitimate and inadvertent. Conservatively estimating 54,000 hours and a difference of $5.33 per hour between the journeyman electrician rate and the journeyman lineman rate, Farfield could have paid its employees paid as journeyman electricians at least $287,828 less on the Wayne Junction Project than it did.  Conservatively estimating 25,000 hours and a difference of $6.38 per hour between the laborer rate and the groundman rate, Farfield could have paid its employees paid at the laborer rate at least $159,500 less on the Wayne Junction Project than it did.

37

The above amounts do not include the hours which Farfield could have paid its journeyman at the groundman rate for digging, trenching, clearing and grubbing, shoveling, shoring, loading and unloading materials and equipment, and similar tasks, and for the nonproductive time spent in daily briefings and waiting for trains to pass.

Farfield also paid employees more than it was required for offsite work.  Farfield could have paid between an average of 1.5 to 2 hours every day - spent traveling offsite to and from the worksite and loading materials and equipment at its offsite Olney yard - at the employee's shop rate, which was significantly less than the prevailing wage rate paid.  Farfield could have paid its employees at the shop rate for threading and bending galvanized rigid steel conduit, because the threading and bending was not done on the site of construction.  *Exhibit P-25, page IBEWT 0020324, Section 7a(1) first sentence*.

Such actions by Farfield are inconsistent with a conclusion that Farfield acted in reckless disregard of its obligations under the Davis-Bacon Act.  If Farfield did not care about compliance and was trying to "cheat" SEPTA or save money, it would never have paid its employees at rates significantly higher than required, nor would it have paid for time worked offsite at the prevailing wage rate.  The additional amounts Farfield knowingly and willingly paid its employees far exceed the amounts which the Special Master concluded Farfield underpaid its employees.

Farfield knew that it was a target of the IBEW, that the IBEW did not want Farfield as a competitor to union companies, that the IBEW had unsuccessfully tried to get Farfield to become a unionized company, and that the IBEW routinely obtained certified payrolls of Farfield on public projects to see if Farfield made any mistake in paying workers.  Farfield understood that if there were any intentional mistakes on its certified payrolls or violations of the prevailing wage

38

acts, Farfield could be debarred from working on public (government or government-related) projects. Since almost of all of Farfield's work is and has been public projects, getting debarred would put Farfield out of business, so Farfield was careful to pay workers the proper amounts. Farfield routinely held management meetings for managers and superintendents and discussed the prevailing wage laws and the importance of complying with the prevailing wage laws.

### H.   IBEW Local 98 Did Not Prove That a Farfield Employee Acted Knowingly.

A False Claims Act Plaintiff "must prove an entity's scienter by demonstrating that a particular employee or officer acted knowingly. *United States v. Fadul*, 2013 WL 781614 *9 (D. Md. 2013). Plaintiff has not proven that a particular employee or officer of Farfield acted knowingly. To the contrary, the Special Master found that Farfield's managers and supervisors believed that groundmen could do what journeymen linemen were doing.

For the reasons discussed above throughout this Section I, the Defendant objects to Conclusions of Law 15 through 17.

## II.   IBEW LOCAL 98 DID NOT PROVE THE MATERIALITY OF THE ALLEGED FALSE RECORD OR STATEMENT.

Defendant objects to the Special Master's recommended Conclusions of Law 21, 22 and 23.

In Conclusion of Law 21, the Special Master cites two pages from the SEPTA contract in support of his conclusion that "Farfield's statements of compliance with the SEPTA contract and federal prevailing wage laws in its certified payrolls were **hardly immaterial**." (*Emphasis added)* First, one of the elements under the FCA is "materiality." Concluding that something is "hardly immaterial" is not the same as finding, affirmatively, that it is "material." Second, the two citations to the contract both refer to permissive, rather than mandatory, action: "the FTA **may** . . . take such action as may be necessary to cause the suspension of any further

39

payment . . . " and "a breach of the contract clauses in 29 CFR 5.5 **may be grounds** for termination of the Contract, and for debarment as a Contractor . . . " *Exhibit P-25A at 243591, 243595 (emphasis added).* As these provisions are not mandatory, in order to prove materiality testimony from SEPTA or other government officials would be necessary to prove that Farfield's allegedly false statements of compliance were material to SEPTA's decision to pay Farfield. Plaintiff provided no such evidence.

To the contrary, Defendant presented testimony that SEPTA audited and talked to Farfield's employees about their classifications and pay and never raised any issues with Farfield, and paid all invoices for the Project. Findings of Fact 16, 17, 59; Stipulation 175, Tr. 30:12-13. SEPTA also knew about the USDOL audit of Farfield, never raised any issues, and paid all invoices. SEPTA also knew about the False Claims Act case, never raised any issues, and continued to award contracts to Farfield and pay invoices through the date of trial in this matter in 2019, more than 15 years later.

In Conclusion of Law 22 the Special Master states:

> Certified payrolls containing required statements of compliance with prevailing wage requirements are submitted in order to obtain government payments and therefore those statements are material. *United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Invs.,* LLC, 828 F.3d 587, 592 (7th Cir. 2016).

Nowhere in *United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Invs., LLC,* does it say that certified payrolls containing required statements of compliance with prevailing wage requirements submitted to obtain government payments are material. The Special Master's conclusion is contrary to binding Supreme Court precedent. *Universal Health Services, Inc. v. United States ex rel. Escobar, 136 S. Ct. 1989 (2016).* In *Escobar* the Court held: "A misrepresentation cannot be deemed material merely because the

40

Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment." *Id.* at 2003. Under *Escobar*, the mere fact that a government designates that a certified payroll be submitted as a condition of payment, does not make a misrepresentation in that statement material. It is up to a Plaintiff to prove materiality. Neither a Special Master nor a Court may assume materiality. One way a Plaintiff might prove materiality is by the testimony of an appropriate government employee explaining why it is material. IBEW Local 98 presented no such proof.

The *Horning* case cited by the Special Master actually supports Farfield's position. Horning was a roofing subcontractor and the union claimed that Horning underpaid employees on a federal government project in violation of the Davis-Bacon Act. In Horning, as in the present case, if the union believed that workers were underpaid, the union could have taken its claim to the Department of Labor.

