## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* | **:** | **CIVIL ACTION** |
| **INTERNATIONAL BROTHERHOOD** | **:** | |
| **OF ELECTRICAL WORKERS LOCAL** | **:** | |
| **UNION NO. 98** | **:** | |
| | **:** | |
| **v.** | **:** | **NO. 09-4230** |
| | **:** | |
| **THE FARFIELD COMPANY** | **:** | |

### MEMORANDUM

**KEARNEY, J.**                                                                 **February 5, 2020**

A union bringing claims on behalf of the United States under the False Claims Act challenged a construction contractor's payroll invoices submitted to SEPTA for the contractor's services under contract for a federally funded rail improvement project from 2002-2007. After a decade of back and forth, the parties agreed on the eve of trial to present their evidence over eight days of hearings to a Special Master chosen by the parties. In a timely and exhaustive Report and Recommendation, the Special Master recommended we enter judgment of $1,055,320.62 against the contractor after specific findings the contractor violated the False Claims Act. The contractor now objects to the Report and Recommendation on seven grounds with multiple sub-arguments. It asks we instead adopt the entirety of its findings offered to the Special Master. Many of its present objections dispute the Special Master's credibility findings to which we defer with the parties' consent. Although we defined the burden shifting and legal issues before the close of evidence after full briefing, the contractor repeats its objections. At the contractor's request and consistent with Rule 53, we revisited these legal findings and reviewed each objection based on our separate analysis of the transcribed record. After this exhaustive analysis, we overrule the contractor's objections and today adopt the Special Master's Report and Recommendation finding the contractor violated the False Claims Act requiring compensation mandated by Congress.

## I. Background[1]

In March 2002, construction contractor The Farfield Company agreed to provide Southeastern Pennsylvania Transportation Authority ("SEPTA") with requested services for a track and signal improvement project along a seven and a half-mile stretch of railroad track ("Wayne Junction Project") funded in part by the federal government.[2] Section VIII.S. of the SEPTA contract provides: "Contract Made Subject to Federal, State and Local Law Contractor expressly agrees to comply with all applicable laws, ordinances, and regulations of the Federal, State and Local governments which are in effect or become effective during the term of the Contract."[3]

The work under the SEPTA contract involved, among other things, running and laying electrical conduit in trenches alongside railroad track, cleared and dug by Farfield's employees.[4] After opening and securing trenches, Farfield employees installed electrical conduit and pulled electrical wires through the conduit. Installing or laying of conduit included bending conduit so it could go around bends or obstacles, keeping conduit off the ground, preparing conduit by gluing or otherwise connecting multiple pieces of conduit together, physically laying conduit in the ground, and coring manholes to connect conduit.[5]

Farfield's work on the Wayne Junction Project began in August or September 2002 and continued to September 2007. SEPTA's contract required Farfield to comply with the Davis-Bacon Act including "[t]he Contractor shall submit weekly, for each week in which any contract work is performed, a copy of all payrolls to SEPTA for transmission to the [Federal Transit Administration]. The payrolls submitted shall set out accurately and completely all of the information required to be maintained under" federal regulations implementing the Davis-Bacon Act.[6] The SEPTA contract required Farfield to, among other things, certify "each laborer or

2

mechanic has been paid not less than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the Contract."[7]

The issues before us involve Farfield's classification of employees' work on the Wayne Junction Project as it affects the wages they are paid. The International Brotherhood of Electrical Workers Local Union No. 98 alleges Farfield falsely certified payrolls submitted to SEPTA of paying its employees the prevailing wages which did not match the prevailing wages for persons doing this work. In other words, Local 98 claims Farfield represented it paid workers at lower wages for work which the federal government requires be paid at a higher prevailing wage based on the experience and skill involved. Farfield submitted its payrolls to SEPTA which in turn submitted claims for payment to the Federal Transportation Administration. Local 98 contends Farfield employees classified as "groundmen" and "laborers" performed "journeyman electrician" or "journeymen linemen" work—a higher skilled classification—and should have been paid at the higher wage rate. Farfield denies this, arguing it properly classified and paid its employees and, even if it paid some of its employees under the wrong classification, it did not do so "knowingly" as to violate the False Claims Act.

The difference among the classifications of groundmen, laborers, and journeyman linemen and journeymen electricians is based on the skill needed for each position. Groundmen are unskilled. Journeymen linemen and electricians are highly trained workers. SEPTA and Farfield recognized this distinction in their contract defining the prevailing wage for a "groundman" at $19.34 per hour plus fringes; a "lineman" (also known as a "journeyman lineman") at $32.23 per hour plus fringes; "electricians" (also known as "journeyman electricians") at $32.95 per hour plus fringes; and "laborers" between $20.05 and $20.25 per hour plus fringes.[8] Although the SEPTA

3

contract does not require an employee performing "journeyman" work actually be a journeyman, the contract requires an employee performing journeyman work be paid at the journeyman rate.[9]

One way of determining the proper wage is the type of work performed. The process of installing electrical wire from one point to another is known as a "wire pull."[10] Apprentices and journeymen receive training on wire pulls; groundmen do not receive training on wire pulls.[11] An apprentice must complete 7,000 hours of training before becoming a journeyman.[12] Groundmen may assist journeymen in connecting wire, putting plastic pipe in a trench, laying conduit and security cable, pulling wire, cable pulls, bending conduit, threading conduit, and other tasks.[13]

Local 98 filed a sealed *qui tam* complaint in 2009 alleging Farfield paid forty-two workers who performed journeymen work at wages lower than required by the Davis-Bacon Act[14] on the Wayne Junction Project, as well as five other federally-funded projects, and then submitted claims for payment based on false payroll certifications in violation of the False Claims Act.[15] Two years later, the United States declined to intervene in the action. We unsealed the complaint and Local 98 filed an amended complaint on February 3, 2012.[16] In its amended complaint, Local 98 alleged Farfield misclassified its workers performing electrician's work to gain a competitive bidding advantage on the same federally funded construction projects between 2001 and 2009.[17] Local 98 alleged Farfield submitted fraudulent certified payroll records to SEPTA intending SEPTA to use those records to submit false invoices to the federal government. Farfield alleges those false payroll records are material in the federal government's decision to pay SEPTA's false invoices under Section 3729(a)(1)(B) of the False Claims Act.[18]

## A. We appointed a Special Master with counsel's consent.

After years of discovery, the Clerk of Court assigned this matter to us in late September 2018. We directed a second round of motion practice on the issue of the Department of Labor's

4

jurisdiction under the primary jurisdiction doctrine and, after finding we could proceed to resolve this case, we issued a scheduling order setting the parties' pre-trial obligations and a trial date.[19]

On August 26, 2019, we found genuine issues of material fact regarding the work groundmen performed on the Wayne Junction Project precluded the entry of summary judgment in Farfield's favor.[20] On August 27, 2019, with a seven-day non-jury trial scheduled to begin on September 19, 2019, we asked the parties to present their good faith evaluation, after fulsome consultation among counsel, why we should not appoint a Special Master under Federal Rule of Civil Procedure 53.[21] We advised counsel the Special Master will be required to file a Report and Recommendation with findings as to liability and damages, if any, and we will review questions of law on a *de novo* standard by evaluating fact and credibility decisions based on an abuse of discretion standard of review.[22]

Local 98 and Farfield agreed to the appointment of a Rule 53 Special Master to hear evidence and make findings as to liability and damages, if any, but applying a standard of review under Rule 53(f)(3).[23] Rule 53(f)(3) sets the standard of review on a Special Master's Report and Recommendation: we must apply *de novo* review to all objections to conclusions of law made or recommended by a master as well as to findings of fact unless the parties, with our approval, stipulate (a) "the findings will be review for clear error; or" (b) "the findings of a master appointed under Rule 53(a)(1)(A) or (C) will be final."[24]

On September 3, 2019, we discussed the applicable standard of review with counsel and our particular concern with *de novo* review of the Special Master's credibility determinations. Both counsel agreed we will not apply a *de novo* standard of review to the Special Master's credibility findings and there will be no additional evidentiary hearings. Based on counsels' representations, we appointed Bruce P. Merenstein, Esquire as Special Master.[25]

5

Our Order appointing Special Master Merenstein, *inter alia,* set the terms of his authority consistent with Rule 53; directed Special Master Merenstein file a Report and Recommendation; ordered objections or motions to modify Special Master Merenstein's findings of fact and conclusions of law within twenty-one days after filing of the findings of fact and conclusions of law with responses filed within ten days; and "[c]onsistent with counsel's representation during yesterday's conference call, we will review conclusions of law *de novo* and all objections to findings of fact based solely on review of the transcribed record and without further evidentiary hearings; ...."[26]

## B. Our October 15, 2019 opinion on Local 98's burden of proving damages and retention of Farfield's time records.

Before Special Master Merenstein began evidentiary hearings, we ordered the parties to brief the burden of proof as to Local 98's damages and the retention of Farfield's time records.[27] Both parties raised these legal issues in their pre-trial memoranda.[28] The parties briefed the issue but elected not to wait for our ruling on the burden of proof and instead began hearings with Special Master Merenstein on October 2, 2019.

Local 98's damages theory under the False Claims Act is Farfield misclassified groundmen and laborers, paying them at a lower rate for electrical work they performed which should have been paid at the higher journeyman rate.[29] Local 98 claims Farfield misclassified forty-two workers, violating prevailing wage rates under the Davis-Bacon Act. Local 98 relies on Farfield's "phase code" time sheets as well as the representative testimony of some of the forty-two workers to prove damages. Farfield produced time sheets assigning "phase codes" to workers' time. Local 98 contends twelve "phase codes" equate to the performance of electrical work. Farfield denies its phase codes show its employees performed electrical work and contends it used the phase codes for internal accounting purposes only.

6

Local 98 asked we impose a higher burden on Farfield under *Anderson v. Mt. Clemens Pottery Company*[30] because Farfield failed to maintain employment records required by the Fair Labor Standards Act and Davis-Bacon Act and, absent adequate records, Local 98 cannot establish time spent performing uncompensated work. In *Mt. Clemens*, the Supreme Court articulated a burden shifting analysis in Fair Labor Standards Act claims: "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."[31] Recognizing the remedial nature of the Fair Labor Standards Act, the Supreme Court held the burden of proving damages should not be put on the employee where the employer's records are "inaccurate or inadequate" in violation of its statutory obligation to maintain proper records.[32]

Local 98 argued *Mt. Clemens* applies to its burden of proving the amount of damages and it may meet its burden by using representative evidence; the testimony of some of the forty-two groundmen and laborer it alleged Farfield misclassified coupled with Farfield's phase code time sheets.[33] In response, Farfield argued *Mt. Clemens'* burden shifting does not apply in this False Claims Act case; the burden of proof on damages for failure to keep records cannot shift to Farfield because Davis-Bacon Act only required it to retain payroll records for three years and the Fair Labor Standards Act only required it to retain records for two or three years; Farfield did not have timely notice of a payroll records issue under the Davis-Bacon Act; and, even if *Mt. Clemens*

7

applies, Local 98 must still present evidence of the amount and extent of work for shifting the burden of proof on damages.[34]

After considering the parties' arguments, we determined Special Master Merenstein may apply *Mt. Clemens* to evaluate an award of damages if he finds Local 98 meets its burden based on the phase code timesheets and related evidence and if Farfield fails to meet its burden based on its evidence the phase codes do not show misclassification.[35] We instructed the parties we expect Special Master Merenstein to make credibility and fact determinations, file conclusions of law, and decide damages, if any, and we will not allow a two-step process to review Special Master Merenstein's credibility findings consistent with the parties' consent to the Special Master.[36] We ordered the parties and Special Master Merenstein are governed by our October 15, 2019 memorandum describing the limited instance in which the burden shifting would apply if warranted by the Special Master's findings of fact based on his evaluation of witness credibility and necessary conclusions of law.[37]

## C. Special Master Merenstein's Report and Recommendation.

On November 29, 2019, Special Master Merenstein filed his Report and Recommendation after eight days of evidentiary hearings including testimony from twenty witnesses, deposition testimony of two witnesses, and over eighty exhibits.[38] Special Master Merenstein recommends we enter judgment for Local 98, as relator for the United States, and against Farfield.[39]

Special Master Merenstein identified five key disputed issues: (1) *What work* did groundmen and laborers do on the Wayne Junction Project? (2) Based on local area practices, *which of the work*, done by groundmen and laborers, if any, should have been classified and paid as journeyman work? (3) *How much of the work* done by groundmen and laborers, if any, should have been classified as paid as journeyman work? (4) If any work done by groundmen and laborers

8

should have been classified and paid as journeyman work, did Farfield *knowingly misclassify this work*? and (5) If Farfield knowingly misclassified some of the work done by groundmen and laborers, what is the *proper amount of civil penalties and damages*?[40]

With the parties' consent, Special Master Merenstein presided over a hearing rife with credibility determinations which the parties agreed would be resolved solely by him. Special Master Merenstein described the parties' "diametrically opposing views on many of these issues and, at the hearing, often presented irreconcilably conflicting versions of what occurred on a day-to-day basis on the Wayne Junction Project."[41]

After evaluating the credibility of witnesses, Special Master Merenstein issued 220 findings of fact and thirty-nine conclusions of law to support his findings: (1) groundmen and laborers did many of the same tasks on the Wayne Junction Project as journeymen did, largely because Farfield allowed its foremen to determine which workers did which tasks, without regard for the workers' classifications; (2) certain work done by groundmen and laborers on the Project, particularly installing electrical conduit, pulling electrical wires, and performing electrical terminations, constituted journeyman work and therefore should have been classified and paid as journeyman work; (3) based on the evidence presented at the hearing, particularly the phase codes used by Farfield to track work done on the Wayne Junction Project, but also daily foreman reports, photographs of the worksite, other documents, and witness testimony, the amount and extent of work that was misclassified as groundman or laborer work can be determined by reasonable inference; (4) although the evidence does not demonstrate that Farfield intentionally submitted false statements regarding the work performed by its employees on the Wayne Junction Project, it acted in reckless disregard of the truth or falsity of this information, largely by allowing its foremen to determine which workers did which tasks, without regard for the workers' classifications,

9

despite Farfield's awareness of its prevailing wage obligations; and (5) based on Farfield's records, including certified payrolls and phase code timesheets, it is possible to approximate the amount and extent of underpayments due to the misclassifications, and thus calculate the proper amount of civil penalties and damages.[42]

Summarizing his findings of fact, conclusions of law, and analysis, Special Master Merenstein concluded "for the most part, all classification of employees on the Wayne Junction Project performed all of the tasks on the Project. While the vast majority of the work on the Project did not require the skills of a journeyman, a small portion of the work ... should have been classified as journeyman work, based on the local area practices that govern the classification and pay for work under the Davis-Bacon Act."[43]

Local 98 attributed thirty percent of the work to journeyman work and Farfield attributed less than five percent of the work to journeyman work. After eight days of hearings evaluating the credibility of witnesses, Special Master Merenstein found approximately thirteen percent of the work should have been classified as journeyman work.[44] Based on the testimony and exhibits adduced at the hearing, Special Master Merenstein concluded six of the twelve phase codes are reasonably accurate proxies for "electrical" work journeymen should have performed. Special Master Merenstein concluded to the extent groundmen or laborers performed the work under six of the phase codes, Farfield misclassified and underpaid them, and its statements on its payrolls certifying each of its workers' classifications "conform with the work he performed" were false.[45]

Special Master Merenstein concluded a small portion of the disputed work—high-voltage terminations and signal and switch terminations—constituted journeyman work, and any groundmen or laborers who performed this work were misclassified and underpaid.[46] He found the "bulk of the work in dispute" —installation of electrical conduit and pulling electrical wires—

10

constitutes journeyman work and, alternatively, both laborer and journeyman work, and to the extent groundmen performed this work they were misclassified and underpaid.[47]

In determining the quantity of journeyman work performed by groundmen and laborers, Special Master Merenstein considered Farfield's phase codes, daily foremen reports, photographs of the worksite, other exhibits including Local 98's spreadsheet compiling phase codes, wage rate, hours worked, and pay classification of Farfield employees, and witness testimony.[48] Special Master Merenstein concluded Farfield presented sufficient evidence to negate the reasonableness of the inference *all* hours assigned to journeyman task codes actually constituted journeyman work. He found Farfield proved at least 1.5 hours of each eight-hour day involved routine, non-journeyman work, and reduced the hours worked under the relevant phase codes by 18.75% (1.5 hours out of every eight-hour day) in calculating the number of misclassified and underpaid hours.[49] Special Master Merenstein found while it may be possible, even after subtracting 18.75% of the time under journeyman task codes, some remaining time working under journeyman tasks is not journeyman work, Farfield failed to present evidence to negate the reasonableness of the inference all of the remaining work under these task codes is journeyman work that should have been classified and paid at the journeyman rate.[50] Farfield objects to this finding, but does not provide us with a record cite supporting its objection.