> Horning may, or may not, have violated the Davis-Bacon Act. But the Union did not bring a claim under that statute. Instead, it sued under the False Claims Act, which requires proof that the defendant knowingly submitted a false claim to the government for payment.

*Horning,* 898 F.3d at 595.

> By choosing the False Claims route, the Union undertook to show that Horning knowingly made false statements (or misleading omissions of the type described in *Universal Health Services*) that were material to the government's payment decision. We conclude that the Union did not proffer enough evidence to permit a reasonable jury to conclude that Horning acted with the requisite knowledge.

*Id. at* 589.

By choosing the False Claims route, Plaintiff Local 98 assumed burdens that it did not satisfy and this conclusion of law is not supported by any record evidence.

In Conclusion of Law 23, the Special Master cited *United States ex rel. Doe v. Heart Solution, PC,* 923 F.3d 308 (3d Cir. 2019), for the proposition that "because the truth or falsity of

41

the statements was important to the determinations of whether Farfield would continue to be paid, whether the contract would not be suspended, and whether Farfield would remain eligible for government contracts, the statements suffice to demonstrate both materiality and causation."

In *Doe*, the Third Circuit determined that the materiality element had been satisfied because the government met its burden when it submitted that, pursuant to the relevant Medicare regulation, Medicare would not pay the claims at issue in the absence of the required certification.  *Id.* at 318.

In the Farfield case, Local 98 presented no evidence to show that the truth or falsity of the certified payrolls were material to SEPTA's decision to pay.  The Special Master's conclusion that the truth or falsity of the statements was important to the government's determinations is not supported by any actual evidence.  Nor are these Conclusions supported by any Findings of Fact. As noted above, a finding that something is "hardly immaterial" is not the same as a finding that it is actually "material."

In *Doe,* the Third Circuit criticized the district court for failing to apply the Supreme Court's *Escobar* decision.  In *Escobar*, the Supreme Court held that materiality is an element of all FCA claims, regardless of whether the specific statutory provision lists materiality as an element.  The Third Circuit explained:

> The Court then provided guidance on how the materiality requirement should be applied.  It explained that a misrepresentation is not material merely because the government designates compliance with a particular regulatory requirement as a condition of payment or because "the Government would have the option to decline to pay if it knew of the defendant's noncompliance [with the regulation]."  In fact, it is "very strong evidence" that a requirement is not material "if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated."  Thus, materiality "cannot be found where noncompliance is minor or insubstantial."  On the other hand, materiality may be found where "the Government consistently refuses to pay claims

42

> in the mine run of cases based on noncompliance with the particular
> statutory, regulatory, or contractual requirement."

*Doe*, 923 F.3d at 317-318 (citing *Escobar*, 136 S. Ct. 1989, 2002-2003). Thus, materiality

cannot be assumed based on lack of compliance with a particular regulatory requirement. This is

exactly what the Special Master did when he stated that, under the SEPTA contract, "payment to

Farfield **could have been** withheld or suspended" or that "Farfield's contract **could have been**

terminated." Conclusion of Law 21. The *Escobar* case specifically stated that this is

insufficient:

> A misrepresentation cannot be deemed material merely because the
> Government designates compliance with a particular statutory, regulatory,
> or contractual requirement as a condition of payment. **Nor is it sufficient
> for a finding of materiality that the Government would have the
> option to decline to pay if it knew of the defendant's noncompliance.**
> Materiality, in addition, cannot be found where noncompliance is minor or
> insubstantial."

*Escobar* at 2003 (citations omitted)(emphasis added). There is no evidence, as required by

*Escobar*, that Farfield's alleged noncompliance with the certification requirement **would have**

affected SEPTA's decision to pay. Again Plaintiff IBEW Local 98 could have provided

testimony from a SEPTA or other government employee explaining why it is material, but did

not do so.

   *Escobar* also held that it is "very strong evidence" that a requirement is not material "if

the Government pays a particular claim in full despite its actual knowledge that certain

requirements were violated." In this case, as stated above, SEPTA was aware of the DOL audit

of Farfield. Despite this awareness, SEPTA never questioned Farfield about its compliance with

the prevailing wage laws and never withheld payments from Farfield. While SEPTA may not

have had actual knowledge that requirements were violated (indeed, Farfield maintains that no

requirements were violated), it was at least on notice of a possible violation due to the audit, but

43

yet took no action, and continued to pay Farfield.  This is yet another factor leading to the conclusion that the materiality element of Plaintiff's FCA's claims has not been proven.

"A False Claims Act violation includes four elements:  falsity, causation, knowledge, and materiality."  *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017) (citing *Escobar*, 136 S. Ct. 1989, 1996).

"The materiality standard is demanding.  The False Claims Act is not 'an all-purpose antifraud statute,' . . . or a vehicle for punishing garden-variety breaches of contract or regulatory violations."  *Escobar, supra*, at 2003 (citing *Allison Engine Co. v. United States,* 553 U.S. 662, 672 (2008)).  This standard is "demanding" and "rigorous."  Further, a material misrepresentation "is one that goes 'to the very essence of the bargain.'"  *Petratos*, *supra, at* 489 (citing *Escobar*); *United States ex rel. Cressman v. Solid Waste Services, Inc.*, 2018 WL 1693349, *5 (E.D. Pa. 2018).

"Federal courts have recognized that there is a "heightened materiality standard" after *Escobar*.  See *Petratos, supra*, 855 F.3d at 492-493 (citing cases from other circuits).

"In the Third Circuit, that the Government established an administrative mechanism for addressing violations of the statutes or regulations at issue is also relevant to the materiality inquiry."  *United States ex rel. Schimelpfenig v. Dr. Reddy's Laboratories Limited*, 2017 WL 1133956, *7 (E.D. Pa. 2017) (noting that the False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations).  The USDOL has an administrative mechanism to enforce compliance with wage and hour laws.  It was invoked on the Wayne Junction Project, but the USDOL took no action against Farfield based on its classification or pay of groundmen and laborers.