Subtracting 18.75% of time from the journeyman task codes, Special Master Merenstein found the total hours all workers spent on the Wayne Junction Project under the journeyman task codes is 13.5% of the total working hours and nearly 87% is *not* work, according to local area practice, should have been classified and paid as journeyman work.[51] Applying his factual findings, Special Master Merenstein calculated an underpayment of $159,273.54 for 14,508 hours of work over 105 separate weeks on the Wayne Junction Project.[52] He then trebled the damages

11

under Section 3729(a)(1) of the False Claims Act for a total of $477,820.62.[53] Special Master Merenstein concluded the statutory civil penalty of $5,500 per violation is mandatory, and multiplied $5,550 by 105 violations (representing the number of false payroll records Farfield submitted to SEPTA) for a total civil penalty of $577,500.[54] Adding the total damages of $477,820.62 to the statutory civil penalty of $577,500.00, Special Master Merenstein recommended a total judgment of $1,055,320.62 allocated between the United States and Local 98 as the relator.[55]

## D. Farfield objects to Special Master Merenstein's Report and Recommendation.

Farfield objected to Special Master Merenstein's Report and Recommendation with proposed changes.[56] It asks us to wholesale adopt its proposed findings of fact and conclusions of law submitted to Special Master Merenstein.[57] Local 98 responds we should deny Farfield's objections and enter judgment as recommended by Special Master Merenstein.[58]

After reviewing Farfield's voluminous attempt to recast credibility findings after agreeing it would not do so, and our independent review of the record, we agree with the Special Master's exhaustive and thoughtful findings of fact and conclusions of law and adopt his Report and Recommendation.

## II. Analysis

Rule 53 governs our standard of review; we review findings of fact, unless the parties stipulate to a clear error or the findings will be final, and conclusions of law *de novo*.[59] We may "adopt or affirm, modify, wholly or partly reject or reverse, or resubmit to the master with instructions" the Report and Recommendation.[60] The parties did not stipulate Special Master Merenstein's findings of fact will be reviewed for clear error or final as provided by Rule 53(f)(3)(A) and (B), accordingly we apply a *de novo* standard. But the parties agreed at our

12

September 3, 2019 conference we will not review Special Master Merenstein's credibility determinations.

The dispute focuses on the intersection of two Congressional mandates: the Davis-Bacon Act and the False Claims Act as applied to Farfield under its contract with SEPTA. In the Davis-Bacon Act, Congress requires each contract over $2,000 to which the United States is a party for "construction, alteration, or repair, … of … public works," must contain a clause setting the minimum wages to be paid to various classes of workers employed under the contract.[61] The minimum wages are based on the local prevailing wage rates determined by the Secretary of Labor.[62] SEPTA, receiving funds from the United States Federal Transportation Administration, is bound by these obligations.

In the False Claims Act, Congress "prohibits the submission of false claims for payment to the United States."[63] A False Claims Act violation has four elements: "falsity, causation, knowledge, and materiality."[64] To establish a violation of section 3729(a)(1) of the False Claims Act, a plaintiff must prove "(1) the defendant presented or caused to be presented to an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."[65] Relevant here, a defendant acts "knowingly" if it "acts in reckless disregard of the truth or falsity of the information."[66]

In our memorandum denying Farfield's motion for summary judgment, we found a claim under the False Claims Act may be predicated on an alleged violation of the Davis-Bacon Act.[67] Local 98 alleges Farfield misclassified its groundmen workers in violation of the Davis-Bacon Act and then submitted fraudulent certified payrolls for payment by the federal government under the False Claims Act, 31 U.S.C. § 3729(a)(1)(B), making "any person who – knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim …

13

liable to the United States Government for a civil penalty ... plus 3 times the amount of damages which the Government sustains because of the act of that person."[68]

## A. We overrule Farfield's objections and adopt Special Master Merenstein's Report and Recommendation in its entirety.

Farfield makes seven categories of objections, many with sub-arguments, to Special Master Merenstein's Report and Recommendation: (1) Local 98 failed to sustain its burden of proving Farfield acted in reckless disregard in violation of the False Claims Act and failed to prove scienter required for False Claims Act liability; (2) Local 98 did not prove materiality of the alleged false record or statement; (3) certified payroll records are not claims under the False Claims Act; (4) Local 98's evidence is "not representative" and *Mt. Clemens* burden shifting is not justified; (5) Farfield did not misclassify its workers on the Wayne Junction Projection; (6) "additional objections" to specific findings of fact; and, (7) Farfield did not violate the False Claims Act.

Local 98 responds (1) the record shows Farfield acted in reckless disregard for the truth or falsity of its claim it paid the appropriate wage rates to groundmen and laborers on the Wayne Junction Project; (2) it proved materiality of Farfield's false certified payrolls; (3) each false certified payroll is a separate penalty under the False Claims Act; (4) its evidence is representative and satisfies *Mt. Clemens's* standards for burden shifting; and, (5) Farfield misclassified its workers and violated the False Claims Act.[69]

We address each of Farfield's objections in turn.

### 1. The Special Master properly found Farfield acted in reckless disregard under the False Claims Act.

Farfield first objects to Special Master Merenstein's finding Farfield recklessly disregarded the truth or falsity of its certified statements to SEPTA under the False Claims Act. Special Master Merenstein summarized his finding of reckless disregard: "[a]lthough the evidence does not

14

demonstrate that Farfield intentionally submitted false statements regarding work performed by its employees on the Wayne Junction Project, it acted in reckless disregard of the truth or falsity of this information, largely by allowing its foremen to determine which workers did which tasks, without regard for the workers' classifications, despite Farfield's awareness of its prevailing wage obligations."[70]

Farfield objects to Special Master Merenstein's Conclusions of Law 15 through 17:

15. The standard of reckless disregard represents "an intent to hold liable '[o]nly those who act in gross negligence,' that is, those who failed 'to make such inquiry as would be reasonable and prudent to conduct under the circumstances.'" *United States v. King-Vassel*, 728 F.3d 707, 712-13 (7th Cir. 2013) (quoting S. Rep. No. 99-345, at 20, reprinted in 1986 U.S.C.C.A.N. 5266, 5285). While an honest mistake or even simple negligence is not sufficient to demonstrate reckless disregard, *United States ex rel. Hill v. University of Med. & Dentistry*, 448 F. App'x 314, 317 (3d Cir. 2011), liability can be based on "mere passive disregard that the [finder of fact] finds to have been reckless," *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 245 n.12 (3d Cir. 2004).

16. In other contexts, the Supreme Court has noted that reckless disregard is the failure to take steps to prevent something from happening when the defendant knows or, because it is so obvious, should have known that there is an unjustifiably high risk of it happening. See *Farmer v. Brennan*, 511 U.S. 825, 836 (1994); *see also Bedrosian v. United States*, 912 F.3d 144, 153 (3d Cir. 2018) (noting that recklessness with regard to a filing requirement exists where a filer clearly ought to have known that there was a grave risk of non-compliance and the filer was in a position to determine if there was compliance).

17. Farfield's delegation of full discretion and responsibility to its foremen to use workers on their crews as they saw fit, at the same time that Farfield was well aware of its obligations under the SEPTA contract and federal prevailing wage laws to ensure that employees were paid the appropriate prevailing wage rate for the classification of the work they actually performed, constituted reckless disregard of the truth or falsity of the statements in the weekly certified payrolls that Farfield was paying all of its employees the appropriate wage for the work they actually performed.[71]

Farfield argues Special Master Merenstein erred in concluding Farfield acted in reckless disregard under the False Claims Act because (a) Farfield's managers and supervisors believed they were acting in accordance with the Davis-Bacon Act's pay and classification requirements; (b) the Department of Labor's 2004 audit of Farfield finding no wage issues (other than a minor

15

underpayment issue to carpenters on Labor Day) "negates any possible conclusion" Farfield acted in reckless disregard of its obligations under the Davis-Bacon Act; (c) Farfield acted in accord with Local 98's collective bargaining agreement; (d) Farfield managers were aware SEPTA investigated and questioned Farfield employees about their pay rates and classifications, and SEPTA never raised any issues with Farfield; (e) Local 98's original complaint alleged violations of the False Claims Act by misclassifying workers on five other projects, but the court dismissed those claims with prejudice; (f) Special Master Merenstein's comment "there are a number of close questions of fact and law" shows Local 98 failed to sustain its burden of proof; (g) Farfield paid its employees more than required under the prevailing wage determination; and, (h) Local 98 did not prove a Farfield employee or officer acted knowingly. We reject each argument and overrule Farfield's objection to Special Master Merenstein's finding it acted in reckless disregard of the truth or falsity of certifications submitted to SEPTA.

### a) The record confirms Farfield hired Joseph McGee, Sr. and delegated responsibility to him to determine classification of employees.

Although Farfield concedes it hired Joseph McGee, Sr. to "run its Transit Division," it seeks to distance itself from Mr. McGee's conduct arguing it relied on his experience in prevailing wage projects for SEPTA rail work. Farfield argues because it relied on Mr. McGee, Sr. and he told Farfield managers and supervisors groundmen could do anything a journeyman lineman could do, "there was no reason for [Farfield] management to direct the foremen that they needed to limit the groundmen to perform only certain tasks" and "there was no need for Farfield to track hours spent by the groundmen on numerous specific tasks, since Farfield believed and understood that the groundmen were being paid appropriately for the work they were performing at the groundmen rate, since that equaled or was higher than the rate required to be paid ...."[72] Farfield reasons

16

because it relied on Mr. McGee, Sr., it lacked the requisite scienter to, and did not knowingly, violate the False Claims Act.

Local 98 responds Mr. McGee, Sr. *is* Farfield management and it cannot excise Mr. McGee from its management team hoping to show a lack of scienter. Local 98 cites record evidence showing Mr. McGee, Sr. acted at Farfield's point person on the Wayne Avenue Project who exercised authority over every aspect of the project:

- Dennis Pierce, Farfield's Chief Operating Officer at the time of the Wayne Junction Project and responsible for all production for Farfield, recruited Mr. McGee to expand Farfield's marketplace into the transit business.[73]

- Farfield hired Mr. McGee, Sr. as its divisional Vice President for the Transit Division at the time of the Wayne Junction Project[74] and Mr. McGee, Sr. testified to his responsibility for all Farfield transit projects including to oversee and manage the Wayne Junction Project.[75] Mr. McGee, Sr. testified he went to the Wayne Junction job site "almost every day."[76]

- Mr. McGee, Sr. testified his position at Farfield made him ultimately responsible and accountable for any project, including the Wayne Junction Project, in the Transit Division he managed.[77]

- Mr. Pierce testified in the 2002 to 2007 time period, Mr. McGee, Sr. worked only on the Wayne Junction Project and Farfield hired Mr. McGee, Sr. for his skills and knowledge in rail work.[78]

- Farfield Manager Jackson, contract manager for Farfield and a trained journeyman electrician, testified Mr. McGee, Sr. hired and fired employees on the Wayne Junction Project, determined employees' classifications, and approved any change in an employee's classification.[79]

The record supports a finding Farfield hired Mr. McGee, Sr. and relied on his expertise including the classification of employees in rail work. As the Farfield Vice President who classified employees on the Wayne Junction Project, Mr. McGee, Sr. testified to the differences between groundmen and linemen classifications:

- Groundmen are "completely untrained," are "trying to learn the [electrical] trade," and are "completely unskilled until [they] get into an apprenticeship program."[80]

- The only time groundmen "pull wire" is when they assist linemen "pulling contact wire in."[81]

- Groundmen cannot do everything a lineman can do, explaining a groundman "is the grunt on the ground that gets what the lineman needs in the bucket" and the groundman does not "have the skill to put contact wire up and certainly doesn't have the skill to do it safely."[82] Farfield employees assisting linemen were classified as groundmen.[83]

- "Pulling wire" is electrician's work, and in his career, Mr. McGee, Sr. never saw a groundman "pull wire anywhere, ever."[84]

The evidence demonstrates Farfield hired Mr. McGee, Sr. for his expertise and relied on him to classify employees, and approve changes in an employee's classification, on the Wayne Junction Project. Farfield's policy made it Mr. McGee, Sr.'s responsibility to monitor employee classifications with the assistance of superintendents and foremen who, in turn, were responsible for assigning and monitoring work.[85]

Farfield managers and supervisors Mr. Jackson, Robert Pennington, and Christopher Derr swore Mr. McGee, Sr. told them groundmen could perform any task a journeyman lineman could perform and relied on Mr. McGee, Sr.'s representations.[86] Special Master Merenstein explained Farfield's managers and supervisors Mr. Jackson, Mr. Pennington, and Mr. Derr, did not concern themselves with monitoring worker classifications for purposes of complying with Farfield's prevailing wage obligations.[87] Special Master Merenstein did not find testimony of Farfield's witnesses credible—testimony only journeymen performed tasks involved in installing electrical conduct and pulling electrical wire or cable—explaining the testimony is contradicted by other credible testimony and inconsistent with Farfield's own witnesses' testimony because all work on the Wayne Junction Project amounted to groundman work, it did not need to monitor which classification of worker performed which tasks, along with undisputed evidence Farfield gave its foremen full discretion to assign work as they saw fit.

18

The record evidence confirms Farfield, through Mr. McGee, Sr., acted in reckless disregard of the truth or falsity of the claims submitted by allowing its foremen to determine tasks performed by workers without regard for the worker's classification. Because Mr. McGee, Sr. told Farfield's managers groundmen could do anything a journeyman lineman could do—an assertion contradicted by Mr. McGee, Sr.'s testimony—does not show Farfield "lack the required scienter, and did not knowingly, violate the False Claims Act."

Farfield's objections to the cases defining "reckless disregard" relied on by Special Master Merenstein are equally unpersuasive. Farfield objects to Special Master Merenstein's reliance on *United States v. King-Vassel*,[88] a decision from the United States Court of Appeals for the Seventh Circuit. In *King-Vassel*, the relator physician filed a False Claims Act action against a psychiatrist's "off-label" prescriptions. The district court granted summary judgment for the psychiatrist because the relator did not have an expert on the issue of whether the claims were false within the meaning of the False Claims Act.[89] The court of appeals reversed, finding the relator need only show reckless disregard which the court defined by referring to the Senate Report amending the False Claims Act to add "reckless disregard." Under the court of appeals' reading of the Senate Report, the amendment of the False Claims Act to include "reckless disregard" evidenced Congress's intent to hold liable "'[o]nly those who act in gross negligence,' that is, those who failed 'to make such inquiry as would be reasonable and prudent to conduct under the circumstances.'"[90]

Farfield contends Special Master Merenstein erred by relying on *King-Vassel* because the court of appeals "paraphrased the language from the Report in a way that changed the spirit of the language." According to Farfield, the Senate intended "reckless disregard" to mean "gross negligence" imposing a duty of "limited inquiry" that is "reasonable and prudent to conduct under

19

the circumstances" and the circuit court's failure to mention "limited inquiry" somehow makes the case bad law and the Special Master should not have relied on it. We reject this argument. First, *King-Vassel* is not overruled or superseded by a court or statute. Second, Farfield fails to cite authority *King-Vassel* applied an erroneous standard to define reckless disregard. Even if the court of appeals in *King-Vassel* somehow erred in failing to use the term "limited duty," Special Master Merenstein did not impose a more burdensome duty on Farfield. He correctly noted "an honest mistake or even simple negligence is not sufficient to demonstrate reckless disregard" and, in this Circuit, liability may be based on "mere passive disregard that the [finder of fact] finds to have been reckless ...."[91]

Special Master Merenstein found Local 98 proved Farfield acted in reckless disregard of the truth of the information in its certified payrolls submitted to SEPTA, a finding supported by record evidence Farfield's executives and managers knew prevailing wage requirements of the Davis-Bacon Act and the SEPTA contract; Farfield delegated to its foremen the responsibility for determining its workers tasks on a day-to-day basis; Farfield did not instruct its foremen to assign specific tasks to workers on the basis of the workers' classification or provide guidance to its foremen on how to assign work tasks; and, by allowing foremen full discretion to assign workers tasks as the foremen saw fit, Farfield "disregarded the strong possibility ... workers would be paid the prevailing wage rate for their nominal classification but would not be paid the prevailing wage rate for the classification of work they were actually performing."[92]

Farfield objects to Special Master Merenstein's reference to non-False Claims Act cases defining reckless disregard. We do not find this reference erroneous, but further explains "reckless disregard." We overrule Farfield's objections on this basis to Conclusions of Law 15, 16, and 17.

20

### b) We overrule Farfield's objection the Department of Labor's audit absolves it from a finding of reckless disregard.

Farfield argues a Department of Labor ("DOL") audit in September 2004 negates a finding of reckless disregard. Farfield made this same argument in support of its summary judgment motion. Local 98 argued there is no evidence in the record showing the scope, extent, or focus of the DOL's investigation. We found fact issues surrounding the DOL's audit precluded summary judgment.[93]

The DOL audited Farfield on the Wayne Junction Project in September 2004. DOL investigator Brian Johnson requested from Mr. McGee, Sr. documents including "[w]eekly payroll records and daily time records for employees and any other individuals who worked for the company during the period from September of 2002 to the present. ...."[94] Mr. McGee, Sr. forwarded Mr. Johnson's request to Farfield's Vice President John Kleimo. After investigation, the DOL found Farfield underpaid four carpenters for work on a holiday (Labor Day) and did not notify Farfield of any misclassification violations.