44

In the Farfield case, trial has occurred and Plaintiff IBEW Local 98 has presented no evidence of materiality.  Further, the Special Master has made no Findings of Fact with respect to any evidence supporting a conclusion of materiality.  Under *Escobar*, mere non-compliance with Davis-Bacon and Related Acts is insufficient to succeed on a claim under the False Claims Act (FCA).

The United States has declined to intervene in this civil action.  That in itself is evidence of non-materiality.  *United States ex rel. Cressman v. Solid Waste Services, Inc.*, 2018 WL 1693349 at *6 (E.D. Pa. 2018)

Farfield presented evidence that the alleged violations were not material for FCA purposes.  Farfield demonstrated that the USDOL and SEPTA both audited Farfield concerning wages paid and that the only action taken against Farfield was a requirement to pay four carpenters for the Labor Day holiday at the higher prevailing wage rate rather than the shop rate since the holiday was listed in the Wage Determination.  Neither the USDOL nor SEPTA took action against Farfield concerning the pay and classification of laborers and groundmen, even though both the USDOL and SEPTA interviewed employees and asked them about their pay rates and classifications.

After Farfield was audited for the Wayne Junction Project, SEPTA continued to pay Farfield for work on the Wayne Junction Project, and never raised any complaints or issues about employee classifications.  *See Special Master Findings of Fact 16 and 17.*

After the Wayne Junction Project was completed, SEPTA engaged Farfield on other projects and paid Farfield for its work on those projects, continuing for projects through the date of trial in 2019, more than 15 years after the USDOL audit.

45

The SEPTA contract was in the amount of $54,700,000, before change orders.  *See*

Finding of Fact 15.  The total underpayment amount concluded by the Special Master was either

$159,273.54, or in the alternative $52,521.77.  Conclusions of Law 33 and 39.  This is a tiny

fraction of the value of the Contract – either .0029 or .00096 – hardly a material amount.

Farfield's evidence, although sufficient to prove non-materiality, was not required.  The

burden to prove materiality remained at all times on Plaintiff, and Plaintiff failed to meet that

burden of proof.

## III. CERTIFIED PAYROLLS ARE NOT CLAIMS UNDER THE FALSE CLAIMS ACT.

Defendant objects to the Special Master's Conclusions of Law 36, 37, 38 and 39.

Under the current version of the False Claims Act ("FCA"), the term "claim" is defined

as follows:

(2) the term "claim"—

    (A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

        (i) is presented to an officer, employee, or agent of the United States; or

        (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

            (I) provides or has provided any portion of the money or property requested or demanded; or

            (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

    (B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal

46

employment or as an income subsidy with no restrictions on that
individual's use of the money or property;

31 U.S.C. § 3729(b)(2).  Under the pre-2009 version, the definition was as follows:

(c) **Claim defined**.— For purposes of this section, "claim" includes any request
or demand, whether under a contract or otherwise, for money or property which is
made to a contractor, grantee, or other recipient if the United States Government
provides any portion of the money or property which is requested or demanded, or
if the Government will reimburse such contractor, grantee, or other recipient for
any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(c).

In his Findings of Fact and Conclusions of Law, the Special Master determined that there
were either 105 or 99 weeks in which certified payrolls contained false statements.  When
calculating the amount of civil penalties in this case, he multiplied the minimum civil penalty of
$5,500 by 105 "violations" for a total of $577,500, or by 99 week for a total of $544,500.
Conclusions of Law 33, 36, and 39.

The Special Master's determination in this regard is in error because the certified payrolls
do not constitute "claims" under the False Claims Act.  The certified payrolls do not constitute a
"request or demand . . . for money."  Instead, Farfield submitted monthly invoices to SEPTA in
which it sought payment and money for its work on the Project.  Though Farfield maintains that
it has not violated the FCA, if Farfield is liable under the FCA in this case, then the monthly
invoices that relate to the certified payrolls with alleged false statements are the "false claims"
under the Act.  The $5,500 civil penalty should be multiplied by this number of invoices, not by
105 or 99, which is the number of allegedly false certified payrolls.

The issue of how to determine the number of "claims" subject to the civil penalty has
been addressed in numerous court decisions, including by the United States Supreme Court in
*United States v. Bornstein*, 423 U.S. 303 (1976).  In that case, the Court discussed the fact that
the False Claims Act offers little guidance on how to properly determine the number of

47

"forfeitures" or "violations" subject to the applicable civil penalty.  In *Bornstein*, the government

sued a subcontractor under the Act.  The subcontractor had made three shipments of falsely

branded goods to the prime contractor, which submitted false claims to the government in the

form of 35 invoices.  The court held that "A correct application of the statutory language

requires . . . that the focus in each case be upon the specific conduct of the person from whom

the Government seeks to collect the statutory forfeitures."  *Id.* at 313.  In a footnote, the Court

explained:

> In cases involving prime contractors the number of imposable forfeitures
> has generally been set at the number of individual false payment demands
> that the contractor has made upon the Government.  . . . This result is in
> accord with this Court's statement that "the conception of a claim against
> the government normally connotes a demand for money or for some
> transfer of public property."

*Id*. at n. 4 (citing *United States v. McNinch*, 356 U.S. 595, 599 (1958) (quoting *United States v.*

*Tieger*, 234 F.2d 589, 591 (3d Cir. 1956).  The *Bornstein* case has been cited in numerous

subsequent FCA cases where the number of claims or violations is at issue.

In *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176 (3d Cir. 2001), *cert. denied*,

536 U.S. 906 (2002), the court noted that "the crux of the dispute is whether the submission of

these fraudulent bills was a 'false claim for payment or approval.'"  *Id*. at 182.  The court stated

that "the conception of a claim against the government normally connotes a demand for money

or for some transfer of public property."  *Id*. at 183, 184 (citing *Bornstein*, 423 U.S. at 309 n. 4).

The court dismissed the FCA claim based on its determination that the submission of inflated

legal bills for approval by the U.S. Bankruptcy Court does not violate the FCA.