After hearing evidence on the DOL investigation, Special Master Merenstein found DOL investigator Johnson visited Farfield's local office, interviewed employees, reviewed documents, and corresponded with Farfield's Vice President Kleimo by email and telephone as stipulated by the parties.[95] But Mr. Kleimo did not know who Mr. Johnson spoke with, including whether he spoke with Mr. McGee, Sr., tradesmen, or foremen and he did not know what documents Mr. Johnson reviewed as part of the audit.[96] Special Master Merenstein found Mr. Johnson reviewed certified payrolls, but the record does not show whether he took steps to determine if Farfield's classifications and workers' pay on certified payrolls conformed with the work performed.[97] Farfield does not cite evidence Special Master ignored regarding as to whether Mr. Johnson took steps to make this determination.

21

Farfield argues because Mr. Johnson did not inform Farfield of a worker misclassification issue, Farfield believed it properly classified and paid its workers and continued its classification and pay practices demonstrating it did not act with reckless disregard of its obligations under the Davis-Bacon Act. Farfield relies on *United States ex rel. Rueter v. Sparks*.[98] In *Rueter*, the relator claimed defendant knowingly submitted, *inter alia*, false hours and wage rates in a federally funded highway and bridge work project under the False Claims Act. The district court found the evidence did not demonstrate defendant acted in deliberate ignorance or reckless disregard of the truth or falsity of information submitted in certified payrolls in part because a DOL audit did not reveal Davis-Bacon Act wage violations.[99] But *Rueter* does not stand for the proposition a DOL audit finding no wage violations forecloses, as a matter of law, a finding of reckless disregard. Rather it is simply evidence going to whether a defendant acted in reckless disregard of wage and classification requirements.

Special Master Merenstein did not ignore the DOL audit. To the contrary, he recognized the DOL's 2004 audit and discussed its findings. But based on the evidence before him, Special Master Merenstein explained the DOL's audit did not affect his conclusion Farfield acted in reckless disregard of its prevailing wage obligations. He explained its delegation to foremen of "complete authority for assigning tasks at the worksite to its foremen, without regard to worker classifications and without providing guidance or instructions to the foremen regarding the proper use of groundmen and laborers" as well as the "absence of evidence that [DOL auditor Johnson] obtained or reviewed information regarding the actual work that groundmen and laborers were doing on the Wayne Junction Project" supported a finding of reckless disregard.[100]

These fact findings are supported by Mr. Jackson and other Farfield witnesses who swore:

- crews of workers led by foremen performed work on the Wayne Junction Project;

22

- Farfield did not have a formal process for selecting workers for crews based on their classifications and classifications did not play a role in the selection of crew members;

- foremen had the primary responsibility for selecting crew members;

- although some crews specialized in particular types of work, most were not limited in the work they performed;

- foremen and superintendents were responsible for assigning and monitoring work and had the ultimate responsibility for determining the work performed by crew members;

- Farfield did not instruct its foremen on how to assign workers of different classifications to tasks;

- Although foremen may have been informed of a worker's classification at the time of hiring, the classifications "played either no role or only a minor role in the assigned of work to" crew members;

- Tasks installing conduit and pulling wire were not performed by any particular classification of worker and all workers on a crew performed all tasks at various times;

- Many of Farfield's managers believed all or virtually all of the work on the Wayne Junction Project constituted groundmen work and any worker could do any task;

- As a result, Farfield's managers did not concern themselves with monitoring worker classifications for purposes of compliance with prevailing wage obligations;

- The evidence did not support a finding groundmen and laborers were simply "helping" journeymen with installation or conduct and pulling wire and testimony demonstrated many groundmen and laborers actually performed all tasks associated with conduit installation and wire pull; and,

- The Special Master did not find credible Farfield's witnesses' testimony only journeymen performed tasks involved in installing electrical conduit or pulling electrical wire or cable.[101]

Special Master Merenstein rejected Farfield's argument the DOL audit shows it did not act with reckless disregard of its obligations under the Davis-Bacon Act based on the evidence of record and credibility determinations. We overrule Farfield's objection on this basis.

23

### c) Local 126's Collective Bargaining Agreements do not preclude a finding Farfield acted in reckless disregard.

Similar to its argument regarding the DOL's audit, Farfield argues it cannot have acted in reckless disregard because it complied with Local 126's collective bargaining agreements. Farfield objects to Special Master Merenstein's Findings of Fact 161 to 166 (which it contends are not proper factual findings but conclusions of law) and Conclusions of Law 6 through 11.

From 2002 through 2007, Article III of Local 126's collective bargaining agreements addressed "employer rights" and "union rights."[102] Section 3:12 of the collective bargaining agreements provide:

> The Union understands the Employer is responsible to perform the work required by the owner. The *Employer shall, therefore, have no restrictions, except those specifically provided for in the collective bargaining agreement*, in planning, directing and controlling the operation of all his work, *in deciding the number and kind of Employees to properly perform the work*, in hiring and laying off Employees, in transferring Employees from job to job within the Local Union's geographical jurisdiction, in determining the need and number as well as the person who will act as Foreman, in requiring all Employees to observe the Employer's and/or owner's rules and regulations not inconsistent with this Agreement, in requiring all Employees to observe all safety regulations, and in discharging Employees for proper cause.[103]

Farfield argues the highlighted language of Section 3:12 allows it to decide the number and kind of employees to properly perform work regardless of the law and obligations on a federally funded project. It specifically argues nothing in the collective bargaining agreements restricted the work performed by groundmen except "aerial work and energized work."[104]

At the hearing, Local 98's expert witness, Thomas Leach, former Business Manager and Financial Secretary for Local 126 and a journeyman lineman, testified to local industry trade practices and standards.[105] Mr. Leach testified based on local industry practices groundmen are not permitted to connect conduit; thread conduit; bend conduit; lay conduit; connect or splice

24

conduit at a manhole; pull wire; monitoring or addressing tension of a cable through a conduit ("capstan"); terminate a cable run; and perform splicing and/or stripping functions.[106]

Farfield argues Mr. Leach admitted at the hearing his testimony "could be" in conflict with the clear language of Section 3:12, agreed local industry practices are not written down anywhere, and agreed nothing in the collective bargaining agreements prohibits the type of work he testified is contrary to local industry practice.[107] Farfield argues Mr. Leach's parol testimony cannot be used to contradict the clear language of the collective bargaining agreements. It objects to Special Master Merenstein's Findings of Fact 165 and 166:[108]

> 165. The Special Master finds that this clause providing that there are no restrictions, other than those in the collective bargaining agreement, on a signatory employer's right to choose "the number and kind of Employees to properly perform the work" on a project is not in conflict with the local area practices regarding the work a groundman can do and what work must be done by a journeyman. An employer's *right* to choose which workers will do which work on a project is not the same thing as the established area *practice* regarding which workers should do which work. Similarly, the fact that a collective bargaining agreement may not prohibit an employer from using groundmen (rather than journeymen) to perform particular tasks does not mean that using them in this manner is consistent with the actual *practice* in that area.

> 166. The Special Master finds that local area practices not expressly contained in the Local 126 collective bargaining agreement preclude groundmen from installing electrical conduit, pulling electrical wire, or performing splices or terminations. Tr. 754:17-755:5, 757:10-22, 759:2-760:1, 760:15-761:6, 762:20-764:5, 766:18-767:7, 767:15-17, 769:15-19, 786:22-787:10, 796:21-797:13, 798:8-799:12 (Leach).

Farfield objects to Special Master Merenstein's Conclusions of Law 6 through 11:[109]

> 6. It is well-established that where union contracts are the basis for a prevailing wage determination, as they are here, local union area practices determine what work falls under which trade classifications. As a leading case explained, "where a wage determination is based on a collective bargaining agreement, the proper classification of employees is determined exclusively by the practices of the signatory unions." *Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059-62 (D.C. Cir. 2007) (citing *Fry Bros. Corp.*, 123 WAB No. 76-06 (June 14, 1977)); *see also United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. C. W. Roen Constr. Co.*, 183 F.3d 1088, 1093-94 (9th Cir. 1999).

25

7. While collective bargaining agreements governing the work at issue are the first place to look when union practices determine the local area practices for classification of work, "the industrial common law—the practices of the industry and the shop—is equally a part of the collective bargaining agreement although not expressed in it." *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581-82 (1960); *see also Conrail v. Railway Labor Executives' Ass'n*, 491 U.S. 299, 311 (1989) ("it is well established that the parties' 'practice, usage and custom' is of significance in interpreting their agreement." (citation omitted)). "Under longstanding labor law principles, the scope and meaning of a collective bargaining agreement is not limited to the text of the agreement." *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1046 (9th Cir. 2016). "The essence of the CBA is derived not only from its express provisions, but also from the industrial common law." *NFL Players Ass'n v. NFL*, 831 F.3d 985, 993 (8th Cir. 2016) (citation omitted). "Clear and long-standing practices of the parties—in other words, 'past practices'—can establish terms of the agreement that are as binding as any specific written provision." *Muller v. GPO*, 809 F.3d 1375, 1383 (Fed. Cir. 2016) (citation omitted); *see also Abhe & Svoboda*, 508 F.3d at 1059 (noting that it is the *practices* of the relevant local union that govern classifications).

8. The Third Circuit has noted that it "is well established that industry or shop practices form part of the collective bargaining agreement." *Connors v. Consolidation Coal Co.*, 866 F.2d 599, 603 (3d Cir. 1989); *see also Rosano v. Township of Teaneck*, 754 F.3d 177, 190-91 (3d Cir. 2014) (holding that "practice, usage and custom" must be considered in interpreting obligations under a collective bargaining agreement).

9. Following these principles, a district court in this district rejected an employer's arguments that an arbitrator's awarding of work to a particular class of employees was not derived from the language of the contract and was contrary to the management rights clause of the contract, noting that "custom and past practice (the so-called 'law of shop') also play a fundamental role in the interpretation" of collective bargaining agreements. *PPL Servs. Corp. v. IBEW, Local 1600*, No. 11-3273, 2012 U.S. Dist. LEXIS 170075, at *14-*18 (E.D. Pa. Nov. 29, 2012); *see also id.* at *26 ("it is [a] violation of its CBA with IBEW for PPL to assign overtime work to one classification of employee over another classification of employee when that work has usually and customarily been performed by the other classification" (emphasis in original)).

10. Where a classification practice may be "identifiable" in a local area, but is not the "prevailing" practice, it should not govern classification determinations. *See, e.g., Building & Constr. Trades' Dep't v. Donovan*, 712 F.2d 611, 624-26 (D.C. Cir. 1983). Thus, whereas laborers may in some circumstances and in some areas install conduit and pull wires, this is not the local area practice in the Philadelphia area and does not govern the classification of this work on the Wayne Junction Project.

11. Farfield did not adhere to local area practices regarding which classifications of workers could install electrical conduit, pull wires or cables, and perform electrical terminations.

Farfield essentially argues Special Master Merenstein erred in finding Farfield acted in reckless disregard based on his application of local industry practices because the collective bargaining agreements did not prohibit groundmen from performing any work except "aerial" and "energized work."

Farfield first objects to Conclusion of Law 6, arguing the legal authority relied on by Special Master Merenstein is distinguishable; Special Master Merenstein based his conclusion on a fact he never found and is not supported by the record evidence; and Local 98 never proved the wage determination for the Wayne Junction Project is based on a collective bargaining agreement.[110] Farfield challenges Special Master Merenstein's conclusion: "It is well-established that where union contracts are the basis for a prevailing wage determination, as they are here, local area practices on classifications determine what work falls under which trade classification." Farfield argues no testimony from the hearings, and the parties did not stipulate, to support an assertion union contracts are the basis for the wage determination in this case.

We reject Farfield's objection on this basis in its entirety. Farfield argues on one hand Section 3:12 of the collective bargaining agreements allowed it to assign any work to groundmen (with the exception of aerial work and "hot" work) but on the other hand asserts the very same collective bargaining agreements are not the basis for the wage determination. Mr. Leach signed the collective bargaining agreements on behalf of Local 126 as its Business Manager and Financial Secretary.[111] He testified to the local area practice regarding work groundmen could and could not do. The prevailing wage determination for the Wayne Junction Project is based on Local 126 practices to which Mr. Leach testified. Special Master Merenstein recognized Section 3:12 provides no restrictions, other than specifically provided for, on an employer's right to choose "the number and kind of Employees to properly perform the work" but this is not in conflict with the

27

local area practices regarding groundmen and journeymen work. And this does not mean Farfield may ignore legal authority we interpret collective bargaining agreements within the context of local area practices for classification of work. For example, Special Master Merenstein relied on *Abhe & Svoboda v. Chao* for his conclusion where union contracts are the basis of a prevailing wage determination, local union area practices on classifications are determinative.[112] In *Abhe & Svoboda*, a contractor challenged the decision by the Administrator of Department of Labor's Wage and Hour Division the contractor misclassified its employees. The court of appeals found it did not have subject matter jurisdiction over the contractor's challenge to the Department's wage determinations. Wages for painters, laborers, and carpenters on the federally funded bridge work projects at issue were based on collective bargaining agreements. The Wage and Hour Division investigated the contractor's classification practices and found the painters union claimed all work performed on bridge painting projects. The Administrator of the Wage and Hour Division found "this was the area practice and ... the Company had misclassified its employees when it had paid some of them as laborers and carpenters."[113] Although the court of appeals concluded it did not have subject matter jurisdiction over the contractor's challenge to the Secretary of Labor's determination of proper job classifications, the court noted "[w]here collective bargaining agreements form the basis of wage determinations, the practice of local signatory unions is conclusive under Department precedent."[114]

In recognizing this general rule, the court of appeals relied on *Fry Brothers Corp.*, a Wage Appeals Board decision.[115] Referred to as the "*Fry Brothers* rule," the case stands generally for the proposition, under the Davis-Bacon Act, the Department of Labor determines the prevailing wage which includes the locally prevailing practice of classifying jobs: when the Department of Labor "determines that the prevailing wage for a particular craft derives from experience under

28

negotiated agreements, the [DOL] has to see to it that the wage determinations carry along with them as fairly and fully as may be practicable, the classifications of work according to job content upon which the wage rates are based."[116] Otherwise, if a contractor "who is not bound by the classifications of work at which the majority of employees in the area are working is free to classify or reclassify ... craft work as he wishes," the contract can, "with respect to wage rates, take almost any job away from the group of contractors and" employees who work for them "who have established the locality wage standard" and there would be "little left" of the Davis-Bacon Act.[117]

In *United States ex rel. Plumbers & Steamfitters Local Union No. 38 v. C.W. Roen Construction Co.*, the United States Court of Appeals for the Ninth Circuit reversed the district court's entry of summary judgment in favor of the contractor in a *qui tam* claim brought by a local union.[118] In granting summary judgment for the contractor, the district court concluded no reasonable juror could find the contractor acted with the requisite scienter under the False Claims Act because the Department of Labor did not conduct an area practice survey and the Department's "other efforts to establish the prevailing wage were 'uncertain.'"[119] The court of appeals reversed and specifically adopted the *Fry Brothers* rule, finding area practice survey is "not a prerequisite to the determination of prevailing wage rates or job classifications" because such determinations "may be derived from collective bargaining agreements."[120] The court also found letters sent by the Department of Labor established the prevailing practice in the area and were not "uncertain" as found by the district court. The court reversed summary judgment because of an insufficiently developed record in the district court, including "[q]uestions regarding the precise manner in which the Department [of Labor] may or must determine prevailing wage rates and job classifications
...."[121]

Farfield argues *Plumbers & Steamfitters* does not "hold that area practices supersede specific provisions of the collective bargaining agreement, and in fact holds that the collective bargaining agreement established the prevailing practices." We disagree with Farfield's interpretation of *Plumbers & Steamfitters*. The court of appeals held, under *Fry Brothers*, the prevailing wage rate may be derived from collective bargaining agreements or an area practice survey conducted by the Department of Labor. Where the Department of Labor determines prevailing wages are established by a collective bargaining agreement, the job classifications for the project or area at issue are also established by the agreement because, if a contractor is not bound by "classifications of work at which the majority of employees *in the area are working* is free to classify or reclassify" employees, a contractor can take jobs away from employees who "have established the locality wage standard."[122]

Local 98 argues there is no merit to Farfield's argument the collective bargaining agreements *and not the prevailing area practices* determines Davis-Bacon Act payment obligations. Local 98 argues both *Abhe & Svoboda* and *Fry Brothers* point to local prevailing practices for wage determinations. Local 98 argues even if Section 3:12 of the collective bargaining agreements did not prevent Farfield from using groundmen to perform electrical work on the Project, the unrebutted testimony of Local 98's witness Mr. Leach shows the prevailing practice of Local 126 is groundmen and laborers cannot perform the electrical tasks they performed on the Project.