In *United States v. Krizek*, 111 F.3d 934 (D.C. Cir. 1997), the United States brought an

FCA action against a psychiatrist and his wife in connection with billing for treatment of

Medicare and Medicaid patients and the submission of those billing records.  The court cited a

number of *Bornstein* cases and noted that "the gravamen of these cases is that the focus is on the conduct of the defendant. The Court asks, 'With what act did the defendant submit his demand or request and how many such acts were there?'" *Id.* at 939. The court determined that the Krizeks made a request or demand every time they submitted an HCFA 1500 (the form used to submit reimbursement requests). The court stated, "The question turns … on how many times the defendants made a 'request or demand.'" *Id*. at 940. The court rejected the government's suggestion that each false CPT ("Current Procedures Terminology") code should be treated as a separate claim because "the charges are . . . totaled to produce one request or demand." *Id*.

In *United States v. Ehrlich*, 643 F.2d 634 (9th Cir. 1981), *cert. denied*, 454 U.S. 940 (1981), the court determined that the builder of subsidized housing was liable under the FCA for one forfeiture for each monthly voucher submitted to the Department of Housing and Urban Development. The court stated, "The monthly vouchers of the mortgagee were false claims within the meaning of the Act. The concept of a claim against the government includes a demand for money. … Due to Ehrlich's false certifications, the interest subsidies demanded and paid each month were falsely inflated. Individual demands for payment pursuant to one overall contract constitute individual false claims." *Id*. at 637 (citations omitted).

49

In a recent Eastern District of Pennsylvania case, *Smith v. Carolina Medical Center*,

274 F.Supp.3d 300 (E.D. Pa. 2017), Chief Judge Stengel discussed fraudulent inducement

"pre-2010":

> For a defendant to be held liable under the FCA, he must have made a false statement in a "claim." A "claim" is "any request or demand . . . for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded . . ." 31 U.S.C. § 3729(b)(2). The "claim" requirement is somewhat flexible; the Supreme Court has held that the FCA "reaches . . . all fraudulent attempts to cause the Government to pay out sums of money." . . . Thus, although FCA liability must ultimately be premised on "at least 'a single false [or fraudulent] claim' that the defendants submitted to the Government for payment," . . . , courts have held that false certifications in enrollment or application forms can also create FCA liability where claims are subsequently presented pursuant to the fraudulently induced relationship with the government

*Id. at* 310 (citations omitted). Thus, in the Farfield case, while the alleged false certifications in

the certified payrolls may create FCA liability, there must still be a "claim" or request or demand

for money. In this case, that "claim" is the monthly invoice.

*United States ex rel. Bahnsen v. Boston Scientific Neuromodulation Corp.*, 2018

WL 4604307 (D. N.J. 2018), was an FCA case involving Medicare reimbursement. Plaintiff

argued that all entries on the spreadsheet were "claims" under the FCA. The court held that

Form 1500, submitted for Medicare reimbursement, represents a "claim," regardless of the

number of diagnostic codes or line entries included on each form. The court discussed *Krizek*,

*supra*, and stated:

> Moreover, the *Krizek* Court noted, had it adopted the Government's position that each CPT code constituted a claim, it would have enabled the government to seek "an astronomical $81 million worth of damages for alleged actual damages of $245,392." *Krizek*, 111 F.3d at 940. *See also United States v. Speqtrum, Inc.*, No. 10-2111, 2016 WL 5349196, at *4 (D.D.C. Sept. 23, 2016) (following *Krizek* in concluding that invoices, not the individual false entries in the invoices, were claims); *Cantrell v. New*

50

York Univ., 326 F. Supp. 2d 468, 470 (S.D.N.Y. 2004) ("One invoice
constitutes one false claim, even though it contains numerous individual
entries, and a false claim is made when the invoice is presented for
payment." (citing *Krizek*, 111 F.3d at 938-40)).

Bahnsen at *4.

In *United States ex rel. Landis v. Tailwind Sports Corp.*, 234 F.Supp.3d 180 (D. D.C.
2017), the court stated that "the existence of a 'claim' is clearly essential to – and thus *part of* –
the FCA violations alleged in the government's complaint." The court cited the FCA's
definition of "claim" and stated, "Here, Tailwind submitted requests for payment to the Postal
Service, in the form of invoices . . . Invoices requesting payment for goods or services are
certainly 'claims' under the FCA." *Id. at* 191 (citing *Bornstein*, 423 U.S. at 312).

In *United States ex rel. Kerr-McGee Oil & Gas Corp.*, 2010 WL 3730894 (D. Colo.
2010), the Relator brought suit under the FCA and alleged that the Defendant filed false royalty
reports with the Minerals Management Service concerning oil and gas leases on government
land. The parties' primary dispute on the issue of civil penalties involved the number of claims
that could be subject to a penalty. Defendants were permitted to file one consolidated monthly
royalty report that set forth the royalties owed from each of the 57 leases that Defendant held.
The Plaintiff contended that each miscalculated royalty from each lease constituted a separate
false claim, for a total of 1,403 separate false claims. The Defendant argued that only the
consolidated monthly filing itself constituted the false claim. There were 48 monthly reports that
contain one or more royalty miscalculations. The Court concluded that the monthly consolidated
form filed by Defendants "acts as the 'claim' for which penalties are assessed." *Id*. at *5. This
court "found persuasive" *Krizek's* interpretation of the "False Claim Act's definition of 'claim' –
the unit by which statutory penalties are imposed – as being 'any request or demand . . .
presented to' the Government." *Id.*

51

The False Claims Act section now at issue in this case, 31 U.S.C. § 3729(a)(1)(B), provides for liability for "any person who – (B) knowingly makes, uses, or causes to be made or used a false record or statement material to a false or fraudulent claim."  Courts have cautioned that "the terms 'record or statement' in § 3729(a)(1)(B) should not be interpreted to encompass the term 'claim' because 'claim' has been defined by § 3729(b)(2)(A) to mean 'any request or demand' for money or property."  *United States ex rel. Howard v. KBR, Inc.*, 139 F.Supp.3d 917, 945 (C.D. Ill. 2015), *leave to appeal denied*, 2016 WL 9776138 (C.D. Ill. 2016) (citing *United States ex rel. Watkins v. KBR, Inc.*, 106 F.Supp.3d 946, 966 (C.D. Ill. 2015)).  The court concluded, "as such, the Court finds the alleged invoices submitted by KBR were 'claims' under §3729(a)(1)(A), the section of the FCA relied on by the Relators in this case."  *Id.*

Thus, the False Claims Act and the case law confirm that the "false claims" in this case, if any, are the invoices that Farfield submitted to SEPTA monthly for payment and not the weekly certified payrolls for the Project.