We find no error in Special Master Merenstein's finding Section 3:12 of the collective bargaining agreements providing no restrictions on Farfield to decide "the number and kind of Employees to properly perform the work" is not in conflict with local area practices regarding the work a groundman can do versus what work must be done by a journeyman; Farfield's right to

30

choose which workers will do which work is not the same thing as the established practice regarding which workers should do which work; and while a collective bargaining agreement may not prohibit an employer from using groundmen rather than journeymen to perform a particular task does not mean using them in such a manner is consistent with the local area practice.[123] This finding is consistent with the case law and the record evidence.

Farfield next objects to Conclusions of Law 7 through 10 arguing they are not supported by the case law cited by Special Master Merenstein. Farfield essentially argues Special Master Merenstein erred when he considered local area practice, as testified to by Mr. Leach, because the collective bargaining agreement gave Farfield the right to assign workers in any way it wanted (with the exception of aerial and energized work). Farfield argues the cases relied on by Special Master Merenstein do not allow custom and practice to contradict the express terms of a collective bargaining agreement.

Farfield's arguments distinguishing the case law cited by Special Master Merenstein are not persuasive. And it does not cite case authority for its proposition the terms of a collective bargaining agreement trump local area practice. Under *Abhe & Svoboda* and *Fry Brothers*, as well as law in this Circuit, we may consider the local prevailing practice for job classification. This is so even where a collective bargaining agreement provides the contractor with the right to determine which employees will be used to perform certain jobs. For example, in *PPL Services Corp. v. International Brotherhood of Electrical Workers, Local 1600*, the court rejected the employer's argument a "management rights" provision in a collective bargaining agreement allowed it to "introduce new methods in order to improve efficiency and to determine which employees will be used to perform them."[124] A "steno/clerk" filed a grievance with the union alleging the employer did not give her the opportunity to access work overtime while allowing other special temporary

31

clerks the opportunity to access work overtime.[125] After an arbitration hearing, the arbitrator found in favor of the steno/clerk, directing the employer to pay her 42.5 hours of overtime for the time the access to processing work took place. The employer argued the arbitration award violated the "management rights" provision of the collective bargaining agreement. The court rejected the argument, finding the provision "has nothing to do with [employer's] obligations to existing employees like the Steno/Clerks and the assignment of work within the bargaining unit. ... This case merely stands for the proposition that it is a violation of its CBA with [the Union] for [employer] to assign overtime work to one classification of employee over another classification of employee when that work has *usually and customarily* been performed by the other classification."[126]

In *Connors v. Consolidation Coal Co.*, our Court of Appeals considered a coal company's challenge to the district court's decision requiring it to make contributions to employee benefit trust funds for "worked lunch hours."[127] The collective bargaining agreement required employers to contribute to the trust funds for hours worked in a defined eight-hour workday including a thirty minute lunch break.[128] The coal company argued it is not required to make a contribution to the trust funds for worked lunch hours because the lunch period is considered a half-hour worked for which the company made a contribution. Our Court of Appeals rejected this argument, concluding when a employee works through his contractual right to a lunch period, the company cannot gain an extra half-hour of productivity without contributing to the trust funds.[129] Our Court of Appeals found its conclusion consistent with industry practice because "[i]t is well established that industry or shop practices form part of the collective bargaining agreement."[130]

Farfield concedes *Connors* and the more recent decision from our Court of Appeals in *Rosano v. Township of Teaneck,*[131] permit a court to consider custom and practice to interpret a

32

collective bargaining agreement but argues these cases are not applicable because the custom and practice is not inconsistent with the collective bargaining agreements. Farfield argues Special Master Merenstein's reliance on cases considering custom and practice is in error because it contradicts the express terms of Section 3:12 of the collective bargaining agreement. If we accepted Farfield's argument, parties could contract around its obligations under the Davis-Bacon Act to pay workers for the work performed. The collective bargaining agreement requires contractors to "comply with all applicable laws, ordinances, and regulations of the Federal, State and Local governments which are in effect or become effective during the term of the Contract."

We similarly find no support for Farfield's argument Section 3:12 of the collective bargaining agreement means it has "no restrictions" (with small exception) to decide the kind of work its employees may perform even if the type of work performed is, by local practice, journeyman work which should be paid at journeyman rate. The SEPTA contract requires workers performing journeyman work must be paid at the journeyman rate.[132] Farfield simply does not agree with Special Master Merenstein's finding, based on evidence and credibility determinations, local area practice considers installing conduit and pulling wire and cable journeyman work, not groundmen or laborer work.

Farfield objects to Conclusion of Law 11 finding Farfield did not adhere to local area practices regarding which classifications of workers could install electrical conduit, pull wires or cables, and perform electrical terminations. Farfield argues the record evidence does not support Conclusion of Law 11 and it is contrary to the SEPTA contract, the collective bargaining agreements, and Mr. Leach's testimony conceding laborers may install conduit and pull wires and cable.

33

As already addressed, we reject Farfield's arguments the SEPTA contract and the collective bargaining agreements preclude Special Master Merenstein's consideration of local area practices. But we must address Farfield's argument Mr. Leach "admitted" laborers install and lay conduit and pull wire under local area practice. Mr. Leach testified laborers install conduit and perform wire pulls. He explained "other trades do install conduit" but he "would not use the term 'permitted'" because "[t]he IBEW has always been very must against other trades installing electrical apparatus, and that includes electrical conduits."[133] With regard to wire pulls, Mr. Leach testified Local 126 is "adamantly against" wire pulls performed by classifications outside of Local 126 because "[w]e think it should be done by electrical workers and signatory electrical contractors."[134] Nevertheless, Mr. Leach conceded wire pulls are performed by laborers.[135]

Farfield argues if under area practice a non-journeyman laborer can install and lay conduit and pull wire, and an electrical worker under Local 126 can install and law conduit and pull wire, then a groundmen, who is an electrical worker under Local 126, can install and pull wire. Farfield argues Special Master Merenstein's conclusion only journeymen can perform these tasks, and not groundmen and laborers, is contrary to Mr. Leach's testimony.

After considering Mr. Leach's testimony, including credibility determinations, as well all the evidence adduced, Special Master Merenstein concluded whether installing electrical conduit and pulling wires is journeyman work is a "closer question." He concluded, for our benefit, installing conduit and pulling wire is journeyman work *and,* alternatively, the work is both laborer and journeyman work and Farfield misclassified and underpaid groundmen only.[136]

We disagree with Farfield. Special Master Merenstein made a finding based on the evidence before him and credibility determinations installing conduit and pulling is journeyman work and, to the extent groundmen and laborers performed such work, Farfield misclassified and

34

underpaid them. We will not second guess this finding based on evaluating witness testimony. For all the reasons discussed, we overrule Farfield's objection.

### d) We overrule Farfield's objection SEPTA's investigation precludes a finding of reckless disregard.

Farfield next argues, similar to its argument regarding the DOL's audit, it cannot have acted with reckless disregard because SEPTA investigated and questioned Farfield's workers about their pay rates and classifications on the Wayne Junction Project and did not raise issues with Farfield or withhold payment on invoices.

Special Master Merenstein found "on two or three occasions during the Wayne Junction Project, a SEPTA employee met with Farfield workers regarding their work and their pay rate" but "no evidence was presented regarding the discussions between the unidentified SEPTA person and Farfield's workers or the results of any investigation."[137] Special Master Merenstein's fact finding is supported by the record. Mr. McGee, Sr. testified he spoke with someone from SEPTA regarding how Farfield classified its employees.[138] Mr. McGee, Sr. knew someone from SEPTA (whose name he could not remember) interviewed "some folks in the field and had questions about what they were doing and what they were getting paid," but did not know the Farfield employees to whom the SEPTA representative spoke, "was never privy" to the conversations, and he does not recall the specific dates SEPTA spoke with Farfield employees.[139]

There is no evidence of the substance of discussions between SEPTA's representative and Farfield's employee and Farfield did not present additional evidence to Special Master Merenstein on this issue. We overrule Farfield's objection on this basis.

35

### e) Local 98's voluntary dismissal of claims is not relevant to Farfield's reckless disregard on the Wayne Junction Project.

Local 98's original complaint alleged Farfield violated the False Claims Act by misclassifying its employees on six rail projects.[140] After the United States declined to intervene, Farfield filed an Amended Complaint alleging Farfield violated the False Claims Act on five rail projects.[141] On May 21, 2019, Local 98 voluntarily dismissed its claims relating to four of the five rail construction projects, electing to proceed only on the Wayne Junction Project.[142] We granted Local 98's Motion.[143]

Farfield contends three of the dismissed projects pre-date the Wayne Junction Project and Mr. McGee, Sr. of Farfield's Transit Division ran those projects. Farfield argues it would not recklessly disregard its obligations under the Davis-Bacon Act on the Wayne Junction Project while following them on all of its other projects. It assumes because Local 98 elected to dismiss its claims related to other construction projects, it met its obligations under the Davis-Bacon Act on the Wayne Junction Project.

We overrule Farfield's objections on this basis. First, Farfield fails to provide a record cite where it made this argument or introduced this evidence to Special Master Merenstein. Second, Local 98 voluntarily dismissed its allegations of False Claims Act violations on all projects except for the Wayne Junction Project "[b]ased upon information elicited during discovery."[144] The claims were not dismissed on their merits but dismissed after Local 98's assessment of discovery. Farfield's argument presumes Local 98's dismissal of claims means Farfield did not act with reckless disregard as to the four projects. But there is no evidence to support such a presumption. Simply because Local 98 elected to dismiss claims regarding the four other rail projects does not preclude a finding Farfield acted in reckless disregard as to the Wayne Junction Project.

36

### f) Special Master Merenstein's description of his assessment of the facts and law do not undercut a finding of reckless disregard.

Farfield next takes issue with Special Master Merenstein's use of the words "close questions of fact and law" when summarizing his findings, conclusions, and analysis. With reference to his finding Local 98 met its burden of proof, Special Master Merenstein explained: "Although there are a number of close questions of fact and law, the Special Master concludes that Local 98 has met its burden of proving that Farfield violated the False Claims Act."[145] Farfield argues if it is such a close question, Local 98 failed to sustain its burden of proof.

Special Master Merenstein described as "a closer question" whether installing electrical conduit and pulling electrical wires, the bulk of the disputed work, constitutes journeyman work.[146] Special Master Merenstein concluded installing electrical conduit and pulling electrical wire is both journeyman and laborer work and found only groundmen were misclassified and underpaid to the extent they performed this work.[147] Farfield argues if this is such a close question, and Local 98's expert Mr. Leach admitted local industry practice allows laborers union workers to perform the disputed work, then it "proves" it is not necessary for a journeyman lineman from the electrical workers union to perform the work. Farfield argues it proves non-journeymen can perform the work either under the "laborers" classification wage rate or under Local 126's electrical worker "groundman" classification.

In any event, argues Farfield, "close questions" preclude a finding of reckless disregard under the False Claims Act. Farfield cites no authority to support its argument. Fact finders and judges often address "close" questions. Fact disputes and legal issues may be "close questions," but they are nevertheless made. Special Master Merenstein's characterization of close or closer questions does not mean he erred in finding, based on the evidence he assessed including

37

credibility determinations, Local 98 met its burden of proof under the False Claims Act. We deny Farfield's objection on this basis.

### g) Farfield's assertion it paid its employees more than required does not preclude a finding of reckless disregard.

Farfield argues it paid its employees at wage rates higher than required by the Davis-Bacon Act as well as for offsite hours it could have paid at the lower "shop" rate and paid its workers more than required under the SEPTA contract. Farfield argues because it paid its employees more than required, any misclassification it made based on limited specific tasks is "legitimate and inadvertent" and cannot constitute reckless disregard. Farfield argues if it did not care about compliance and tried to "cheat" SEPTA or save money, it would never have paid its employees higher rates or paid its employees for time worked offsite at the prevailing wage rates and further shows it did not act in reckless disregard.

Farfield argues the amount it overpaid its employees "far exceeds" the amount Special Master Merenstein found to be underpaid. Local 98 responds there is no evidence Farfield's asserted "overpayments" are greater than the underpayments found by Special Master Merenstein. Local 98 also argues there is no legal authority for Farfield's "offset" argument, contending there is no legal basis to offset wages paid to one employee by the wages paid to another employee.

Special Master Merenstein found Farfield failed to support its contention "its underpayments of some employees for the work they actually performed and its false statement on certified payrolls that it paid employees the prevailing rate for the classification of work actually performed can be offset by Farfield's alleged overpayment of those employees by paying them at a higher classification than required under the SEPTA contract for other work."[148] It simply renews here the same argument made to Special Master Merenstein and fails to provide us with any legal

38

authority its "offset" theory precludes a finding it acted in reckless disregard. We overrule Farfield's objection on this basis.

### h) The evidence supports Special Master Merenstein's finding Farfield acted with reckless disregard.

Farfield argues Local 98 failed to prove a Farfield employee acted knowingly under the False Claims Act. This is essentially a summary of its earlier objections. Farfield relies on *United States v. Fadul*.[149] In *Fadul*, the United States alleged a mobile diagnostic provider owned by a physician violated the False Claims Act by submitting false claims to federal insurance programs. On the scienter element, the district court rejected the United States' attempt to "pool together the collective knowledge" of defendant's employees to establish it acted with actual knowledge or reckless disregard.[150] "When the Government seeks to hold an entity liable under the False Claims Act, it cannot rely on the collective knowledge of the entity's agent to establish scienter" and instead "must prove an entity's scienter by demonstrating that a particular employee or officer acted knowingly."[151]

Based on *Fadul*, Farfield argues Local 98 failed to prove a particular employee of Farfield acted knowingly, citing Special Master Merenstein's finding Farfield's managers and supervisors believed groundmen could perform the work of journeymen linemen. But this argument ignores the record evidence Mr. McGee, Sr., hired by Farfield to run its Transit Division, acted as Farfield's point person on the Wayne Avenue Project who exercised authority over the project; classified employees; knew the differences between groundmen and linemen classifications; approved changes in employee classification; and, Farfield made him responsible to monitor employee classifications with the assistance of superintendents and foremen who, in turn, were responsible for assigning and monitoring work.[152] We again overrule Farfield's objection on this basis.

## 2. Record evidence supports the materiality of Farfield's false certified payrolls.

Farfield's second objection is to Conclusions of Law 21, 22, and 23 regarding "materiality." The False Claims Act imposes liability on "any person who – knowingly makes, uses, or causes to be made or used, a false record or statement *material* to a false or fraudulent claim."[153]

On materiality, Special Master Merenstein concluded:

> 21. Farfield's statements of compliance with the SEPTA contract and federal prevailing wage laws in its certified payrolls were hardly immaterial. Under the SEPTA contract, payments to Farfield could have been withheld or suspended if Farfield failed to pay prevailing wages, Exh. P-25A at 243591, and Farfield's contract could have been terminated or the company debarred from obtaining future government contracts if it violated federal prevailing wage laws, *id.* at 243595.

> 22. Certified payrolls containing required statements of compliance with prevailing wage requirements are submitted in order to obtain government payments and therefore those statements are material. *United States ex rel. Sheet Metal Workers Int'l Ass'n, Local Union 20 v. Horning Invs., LLC*, 828 F.3d 587, 592 (7th Cir. 2016).

> 23. Because the truth or falsity of the statements was important to the determinations whether Farfield would continue to be paid, whether the contract would not be suspended, and whether Farfield would remain eligible for government contracts, the statements suffice to demonstrate both materiality and causation. *See United States ex rel. Doe v. Heart Solution, PC*, 923 F.3d 308, 318 (3d Cir. 2019).[154]

In 2009, Congress amended the False Claims Act to, *inter alia*, define "material" as "having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."[155] In its 2016 *Escobar*[156] decision, the Supreme Court addressed whether an implied false certification[157] theory can be a basis for liability under Section 3729(a)(1)(A) of the False Claims Act[158] and materiality in the Government's payment decision. For our purposes, *Escobar* is relevant to the materiality issue.

In *Escobar*, relators alleged a healthcare provider violated the False Claims Act by submitting reimbursement claims to Medicaid, a state and federally-funded program, representing

certain services provided by specific types of professionals failed to disclose violations pertaining to staff qualifications and licensing.[159] Under the state Medicaid program, mental health facilities are required to maintain certain types of clinicians on staff with certain licensing and supervision requirements. Relators alleged the provider violated the Medicaid regulations because it employed unqualified, unlicensed, and unsupervised staff and then submitted claims for services performed by unqualified and unlicensed staff for reimbursement. Relators contended the provider defrauded the Medicaid program because it would not have reimbursed the claims had it know services were performed by unlicensed and unsupervised staff.[160]

After holding the implied certification theory can be a basis for liability under the False Claims Act, the Court addressed "materiality." The healthcare provider argued it can only face liability under the False Claims Act if it fails to disclose the violation of a contractual, statutory, or regulatory provision the United States expressly designated as a condition of payment. The Court rejected this argument, finding the False Claims Act does not impose this limit of liability. But the Court also found "not every undisclosed violation of an express condition of payment automatically triggers liability" and "[w]hether a provision is labeled a condition of payment is relevant to but not dispositive of the materiality inquiry."[161]

The Court first examined the language of the False Claims Act and concluded nothing in the statute or common-law meaning of fraud supports the limit of liability suggested by the healthcare provider. The Court rejected the argument liability under the False Claims Act is only found where the United States expressly designates a certain provision or requirement as a condition of payment. Instead, a misrepresentation about compliance with a statutory, regulatory, or contractual requirement must be "material" to the United States' payment decision.