## IV.  PLAINTIFF'S EVIDENCE WAS NOT REPRESENTATIVE, AND BURDEN SHIFTING IS NOT JUSTIFIED.

Plaintiff has contended it can satisfy, through "representative worker testimony" the burden of proof on False Claims Act liability, and the prima facie burden to shift the burden of proof on damages.  *ECF 204*.  Plaintiff relies on *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 688 (1946), to shift the burden of proof to require that Defendant prove there was no wage underpayment damages or that the alleged underpayment of wage damages is less than what Plaintiff claims.  Such burden-shifting would apply only to damages and not to other issues, as to which Plaintiff retains the burden of proof.  *Memorandum Opinion, ECF 209* (October 15, 2019) at 2.

52

### A.   Plaintiff Did Not Prove That Its Limited Evidence Was Representative Of All Groundmen and Laborers On The Wayne Junction Project

IBEW Local 98's case is based on its assertion that 42 workers were underpaid.  Local 98 presented the testimony of six former Farfield tradespeople who worked on the Wayne Junction Project.  Wes Reed was a journeyman or foreman the entire time, and there is no claim that he was underpaid.  David Hale started as a groundman, was then paid as a laborer, then a journeyman lineman, and then a journeyman electrician foreman.  Chris DeLuca, Ryan Franchetti, Adrian Lauria and Kevin Redmond started as groundmen, were then paid as laborers, and were then paid at a fourth-period apprentice equivalent rate though classified as laborers.

Plaintiff IBEW Local 98 offered those witnesses as "representative" of the 42 employees it claims should have been paid journeyman lineman wages on the Wayne Junction Project.  *See Exhibits P-18 and P-19.*  There was no proof that the witnesses who testified were representative of those that did not.  The evidence in fact proves that the work performed by those witnesses was ***not*** representative of the work performed by those who did not testify.

Of the 42 allegedly underpaid workers, there was no testimony as to what work was performed by twenty of them on the Wayne Junction Project (Brandon Tanksley, Anthony David, Terry Young, Joe Cikanovich, Erik Lutz, Mike Lapp, Jason Harting, Ken Wenditz, Andrew Byrne, Damon Coleman, Doug Leydig, Peter Derestie, Jr., Fletcher Harris, Dominic Koehl, Dave Ritz, Dan Epstein, Christopher Brown, Chris Doctor, Shawn Massey and William Hillman), let alone any testimony that the work of any other person was representative of the work they did.  Of the remaining 22 individuals there was no testimony that any of the work performed by eight individuals on the Wayne Junction Project was what Plaintiff IBEW Local 98 claims was journeyman electrical work or that the work of any other person was representative of the work they did.

53

Hale, DeLuca, Franchetti, Lauria and Redmond were all on one of the two termination crews, were specially trained and certified by either Safetran or 3M, were approved by SEPTA, and performed work that ***no other Farfield employees performed on the Project***, other than Joe McGee, Jr. and Derek Dunn, both of whom acted as the journeyman electrician foreman of the signal termination crew, and both of whom were paid at the journeyman foreman rate.  Hale was the foreman of the high voltage termination crew and was also paid at the journeyman electrician foreman rate.  The rate paid to DeLuca, Franchetti, Lauria and Redmond was $35.22 per hour, which was very close to the journeyman lineman rate.  They did different work from, and were paid more than, others among the 42.

Depending on whether the journeyman/foremen is included, Plaintiff IBEW Local 98 presented testimony from 12-14% of the people who Local 98 claims were underpaid.  Courts in other cases have found that "representative" evidence is provided when higher percentages of workers testify.  *Donovan v. Williams Oil*, 717 F.2d 503 (10 Cir. 1983) (59%); *Brennan v. General Motors Acceptance Corp*., 482 F.2d 825 (5th Cir. 1973) (76%).

Inferential statistics can be probative if they draw inferences based on a representative sample, but there must be actual proof that the sample is representative.  *United States v. Vista Hospice Care, Inc*. 2016 WL 3449833 *11, *13 (N.D. TX. 2016).

In *Espenscheid v. DirectSat USA, LLC,* 705 F.3d 770 (7th Cir. 2013), the court questioned how the "representative" members were chosen and observed that plaintiffs'

> counsel has not explained in his briefs, and was unable to explain to us at the oral argument though pressed repeatedly, how these "representatives" were chosen—whether for example they were volunteers, or perhaps selected by class counsel after extensive interviews and hand picked to magnify the damages sought by the class.  There is no suggestion that sampling methods used in statistical analysis were employed to create a random sample of class members to be the witnesses, or more precisely

54

> random samples, each one composed of victims of a particular type of alleged violation.

*Id*. at 774.

> In *Espenscheid,* the court cited *Mt. Clemens* and noted,

>> A further complication is that the technicians have no records of the amount of time they worked but didn't report on their time sheets. … The plaintiffs claim that their records are incomplete because DirectSat told them not to report all their time.  But this if true does not excuse them from having to establish the amount of the unreported time.  The 'representative' proof they have submitted does not do this.  The unreported time for each employee could be reconstructed from memory, inferred from the particulars of the jobs the technicians did, or estimated in other ways—any method that enables the trier of fact to draw a 'just and reasonable inference' concerning the amount of time the employee had worked would suffice. … But what can't support an inference about the work time of thousands of workers is evidence of the experience of a small, unrepresentative sample of them.

*Id.* at 774-775.

Plaintiff obtained affidavits in 2008 from the former Farfield workers who testified at trial.  Plaintiff investigated Farfield's payment practices before it filed suit.  Plaintiff sued in 2009.  Despite all that Plaintiff did to gather evidence against Farfield more than ten years ago, Plaintiff presented no evidence averaging or estimating how much time any non-journeyman spent doing work that Plaintiff claims should have been paid at the journeyman lineman rate.  Of equal importance, Plaintiff presented no evidence to excuse it from presenting any average or estimate.