41

The Court defined the contours of "materiality." It considered the statutory definition in § 3729(b)(4) and common law, including contracts and torts, concluding "[u]nder any understanding of the concept, materiality 'look[s] to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation.'"[162] The materiality standard is "demanding" and "rigorous" and one going "to the very essence of the bargain."[163] This requirement helps ensure the False Claims Act does not become "an all-purpose antifraud statute ... or a vehicle for punishing garden-variety breaches of contract or regulatory violations."[164]

*Escobar* teaches "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with a particular statutory, regulatory, or contractual requirement as a condition of payment;" it is not "sufficient for a finding of materiality that the Government would have the option to decline to pay if it knew of the defendant's noncompliance"; and materiality "cannot be found where noncompliance is minor or insubstantial."[165] The Supreme Court directs "[i]n sum, when evaluating materiality under the False Claims Act, the Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive. Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refuses to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated, that is very strong evidence that those requirements are not material. Or, if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material."[166]

42

Farfield argues Special Master Merenstein erred in Conclusion of Law 21 because his chosen phrase "hardly immaterial," with reference to Farfield's certified payrolls, is not the same as affirmatively finding the certified payrolls "material." Farfield argues the relevant SEPTA contractual provisions are permissive, not mandatory, by use of the words "may" suspend payment and "may be grounds for termination of the Contract, and for debarment as a Contractor."[167] Under the terms of the contract, SEPTA could withhold or suspend payments to Farfield for failure to pay prevailing wages and terminated Farfield's contract or debar it from future government contracts if Farfield violated federal prevailing wage laws. Farfield argues because its contract with SEPTA does not require mandatory action, the SEPTA contract cannot be the basis of finding materiality.

Farfield argues Local 98 failed to adduce evidence of materiality, pointing to SEPTA's "audit" and SEPTA's knowledge of the DOL audit. It again argues SEPTA spoke with Farfield employees and their classifications and pay and never raised issues and paid all invoices. It argues SEPTA knew about the DOL audit and never raised issues and paid all invoices. We already rejected Farfield's DOL audit and SEPTA investigation arguments, finding no record evidence to support its version of these events.

Farfield argues Conclusions of Law 22 and 23 are in error as not supported by the case law and contrary to the Supreme Court's definition of materiality. It argues the mere fact the United States requires submission of a certified payroll as a condition of payment does not make a misrepresentation in the certified payroll material, and it is up to Local 98 to prove materiality such as adducing testimony of an appropriate "government employee explaining why it is material." It argues Local 98 failed to offer such proof.

43

Farfield also argues Local 98 offered no evidence the truth or falsity of the certified payrolls were material to SEPTA's decision to pay, Special Master Merenstein's conclusion is not supported by findings of fact, and when Special Master Merenstein concluded payment to Farfield "could have been withheld or suspended" or Farfield's contract "could have been terminated" is insufficient under *Escobar*. Farfield argues it presented evidence its alleged misrepresentations were not material under the False Claims Act, again pointing to the SEPTA and DOL audits. It points to Special Master Merenstein's findings SEPTA continued to pay Farfield and, after completion of the Wayne Junction Project, SEPTA engaged Farfield in other projects. Farfield lastly argues the underpayment calculated by Special Master Merenstein of $159,273.54 or, alternatively, $52,521.77 is a tiny fraction of the $54.7 million contract with SEPTA and is not material.

Local 98 responds Farfield's worker misclassification and submission of false certified payrolls is "capable of influencing the payment or receipt of money" as defined by the False Claims Act because Congress and the DOL established "multiple legal mechanisms to withhold payment from a contractor who misclassifies its employees" by terminating the contract or debarring the contractor from future contracts. Local 98 argues there is no evidence SEPTA had actual knowledge of Farfield's misclassification before paying invoices. Local 98 points to Farfield's Vice President Kleimo's testimony he understood if the DOL ever found Farfield to have intentionally violated a prevailing wage act the consequence "would have put us out of business."[168]

Local 98 argues Special Master Merenstein rejected Farfield's arguments regarding the effect of the DOL audit and SEPTA's investigation finding Farfield did not present evidence regarding those audits including the scope of the audits and the discussions between unidentified

44

SEPTA personnel and Farfield workers. Local 98 points to the SEPTA contract requiring Farfield to submit certified payrolls to SEPTA.[169] The SEPTA contract contained, as required by federal regulation, "[e]ach payroll submitted shall be accompanied by a 'Statement of Compliance,' signed by the Contractor or Subcontractor of his or her agent who pays or supervises the payment of the persons employed under the Contract and shall certify the following: (i) That the payroll period contains the information required to be maintained under 29 C.F.R. 5.5(a)(3)(i) and that such information is correct and complaint; (ii) That each laborer or mechanic (including each helper, apprentice, and trainee) employed on the Contract during the payroll period has been paid the full weekly wages earned, without rebate, either directly or indirectly from the full wages earned, other than permissible deductions as set forth in 29 C.F.R. Part 3; (iii) That each laborer or mechanic has been paid not less than the applicable wage rates and fringe benefits or cash equivalents for the classification of work performed, as specified in the applicable wage determination incorporated into the Contract."[170] If Farfield violated these requirements, the contract allowed SEPTA to (1) withhold or suspend payments to Farfield; (2) terminate the Farfield contract; or (3) debar Farfield from future contracts.[171]

Local 98 argues the withholding remedy is not optional, quoting the contractual language (tracking regulation 29 C.F.R. § 5.5(a)(2)): "The FTA *shall* upon its own action or upon written request of an authorized representative of the Department of Labor withhold or cause to be withheld from the Contractor, under the Contract or any other Federal contract with the same, or any other Federally-assisted contract subject to Davis-Bacon prevailing wage requirements, which is withheld by the same prime contractor, so much of the accrued payments or advances as may be considered necessary to pay laborers and mechanics, including apprentices, trainees, and helpers, employed by the Contractor … the full amount of wages required by the Contract."[172] It

argues if the DOL reviewed worker classification problems and made findings similar to Special Master Merenstein, SEPTA would have been required to withhold unpaid wages from Farfield. As to debarment, Local 98 cites federal regulation 29 C.F.R. § 5.12(a)(1) if the Secretary of Labor finds a contractor "to be in aggravated or willful violation" of the Davis-Bacon Related Act or the Davis-Bacon Act, the contract "shall be ineligible" for future contracts.[173]

We overrule Farfield's objection to Conclusions of Law 21, 22, and 23. Special Master Merenstein applied the *Escobar* standard and concluded, based on ample cited evidence including the SEPTA contract, Farfield's statements of compliance with the SEPTA contract and prevailing wage laws in its certified payrolls are material to obtaining payment from the United States. SEPTA's contract and federal regulation required certifications of compliance with the Davis-Bacon Act's wage requirements. There is no evidence SEPTA paid Farfield in full despite of its "actual knowledge that certain requirements were violated."[174] There is no evidence non-compliance with SEPTA's contractual requirements is "minor or insubstantial."[175]

There is evidence of the SEPTA contract requirements and Farfield witnesses' testimony compliance with prevailing wage requirements is crucial and debarment because of a violation of prevailing wage requirements would be "catastrophic" and would put it "out of business"; Farfield has "always been very sensitive to [prevailing wage laws] and we've always had a lot of checks and balances to follow up on what's being done, making sure the apprentice ratios are corrects, making sure that people are being classified and paid at the rate for the work they're doing"; "we've been under a magnifying glass" by the union;[176] and Farfield knew its obligations to pay prevailing wages.[177] Special Master Merenstein considered all the evidence and based on his assessment, including credibility determinations, concluded the truth or falsity of statements in certified payroll records submitted by Farfield to SEPTA are material to SEPTA's decision to pay.

46

### 3. The False Claims Act's civil penalty applies to each of Farfield's "false records or statements" in each of its certified payrolls.

Farfield objects to Special Master Merenstein's Conclusions of Law 36 through 39 applying the statutory civil penalty of § 3729(a)(1) of the False Claims Act to each of the 105 certified weekly payrolls he found Farfield underpaid its workers. In addition to damages, the False Claims Act imposes a "civil penalty of not less than $5,000 and not more than $10,000 …, plus 3 times the amount of damages which the Government sustains because of the act of that person."[178]

The parties agree the SEPTA contract required Farfield to submit certified payrolls to SEPTA;[179] the contract required Farfield to submit weekly a copy of all payrolls to SEPTA for transmission to the Federal Transportation Administration;[180] and Farfield submitted bills to SEPTA "to get SEPTA to pay the bills, not any other entity or body or the United States Government."[181]

Special Master Merenstein concluded:

> 36. On the assumption that civil penalties are mandatory under the False Claims Act, the Special Master recommends imposition of the minimum penalty of $5,500 per violation, because Farfield did not intend to make a false statement, but did so recklessly, and because imposition of a penalty for each of the 105 violations, when added to the treble damages, is already more than sufficient to compensate the government (which declined both to intervene and to exercise jurisdiction when this matter was later referred to the USDOL) for any violation of the False Claims Act. At $5,500 per violation, the civil penalty is $577,500.
>
> 37. The total recommended judgment is $1,055,320.62.
>
> 38. When the United States does not intervene in a False Claims Act case, a relator is entitled to between 25 and 30% of the judgment. 31 U.S.C. § 3730(d)(2). The Special Master recommends that Local 98 be awarded 30% of the total judgment, or $316,596.19.
>
> 39. As noted, it is possible to determine the underpayment from misclassifications if, contrary to the Special Master's finding, installing electrical conduit and pulling wire or cable are both laborer and journeyman work. In that case, the underpayment to

47

groundmen for doing this work while not classified and paid at the prevailing wage rate for laborers, together with the underpayment of workers from the termination crews who were not paid the prevailing wage rate for journeyman linemen, would be $52,521.77, for 8,198 hours of work, during 99 separate weeks of the Wayne Junction Project. The damages would be $157,565.31, or three times the underpayment, while the civil penalty would be $544,500, at $5,500 per violation, for a total judgment of $702,065.31.

Applying a $5,500 civil penalty to 105 weeks of certified payrolls he found false, Special Master Merenstein calculated a total of $577,500 in civil penalties. Farfield argues the certified payrolls are not "claims" under the False Claims Act because they are not a "request or demand … for money."[182] Farfield argues it did not violate the False Claims Act, but if it did, the "monthly invoices" [183] relating to the certified payrolls are the "false claims" *not* the weeks in which certified payrolls contained false statements. In a nutshell, Farfield argues it is the monthly invoices it submitted to SEPTA and not the weekly certified payrolls contained in the invoices which are "claims" under the False Claims Act.

Local 98 responds each false certified payroll constitutes a separate penalty, and not the invoices Farfield submitted to SEPTA.[184] According to Local 98, Farfield submitted forty monthly invoices to SEPTA. Although neither Farfield nor Local 98 cite to the invoices in the record, we found one invoice identified as "Period Number: 40" for period ending September 14, 2007.[185] We assume this means Farfield submitted at least forty invoices to SEPTA, which is consistent with the number identified by Local 98 in its response to Farfield's objections. If we consider the forty invoices as claims rather than the 105 certified weekly payrolls, we may impose a civil penalty beginning at $220,000 rather than $557,500.[186]

Under the False Claims Act, the term "claim":

(A) means any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that—

48

(i) is presented to an officer, employee, or agent of the United States; or

(ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government—

    (I) provides or has provided any portion of the money or property requested or demanded; or

    (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded; and

(B) does not include requests or demands for money or property that the Government has paid to an individual as compensation for Federal employment or as an income subsidy with no restrictions on that individual's use of the money or property;[187]

Farfield bases its argument on the Supreme Court's decision in *United States v. Bornstein*.[188] In *Bornstein*, the United States contracted with a company for radio kits each to contain electron tubes meeting certain specifications. The contractor subcontracted with another entity to supply the electron tubes. The tubes supplied by the subcontractor to the prime contractor were not of the required quality, and falsely marked by the subcontractor. The subcontractor supplied the prime contractor with the falsely marked tubes in three separately invoiced shipments. The prime contractor prepared the radio kits with the falsely marked tubes and shipped them to the United States under thirty-five invoices each including claims for payment.[189]

When the United States discovered the fraud, it brought a False Claims Act action against the subcontractor seeking damages as well as a civil penalty on the thirty-five invoices.[190] The district court agreed and imposed a penalty on each of thirty-five invoices. The court of appeals reversed the district court on the imposed penalty concluding because there had only been one contract involved (the contract between the prime contractor and subcontractor), there should only be one statutory penalty.[191]

49

The Supreme Court considered whether the subcontractor should be liable for each claim submitted by the prime contractor (thirty-five invoices) or whether it should be liable only for certain identifiable acts it committed. The Court rejected the reasoning the number of forfeitures should equal the number of contracts or the number of claims submitted by the prime contractor. Applying the text of the statute, the Court found "the statute imposes liability only for the commission of acts which cause false claims to be presented."[192] And because the subcontractor made three shipments of falsely branded radio tubes, the Court found it liable for three statutory penalties.[193] We are directed in *Bornstein* to "focus ... upon the specific conduct of the person from whom the Government seeks to collect the statutory forfeitures."[194]

Relying on *Bornstein*, Farfield argues the "false claims" could only be the invoices it submitted to SEPTA, not the weekly certified payrolls. Local 98 argues *Bornstein* and the cases cited by Farfield are distinguishable because they address the imposition of a civil penalty under Section 3729(a)(1)(A) and not Section 3729(a)(1)(B), the section of the False Claims Act on which Local 98 bases its claim.

There is a significant difference in the two penalties. Section 3729(a)(1)(A) imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval." Section 3729(a)(1)(B) imposes liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." For this and other conduct prohibited by Section 3729(a)(1), the False Claims Act imposes a civil penalty. Local 98 argues the conduct prohibited by (a)(1)(B) is different than the conduct prohibited by (a)(1)(A) and a civil penalty should be imposed on each of Farfield's 105 weekly certified payrolls Special Master Merenstein found false.

50

The False Claims Act "gives rise to several distinct theories of liability."[195] A defendant may be liable under the "presentment clause" of Section 3729(a)(1)(A) or the "false statement clause" of Section 3729(a)(1)(B). "The 'presentment clause,' § 3729(a)(1)(A), and 'false statement clause,' § 3729(a)(1)(B), have always been 'complementary,' as they were 'designed to prevent those who make false records or statements to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval.'"[196] Although the elements of a presentment clause claim and false statement clause claim "are almost the same, the false statement provision 'requires evidence that the defendant made a false statement to the government, as opposed to the submission of a false claim for payment.'"[197]

The False Claims Act imposes a civil penalty for "a false record or statement material to a false or fraudulent claim." As observed by the United States Court of Appeals for the Second Circuit "nothing in the statute requires the court to impose penalties based on the number of false *claims* under § 3729(a)(1)(A), instead of the number of false *statements* under § 3729(a)(1)(B)."[198] In *Saavedra*, the court of appeals applied a civil penalty to each of the thirteen false statements the jury found defendant made. It concluded Section 3729(a)(1)(B) imposes liability "for the commission of *acts* which cause false claims to be presented … regardless of the number of false claims that result."[199] In reaching its holding, the court of appeals relied on *Bornstein*.

Special Master Merenstein found Farfield falsely certified 105 weekly payrolls. The Supreme Court in *Bornstein* directs we focus on the "the specific conduct of the person from whom the Government seeks to collect the statutory forfeiture."[200] Farfield falsely certified 105 weekly payrolls. It seeks to minimize its exposure by pointing to its invoices to SEPTA as a "claim" under Section 3729(a)(1)(A). But it is sued for its conduct under Section 3729(a)(1)(B). If we were to adopt Farfield's reasoning, it could limit its exposure to the statutory penalty simply by submitting

51

fewer invoices even though those invoices are based on false statements. We overrule Farfield's objections to the imposition of a civil penalty based on 105 weekly certified payrolls.

## 4. Local 98's adduced representative evidence and *Mt. Clemens'* burden shifting applies.

Farfield next objects to the application of the burden shifting paradigm of *Anderson v. Mt. Clemens Pottery Co.*[201] Farfield objects to Conclusions of Law 27 through 39 applying *Mt. Clemens* and calculating damages for Farfield's underpayment for misclassifying some workers and imposing civil penalties.