Plaintiff has presented no statistical proof or any expert testimony that the 5 groundmen/laborers are representative of the 42 people IBEW Local 98 claims were underpaid.  Plaintiff presented no evidence from any of its witnesses who worked on the Wayne Junction Project that their purported journeyman electrical work, and their testimony about others' purported journeyman electrical work, was representative of the 42 people IBEW Local 98

claims were underpaid.  As a result, Plaintiff has neither proven that its 5 (or 6) witnesses are representative of the other workers or that the alleged underpayment of the 5 are representative of the other 37.

Defendant objects to the Special Master's Conclusion of Law 27, which states:

> Farfield contends that it cannot be found liable for violating the False Claims Act on the basis of misclassifications of workers who did not testify at the hearing.  But this is not a prevailing wage case in which compensation is sought for individual workers who were underpaid; it is a case involving a claim for violation of the False Claims Act through the making of false statements.

The first sentence of Conclusion of Law 27 is false.  The Special Master appears to have accused Farfield of making that non-existent contention, to bolster the Special Master's demonstrably unsupported credibility findings.  *See* e.g., Farfield Objection to Finding of Fact 141.

Plaintiff, in its Memorandum Of Law Concerning Burden Of Proof And Recordkeeping Issues, asserted:  "Thus, Plaintiff believes that based on ***representative testimony of several groundmen and laborers***, in addition to foremen and others who observed groundmen and laborer work, coupled with Farfield's phase code data, it can meet both liability and Step 1 of *Mt. Clemens* by providing prima facie evidence of underpaid wages."  *ECF 204* at 8 (emphasis added).

Plaintiff and Defendant were required to submit simultaneously post-testimony proposed Findings of Fact and Conclusions of Law, so Farfield did not get to see IBEW Local 98's proposed findings or conclusions before Farfield submitted its own.

Farfield stated the following in its proposed Conclusions of Law:

> IBEW Local 98's case is based on its assertion that 42 workers were underpaid.  Local 98 presented the testimony of six former Farfield tradespeople who worked on the Wayne Junction Project.  Wes Reed, was a journeyman or foreman the entire time he worked on the Wayne

56

Junction Project, and there is no claim that he was underpaid. David Hale
started as a groundman, was then paid as a laborer, then a journeyman
lineman, and then a journeyman electrician foreman. Chris DeLuca. Ryan
Franchetti, Adrian Lauria and Kevin Redmond started as groundmen, were
then paid as laborers, and were then paid at a fourth-period apprentice
equivalent rate though classified as laborers.

*IBEW 98 may offer these witnesses as being "representative"* of the
42 employees it claims should have been paid journeyman lineman wages
on the Wayne Junction Project. *See* Exhibits P-18 and P-19. ***There was
no proof that the witnesses who testified were representative of those
that did not.***

*Defendant's Proposed Conclusions of Law*, Section 7, page 19 (emphasis added), attached
hereto.

Farfield did not know, post-testimony, whether Plaintiff IBEW Local 98 would claim that

its few witnesses were representative of others, but Farfield was prepared to do address that, and

Farfield explained why those who testified were not representative of others. That is not the

same thing as the Special Master's accusation that "Farfield contends that it cannot be found

liable for violating the False Claims Act on the basis of misclassifications of workers who did

not testify at the hearing."

### B. The *Mt. Clemens* Standard.

Under *Mt. Clemens*, to achieve burden-shifting, a plaintiff must provide "evidence to

show the amount and extent of that work as a matter of just and reasonable inference."

*Mt. Clemens, supra,* 328 U.S. at 687. If the plaintiff is able to present sufficient evidence to shift

the burden of proof, the employer is "to come forward with evidence of the precise amount of

work performed or with evidence to negative the reasonableness of the inference to be drawn

from the employee's [plaintiff's] evidence." *Mt. Clemens, supra,* 328 U.S. at 687-88.

In *Rosano v. Township of Teaneck*, 754 F.3d 177 (3d Cir. 2014), police officers sued a

municipality for overtime pay. The officers presented a spreadsheet that calculated individual

officers' overtime hours based on an eight-hour day, although the applicable work period was

longer. In rejecting the officers' claim, the court observed that an estimate of damages that does not "set forth the proper method of calculation and does not account for day-to-day differences in officer scheduling, hardly provides a foundation for an inquiring court to "reasonably infer[ ]" FLSA violations or the amount of an award." *Id*. at 189. Although the officers claimed that the municipality had not kept adequate time records and that the burden of proof should be shifted to the municipality, because the officers failed to set forth any evidence that would assist in estimating damages, they did not meet their burden with or without *Mt. Clemens* burden-shifting. *Id*. at n.4.

In *Matter of Pythagoras Gen. Contr*., 2011 WL 729638 (DOL Adm. Rev. Bd. 2011), the USDOL pursued an action against the employer. The USDOL presented evidence of the allocation of time that employees worked as mason tenders and how much time they worked as Tier B laborers. *Id*. at *7 8 and *17 19.

In this matter, Plaintiff IBEW Local 98 did not present the necessary evidence of the amount and extent of purported journeyman work allegedly performed by Farfield employees. Plaintiff obtained affidavits more than 10 years ago from the former Farfield workers who testified at trial and Local 98 investigated Farfield's payment practices before it filed suit in 2009. Despite that, Plaintiff presented no evidence averaging or estimating how much time any non-journeyman spent doing work that Plaintiff claims should have been paid at the journeyman lineman rate. Plaintiff presented no evidence to excuse it from presenting any average or estimate.

Plaintiff limited its final theory to 12 phase codes. The Special Master found that 6 of the 12 phase codes provided a just and reasonable inference that journeyman work was performed for hours coded to those 6 phase codes. However, it is undisputed that the hours coded to those

58

6 phase codes included not just non-productive time (which the Special Master estimated at 1.5 hours per day and deducted from his damages calculations), but also productive time spent in non-"journeyman" tasks.  As is evident from even a cursory review of the timesheets, all 8 hours for a workday were often costed to the same phase code.  This  included the morning briefing, the offsite loading and unloading of materials, the offsite travel to and from the Olney yard, the nonproductive time waiting for trains to pass, as well as the unloading and loading of materials at the worksite.  It also included the clearing, grubbing, digging, shoveling of ballast, laying of tarps and plywood, shoring, trenching, and all of the tasks associated with that phase code.  After deducting 1.5 hours per day, the Special Master included all of the remaining hours of "productive" time from the 6 phase codes in the damages calculations.