As we explained in our October 15, 2019 Memorandum defining the parties' burden of proof at trial,[202] the Supreme Court in *Mt. Clemens* articulated a burden shifting analysis in Fair Labor Standards Act claims: "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference. The burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence. If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate."[203]

Recognizing the remedial nature of the Fair Labor Standards Act, the Supreme Court held the burden of proving damages should not be put on the employee where the employer's records are "inaccurate or inadequate" in violation of its statutory obligation to maintain proper records.[204] Although *Mt. Clemens* arose in a Fair Labor Standards Act case, its burden shifting applies to Davis-Bacon Act claims, including an award of back wages to non-testifying employees based on representative testimony of only some employees.[205] *Mt. Clemens* is widely cited as authority to allow "representative employees to prove violations with respect to all employees."[206]

In the parties' briefing on the burden of proof, Local 98 argued *Mt. Clemens* should apply if Special Master Merenstein finds liability under the False Claims Act and Farfield argues *some* hours worked by groundmen and laborers under the phase codes are not attributable to journeyman electrical work.[207] Local 98 expected Farfield to "continue to argue that its phase codes do not accurately describe the work performed"[208] and argued the Special Master must then apply *Mt. Clemens* burden shifting because Farfield cannot meet its burden to "come forward with evidence of the precise amount of work performed or with evidence to negative [sic] the reasonableness of the inference to be drawn from the employee's evidence." Local 98 argued there are no documents beyond the phase code time sheets. Because Farfield cannot meet its burden under *Mt. Clemens*, Local 98 argued Farfield is responsible for damages based on *all* hours worked by groundmen and laborers on electrical phase codes reflected on the timesheets.

Farfield argued *Mt. Clemens* does not apply because the burden of proof of damages should not to shift to it in a False Claims Act case; the burden of proof on damages for failure to keep records cannot shift to Farfield when the Davis-Bacon Act only required it to retain payroll records for three years; the burden of proof on damages for failure to provide records based on Fair Labor Standards Act cases cannot shift to Farfield when the Fair Labor Standards Act only requires a defendant to retain records for two or three years; Farfield did not have timely notice of any payroll records issue under the Davis-Bacon Act and the burden cannot shift to it; and even if the burden shifted to Farfield under *Mt. Clemens*, Local 98 must still present evidence of the amount and extent of work to shift the burden of proof on damages.[209]

We concluded and directed the parties *Mt. Clemens*' burden shifting should apply if Special Master Merenstein found Farfield liable under the False Claims Act and, reaching the question of damages, determines the phase code timesheets and other evidence do not accurately describe the

53

work performed by groundmen and laborers of all hours of work on a given day. We told the parties Special Master Merenstein must assess the evidence and determine whether a party met its burden, these issues will be resolved by his credibility determinations: if he finds Local 98 meets its burden based on the phase code timesheets and related evidence and if he finds Farfield fails to meet its burden based on its argument and evidence the phase code timesheets do not demonstrate misclassification, then Special Master Merenstein may apply *Mt. Clemens* to evaluate damages.[210]

After considering the evidence and making credibility determinations after eight days of hearings, Special Master Merenstein found the phase code timesheets "are the only document containing information which would indicate what work a particular employee performed on the Wayne Junction Project on a particular day" and the "phase codes on the timesheets accurately reflect the work that a particular employee performed on the Wayne Junction Project on a particular day."[211]

Special Master Merenstein found six of the twelve task codes on the phase code timesheets included work that should have been classified and paid as journeyman work. From the spreadsheet prepared by Local 98, Special Master Merenstein identified the hours worked and actual wage rate for workers who performed work under the six task codes and classified as either groundmen or laborers.[212] Consistent with our October 15, 2019 Memorandum, Special Master Merenstein applied *Mt. Clemens* based on the phase codes and testimony of six employees at the hearings.

Farfield now objects to the Special Master's application of *Mt. Clemens* arguing (1) Local 98 produced only six former Farfield employees who worked on the Wayne Junction Project as representative of the forty-two employees it claims should have been paid journeyman wages, but these witnesses are not representative of the work performed by those who did not testify; and (2)

54

Local 98 failed to present evidence of the amount and extent of alleged journeyman work performed by Farfield employees. Farfield argues *Mt. Clemens'* burden shifting does not apply because it did not knowingly misclassify its workers, and this is a False Claims Act not a Davis-Bacon Act or Fair Labor Standards Act case. Farfield again argues it saw no need to keep records of each task every employee performed and is not required to do so, believing groundmen could do all tasks they performed on the Wayne Junction Project and conformed to Local 126's collective bargaining agreements.

Farfield is repeating itself and now requiring us to do so. We already addressed some of Farfield's arguments in our October 15, 2019 Memorandum addressing the application of *Mt. Clemens* to Local 98's proof. We rejected Farfield's argument *Mt. Clemens'* burden shifting should not apply in a False Claims Act. We explained while we found no case applying *Mt. Clemens* burden shifting on damages in a False Claims Act case, we did not find this dispositive given the circumstances of this case. We explained the SEPTA contract includes Davis-Bacon Act recordkeeping regulations and contemplates the parties' intent Farfield maintain Davis-Bacon Act compliant records and submit those records to SEPTA for transmission to the Federal Transportation Administration.[213]

We rejected Farfield's argument *Mt. Clemens* does not apply because neither the Davis-Bacon Act nor the Fair Labor Standards Act required it to retain records after three years. We explained while it is true the Davis-Bacon Act requires a contractor to maintain the required records for a period of three years, Farfield never told us what records it maintained but no longer possessed because of the three-year record retention rule.[214] We explained Farfield maintained phase code time sheets, but we had no idea what records Farfield may have once possessed which could refute, or otherwise explain, the phase codes.

55

Even after the hearing, Farfield does not explain what other documents it once had but no longer possesses because of the retention rules. Its witness, Mr. Pierce, testified phase code time sheets were used to report the hours worked in a particular phase code for an employee on any given day and foremen prepared the phase code time sheets on a weekly basis for Farfield's Project Supervisor Mr. Derr to prepare payroll.[215] Special Master Merenstein concluded, to the extent Farfield challenged the use of its own phase code system and phase code timesheets as evidence of the amount, extent, and type of work its employees performed on the Wayne Junction Project, it must bear "the burden of any consequent imprecision from the absence of its records."[216]

We reject Farfield's objections to the application of *Mt. Clemens* because the testimony of six former Farfield employees are not representative of all groundmen and laborers. Farfield argues there is no proof the six witnesses are representative of the employees who did not testify. Local 98 responds of the six witnesses, five witnesses were groundmen or laborers at some point over the length of the Wayne Junction Project and the sixth witness held the position of foreman who led crews of workers including groundmen and laborers. The six witnesses testified about the work of twenty-two of the forty-two groundmen and laborers at issue, or fifty-two percent of the total group.

For example, Joseph "Wes" Reed, a Farfield foreman at the time of the Wayne Junction Project testified classification of individual workers did not play a role in determining work assignments and he "was just trying to get as much done as we could ... from week to week" and he did not receive instruction from supervisors Mr. Pennington or Mr. Jackson or any other Farfield supervisor to monitor the classifications of workers and work they performed.[217] David Hale, a groundman, testified everyone on his work crew performed the same work and he testified he tied down conduit pulled cable, bent conduit, and installed conduit.[218] Adrian Lauria, a laborer at the

56

beginning of the Wayne Junction Project, performed all work except wire termination including bending conduit and installing innerduct (which her testified everyone on his crew performed), and Mr. Reed did not put limitations on the work he or other members of his crew performed.[219] Ryan Franchetti, hired as a laborer by Farfield in 2002, testified "[e]verybody did the same thing depending on who got to the conduit first ..." and "nobody specific did one task. Everybody kind of did all the tasks at hand."[220]

Special Master Merenstein considered this testimony, phase code time sheets, certified payrolls, and all the evidence at trial, made credibility determinations and concluded *Mt. Clemens* applied to the measure of damages. He recognized our Court of Appeals' admonition calculations may not be based on "mere speculation."[221] But "[w]here [plaintiff] produces evidence from which a fact finder may reasonably infer the amounts due to the employer [sic], the burden shifts to the employer to 'come forward with evidence of the precise amount of earnings received and work performed by the [employees] or with evidence to negate the district court's reasonable inferences based on the evidence.'"[222] On the quantum of evidence, which Farfield challenges, our Court of Appeals in *Central Laundry* noted it is "not necessary for every single affected employee to testify" to prove a violation or recoup back wages and testimony of co-workers who observed other employees at the jobsite, "[t]ogether with documentation, such as time cards," provides "a basis to infer the amount of time an employee worked."[223]

As fully discussed above, ample evidence supports Special Master Merenstein's application of *Mt. Clemens.* Based on his assessment, Special Master Merenstein found Farfield presented sufficient evidence at least 1.5 hours of each eight-hour day, on average, constituted non-production time a worker would not be misclassified or underpaid. He deducted this time from the journeyman task codes, carefully calculating 13.5% of the total working hours on the

Wayne Junction Project constituted misclassified work.[224] This finding is supported by the record. We overrule Farfield's objections to Conclusions of Law 27 through 39.

## 5. Record evidence supports a finding Farfield misclassified its employees on the Wayne Junction Project.

In another largely repetitive objection, Farfield argues it did not misclassify its employees. It argues most of the work on the Wayne Junction Project involved clearing and grubbing, digging, shoveling ballast, trenching, shoring, loading and unloading materials, civil work, and non-productive time; even with this type of unskilled work, Farfield paid more than 47.5% of what Local 98 identified as "electrical" work at the journey lineman rate, electrical apprentice rate, or higher rates; Farfield's use of groundmen while working alongside journeymen accords with the collective bargaining agreements; and, the DOL audited the Project and, other than a payment of the Labor Day holiday to four carpenters, found no Davis-Bacon Act issues. Farfield argues *any* findings of fact and conclusions of law to the contrary is "improper and contrary to the law."

After hearing testimony and considering exhibits presented over eight days of hearing, Special Master Merenstein concluded six of the twelve phase codes identified by Local 98 as "electrical" work should have been performed by journeymen and, to the extent groundmen and laborers performed this work, Farfield misclassified and underpaid the workers. The record supports these findings, including:

- There is no requirement under the SEPTA contract an employee performing journeyman work be a journeyman; the contract requires the employee be paid at the journeyman rate for journeyman work.[225]

- Farfield used work-related phrases called "phase codes" for internal cost accounting.[226]

- Farfield used phase code timesheets to report the hours worked in a particular phase code for an employee on any given day prepared by Farfield's foremen on a weekly basis.[227]

- Mr. Jackson testified the phase codes accurately reflect the work performed in the field by an employee.[228]

- Local 98 compiled a spreadsheet based on Farfield's phase code time sheets, handwritten time sheets, certified payrolls, and daily foreman reports. The spreadsheet lists each week in which an employee worked, and the hours worked each day of the week by phase code as well as his classification and rate of pay for the week.[229]

- Farfield's divisional Vice President McGee, Sr. had the responsibility and the "final law" for employees' classification.[230]

- Farfield's Chief Operating Officer Pierce testified Farfield did not have any guideline, policy, or structure Mr. McGee, Sr. followed to determine a worker's classification,[231] and Farfield's policy vested divisional Vice Presidents, such as Mr. McGee, Sr., with the responsibility for monitoring the classifications of employees, with the assistance of superintendents and foremen who monitored employees' daily working tasks.[232]

- Farfield's witnesses testified "crews" of workers lead by foremen performed work and workers were chosen without regard to classification; foremen had the ultimate responsibility for determining the tasks performed by workers and foremen had no training or instruction from Farfield regarding the assignment of workers of different classifications to different tasks; and classifications played either no role or only a minor role in the assignment of worker to crew members.[233]

- Groundmen and laborers installed conduit and wire pulls and, based on credibility determinations, Special Master Merenstein did not find credible Farfield's witness testimony only journeymen installed conduit and wire pulls. Special Master Merenstein found testimony contradicted by other credible testimony these tasks were performed by workers who were classified and paid below the journeyman rate;

- Under local area practices, installing electrical conduit, pulling wires or cables, and performing electrical terminations constitute journeymen work.[234]

- Six phase codes represent journeymen work as supported by testimony, photographs, daily foremen reports, and other documents introduced at the hearing.[235]

- Farfield failed to present sufficient evidence to negate the reasonableness of the inference work under journeymen task codes constitutes journeyman work including installing electrical conduit, pulling electric wires or cable, and terminations.[236]

The record supports the conclusion Farfield misclassified and underpaid its groundmen when they performed journeyman work. We overrule Farfield's objection.

### 6. We overrule Farfield's "additional objections."

In its "additional objections," Farfield objects to Special Master Merenstein's Conclusions of Law 4, 5, 13, and 24 and fifty-two Findings of Fact, four of which it objected to earlier in its briefing.[237]

In Conclusion of Law 4, Special Master Merenstein quoted the SEPTA contract:

> 4. The weekly payrolls also were required to include a certification that, among other things, each worker was paid not less than *the prevailing rate* in the applicable wage determination "for the classification of work performed."[238]

Farfield objects to the bolded language, arguing the SEPTA contract does not use the phrase "prevailing rate" and instead requires "[e]ach payroll submitted shall be accompanied by a 'Statement of Compliance' ..." certifying, *inter alia*, "[t]hat each laborer or mechanic has been paid not less than the *applicable wage rates* and fringe benefits or cash equivalents for the classification of work performed, as specified in the *applicable wage determination* incorporated into the Contract."[239] Although Farfield objects to Special Master Merenstein's use of the phrase "the prevailing rate" instead of "applicable wage rates," it does not explain why this is an error, including if there is a material difference in these phrases and how it has been prejudiced by the use of "prevailing rate" rather than "applicable wage rates ... as specified in the applicable wage determination."

Under the Davis-Bacon Act, federal construction contracts must contain a provision "stating the minimum wages to be paid to various classes of laborers ..." which minimum wage is based on the wages the Secretary of Labor determines to be "prevailing."[240] The Davis-Bacon Act requires Farfield to pay its workers "prevailing wages" and to submit weekly statements certifying

60

its payments are "not less than the applicable wage rates ...."[241] SEPTA's contract contains the language required by the Davis-Bacon Act regulation. We see no error in Special Master Merenstein's use of the phrase "prevailing rate."

Farfield next objects to Special Master Merenstein's Conclusion of Law 5:

5. The SEPTA contract permitted Farfield to pay employees performing work in more than one classification the prevailing rate specified for each classification for the time actually worked in each classification—for example, it could pay groundmen or laborers the journeyman rate for journeyman work installing electrical conduit or pulling wire or cable and the groundman or laborer rate for non-journeyman work associated with those tasks—provided Farfield's "payroll records accurately set forth the time spent in each classification in which work is performed."[242]

Farfield again argues this is error because installing electrical conduit or pulling wire or cable is not journeyman work and can be laborer and groundmen work. As already discussed, Special Master Merenstein found installing electrical conduit and pulling electrical wire constitutes journeyman work and, alternatively found, this work is both laborer and journeyman work but *not* groundmen work.[243] His detailed findings are supported by Mr. McGee, Sr.'s sworn testimony groundmen are "completely untrained," are "trying to learn the [electrical] trade," and are "completely unskilled until [they] get into an apprenticeship program";[244] the only time groundmen "pull wire" is when they assist linemen "pulling contact wire in";[245] groundmen cannot do everything a lineman can do, explaining a groundman "is the grunt on the ground that gets what the lineman needs in the bucket" and the groundman does not "have the skill to put contact wire up and certainly doesn't have the skill to do it safely";[246] Farfield employees assisting linemen were classified as groundmen;[247] and "pulling wire" is electrician's work, and in his career, Mr. McGee, Sr. never saw a groundman "pull wire anywhere, ever."[248] As explained above, the record amply supports a finding groundmen could not install electrical conduit or pull wire or cable on their own.

61

Farfield objects to Special Master Merenstein's Conclusions of Law 13 and 24:

> 13. Farfield's statement on weekly certified payrolls that the wage rate for each employee was not less than the prevailing rate in the applicable wage determination for the work each employee actually performed was false for any week in which a groundman or laborer performed work that should have been classified and paid as journeyman work. *See, e.g., United States ex rel. Wall v. Circle C. Constr.*, LLC, 697 F.3d 345, 357 (6th Cir. 2012).

> 24. Farfield violated the False Claims Act by falsely certifying in its weekly payrolls that it had paid all of its employees the prevailing wage for the classification of work they actually performed, when it did not pay groundmen and laborers the prevailing wage rate for journeyman linemen work they performed.[249]

Farfield objects to this conclusion again arguing Farfield did not misclassify its employees when it paid its groundmen and laborers at those rates because the work they performed did not constitute journeyman work. We found record evidence groundmen performed journeyman work, and Farfield did not pay at the journeyman rate, and, Farfield falsely certified its weekly payrolls it paid all employees the prevailing wage for the classification of work actually performed when it failed to pay groundmen and laborers the prevailing wage rate for journeyman work. We deny these objections.