Plaintiff could have provided a reasonable estimate of time spent performing what it maintains are "journeyman" only tasks, which it did not do.  Defendant produced testimony and evidence that all of the phase codes, including the 6 found by the Special Master to include "journeyman" tasks, included time spent in material handling, loading and unloading of equipment, digging, waiting while trains passed, etc.  Plaintiff also stipulated to this.  In light of IBEW Local 98's lack of proofs of the amount and extent of that work as a matter of just and reasonable inference, Plaintiff has not established a prima facie case under *Mt. Clemens*. Further, Defendant came forward with evidence to negative the reasonableness of any inference that all of the productive time hours should be computed as if they were purported journeyman work, including testimony as to estimates of the total amount of time spent in what Plaintiff purported to be journeyman tasks.

Further, no burden shifting applies in this matter because Farfield did not knowingly misclassify workers, and this is a False Claims Act case, not a Davis-Bacon Act or Fair Labor

59

Standards Act case. The False Claims Act does not apply to inadvertent or legitimate misclassifications, as both the Davis-Bacon Act and the Fair Labor Standards Act do.

Farfield saw no need to keep records of each task that every employee performed, nor is such required. Farfield believed that groundmen could do all of the tasks that they performed on the Wayne Junction Project. Farfield's belief is in conformity with IBEW Local 126's collective bargaining agreements. Plaintiff's allegations of what groundman can and cannot do is contrary to the clear and explicit provisions of those collective bargaining agreements. Farfield saw no need to change its recordkeeping or pay and classification practices after the USDOL audit in 2004, which found no misclassification of workers nor improper recordkeeping under the Davis-Bacon Act.

For the reasons discussed above, Farfield objects to the Special Master's damages and burden shifting Conclusions of Law, including Conclusions of Law 27 through 39.

## V. FARFIELD DID NOT MISCLASSIFY ITS EMPLOYEES ON THE WAYNE JUNCTION PROJECT.

Farfield did not misclassify its employees on the Wayne Junction Project. Most of the work on the Project involved clearing and grubbing, digging, shoveling ballast, trenching, shoring, loading and unloading materials, civil work, and nonproductive time. Even with this type of work, Farfield paid more than 47.5% of what the Plaintiff identified as "electrical" work at the journeyman lineman rate, the electrical apprentice rate, and the even higher journeyman electrician and foreman rates. As discussed, Farfield's use of groundmen – an electrical worker classification under the prevailing wage determination – while working alongside journeymen was in accordance with IBEW Local 126's collective bargaining agreements. It was stipulated that groundmen could do or could assist journeymen in every task that they performed on the Project. Further, this practice was reviewed and accepted by the USDOL, which advised

60

Farfield that there were no issues under the Davis-Bacon Act, other than payment of the Labor

Day holiday for four carpenters.  Any findings and conclusions to the contrary subject Farfield to

a different standard than that required of a union contractor signatory to those agreements – a

result that is improper and contrary to the law.

## VI.  ADDITIONAL OBJECTIONS

Defendant objects to the specific language of the Special Master's Conclusion of Law 4.

The language in the SEPTA Contract states:  "That each laborer or mechanic has been paid not

less than the applicable wage rates and fringe benefits or cash equivalents for the classification of

work performed, as specified in the applicable wage determination, incorporated into the

Contract."  This language does not use the phrase "prevailing rate" as used by the Special

Master, but instead specifically refers to the "applicable wage rates … as specified in the

applicable wage determination."

Defendant objects to Conclusion of Law 5, which states:

> The SEPTA contract permitted Farfield to pay employees performing
> work in more than one classification the prevailing rate specified for each
> classification for the time actually worked in each classification - for
> example, it could pay groundmen or laborers the journeyman rate for
> journeyman work installing electrical conduit or pulling wire or cable and
> the groundman or laborer rate for non-journeyman work associated with
> those tasks - *provided* Farfield's "payroll records accurately set forth the
> time spent in each classification in which work is performed."
> Exh. P-25A at 243589.

As discussed above and in Defendant's Proposed Findings of Fact and Conclusions of

Law, installing electrical conduit or pulling wire or cable is not journeyman work.  It can be

Laborer work as well as Groundman work.

Defendant objects to Conclusion of Law 13, which states:

> Farfield's statement on weekly certified payrolls that the wage rate for
> each employee was not less than the prevailing rate in the applicable wage
> determination for the work each employee actually performed was false

61

> for any week in which a groundman or laborer performed work that should have been classified and paid as journeyman work. *See, e.g., United States ex rel. Wall v. Circle C. Constr., LLC,* 697 F.3d 345, 357 (6th Cir. 2012).

As discussed above, Farfield did not misclassify its employees when its paid its

groundmen and laborers at those rates, as the work they performed was not journeyman work.

Defendant objects to Conclusion of Law 24, which states:

> Farfield violated the False Claims Act by falsely certifying in its weekly payrolls that it had paid all of its employees the prevailing wage for the classification of work they actually performed, when it did not pay groundmen and laborers the prevailing wage rate for journeyman linemen work they performed.

As discussed above, Farfield did not misclassify its employees when its paid its

groundmen and laborers at those rates, as the work they performed was not journeyman lineman

work, and thus Farfield did not falsely certify its weekly payrolls.

Defendant Farfield objects to those Findings of Fact on which the Conclusions discussed

and objected to are based, which include the following Findings of Fact, many of which are

actually conclusions of law and not findings of fact:  40, 43, 46, 51, 58, 59, 67, 78, 83, 86, 92,

93, 98, 99, 100, 140, 141, 143, 144, 150, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 176,

184, 185, 186, 190, 193, 195, 197, 198, 201, 202, 203, 204, 205, 207, 208, 211, 213, 214, 215,

219, and 220.