Farfield objects to fifty-two Findings of Fact, four of which it objected to earlier in its briefing. Aside from the four, Farfield fails to explain the basis of its collective objection and how Special Master Merenstein erred. We overrule these objections.

Farfield makes a specific objection to Finding of Fact 141:

> 141. Many Farfield managers believed that all or virtually all of the work on the Wayne Junction Project was groundman work and therefore, any worker could do any task. Tr. 274:14-275:19, 1941:17-1942:3, 2014:14-21 (Jackson); 1581:16-1582:10, 1589:9-1590:12, 1623:3-7, 1681:9-14 (Derr); 1822:17-1823:5 (Pennington).

Farfield argues this finding is untrue and unsupported by the record cited by Special Master Merenstein. Farfield contends Mr. Jackson, contract manager for Farfield and a trained

journeyman electrician, ***did not*** testify "any worker could do any task or that he believed any worker could do any task"; instead, he testified Mr. McGee, Sr. told him groundmen and laborers and groundmen and linemen can do the same thing.[250]

A review of Mr. Jackson's testimony shows he asked Mr. McGee, Sr. "who's allowed to do what. And his statement was laborers and groundsmen [sic] can all do the same thing, and that's when he said groundsmen [sic] can do the same as linemen;"[251] he had a conversation with Mr. McGee, Sr. "when [Jackson] first got there that this Wayne Junction project was lineman territory, and lineman can help groundmen and groundmen can do everything a lineman could do";[252] and, when asked if he ever used employees to do work that electricians should have been doing who were not electricians, Mr. Jackson responded "No. I'm concerned about the terminating crew. I mean that was – groundmen being told could do anything linemen could do, so I'm going to have to say no to that."[253]

Farfield objects while Mr. Derr explained laborers and journeyman electricians can do groundman work does not violate the Davis-Bacon Act because laborers and journeyman electrician are paid more than groundmen, and this is not the same as saying any worker can do any task. But while Mr. Derr swore laborers and journeymen performed groundmen work, he also swore groundmen (who are paid less than laborers and journeymen) installed conduit and pulled wire. Mr. Derr, Farfield's project supervisor on the Wayne Junction Project, swore "[a] groundman could do everything, such as digging, installing the conduit, installing the wire, you know, pulling the rebar, pouring the concrete. Everything that we needed to do on project";[254] he did not see a need to break out specific activities or tasks performed by groundmen;[255] and he understood based on conversations with Mr. McGee, Sr. all work on the project could be performed by groundmen and groundmen could do anything a lineman could do.[256]

63

Mr. Pennington, Farfield's project supervisor and safety officer on the Wayne Junction Project, testified Mr. McGee, Sr. with regard to classifications of employees "explained to us that groundsmen [sic] an do anything a linesman can do."[257] Farfield concedes both Mr. Derr and Mr. Pennington testified groundmen could do anything linemen could do, neither testified "any worker could do any task or that he believed any worker could do any task."[258]

Mr. Jackson, Mr. Derr, and Mr. Pennington all testified Mr. McGee, Sr., the head of Farfield's Transit Division work, told them groundmen could perform any tasks. Based on credibility assessments of their testimony, Special Master Merenstein found these Farfield managers believed – based on Mr. McGee, Sr.'s instruction – all or virtually all of the work on the Wayne Junction Project was groundman work and therefore, any worker could do any task. Instead of citing evidence in the record contradicting the testimony of its own witnesses, Farfield parses words, draws unfounded conclusions, and asks us to assess the credibility of witnesses' testimony. We will not do so. We overrule Farfield's objections.

### 7. Record evidence supports a finding Farfield violated the False Claims Act.

Farfield's seventh, and final, objection is it did not violate the False Claims Act. Farfield repeats its earlier arguments: it did not misclassify its employees on the Wayne Junction Project; its classification of employees as groundmen totally conformed with the collective bargaining agreements of Local 126; most of the work on the Wayne Junction Project involved manual work such as clearing and grubbing, digging, and shoveling, for which Farfield paid more than 47.5 percent of work Local 98 identified as "electrical" at the journeyman lineman, electrical apprentice rate, journeyman electrician, and foreman rates; Local 98 failed to prove scienter and Farfield did not act in reckless disregard because its managers and supervisors relied on Mr. McGee, Sr.; Local 126's collective bargaining agreements did not restrict Farfield other than aerial and energized

64

work, required a journeyman be the foreman on each crew and Farfield had several journeymen on every crew; and Local 98 failed to prove materiality under the False Claims Act.

We addressed these arguments. For the reasons detailed in this memorandum, we overrule Farfield's objections.

## III. Conclusion

We overrule all objections to Special Master Merenstein's Report and Recommendation. We adopt Special Master Merenstein's Report and Recommendation in its entirety. In the accompanying Order, award damages in the amount of $1,055,320.62 of which $316,596.19 is awarded to Local 98 and $738,724.43 awarded to the United States. We may award reasonable expenses and attorney's fees to Local 98 under 31 U.S.C. § 3730(d)(2).

---

[1] Our memorandum denying Farfield's motion for summary judgment provides a more detailed background of this matter. *See* ECF Doc. No. 192.

[2] ECF Doc. No. 231-28 at 9 (Stipulation of Counsel at ¶¶ 7-9). All page references to ECF Doc. No. 231-28 is to the pagination assigned by the CM/ECF docketing system.

[3] ECF Doc. No. 231-27 at 12. All page references to ECF Doc. No. 231-27 is to the pagination assigned by the CM/ECF docketing system.

[4] ECF Doc. No. 214 at Findings of Fact ¶ 110. Electrical conduit made of PVC or metal pipe protects electrical wiring or cable installed underground.

[5] *Id.* at Findings of Facts ¶¶ 108-115.

[6] ECF Doc. No. 231-27 at 49.

[7] *Id.*

[8] ECF Doc. No. 231-28 at 18-19 (Stipulation of Counsel at ¶¶ 64-74).

[9] *Id.* at 18 (Stipulation of Counsel at ¶ 65).

[10] *Id.* at 763 (Notes of Testimony ("N.T.") Thomas Leach).

[11] *Id.*

[12] *Id.* at 739-40.

[13] *Id.* at 29-30 (Stipulation of Counsel at ¶¶ 156-170).

[14] 40 U.S.C. § 3142.

[15] 31 U.S.C. § 3729 *et seq.* Local Union 98 represents certain electrical workers performing "inside" work in the Philadelphia area while the International Brotherhood of Electrical Workers Local Union 126 represents certain electrical workers performing "outside" work. ECF Doc. No. 231-28 at 8 (Stipulation of Counsel at ¶¶ 2-3). Job classifications of "groundman" and "lineman" are "outside" electrical workers under Local 126, and are not classifications of Local 98. *Id.* (Stipulation of Counsel at ¶¶ 4-5). Collective bargaining agreements between the Penn-Del-Jersey Chapter of the National Electrical Contractors Association, Inc. and Local 126 governed the relationship between contractors and Local 126 during the time of the Wayne Junction Projection. Chapters of the National Electrical Contractors Association represent the contractor's interest in bargaining with union. *Id.* at 15 (Stipulation of Counsel at ¶ 46). At some point after Farfield won the SEPTA contract, Timothy Browne, Local 98's head of organizing and assistant business manager, began investigating Farfield's work on the Wayne Junction Project. ECF Doc. No. 231-28 at 77-78 using the pagination assigned by the CM/ECF docketing system (N.T. Browne). Mr. Brown requested from SEPTA a copy of Farfield's certified payrolls. *Id.* at 78. After reviewing the payrolls certified by Farfield, Mr. Browne became concerned of Farfield's use of laborers on the Wayne Junction Project and contacted Local 126 to discuss his concerns. *Id.* at 78-80. Mr. Browne continued to investigate Farfield's practices, explaining Local 98 had more money and resources to investigate than Local 126. *Id.* at 82. Mr. Browne ultimately contacted Local 98's counsel regarding his investigation. *Id.* at 109-113.

[16] ECF Doc. Nos. 16, 17, 30.

[17] ECF Doc. No. 30 at ¶¶ 2-9.

[18] *Id.* at ¶ 40.

[19] ECF Doc. No. 171.

[20] ECF Doc. No. 193.

[21] ECF Doc. No. 194.

[22] *Id.* at ¶ 2.

[23] ECF Doc. Nos. 195, 197.

[24] Fed. R. Civ. P. 53(f)(3)(A), (B); (4).

[25] ECF Doc. No. 199. Judge Stengel earlier appointed Attorney Merenstein as a Special Master to resolve discovery issues. *See* ECF Doc. No. 110.

[26] ECF Doc. No. 199. On the parties' joint motion to extend post-hearing scheduling deadlines, we extended the deadline for Special Master Merenstein's Report and Recommendation to November 29, 2019. *See* ECF Doc. No. 213.

[27] ECF Doc. No. 203.

[28] *See* ECF Doc. Nos. 197, 200.

[29] ECF Doc. No. 231-28 at 10-11 (Stipulation of Counsel at ¶ 16). Local 98 originally articulated three theories for its claims against Farfield but elected to proceed before Special Master Merenstein on its third theory only. *See* ECF Doc. No. 214 at Findings of Fact ¶ 99.

[30] 328 U.S. 680 (1946).

[31] *Id.* at 687-88.

[32] *Id.* at 687.

[33] ECF Doc. No. 204.

[34] ECF Doc. No. 206.

[35] ECF Doc. No. 209.

[36] *Id.* at 13.

[37] ECF Doc. No. 211.

[38] ECF Doc. No. 214 at Findings of Fact ¶¶ 1-4.

[39] ECF Doc. No. 214 at 5.

[40] *Id.* (emphasis in original).

[41] *Id.* at 6.

[42] *Id.*

[43] *Id.* at 6-7.

[44] *Id.* at 7.

[45] *Id.* at 8.

<sup>46</sup> *Id.*

<sup>47</sup> *Id.*

<sup>48</sup> Local 98 is represented by the law firm Jennings Sigmond. A paralegal at Jennings Sigmond prepared a spreadsheet comprised of over 13,952 rows and twenty-six columns of information. The spreadsheet is a compilation of documents produced during discovery including phase code time sheets, handwritten time sheets, certified payrolls, and daily foreman reports among other documents. ECF Doc. No. 231-28 at 16 (Stipulation of Counsel at ¶ 52). The information on the spreadsheet includes Bates stamp references, week beginning and ending dates, phase code time sheet date, payroll type, employee name, phase code (separated into three columns), wage rate paid, hours worked, pay classification, crew, approver, notes, fringe benefit amount credited, and hours worked each day of that week. *Id.* (Stipulation of Counsel at ¶ 54). Local 98's damages expert used the spreadsheet to calculate damages and verified the spreadsheet is 99.781% accurate. *Id.* at 16-17 (Stipulation of Counsel at ¶ 56).

<sup>49</sup> ECF Doc. No. 214 at 9.

<sup>50</sup>*Id.* at Findings of Fact ¶ 201.

<sup>51</sup> *Id.* at ¶ 202.

<sup>52</sup> *Id.* at Conclusions of Law ¶ 33.

<sup>53</sup> *Id.* at Conclusions of Law ¶ 34.

<sup>54</sup> *Id.* at Conclusions of Law ¶¶ 35-36. Special Master Merenstein explained the statutory civil penalty is between $5,500 and $11,000. 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9) (penalties for violations occurring on or before November 2, 2015). Special Master Merenstein chose the lowest amount in a $5,500 penalty. ECF Doc. No. 214 at Conclusion of Law ¶ 36.

<sup>55</sup> ECF Doc. No. 214 at Conclusion of Law ¶¶ 37-38. Special Master Merenstein awarded thirty percent of the total judgment, or $316,596.19, to Local 98 with the remainder of the total judgment awarded to the United States. *Id.* at Conclusions of Law ¶ 38.

<sup>56</sup> ECF Doc. No. 215.

<sup>57</sup> ECF Doc. No. 215-1, 215-2.

<sup>58</sup> ECF Doc. No. 216.

<sup>59</sup> Fed. R. Civ. P. 53(f)(3), (4).

<sup>60</sup> Fed. R. Civ. P. 53(f)(1). *See also* 9 MOORE'S FEDERAL PRACTICE – CIVIL § 53.42 (2020).

<sup>61</sup> 40 U.S.C. § 3142(a).

$^{62}$ *Id.* at § 3142(b).

$^{63}$ *Chang v. Children's Advocacy Ctr. of Delaware Weih Steve Chang*, 938 F.3d 384, 386 (3d Cir. 2019) (citing 31 U.S.C. § 3729(a)(1); *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 486 (3d Cir. 2017)).

$^{64}$ *United States ex rel. Doe v. Heart Solution, P.C.*, 923 F.3d 308, 317 (3d Cir. 2019) (quoting *Genentech Inc.*, 855 F.3d at 487).

$^{65}$ *United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 242 (3d Cir.2004) (quoting *Hutchins v. Wilentz, Goldman & Spitzer*, 253 F.3d 176, 182 (3d Cir. 2001)).

$^{66}$ 31 U.S.C. § 3729(b)(1).

$^{67}$ 406 F. Supp. 3d 408, 413 (2019).

$^{68}$ 31 U.S.C. § 3729(a)(1)(B).

$^{69}$ ECF Doc. No. 216.

$^{70}$ ECF Doc. No. 214 at 6; Findings of Fact ¶ 204 – 213; Conclusions of Law ¶¶ 12 – 24.

$^{71}$ *Id.* at Conclusions of Law ¶¶ 15-17.

$^{72}$ ECF Doc. No. 215 at 11.

$^{73}$ ECF Doc. No. 231-28 at 1108-1109, 1134 (N.T. Pierce); ECF Doc. No. 214 at Findings of Facts ¶¶ 21-27.

$^{74}$ ECF Doc. No. 232-1 at 21. All page references to ECF Doc. No. 232-1 is to the pagination assigned by the CM/ECF docketing system (Joint Exhibit 5, Joseph McGee, Sr. Aug. 9, 2016 deposition at 71).

$^{75}$ *Id.* at 41, 76 (Joint Exhibit 5, McGee, Sr. Aug. 9, 2016 deposition at 134, 195).

$^{76}$ *Id.* at 76 (Joint Exhibit 5, McGee, Sr. Aug. 9. 2016 deposition at 195).

$^{77}$ *Id.* at 41 (Joint Exhibit 5, McGee, Sr. Aug. 9, 2016 deposition at 134); ECF Doc. No. 231-28 at 1469 (N.T. Kleimo).

$^{78}$ ECF Doc. No. 231-28 at 1144, 1184 (N.T. Pierce 1144).

$^{79}$ ECF Doc. No. 231-28 at 201, 205, 2027-28 (N.T. Jackson); ECF Doc. No. 231-28 at 35 (Stipulation of Counsel at ¶ 201).

[80] ECF Doc. No. 232-1 at 59-60, 177 (Joint Exhibit 5, Aug. 9, 2016 deposition of McGee, Sr. at 164-165, 343).

[81] *Id.* at 206 (Joint Exhibit 5, McGee, Sr. Aug. 10, 2016 deposition at 57).

[82] *Id.* at 51-52 (Joint Exhibit 5, McGee, Sr. Aug. 9, 2016 deposition at 156-157).

[83] *Id.* at 55 (Joint Exhibit 5, McGee, Sr. Aug. 9, 2016 deposition at 160).

[84] *Id.* at 167-68, 170, 206-07 (Joint Exhibit 5, McGee, Sr. Aug. 9, 2016 deposition at 333-34, 336) (Joint Exhibit 5, McGee, Sr. Aug. 10, 2016 deposition at 57, 58).

[85] ECF Doc. No. 231-28 at 35 (Stipulation of Counsel at ¶¶ 200, 202).

[86] ECF Doc. No. 231-28 at 275-76 (N.T. Jackson); 1581-82 (N.T. Derr); 1822 (N.T. Pennington).

[87] ECF Doc. No. 214 at Findings of Fact ¶ 141-142.

[88] 728 F.3d 707 (7th Cir. 2013).

[89] *Id.* at 710.

[90] *Id.* at 712-13 (quoting S. Rep. No. 99-345 at * 20).

[91] ECF Doc. No. 214 at Conclusion of Law ¶ 15 (citing *United States ex rel. Hill v. Univ. of Med. & Dentistry*, 448 F. App'x 314, 317 (3d Cir. 2011) and *Zimmer, Inc.*, 386 F.3d at 245 n. 12).

[92] ECF Doc. No. 214 at Findings of Fact ¶¶ 204-213.

[93] ECF Doc. No. 192 at 13.

[94] ECF Doc. No. 230-5.

[95] ECF Doc. No. 231-28 at 32 (Stipulation of Counsel at ¶ 179).

[96] ECF Doc. No. 231-28 at 1416, 1483, 1491-92 (N.T. Kleimo).

[97] ECF Doc. 214 at Findings of Fact ¶ 51.

[98] 939 F. Supp. 636 (C.D. Ill. 1996), *aff'd*, 111 F.3d 133 (7th Cir. 1997).