Farfield would like to specifically note its objection to Finding of Fact 141, which states:

> Many Farfield managers believed that all or virtually all of the work on the Wayne Junction Project was groundman work and therefore, any worker could do any task.    Tr. 274:14-275:19,  1941:17-1942:3, 2014:14-21  (Jackson);  1581:16-1582:10,  1589:9-1590:12,  1623:3-7, 1681:9-14 (Derr); 1822:17-1823:5 (Pennington).

62

That "finding" is untrue, unsupported by the record and specifically not supported by the record cited to by the Special Master. The Special Master cites to testimony by Robert Jackson, Christopher Derr and Robert Pennington.

Jackson's actually testimony was that Joseph McGee, Sr. said groundmen and laborers, and groundmen and linemen can do the same thing. Jackson testified he had a conversation with McGee, Sr., the Wayne Junction project was lineman territory, and linemen can help groundmen and groundmen can do everything a lineman could do. Jackson testified he was told that groundmen can do anything linemen could do. Jackson did not testify that any worker could do any task or that he believed any worker could do any task.

Derr testified that "he" educated Derr on what groundmen could do on the project, which was basically everything Farfield was doing on the project. The things that groundmen were doing on the project included digging, installing the conduit, installing the wire, putting the rebar in, pouring the concrete. "He" was not identified in the transcript portion cited by the Special Master, but "he" is Joseph McGee, Sr., as shown by the context of the transcript, from the question and answer immediately preceding the portion cited by the Special Master.

Derr explained that having laborers or journeyman electrician do groundman work was compliant because journeymen electricians and laborers were paid more than the groundman rate. That is not the same as saying any worker can do any task. The Davis-Bacon Act is a super-minimum wage act, which requires that for work in specific classifications, the employer must pay at least a particular amount. Journeymen electricians and laborers were paid at a rate higher than the mandatory minimum for groundmen, so there was nothing improper about having higher paid journeymen electricians and laborers performing the lower paid groundmen work. Derr testified that based on what Joe McGee, Sr. said, Derr understood that a groundman could

63

do anything a lineman could do.  Derr did not testify that any worker could do any task or that he believed any worker could do any task.

Pennington testified that Joe McGee, Sr. explained that groundmen can do anything linemen can do.  Pennington did not testify that any worker could do any task or that he believed any worker could do any task.

Farfield's proposed modifications are as set forth in Defendant's Proposed Findings of Fact attached hereto.  Similarly, Farfield's modifications to the Conclusions of Law are set forth in Defendant's Proposed Conclusions of Law, also attached hereto.

## VII. THE FARFIELD COMPANY DID NOT VIOLATE THE FALSE CLAIMS ACT.

Farfield did not violate the False Claims Act.  Farfield maintains that it did not misclassify its employees on the Wayne Junction Project, and that its classification of employees as groundmen was in total conformity with IBEW Local 126's collective bargaining agreements. If a union signatory contractor could not be held to have violated those collective bargaining agreements, Farfield cannot be held to a different standard.

Most of the work on the Project involved clearing and grubbing, digging, shoveling ballast, trenching, shoring, loading and unloading materials, civil work, and nonproductive time. Even with this type of work, Farfield paid more than 47.5% of what the Plaintiff identified as "electrical" work at the journeyman lineman rate, the electrical apprentice rate, and the even higher journeyman electrician and foreman rates.

The Plaintiff failed to prove the required scienter, and Farfield did not act in reckless disregard of the Davis-Bacon Act. As found by the Special Master, its managers and supervisors believed, based on the directions of McGee, Sr., who was experienced in transit and rail work, and who had worked for union contractors, that groundmen could do whatever a lineman could

64

do for the work being performed by Farfield employees on the Wayne Junction Project.  This made perfect sense since Farfield subcontracted out to a union contractor all of the catenary overhead line work, and Farfield performed no "hot" or energized work, nor any "hot stick" work on the Project.  Further, documents found on the internet describing duties of groundmen were completely consistent with this understanding.  Under IBEW Local 126's collective bargaining agreements, the employer had no restrictions other than those specifically set forth in the agreements on which employees it assigns to do what work.  The only restrictions in IBEW Local 126's collective bargaining agreements were for hot or energized work, hot stick work, and work performed in the air.  Farfield performed no hot or energized work, performed no hot stick work, subcontracted out all of the overhead catenary work, and had minimal aerial work, with over 67% paid to the journeymen who went in the air.  The collective bargaining agreements required that a journeyman be the foreman on each crew, and Farfield not only had a journeyman in charge of every crew, but usually had several journeymen working on every crew.  The Plaintiff stipulated that groundmen could either do or could assist journeyman in all of the tasks performed by groundmen on the Wayne Junction Project.

Plaintiff also failed to provide any evidence proving materiality under the False Claims Act.  The alleged underpayment – either $159, 274 or $52,522 – is a exceptionally small fraction of the $54,700,000 SEPTA Contract – and those amounts are based on counting every productive hour under the 6 phase codes, rather than on any reasonable estimate of the actual amount of time that groundmen or laborers arguably performed journeymen work.  There was perhaps at most 5% journeyman work on the Project, and Farfield paid 47.5% of its hours at the journeyman rates.

65

For all of the reasons as set forth above, The Farfield Company did not violate the False Claims Act.  Plaintiff has failed to sustain its burden of proof in this matter.  The Farfield Company objects to the Special Master's Report and Recommendation, Findings of Fact and Conclusions of Law, as set forth above.  The Farfield Company proposes modifications to the Special Master's Report as set forth in its Proposed Findings of Fact and Conclusions of Law attached hereto and incorporated herein.

Date:  December 20, 2019                    Respectfully submitted,

                                            STEVENS & LEE


                                             /s/ Susan R. Friedman
                                            Susan R. Friedman, Esquire
                                            Attorney I.D. No. 23741
                                            51 South Duke Street
                                            Lancaster, Pennsylvania  17602
                                            (717) 399-6625

                                            Harry A. Horwitz, Esquire
                                            Attorney I.D. No. 31292
                                            1818 Market Street, 29th Floor
                                            Philadelphia, PA  19103-1702
                                            Tel:  (215) 751-1952
                                            Fax:  (610) 371-7386
                                            hah@stevenslee.com

                                            *Attorneys for Defendant The Farfield Company*