[99] *Id.* at 638-39.

[100] ECF Doc. No. 214 at Findings of Fact ¶ 208.

[101] *Id.* at Findings of Fact ¶¶ 132-149.

[102] ECF Doc. No. 230-1; 230-2; 230-3; 230-4.

[103] ECF Doc. No. 230-1 at 7; ECF Doc. No. 230-2 at 7; ECF Doc. No. 230-3 at 7; ECF Doc. No. 230-4 at 8 (emphasis added). All page references to ECF Doc. Nos. 230-1, 230-2, 230-3, and 230-4 are to the pagination assigned by the CM/ECF docketing system.

[104] ECF Doc. No. 215 at 18-19; ECF Doc. No. 214 at Findings of Fact ¶¶ 162-163.

[105] ECF Doc. No. 231-28 at 13-14 (Stipulation of Counsel at ¶¶ 33-36).

[106] ECF Doc. No. 231-28 at 756-57, 759, 761-69, 771, 788-89, 798-801 (N.T. Leach).

[107] *Id.* at 885-86 (N.T. Leach).

[108] ECF Doc. No. 214 at Findings of Fact ¶¶ 165-166 (emphasis in original).

[109] *Id.* at Conclusions of Law ¶¶ 6-11.

[110] EF Doc. No. 215 at 21-22.

[111] *See* ECF Doc. No. 230-1, 230-2, 230-3, 230-4.

[112] 508 F.3d 1052 (D.C. Cir. 2007).

[113] *Id.* at 1056-57.

[114] *Id.* at 1059.

[115] *In re Matter of Fry Brothers Corp.*, WAB Case No. 76-6, 197 WL 24823 (June 14, 1977). The Wage Appeals Board is the predecessor to the Department of Labor's Administrative Review Board.

[116] *Fry Brothers*, 197 WL 24823 at *6.

[117] *Id.* at * 6.

[118] 183 F.3d 1088 (9th Cir. 1999).

[119] *Id.* at 1089.

[120] *Id.* at 1093-94.

[121] *Id.* at 1095.

[122] *Id.* at 1094 (emphasis added).

[123] *See* ECF Doc. No. 214 at Findings of Fact ¶ 165.

[124] No. 11-3273, 2012 WL 5987546, at * 9 (E.D. Pa. Nov. 29, 2012).

[125] *Id.* at *1.

[126] *Id.* at *9.

[127] 866 F.2d 599 (3d Cir. 1989).

[128] *Id.* at 600-01.

[129] *Id.* at 602.

[130] *Id.* at 603 (citing *United Steelworkers of America v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 581–82 (1960)).

[131] 754 F.3d 177 (3d Cir. 2014).

[132] ECF Doc. No. 231-28 at 18 (Stipulation of Counsel at ¶ 65).

[133] ECF Doc. No. 231-28 at 791 (N.T. Leach).

[134] *Id.*

[135] *Id.* at 791-92.

[136] ECF Doc. No. 214 at 8. Under Special Master Merenstein's alternate theory, he calculated 99 weeks of misclassified and underpaid wages to groundmen amounting to $157,565.31, or three times the underpayment, while the civil penalty would be $544,500, at $5,500 per violation, for a total judgment of $702,065.31. *Id.* at Conclusion of Law ¶ 39.

[137] ECF Doc. No. 214 at Findings of Fact ¶ 59.

[138] ECF Doc. No. 232-1 at 33 (Joint Exhibit 5, McGee, Sr. Aug. 9, 2016 deposition at 124).

[139] *Id.* at 33-34.

[140] ECF Doc. No. 1.

[141] ECF Doc. No. 30.

[142] ECF Doc. No. 172.

[143] ECF Doc. No. 173.

[144] ECF Doc. No. 172 at ¶ 2.

[145] ECF Doc. No. 214 at 5.

[146] *Id.* at 8.

[147] *Id.*

[148] ECF Doc. No. 214 at Conclusions of Law ¶ 31.

[149] No. 11-385, 2013 WL 781614 (D. Md. Feb. 28, 2013).

[150] *Id.* at *9.

[151] *Id.* (citations omitted).

[152] ECF Doc. No. 231-28 at 35 (Stipulation of Counsel ¶¶ 200, 202).

[153] 41 U.S.C. § 3729(a)(1)(B) (emphasis added).

[154] ECF Doc. No. 214 at Conclusions of Law ¶¶ 21-23.

[155] 31 U.S.C. § 3729(b)(4), amended by Pub.L. 111-21, § 4(a), May 20, 2009, 123 Stat. 1617.

[156] *Universal Health Servs., Inc. v. United States ex rel. Escobar*, --- U.S. ---, 136 S.Ct. 1989, 195 L.Ed.2d 348 (2016).

[157] An "implied false certification" theory imposes liability on a defendant's fraudulent omissions from claims for payment made to the United States while an express false certification theory imposes liability for "express falsehoods" made to the United States on a claim for payment. *Escobar*, 136 S.Ct. at 1999. The Court held an implied certification theory can be a basis for liability where two conditions are met: "first, the claim does not merely requires payment, but also makes specific representations about the goods or services provides; and second, the defendant's failure to disclosure noncompliance with material statutory, regulatory, or contractual requirements makes those representations misleading half-truths." *Id.* at 2001 (footnote omitted).

[158] Section 3729(a)(1)(A) imposes liability on any person who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;" 31 U.S.C. § 3729(a)(1)(A). Local 98 brings its claims under Section 3729(a)(1)(B), imposing liability on any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;" *Id.* § 3729(a)(1)(B). A claim under § 3729(a)(1)(B) is "'complementary' to one under section 3729(a)(1)(A), and accordingly, 'the elements for a count brought under section 3729(a)(1)(B) are practically identical to the requirements for a count brought under section 3729(a)(1)(A).'" *United States ex rel. Scott v. Pacific Architects and Engineers (PAE), Inc.*, 270 F.Supp.3d 146, 154 (D.D.C. 2017) (quoting *Pencheng Si v. Laogai Research Found.*, 71 F.Supp.3d 73, 87 (D.D.C. 2014)). "The principal difference between the two claims is that section

3729(a)(1)(A) imposes liability for false claims, while section 3729(a)(1)(B) imposes liability for a knowingly false 'record or statement that was 'material' to a false or fraudulent claim.'" *Id.* (quoting *United States ex rel. Morsell v. Symantec Corp.*, 130 F.Supp.3d 106, 122 (D.D.C. 2015)). "The false statements provision is 'designed to prevent those who make false records or statements ... from escaping liability solely on the ground that they did not themselves present a claim for payment or approval.'" *Id.* (citing *Morsell*, 130 F. Supp.3d at 122-23).

[159] *Escobar*, 136 S.Ct. at 1997-98.

[160] *Id.*

[161] *Id.* at 2001.

[162] *Id.* 2002 (citing 26 R. Lord, Williston on Contracts § 69:12, p. 549 (4th ed. 2003)).

[163] *Genentech Inc.*, 855 F.3d at 489 (citing *Escobar*, 136 S.Ct. at 2002-03, 2003 n. 5).

[164] *Escobar*, 136 S.Ct. at 2003 (quoting *Allison Engine Co., Inc. v. United States ex rel. Sanders,* 553 U.S. 662, 672 (2008)).

[165] *Id.* at 2003 (citations omitted).

[166] *Id.* at 2003-04 (footnote omitted).

[167] ECF Doc. No. 231-27 at 48, 52.

[168] ECF Doc. No. 231-28 at 1457 (N.T. Kleimo).

[169] ECF Doc. No. 231-28 at 20-21 (Stipulation of Counsel at ¶ 75).

[170] ECF Doc. No. 231-27 at 49. *See also* 29 C.F.R. § 5.5(a), (a)(3)(ii).

[171] ECF Doc. No. 231-27 at 48-49, 52.

[172] ECF Doc. No. 231-27 at 48 (emphasis added).

[173] 29 C.F.R. § 5.12(a)(1), (2).

[174] *Escobar*, 136 S.Ct. at 2003.

[175] *United States ex rel. Doe v. Heart Solution, PC*, 923 F. 3d 308, 317-18 (3d Cir. 2019).

[176] ECF Doc. No. 231-28 at 1219-20 (N.T. Pierce), 1457-58 (N.T. Kleimo).

[177] ECF Doc. No. 231-28 at 1588 (N.T. Derr).

[178] 31 U.S.C. § 3729(a)(1).

[179] ECF Doc. No. 231-28 at 21 (Stipulation of Counsel at ¶ 75).

[180] *Id.* at 35 (Stipulation of Counsel at ¶ 204); ECF Doc. No. 231-27 at 49.

[181] ECF Doc. No. 231-28 at 30 (Stipulation of Counsel at ¶ 177).

[182] Farfield quotes the language of the pre-2009 version of the False Claims Act defining claim as: "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c). We already decided the Fraud Enforcement Recovery Act of 2009 ("FERA") amending section 3729 of the False Claims Act applies here. *See* ECF Doc. No. 192. We rejected Farfield's attempt to use the pre-FERA statute to define "claim."

[183] ECF Doc. No. 215 at 49.

[184] ECF Doc. No. 216 at 31.

[185] ECF Doc. No. 230-20.

[186] $5,500 x 40 versus $5,500 x 105.

[187] 31 U.S.C. § 3729(b)(2).

[188] 423 U.S. 303 (1976).

[189] *Bornstein*, 423 U.S. at 307.

[190] The version of the False Claims Act at the time of the *Bornstein* decision imposed a $2,000 "forfeiture" for a violation of the Act. *See Bornstein*, 423 U.S. at 308-09.

[191] *Id.* at 308.

[192] *Id.* at 312.

[193] *Id.* at 313.

[194] *Id.*

[195] *United States ex rel. Larry Hawkins v. Mantech Int'l Corp.*, No. 15-2105, 2020 WL 435490, *5 (D.D.C. Jan. 28, 2020).

[196] *Id.* (quoting *United States ex rel. Totten v. Bombardier Corp.* ("*Totten II*"), 380 F.3d 488, 501 (D.C. Cir. 2004)) (emphasis in original).

[197] *Id.* (quoting *Pencheng Si v. Laogai Research Found.*, 71 F. Supp. 3d 73, 91 (D.D.C. 2014)).

[198] *United States v. Saavedra*, 661 F. App'x 37, 45 (2nd Cir. 2016) (footnote omitted) (emphasis in original). *See also*, *United States v. Zan Man. Co., Inc.*, 803 F. Supp. 620 (E.D. N.Y. 1992).

[199] *Id.* (citing *Bornstein*, 423 U.S. at 312).

[200] *Bornstein*, 423 U.S. at 313.

[201] 328 U.S. 680 (1946).

[202] *See* ECF Doc. No. 209.

[203] *Mt. Clemens*, 328 U.S. at 687-88.

[204] *Id.* at 687.

[205] *In the Matter of Pythagoras Gen. Contracting Corp. v. Adm'r, Wage and Hour Div., United States Dep't of Labor*, 2011 WL 729638, * 1 (DOL Admin. Review Bd. Feb. 10, 2011); *In the Matter of Pythagoras Gen. Contracting Corp. v. Adm'r, Wage and Hour Div., United States Dep't of Labor*, 2011 WL 1247202, *2, *6 (DOL Admin. Review Bd. Mar. 1, 2011), *aff'd*, 926 F. Supp. 2d 490 (S.D.N.Y. 2013).

[206] *Reich v. Gateway Press, Inc.*, 13 F.3d 685, 701 (3d Cir. 1994) (citing *Mt. Clemens*, 328 U.S. at 680 and collecting cases).

[207] ECF Doc. No. 204.

[208] *Id.* at 7.

[209] ECF Doc. No. 206.

[210] ECF Doc. No. 204.

[211] ECF Doc. No. 214 at Findings of Fact ¶¶ 67-68.

[212] *Id.* at Findings of Fact ¶¶ 83-87, 215.

[213] *See* ECF Doc. No. 209 at 13-14.

[214] *Id.* at 14.

[215] ECF Doc. No. 231-28 at 1161-62 (N.T. Pierce).

[216] ECF Doc. No. 214 at Conclusions of Law ¶ 29.

[217] ECF Doc. No. 231-28 at 1287-88 (N.T. Reed).

[218] ECF Doc. No. 231-28 at 348-64 (N.T. Hale).

[219] ECF Doc. No. 231-28 at 517, 520-21, 527-28, 530 (N.T. Lauria).

[220] ECF Doc. No. 231-28 at 612-13 (N.T. Franchetti).

[221] ECF Doc. No. 215 at Conclusion of Law ¶ 28 (citing *Sec'y United States Dep't of Labor v. Central Laundry, Inc.*, No. 18-3007, 2019 WL 5095752 (3d Cir. Oct. 11, 2019).

[222] *Central Laundry*, 2019 WL 5095752 at \*3 (quoting *Martin v. Selker Bros., Inc.*, 949 F.2d 1286, 1297 (3d Cir. 1991)).

[223] *Id.*

[224] ECF Doc. No. 214 at Findings of Fact ¶¶ 200-203.

[225] ECF Doc. No. 231-28 at 18 (Stipulation of Counsel at ¶ 65).

[226] *Id.* at 25 (Stipulation of Counsel at ¶ 98).

[227] ECF Doc. No. 231-28 at 1161-62 (N.T. Pierce).

[228] ECF Doc. No. 231-28 at 300 (N.T. Jackson).

[229] ECF Doc. No. 231-28 at 15-17 (Stipulation of Counsel at ¶¶ 50-56).

[230] ECF Doc. No. 232-1 at 21, 41, 76 (Joint Exhibit 5, McGee, Sr. Aug. 9, 2016 deposition at 71, 134, 195); ECF Doc. No. 231-28 at 1469 (N.T. Kleimo).

[231] ECF Doc. No.231-28 at 1149 (N.T. Pierce).

[232] ECF Doc. No. 231-28 at 34 (Stipulation of Counsel at ¶ 200).

[233] ECF Doc. No. 231-28 at 236-37, 241-47, 2062-63 (N.T. Jackson); 29-99 (N.T. Hale); 1150 (N.T. Pierce); 1286-88 (N.T. Reed); 1916 (N.T. Cuthbert); ECF Doc. No. 232-1 at 47-48 (McGee, Sr. Aug. 9, 2016 deposition), 195 (McGee, Sr. Aug. 10, 2016 deposition).

[234] ECF Doc. No. 214 at Findings of Fact ¶ 150.

[235] *Id.* at Findings of Fact ¶ 185.

[236] *Id.* at Findings of Fact ¶ 186.

[237] Farfield objects to Findings of Fact ¶¶ 40, 43, 46, 51, 58, 59, 67, 78, 83, 86, 92, 93, 98, 99, 100, 140, 141, 143, 144, 150, 165, 166, 167, 168, 169, 170, 171, 172, 173, 174, 176, 184, 185, 186, 190, 193, 195, 197, 198, 201, 202, 203, 204, 205, 207, 208, 211, 213, 214, 215, 219, and 220. Farfield objected to Findings of Facts ¶¶ 141, 165, 166, and 204 in its brief at pages 7, 20, 21, and 56 (ECF Doc. No. 215).

[238] ECF Doc. No. 214 at Conclusions of Law ¶ 4 (emphasis added); ECF Doc. No. 231-27 at 49.

[239] ECF Doc. No. 231-27 at 49 (emphasis added).

[240] 40 U.S.C. § 3142(a), (b).

[241] 29 C.F.R. § 5.5(a)(3)(ii)(B).

[242] ECF Doc. No. 214 at Conclusions of Law ¶ 5.

[243] ECF Doc. No. 214 at 8.

[244] ECF Doc. No. 232-1 at 59-60, 177 (Joint Exhibit 5, McGee, Sr. Aug. 9, 2016 deposition at 164-165, 343); ECF Doc. No. 231-27 at 45.

[245] *Id.* at 206 (McGee, Sr. Aug. 10, 2016 deposition at 57).

[246] *Id.* at 51-52 (McGee, Sr. Aug. 9, 2016 deposition at 156-157).

[247] *Id.* at 55 (McGee, Sr. Aug. 9, 2016 deposition at 160).

[248] *Id.* at 167-68, 170 (McGee, Sr. Aug. 9, 2016 deposition at 333-34, 336), 206-07 (McGee, Sr. Aug. 10, 2016 deposition at 57-58).

[249] ECF Doc. No. 214 at Conclusion of Law ¶¶ 13, 24.

[250] ECF Doc. No. 215 at 63.

[251] ECF Doc. No. 232-1 at 128-29 (N.T. Jackson).

[252] ECF Doc. No. 231-28 at 1941 (N.T. Jackson).

[253] *Id.* at 2015 (N.T. Jackson).

[254] ECF Doc. No. 231-28 at 1582 (N.T. Derr).

[255] *Id.* at 1589-90 (N.T. Derr).

[256] *Id.* at 1623, 1681 (N.T. Derr).

[257] ECF Doc. No. 231-28 at 1822 (N.T. Pennington).

[258] ECF Doc. No. 215 at 63-64.