**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** *ex* | **:** | **CIVIL ACTION** |
| *rel.* **INTERNATIONAL** | **:** | |
| **BROTHERHOOD OF ELECTRICAL** | **:** | |
| **WORKERS LOCAL UNION NO. 98** | **:** | |
| | **:** | |
| **v.** | **:** | **NO. 09-4230** |
| | **:** | |
| **THE FARFIELD COMPANY** | **:** | |

# MEMORANDUM

**KEARNEY, J.**                                                    **April 10, 2020**

Congress authorizes federal courts to order parties violating the False Claims Act to pay the reasonable attorney's fees and costs incurred by the citizen recovering funds for the United States. To root out false claims, Congress motivates competent private lawyers to recover for the government by forcing the government contractor pay their reasonable fees, but not a windfall. We today evaluate the reasonableness of fees and costs sought by lawyers for a union local who investigated, litigated, and tried a challenge to the way a contractor classified and paid its workers on federally funded projects. The contractor vigorously disputed the claim. The union local did not retreat; it invested over $1.4 Million over the twelve-year case. The union local won the case at trial and we ordered the contractor pay $1,055,320.62 under federal law. The union local now seeks an award of $2,006,224.80 in attorney's fees, $2,952 in a supplemental request in attorney's fees, and $223,541.42 in costs. Arguing the union local enjoyed only limited success, the contractor objects to the number of hours and increased hourly rates beyond what the union local incurred. We sustain the contractor's objections to the windfall increase in hourly rates and strike undescribed costs but otherwise overrule its objections. We award $1,433,154 in reasonable attorney's fees and costs incorporated in today's Judgment.

## I. Factual background

Almost twenty years ago, construction contractor The Farfield Company contracted with the Southeastern Pennsylvania Transportation Authority ("SEPTA") to work on five federally funded projects improving Philadelphia-area transit systems. From 2001 to 2007, Farfield worked on SEPTA's Girard Avenue Infrastructure Renewal Project; Wayne Junction to Glenside and Signal Project; Smart Stations Project I and II; and, PATCO Egress Lighting Project.

At some point after Farfield began working on the SEPTA projects, the International Brotherhood of Electrical Workers Local Union No. 98 began investigating Farfield's pay practices. Local 98 believed its investigation revealed Farfield had its unskilled groundmen and laborers perform skilled electrician work but paid the groundmen and laborers at the lower, unskilled rate rather than the higher rate for skilled electrical work. If so, Local 98 believed Farfield's pay practice violated the Davis-Bacon Act.[1]

On September 17, 2009, Local 98, through its Philadelphia counsel Jennings Sigmond, P.C. filed a sealed complaint alleging Farfield's billing on SEPTA's projects violated the False Claims Act, 31 U.S.C. § 3729 *et seq.* by intentionally paying its workers at wages lower than required by the Davis-Bacon Act and then submitting claims to the federal government for payment based on certifications it complied with the Davis-Bacon Act. The parties did not produce an engagement letter between Local 98 and Jennings Sigmond.[2]

On September 21, 2011, the United States declined to intervene and the court unsealed the complaint.[3] After years of litigation described below involving the production of hundreds of thousands of often-disorganized wage records from the mid-2000s, the parties agreed in September 2019 to refer resolution of the case to a Special Master under Federal Rule of Civil Procedure 53. The parties recommended, and we appointed, Bruce P. Merenstein, Esquire as Special Master.[4]

But before agreeing to a Special Master, Local 98, in May 2019, voluntarily agreed to dismiss with prejudice claims against Farfield relating to all projects except for the Wayne Junction to Glenside and Signal Project ("Wayne Junction Project").[5] The parties only disputed, and the Special Master only considered, claims relating to the Wayne Junction Project. The Special Master presided over eight days of evidentiary hearings including testimony from twenty witnesses, deposition testimony of two witnesses, and over eighty exhibits.

On November 29, 2019, the Special Master issued a sixty-seven-page memorandum including 220 findings of detailed facts cited to the record and thirty-nine well-reasoned conclusions of law supporting his report and recommendation we enter judgment in favor of Local 98. Farfield filed detailed objections and Local 98 responded. On February 5, 2020, after considering Farfield's objections to the Special Master's report and recommendation, we overruled the objections and found Farfield liable under the False Claims Act.[6] We entered an Order and Memorandum approving the Special Master's Report and Recommendation and directing Local 98 may timely move for reasonable attorney's fees and costs. Local 98 timely moved for fees and costs. We granted Farfield leave to depose a designee and then file objections. After deposing attorney Marc Gelman regarding Local 98's fees incurred in this litigation, Local 98 filed a supplemental request for attorney's fees for time preparing for and defending Attorney Gelman's deposition.[7]

As true with almost every submission in this case, the arguments challenging the lawyer work for twelve years requires we appreciate the forest from the trees at the outset. We scrutinize the specific objections but first describe the overall arc of this successful representation.

**A. Local 98's progress over twelve-years of funding attorney's fees and costs.**

Jennings Sigmond breaks down the hours spent beginning in 2008 through 2020 chronologically and divided into "phases." We use the "phases" as identified by Jennings Sigmond to detail the history of Local 98's attorney's fees and costs incurred in this twelve-year litigation.

**1. Phase 1: pre-Complaint investigation, preparing Complaint, and submitting Complaint to the Department of Justice, January 2008 – September 2009.**

From January 2008 until September 2009 (Phase 1), Jennings Sigmond engaged in primarily investigative work, legal research to prepare the complaint, and preparing a detailed written report with exhibits submitted to the Department of Justice as required by the False Claims Act. Pre-complaint discovery "was more robust than is typical" for two reasons: (1) it required review of thousands of payroll and related records obtained from SEPTA through a Freedom of Information Act ("FOIA") request relating to the five federally funded projects; and (2) to develop the theory of liability, attorneys interviewed and obtained sworn statements from thirteen then-current Farfield employees with personal knowledge of Farfield's projects.[8]

Local 98 seeks payment for 118.3 hours worked during Phase 1, representing 1.8% of the total hours sought.[9]

**2. Phase 2: Complaint remains under seal pending the United States' review, October 2009 – October 2011.**

From October 2009 until October 2011 (Phase 2), Jennings Sigmond communicated with the Department of Justice, Local 98, and engaged in "ongoing development of the case and litigation strategy."[10] Local 98 seeks payment for 61.6 hours worked during Phase 2, representing 0.9% of the total hours sought.[11]

3. **Phase 3: preparing amended Complaint, responding to motion to dismiss the amended Complaint, and continued investigation, November 2011 – July 2013.**

From November 2011 until July 2013 (Phase 3), Jennings Sigmond filed the first amended complaint in response to Farfield's Motion to dismiss the original complaint; and responding to Farfield's Motion to dismiss the amended complaint.[12]

After the court unsealed the complaint on October 31, 2011, Farfield moved to dismiss.[13] Farfield argued the court lacked subject matter jurisdiction because the False Claims Act does not cover Local 98's claims; the Department of Labor has exclusive jurisdiction over the matter; and the Department of Labor's 2004 investigation cleared Farfield of wrongdoing with regard to its classifications of workers. Farfield also argued Local 98 failed to state a claim under Federal Rules of Civil Procedure 8 and 9.

Local 98 filed an amended complaint on February 3, 2012.[14] Local 98's amended complaint again alleged Farfield intentionally and knowingly misclassified workers performing electrician's work to gain a competitive bidding advantage on the same federally funded construction projects between 2001 and 2009.[15] Local 98 alleged Farfield submitted fraudulent certified payroll records intending those documents to be material in the federal government's decision to pay the false claims violating the False Claims Act, 31 U.S.C. § 3729(a)(1)(B).[16] The amended complaint added significantly more fact detail including the identification of Farfield officers and management who allegedly misclassified workers and submitted certified payrolls to the United States for payment, and nine employees who Farfield allegedly misclassified.

On July 2, 2013, Judge Stengel denied Farfield's Motion to dismiss.[17] Farfield answered the amended complaint on July 29, 2013[18] and Judge Stengel issued a Scheduling Order on August 1, 2013.[19]

Local 98 seeks payment for 401.4 hours worked during this Phase 3, representing 6.1% of the total hours sought.

### 4. Phase 4: extensive discovery and settlement negotiations, August 2013 – January 2017.

From August 2013 until January 2017 (Phase 4), Local 98's counsel Jennings Sigmond engaged in (1) discovery; (2) discovery disputes; and (3) ongoing settlement discussions and negotiations.

### *Discovery.*

Jennings Sigmond asserts Farfield produced approximately 261,587 pages of documents over a two-year period between January 3, 2014 and October 5, 2015. It contends Farfield produced documents in electronic format without identifier or organization requiring it to review each page to determine contents and relevance, and then organized and manually tagged and indexed each document. Jennings Sigmond estimates 68% of the documents produced by Farfield related to the Wayne Junction Project.[20]

After organizing the records, Jennings Sigmond paralegal Nathan Foley extracted and manually entered data into a "Master Spreadsheet" comprised of 348,575 cells. Some of the documents Farfield produced included time sheets assigning "phase codes" to workers' time.[21] The phase code analysis derived from the spreadsheet figured prominently before Special Master Merenstein who described the spreadsheet as "the best mechanism for determining the specific days worked by each employee on the Wayne Junction Project, as well as the total hours each employee worked on each of those days, the phase code or phase codes under which each employee's work was categorized each day, and each employee's classification and pay rate each day" and noted the spreadsheet "was admitted into evidence without objection by Farfield."[22] Jennings Sigmond contends the spreadsheet "eliminated the need for tens of thousands of

documents to be introduced and reviewed, and without doubt contributed significantly to the orderly function at trial."[23]

In addition to document production, the parties conducted twenty-nine depositions – fourteen by Local 98 and fifteen by Farfield – taken in Philadelphia and Lancaster County.

### *Discovery disputes.*

In October 2015, Local 98 moved to compel Farfield "to cooperate in discovery" which Farfield opposed.[24] After an in-person status conference and oral argument on the discovery motion, Judge Stengel appointed Special Master Merenstein on November 5, 2015 to resolve the parties' discovery disputes.[25]  Nearly four months later, on February 29, 2016, Special Master Merenstein issued a decision and recommendation on the discovery issues.[26]

### *Ongoing settlement discussions and negotiations.*

The parties engaged in settlement negotiations with Magistrate Judge Henry Perkin in Allentown consisting of two in-person conferences and thirteen phone conferences.

Jennings Sigmond does not break out its time for the three categories of work in Phase 4. It attributes 4,252.3 hours to work performed in Phase 4, representing 65% of the total hours sought.

Jennings Sigmond attorney Marc Gelman submitted a Declaration in support of the fee petition.[27]  Attorney Gelman swore Jennings Sigmond voluntarily cut 1,101.9 hours of time from the present petition from his firm's bills for which Local 98 does not seek reimbursement. Attorney Gelman cut (1) 1,066.4 hours from Phase 4; and (2) 35.5 hours from staff who worked on the case for less than fifteen hours.[28]

Attorney Gelman swore he cut 1,066.4 hours from Phase 4 to account for the case proceeding to final resolution on the Wayne Junction Project only.  Applying Jennings Sigmond's

estimate of sixty-eight percent of the documents produced by Farfield related to the Wayne Junction Project, Attorney Gelman cut thirty-two percent of the hours worked on document review and indexing during Phase 4 "discovery period."[29]  Attorney Gelman swore he cut 35.5 hours billed by all staff who worked for less than fifteen hours on the case to eliminate potential inefficiencies.[30]  Attorney Gelman cut these hours while now moving for attorney's fees.  There is no evidence Jennings Sigmond did not pay for these hours.  Farfield calculates the fees paid to Jennings Sigmond and there is no material difference in the time billed in Phase 4 and the time paid by Local 98.

### 5. Phase 5: case development, including research and review of documents and depositions, November 2016 – February 2017.

From November 2016 until February 2017 (Phase 5), Jennings Sigmond "considered and analyzed the vast discovery, and sharpened and developed its theories and strategies."  Local 98 seeks payment for 141.3 hours worked during Phase 5, representing 2.2% of the total hours sought.[31]

### 6. Phase 6: non-specific expert testimony and Department of Labor referral, February 2017 – September 2017.

From February 2017 until September 2017 (Phase 6), the parties addressed ongoing discovery including expert opinions.  On February 2, 2017, Judge Stengel ordered Local 98 to brief issues concerning expert testimony.[32]  In its 2013 motion to dismiss the complaint, Farfield argued the court lacked subject matter jurisdiction because the Department of Labor has exclusive jurisdiction over classification disputes under the Davis-Bacon Act.  Local 98 argued the matter did not involve a complex classification dispute because the SEPTA contracts set forth a clear and undisputed prevailing wage practice, and the court need not defer to the Department of Labor's

exclusive jurisdiction.  Judge Stengel denied Farfield's motion to dismiss based, in part, on his finding of subject matter jurisdiction.

But in response to Judge Stengel's February 2, 2017 Order, Local 98 proposed a "non-scientific" industry expert and argued such an expert is critical to its ability to prove Farfield misclassified its workers.  Farfield responded if an expert is critical, then the court does not have subject matter jurisdiction and must defer to the Department of Labor.

After considering the issue, Judge Stengel stayed the case on September 26, 2017 pending referral to the Department of Labor to resolve the issue of worker classifications and wage determinations.[33]  Jennings Sigmond did nothing to refer the matter to the Department of Labor for over a year.

Jennings Sigmond attributes 300.2 hours to the issues relating to its proposed trade industry expert, including attending a status conference with Judge Stengel, preparing tis brief, and responding to Farfield's brief representing 4.6% of the total hours sought.

### 7. Phase 7: Farfield's renewed motion to dismiss and referral to the Department of Labor, October 2018-March 2019.

From October 2018 until March 2019 (Phase 7), the parties addressed referral to the Department of Labor and Farfield's renewed motion to dismiss.  On September 25, 2018, the Clerk of the Court reassigned the case to our calendar upon Judge Stengel's retirement.[34]  At that time, Local 98 conceded it failed to timely refer the matter to the Department of Labor.  During a status call with all counsel, including for the United States, Jennings Sigmond represented attempts to refer this matter to the Department of Labor were stymied by the Department's position it has no protocol to undertake such an investigation on a referral from a federal court.  We allowed Farfield to move to dismiss the action based on whether the referral of this matter to the Department of Labor under the primary jurisdiction doctrine should be excused due to futility of this referral.

Farfield moved to dismiss again arguing we lack subjection matter jurisdiction and it is not futile to refer the matter to the Department of Labor. Local 98 opposed Farfield's motion. We denied Farfield's motion to be renewed after Local 98 referred the matter to the Department of Labor. Jennings Sigmond referred the matter to the Department of Labor on December 21, 2018. The Department of Labor declined to accept referral of the matter on March 4, 2019.

Local 98 seeks a total of 97.8 hours worked in Phase 7, representing 1.5% of the total hours sought.

8. **Phase 8: Farfield's renewed motion to dismiss, resolution of the dispute regarding non-scientific expert testimony, depositions of expert witnesses, and preparation of expert reports, April 2019 – June 2019.**

From April to June 2019 (Phase 8), Farfield renewed its motion to dismiss arguing we lacked subject matter jurisdiction given the Department of Labor's refusal to accept the referral. Local 98 opposed the motion.

Jennings Sigmond asserts the bulk of its work during this Phase 8 is not limited to the motion to dismiss briefing but "hours … related to the witnesses anticipated to testify at trial" including "a significant amount of time … spent related to … 'non-scientific experts' …."[35] It identifies three trial witnesses on local industry trade practices and to provide opinion testimony on Farfield's conduct on the Wayne Junction Project, depositions of these witnesses and Paralegal Foley and Jacqueline Coyle, CPA, Local 98's damages expert, and assisting the "non-scientific experts" in preparing expert reports.

Local 98 seeks payment of attorney's fees for a total of 211.7 hours worked during Phase 8, representing 3.2% of the total hours sought.

**9. Phase 9: motion for summary judgment and settlement conference with Judge Heffley, July 2019 – August 2019.**

In July and August 2019 (Phase 9), Jennings Sigmond needed to respond to Farfield's motion for summary judgment and participate in settlement with Judge Heffley. On July 22, 2019, Farfield moved for summary judgment. Jennings Sigmond contends the response, including a counterstatement of facts, required considerable time, effort, and research to address the "litany" of issues argued by Farfield. It also prepared for and attended oral argument on summary judgment, and on the same day participated in a settlement conference with Judge Heffley.

Local 98 seeks payment of attorney's fees for a total of 278.8 hours of work for Phase 9, representing 4.3% of the total hours sought.

**10. Phase 10: pre-trial filings, trial preparation, and trial, August 2019 – October 2019.**

From August to October 2019 (Phase 10), Jennings Sigmond focused on preparing pre-trial filings, including motions in limine and responses to motions in limine, and preparing for the scheduled eight days of evidentiary hearings before Special Master Merenstein. Local 98 seeks a total of 447.3 hours of work for Phase 10, representing 6.8% of the total hours sought.

**11. Phase 11: post-trial filings, oral argument, and response to Farfield's objections, October 2019 – January 2020.**

From October 2019 to January 2020, Jennings Sigmond prepared and argued post-trial motions and responded to Farfield's objections. The parties appeared at a post-hearing argument before Special Master Merenstein on November 21, 2019. Special Master Merenstein issued his Report and Recommendation on November 29, 2019. Farfield filed objections and proposed modifications to Special Master Merenstein's Report and Recommendation. Jennings Sigmond considers the response to Farfield's objections particularly significant.

Local 98 seeks a total of 230 hours of work for Phase 11, representing 3.5% of the total hours sought.

**B.  Supplemental submission: Deposition preparation and attendance March 2020.**

We overruled Farfield's objections to Special Master Merenstein's Report and Recommendation on February 5, 2020.[36]  Local 98 moved for attorney's fees and costs.  Farfield then moved to postpone or stay our review of attorney's fees and costs pending an appeal or, alternatively, for an extension of time to respond to the motion for attorney's fees and costs until after discovery on the motion for fees.[37]

We denied Farfield's motion to postpone or stay the matter, but allowed it to depose a designee of Jennings Sigmond most knowledgeable on the contemporaneous billing and production of time and expense records for this case.[38]  We also allowed Local 98 to file a Notice supplementing its time records to include the time for counsel to prepare and defend the deposition.

 Farfield deposed the Jennings Sigmond designee on March 4, 2020.  After the deposition, Jennings Sigmond filed a Notice of supplemental requested attorney fees.[39] Jennings Sigmond attorney James E. Goodley swears he incurred 8.2 hours of time preparing for and defending Attorney Gelman's deposition for a total of $2,952.00.[40]

**II.  Analysis**

Local 98 moves for reasonable attorney's fees and expenses under Section 3730 of the False Claims Act allowing a relator, in an action where the United States declines to intervene, "an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs.  All such expenses, fees, and costs shall be awarded against the defendant."[41]  Fees under the False Claims Act are "presumed reasonable when calculated using the 'lodestar' method, by which a court assigns a reasonable hourly rate and multiplies that

rate by the reasonable number of hours expended on the litigation."[42] Local 98 requests reimbursement of attorney's fees of $2,006,224.80 plus expenses of $223,541.42.

In statutory fee cases, Local 98, as the party seeking attorney's fees, "has the burden to prove that its request for attorney's fees is reasonable" by "submit[ting] evidence supporting the hours worked and rates claimed."[43] Farfield, as "the party opposing the fee award then has the burden to challenge, by affidavit or brief with sufficient specificity to give fee applicants notice, the reasonableness of the requested fee."[44] We have "a positive and affirmative function in the fee fixing process, not merely a passive role" and "[i]n calculating the hours reasonably expended, [we] should review the time charged, decide whether the hours set out were reasonably expended for each of particular purposes described and then exclude those that are excessive, redundant, or otherwise unnecessary."[45]

We may only reduce fees where there is an objection made, and we cannot decrease a fee award based on factors "not raised at all" by the adverse party.[46] Farfield objects to the reasonableness of both the hours and costs sought by Local 98. It makes four categories of objections: (1) Local 98's total hours are unreasonable and must be reduced because it only recovered on the Wayne Junction Project, had only limited success on the Wayne Junction Project, and time entries are inadequately described; (2) Jennings Sigmond's rates must be reduced to those billed to and paid by Local 98, fees billed and paid beginning in January 2008 should not be at current rates, and time billed by Paralegal Foley must be charged at a clerk's rate for data entry; (3) fees sought for preparation of the fee petition (fees on fees) must be reduced; and (4) costs must be reduced.

Our Court of Appeals recognizes "'the type of reduction made by the court [need not] be exactly the same as that requested by the adverse party' so long as: (1) 'the fee applicant is given

sufficient notice to present his or her contentions with respect to the reduction that the district court ultimately makes'; (2) 'any reduction is based on objections actually raised by the adverse party'; and (3) 'the district court ... provide[s] a concise but clear explanation of its reasons for the fee award.'"[47]

Once Farfield raises an objection, we have "a great deal of discretion to adjust the fee award in light of those objections."[48] Our discretion in awarding attorney's fees in fee-shifting statutes "includes the ability to deny a fee request altogether when, under the circumstances, the amount requested is 'outrageously excessive.'"[49]

### A. We partially sustain Farfield's challenge to the reasonableness of the number of hours sought by Local 98.

Farfield challenges the number of hours billed by Jennings Sigmond. Jennings Sigmond seeks fees for 3,114.2 hours worked by attorneys[50] and 3,627.3 hours worked by paralegals and clerks.[51] Farfield argues we must find the requested umber of total hours is unreasonable because: (1) Local 98 had only limited success because it recovered on the Wayne Junction Project only, one of the five projects Local 98 initially claimed violated prevailing wage rates; (2) Local 98 had only limited success on the Wayne Junction Project; and (3) time entries are inadequately described and lack requisite specificity.

Jennings Sigmond began representing Local 98 in this matter in January 2008. Over the course of litigation, Jennings Sigmond staffed the case with eight attorneys, two paralegals, four clerks, and one law student. Attorney Gelman swears the hourly rates charged to Local 98 during the twelve-year period ranged from $250 to $375 per hour for attorneys; $75 to $110 per hour for paralegals; $110 per hour for clerks; and $75 per hour for law students.[52]

Jennings Sigmond's time and expense details ("Detail Report") for January 2008 through January 2020 show the actual hourly rate charged to Local 98 and are consistent with Attorney

Gelman's declaration.[53]  The 114-page Detail Report, generated on February 28, 2020, shows Jennings Sigmond attorneys, paralegals, and clerks worked a total of 7,852.55 hours but actually billed Local 98 for 7,222.18 hours.[54]  The Detail Report reflects time billed from January 28, 2008 through January 23, 2020.  The total amount billed by Jennings Sigmond to Local 98 over this time period is $1,338,711.05.[55]  This does not reflect twenty-eight hours attributed to preparing the fee petition or 8.2 hours attributed to preparing for and attending Attorney Gelman's deposition on March 4, 2020 taken in connection with Local 98's fee petition.

### 1.    We overrule Farfield's objection based on "limited success."

We consider Farfield's slightly different first and second objections to the reasonableness of the requested hours together.  In the first argument, Farfield argues after initially alleging five projects violated the Davis-Bacon Act triggering False Claims Act liability, Local 98 voluntarily dismissed four projects and proceeded only on the Wayne Junction Project.  In the second argument, Farfield argues the ultimate recovery on the Wayne Junction Project is itself limited because Special Master Merenstein found (and as we adopted) only a portion of the total amount of work Local 98 claimed as misclassified.  Farfield argues both result in limited success by Local 98 requiring a reduction in the total hours billed.

Farfield argues the SEPTA contracts for each of the five projects amounted to approximately $4.2 million for the Girard Avenue Project; $4 million for the PATCO Project; $54.7 million for the Wayne Junction Project; $18.9 million for the SEPTA Smart Stations I Project; and $25.9 million for SEPTA Smart Stations II Project.  The total value of all five projects is approximately $107.7 million, making the Wayne Junction Project 50.8% of the total value.  Farfield argues the number of total hours should be reduced by fifty percent through May 21, 2019,

when Local 98 dismissed the four projects from the case and elected to proceed only with the Wayne Junction Project.[56]

Jennings Sigmond responds it already accounted for hours spent on the other projects: it voluntarily reduced by thirty-two percent the hours billed during Phase 4 – the discovery and settlement negotiations period from August 2013 to January 2017. Attorney Gelman swears Jennings Sigmond estimated sixty-eight percent of the documents produced by Farfield in discovery related to the Wayne Junction Project and, because the case ultimately went forward on only the Wayne Junction Project, Attorney Gelman reduced the hours billed during Phase 4 by thirty-two percent and also cut 35.5 hours of time of staff who spent less than fifteen hours on the case to eliminate potential inefficiencies.[57] Attorney Gelman swore Jennings Sigmond cut a total of 1,101.9 hours.[58]

Farfield objects, arguing this reduction should be a blanket fifty percent applied to all hours billed through May 21, 2019 and to all phases of litigation, not just Phase 4. Farfield attributes discovery disputes to Local 98's "refusal to limit discovery to the five projects included in its amended complaint" and insisted on the production of documents for all Farfield projects from January 1, 2001 through discovery which it only withdrew after resolving discovery disputes through the efforts of Special Master Merenstein. Farfield additionally objects the time entries fail to specify on which project hours were expended.[59]

Farfield also argues Local 98 had limited success on its claims relating to the Wayne Junction Project itself. It argues Special Master Merenstein found only $159,273.54 in underpayments rather than the $449,055.54 claimed by Local 98.[60] When Special Master Merenstein added penalties and treble damages, the total award amounted to $1,055,320.62.

Farfield argues the over $2 million attorney's fees sought by Local 98 is unreasonable when compared to the total award.

Local 98 responds: (1) it voluntarily cut 1,101.9 hours from its time and we should not further reduce hours; (2) all five projects had a common core of facts and legal theory; and (3) the over $1 million award is not a "limited success." Local 98 first argues it already voluntarily reduced its hours and we should not further reduce hours because the amended complaint refers to all five projects collectively, and "[t]here is not a single factual assertion or cause of action in the [first amended complaint] that does not address the collective group of projects, which includes Wayne Junction"; no Jennings Sigmond attorneys, paralegals, or clerks worked on non-Wayne Junction Project independent of the tasks related to discovery; Attorney Gelman swore "document review during discovery is the only component of the case where work was performed that may have related directly to a particular Farfield project other than Wayne Junction";[61] and at his deposition, Attorney Gelman swore "I mean, there wasn't much non-Wayne Junction work after the initial document review, if any."[62] So, Local 98 argues, with the exception of the hours it voluntarily cut from discovery in Phase 4, "there was no work performed that would not have been completed had [Local 98] officially pursued its claims in relation to Wayne Junction only."[63] It also argues Farfield's May 21, 2019 date is arbitrary because, although Local 98 filed its dismissal on May 21, 2019, the dismissal is simply a "housekeeping" task and does not change the focus on the work the Firm actually performed. Farfield argues Local 98 "failed and refused" to withdraw its claims relating to other projects until our May 21, 2019 Order, causing Farfield to incur excessive and unnecessary fees.

Secondly, Local 98 argues all five projects had a common core of facts and legal theory and, although only the Wayne Junction Project went to trial, Local 98's legal theory of recovery

prevailed. Finally, Local 98 argues it prevailed at trial, the over $1 million award is hardly "limited," and our Court of Appeals rejects the "proportionality" argument Farfield makes here.

We are guided by the Supreme Court the "most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate."[64] This provides us with "an objective basis on which to make an initial estimate of the value of a lawyer's services."[65] But this does not end our inquiry. We must consider the "results obtained." The Court holds the degree of success is "the most critical factor" in determining an appropriate attorney's fee award.[66] "This factor is particularly crucial where a plaintiff is deemed 'prevailing' even though he succeeded on only some of his claims for relief."[67] In this situation, we are directed by the Supreme Court to ask two questions: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded? Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"[68]

The Court recognized in some cases "a plaintiff may present in one lawsuit distinctly different claims for relief that are based on different facts and legal theories" while in another cases "plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories. Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation."[69] The Court recognized where a plaintiff obtained "excellent results, his attorney should recover a fully compensatory fee," normally encompassing "all hours reasonably expended on the litigation" and, "[i]n these circumstances the fee award should not be reduced simply

because the plaintiff failed to prevail on every contention raised in his lawsuit…. Litigants in good faith may raise alternative legal grounds for a desired outcome, and the court's rejection of or failure to reach certain grounds is not a sufficient reason for reducing a fee.  The result is what matters."[70]  To that end, the Court held "[w]here the plaintiff has failed to prevail on a claim that is distinct in all respects from this successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee" but "[w]here a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised."[71]

In applying the *Hensley* analysis, we are mindful of the Court's caution it is "the result is what matters" and "a mathematical approach comparing the total number of issues in the case with those actually prevailed upon … provides little aid in determining what is a reasonable fee in light of all the relevant factors.  Nor is it necessarily significant that a prevailing plaintiff did not receive all the relief requested."[72]  Following *Hensley*, our Court of Appeals held "mathematically deducting fees proportional to a plaintiff's losing claims is 'too simplistic and unrealistic.'"[73]

Applying the first prong of the *Hensley* test, we ask whether Local 98's claims regarding the other four projects are unrelated to the claims relating to the Wayne Junction Project on which Local 98 prevailed.  Claims related to all projects are related; Local 98 alleged Farfield violated the Davis-Bacon Act, and, in turn, the False Claims Act by misclassifying its employees.  The legal theory remained the same over all five projects.

On the second *Hensley* question, we ask whether Local 98 achieved a level of success making the hours reasonably expended a satisfactory basis for a fee award.  We conclude Local 98 succeeded in showing six of the twelve phase codes on the Wayne Junction Project constituted electrical work journeymen should have performed and, to the extent groundmen and laborers

performed electrical work, Farfield misclassified and underpaid its employees and its statements on certified payrolls to the United States government were false. This result came after years of hard-fought litigation. Much of the work to establish liability and damages occurred around the spreadsheet; an exhibit serving as the keystone to the entire litigation.

We will not apply a mechanical, fifty percent blanket reduction argued by Farfield based on the value of the Wayne Junction Project contract when compared to all five projects. We already determined the legal theories and claim were the same across all five projects. And *Hensley* and cases from our Court of Appeals reject a mathematical approach. There is no basis to reduce the requested hours based on lack of success. Rather than wait for summary judgment, Local 98 dismissed claims relating to the other four projects. Attorney Gelman testified the Firm determined the discovery relating to other projects did not support a False Claims Act claim, and it made the decision to drop these projects.[74] This does not constitute limited success.

We also reject Farfield's argument parsing the amount awarded for the misrepresented work on the Wayne Junction Project. Local 98 brought these common arguments in the same trial. The same arguments form the basis of the recovery. We cannot discount work effort leading to a finding of a False Claims Act violation because a careful Special Master found Local 98 met its burden as to some, but not all, of the challenged time. Local 98 succeeded on its False Claims Act theories relating to the Wayne Junction Project. The claims relating to the misrepresented time are not distinct from one another. Same issue, same witnesses. The fact finder did not agree as to some of the challenged time. But the theories under the False Claims Act are identical.

Our focus in this objection is on the number of hours. We address the increased rate below. But the recovery warranted the hours paid by Local 98. We overrule Farfield's objection to hours billed based on a limited success argument.

## 2. We overrule Farfield's challenge to the description of hours worked and block billing by Paralegal Nathan Foley.

Farfield objects to hours billed by Paralegal Nathan Foley as lacking inadequate description. Paralegal Foley performed 2,995.69 hours of work of the total 6,715.3 hours billed by the Jennings Sigmond firm, 44.6% of the total hours sought in Local 98's fee petition.[75] Much of Paralegal Foley's work is attributed to the spreadsheet he created for use in this litigation. Local 98 characterizes the spreadsheet as "enormous, consisting of twenty-six (26) customized columns and 13,952 rows, creating 348,575 discrete cells, each of which required manual input. Filters and other variable components of the Master Spreadsheet allowed one to extract an almost limitless amount of information derived from tens of thousands of source documents at the press of a button."[76]

Farfield does not object to the accuracy or utility of the spreadsheet at trial before Special Master Merenstein; both parties used the spreadsheet at trial. Special Master Merenstein characterized the spreadsheet as "the best mechanism for determining the specific days worked by each employee on the Wayne Junction Project, as well as the total hours each employee worked on each of those days, the phase code or phase codes under which each employee's work was categorized each day, and each employee's classification and pay rate each day."[77]

Farfield's primary objection is to Paralegal Foley's practice of block billing and vague time entries: from June 2015 through April 2017 Paralegal Foley's time entries, totaling 2,251.4 hours, are described only as "reviewed and indexed defendant's payroll data" and from July 2016 through September 2018, his time entries, totaling 972.8 hours, are block billed including the description "reviewed and indexed defendant's payroll data." Farfield objects the entries do not identify on which project the payroll data applied and what data Paralegal Foley reviewed and indexed. Farfield objects the vague description suggests "nothing more than manual data entry into an Excel

spreadsheet, a purely clerical duty" and Local 98 should not be allowed to recover hours at a paralegal's rate for purely clerical, manual data entry. It also objects the block billed entries do not specify how much time Paralegal Foley spent on each task within each entry. Farfield cites Attorney Gelman's testimony he never directed Paralegal Foley, or any other Firm timekeeper, to include more detail in their time entries.[78] Farfield argues although Local 98 deducted 1,066.4 hours from Phase 4 discovery to arrive at 6,715.3 total hours worked, the deducted time came from paralegal and clerk time, not attorney time. Farfield also objects Local 98 failed to provide a total of Paralegal Foley's hours before deductions. Farfield does not develop these objections.

Farfield argues we should reduce all Paralegal Foley's hours for (a) entries described only as "reviewed and indexed defendant's payroll data" and (b) for entries including this same description included in a block billed entry. Farfield then argues we must reduce all fees through April 30, 2019 which included work on all five projects. Farfield calculates the total amount of invoiced fees by Jennings Sigmond and paid by Local 98 from January 1, 2008 through April 30, 2019 is $1,043,684.14. It argues we should subtract from this figure *all* of Paralegal Foley's time, leaving a balance of $689,022.14.[79] After subtracting *all* of Paralegal Foley's time, Farfield argues we should reduce the balance by another fifty percent because the fees "were expended for all five projects …." Reducing $689,022.14 by fifty percent leaves a balance of $344,511.07.

Local 98 responds a one hundred percent reduction of Paralegal Foley's time is unreasonable. First, it argues Farfield produced 261,587 pages of documents without organization or identifiers requiring Paralegal Foley to review each individual page to determine its contents and relevance to the case, and then tagged manually for selection and indexing in an electronic document management system. It argues it "would be untenable to expect [Paralegal] Foley to identify with any particularity the contents of each and every page he reviewed on an hourly basis

or even to which project the data pertained" and would have caused a "tenfold increase in [his] time that [Farfield] now seeks to cut." It also argues it voluntarily reduced by thirty-two percent the time billed in the Phase 4 time period (August 2013 to January 2017) to account for "the very fact that the particular projects were not, and effectively could not be, identified in the time entries."[80] Farfield's objection to Paralegal Foley's time is for the period June 2015 through September 2018, some of which is beyond the Phase 4 time period.

Local 98 also argues the work performed by Paralegal Foley is well beyond that of simple clerical data entry, characterizing the spreadsheet as an "integral piece of evidence" in the case "masterminded" by Paralegal Foley. Local 98 cites Paralegal Foley's deposition where he testified to his work about the spreadsheet: "I did a lot. The first thing was -- as you know, the source documents, speaking primarily about the phase code time sheets, weren't in strict order or even together in the original volume. So one of the first things I did was I extracted the relevant documents, which were the phase code time sheets, handwritten phase code time sheets, daily foreman reports, certified payroll, four-week look-aheads, organized those into discrete volumes and then made them chronological partly to help me identify gaps and missing documents and partly to streamline the process of bringing this data set in line with the data points represented on the documents."[81]

A review of Paralegal Foley's time records show time entries **solely** with the description "reviewed and indexed defendant's payroll data" from June 10, 2015 to July 6, 2016.[82] We disagree with Farfield's assertion Paralegal Foley's time entries from June 2015 through April 2017 contained only the objected-to description. Beginning July 6, 2016, Paralegal Foley's time records show block billed entries of other work he performed, including the "reviewed and indexed defendant's payroll data" description, as well as some entries with only the "reviewed and

indexed" description through September 2017.  Farfield does not specifically object to Paralegal Foley's time entries after September 2017 other than objecting to all time from all timekeepers must be reduced by fifty percent.

Local 98 does not explain why it took Paralegal Foley over a year—from June 2015 to July 2016—of working solely on the spreadsheet and another fourteen months—from July 2016 to September 2017—working on the spreadsheet and other tasks, to complete it.  We are left to wonder why the spreadsheet took two years to complete.  But it is not our role to speculate as to the volume of work necessary or the lawyer's business judgment in allocating resources.  Jennings Sigmond responds it already accounted for hours spent on the other projects: it voluntarily reduced by thirty-two percent the hours billed during Phase 4—the discovery and settlement negotiations period from August 2013 to January 2017.  Attorney Gelman swears Jennings Sigmond estimated sixty-eight percent of the documents produced by Farfield in discovery related to the Wayne Junction Project and, because the case ultimately went forward on only the Wayne Junction Project, Attorney Gelman reduced the hours billed during Phase 4 by thirty-two percent and also cut 35.5 hours of time of staff who spent less than fifteen hours on the case to eliminate potential inefficiencies[83] Attorney Gelman cut a total of 1,101.9 hours.[84]

Farfield objects, arguing this reduction should be fifty percent applied to all hours billed through May 21, 2019 and to all phases of litigation, not just Phase 4.  Farfield attributes discovery disputes to Local 98's "refusal to limit discovery to the five projects included in its amended complaint" and insisted on the production of documents for all Farfield projects from January 1, 2001 through discovery which it only withdrew after resolving discovery disputes through the efforts of Special Master Merenstein.  Farfield additionally objects the time entries fail to specify on which project hours were expended.[85]

Time entries such as "miscellaneous research, telephone conversations, and conferences concerning facts, evidence, and witnesses" are sufficiently specific.[86] Our Court of Appeals found entries such as "att[entio]n to papers" and "att[entio]n to status" without indicating "what 'papers' or 'status'" to which the attorney attended, and entries such as "e-mails," "conference call," "correspondence" and "review papers" are insufficient to determine if the hours claimed are unreasonable for the work performed.[87] We are permitted to award time for block billing – "the practice of recording multiple tasks in one, non-itemized entry" – "so long as 'there is a reasonable correlation between the various activities listed in the block and the time spent completing those tasks.'"[88]

We overrule Farfield's objection to hours worked by Paralegal Foley described as "reviewed and indexed defendant's payroll data" in time entries and block billed entries. We discourage and scrutinize block billing when professionals could be hiding wasted time. But we cannot fairly say a paralegal's investment of these hours to digest over 200,000 documents in such a manner as to allow both parties, and the Special Master, to agree to use his spreadsheet as the agreed foundation for analysis. We also cannot speculate, and Farfield offers no other basis, as to what else Paralegal Foley could have been doing. Local 98, vested with fiduciary duties to its members, decided to pay for these services. Aware of our scrutiny, Local 98 agrees not seek fees for over one thousand of his hours rendering Farfield's objection to failing to distinguish between projects in his billing sheets of no moment. We do not expect billing entries to identify each page of data reviewed by a paralegal. These billing entries fairly disclose the work effort to the paying client Local 98. In the context of Paralegal Foley's work given the hundreds of thousands of pages of disorganized records, and the organizational skills necessary to marshal these materials,

the time entries are sufficiently specific to allow Local 98 to recover the money it paid for these efforts which proved crucial for all parties.

### B. We partially sustain Farfield's challenge to the hourly rates now sought by Local 98 although it paid a lower agreed rate and owes no further fees.

Despite record evidence of the fees billed to Local 98 at Jennings Sigmond's actual rate, Local 98 now moves to be paid the market rate for attorney's fees set by Community Legal Services of Philadelphia ("CLS"). The CLS hourly rates range from $200 to $700 for attorneys recently graduated through attorneys with more than twenty-five years' experience; $160 to $230 for paralegals depending on experience; and $110 to $160 for law students.[89] Applying the highest range of the CLS rates, Local 98 seeks $2,006,224.80 (including preparing the fee petition)[90] plus $2,952 in fees for preparing and attending Attorney Gelman's deposition.[91] Local 98 seeks to use the CLS rates today for fees billed in 2008. For example, Attorney Richard Sigmond worked three hours on January 28, 2008. Local 98 applies a billing rate of $700, the highest range of the CLS rate to his time.[92]

As analyzed below, Farfield objects, *inter alia*, to the use of CLS rates. Farfield argues Jennings Sigmond's time must be calculated on the amount it billed, and Local 98 paid, for legal services during this litigation. This includes discounts Jennings Sigmond sometimes passed on to Local 98 reflected in the invoices.[93] Using a billing and payment summary report produced by Jennings Sigmond for Attorney Gelman's deposition,[94] Farfield prepared a chart of all invoices from Jennings Sigmond to Local 98 and all payments by Local 98 to Jennings Sigmond from February 10, 2008 through February 10, 2020.[95] Jennings Sigmond sometime discounted invoices to Local 98 and Farfield calculates the total fees billed and paid by Local 98 amount to $1,324,435.64.[96] This does not appear to include time attributed to the fee petition or for preparing

and attending Attorney Gelman's deposition. Local 98 does not contest Farfield's calculation or deny its payment to Jennings Sigmond based on the amount billed.

It next argues we should not use current rates because Local 98 paid Jennings Sigmond monthly beginning in 2008 and the rates billed and paid over the years should be used. Farfield last argues the rates charged for Paralegal Foley's work should be a clerk's rate for data entry, not at a paralegal rate.

Local 98 replies it is entitled to the market rate set by CLS in Philadelphia because the Jennings Sigmond firm charged lower rates for "public-spirited reasons," including discounts. Local 98 responds to Farfield's argument regarding the rate for Paralegal Foley's work by again arguing his efforts with the spreadsheet required more skill than simply data entry.

### 1. We limit rates to those incurred by Local 98.

We agree with Farfield's first and second objections: (1) fees awarded should be those Local 98 actually paid as the best evidence of market rates; and (2) current rates should not be applied to services rendered years ago and which were already paid by Local 98. We limit attorney's fees to those actually incurred by Local 98. Farfield does not object to Jennings Sigmond's rates actually billed to Local 98 and concedes courts in this District and the District of New Jersey "have found Jennings Sigmond's usual billing rates to be reasonable in labor cases, for union clients and employee benefit funds."[97]

Local 98 argues we should reward it by ordering Farfield reimburse it for fees it did not pay Jennings Sigmond. Local 98 argues we should not stray "from the rule requiring a defendant to pay the actual market rates."[98] Local 98 cites *Palmer* in support of its argument our Court of Appeals directs the current market rate "must be used" and there is a "rule requiring" Farfield to pay actual market rates. There is no such holding in *Palmer*.

In *Palmer*, the district court awarded attorney's fees to the relator in a False Claims Act case but in an amount approximately forty-three percent less than requested by the relator.[99] Relator appealed. On review, our Court of Appeals affirmed the district court's reduction in attorney's fees.[100] Unlike this case, the district court and the parties in *Palmer* agreed the rate issue was "best resolved by using primarily—if not exclusively—the rates promulgated by the Philadelphia office of Community Legal Services."[101] In support of the use of CLS rates, our Court of Appeals cited its earlier decision in *Maldonado v. Houston*[102] holding CLS rates as a "fair reflection of the prevailing market rates in Philadelphia."[103] *Palmer* stands for the not-so-unusual proposition the CLS rates are the proper measure of market rates in Philadelphia. *Palmer* did ***not*** hold we must use the current market rate or there is a "rule" requiring a defendant to pay the actual market rates. We read *Palmer* to mean ***if*** market rates are to be used in determining a fee award, we use the CLS rates as the reasonable benchmark. But unlike *Palmer*, and our recent decision in *Customs Fraud Investigations, LLC v. Victaulic Co., Inc.*,[104] Local 98 paid Jennings Sigmond's legal bills all along.

Local 98's reliance on *Covington v. District of Columbia* is equally misplaced.[105] In *Covington*, the Court of Appeals for the District of Columbia affirmed the district court's award of attorney's fees in three civil rights actions under 42 U.S.C. § 1988.[106] The court awarded fees based on prevailing market rates where plaintiffs' attorneys charged reduced rates for "non-economic, public-spirited reasons."[107] In *Covington*, the lawyers seeking fees decided to charge less than their customary rates. They did so, in the public interest, in representing indigent prisoners subject to physical abuse by state actors who would otherwise not have the benefit of competent counsel. The lawyers offered "needy clients reduced or below-market rates offered" by the lawyers and other firms. The court of appeals held "[i]n section 1988 attorneys' fee cases,

attorneys who customarily charge reduced fees reflecting non-economic, public-spirited goals may seek fees based on the prevailing market rates if the prevailing party demonstrates the reasonableness of the requested hourly rates. That burden entails the following: first, if the attorney customarily charges clients lower rates than plaintiff has requested under section 1988, the attorney must demonstrate that the customarily reduced rates are charged for non-economic reasons; second, the attorney must offer information documenting his or her skill, experience, and reputation; and third, the attorney must produce evidence of the prevailing market rates in the relevant community for attorneys of comparable skill, experience, and reputation."[108]

Arguing Farfield should be required to compensate Local 98 at the reasonable hourly market rate as determined by CLS rates, and not the "sub-market rate" Jennings Sigmond charged, Local 98 attaches declarations from other attorneys in other cases where the court applied the CLS rate.[109] But those cases are distinguishable as neither involved a client who already paid its counsel an agreed-upon rate.

Local 98 also argues we must apply the community market rate regardless of the actual rates charged and paid by Jennings Sigmond and our Court of Appeals rejects the "billing rate rule" advocated by Farfield. To support its argument, Local 98 cites *Student Public Interest Research Group of New Jersey, Inc. v. AT&T Bell Laboratories*.[110] In *SPIRG*, a fee-shifting case, our Court of Appeals addressed the question "how to calculate the counsel fees for attorneys who operate a for-profit law firm that handles only public interest cases and therefore bills significantly less than a traditional law firm."[111] After addressing four different approaches—the billing rate rule; micro-market rule; modified billing rate; and the community market rate rule—our Court of Appeals held the community market rate rule should apply.[112]

Relying on the Supreme Court's decision in *Blum v. Stenson*,[113] our Court of Appeals adopted the community market rate to the "unusual facts of [the] case, which involves a for-profit public interest firm." The firm representing plaintiffs in *SPIRG* "had no fee arrangement whatsoever with its clients... [The firm] operates for profit and possesses a billing schedule, but, like the attorneys in *Blum*, the firm did not collect a fee from its clients for their service, and would have received no compensation at all if it had lost."[114] The firm representing plaintiffs "pinned all hope for repayment on the fee shifting statute."[115] Our Court of Appeals focused on the unique facts when calculating fees "for this unique genre of attorneys, who operate for profit but essentially rely on fee shifting statutes, must depend on local rates for similar work."[116]

Local 98 had a much different relationship with its counsel. It paid over $1.3 Million in fees at handsome rates. It does not presently offer a retainer agreement suggesting any other arrangement. Unlike counsel in *SPIRG*, Local 98 paid Jennings Sigmond throughout the litigation. Jennings Sigmond did not pin all hope for repayment on a fee shifting statute.

Although Local 98 paid its lawyers on a current basis at their billable rates, Jennings Sigmond now argues it only needs to show "public-spiritedness was a principal reason for" Jennings Sigmond's discount and "not that it was the only reason."[117] In *Board of Trustees of Hotel and Restaurant Employees*, Trustees sued an employer for underpayments to union funds. After the Trustees prevailed in the case, they moved for attorney's fees. The district court awarded attorney's fees under ERISA's fee-shifting provision on the billed rates rather than the market rates.[118] Trustees appealed and the United States Court of Appeals for the District of Columbia reversed the district court and remanded the case to the district court to determine whether the fees actually paid were discounted for public-spirited reasons.[119] While the court of appeals recognized public-spiritedness need not be the only reason for a discount on fees, it cited *Covington* for the

fee applicant's burden of demonstrating that a fee incorporates a public-spirited discount.[120] Although the court of appeals noted "attorneys will presumably not be inclined to misrepresent their reasons for granting a discount, and we assume that it will only rarely be necessary to second guess those reasons," evidence such as an "affidavit from the client may also help to establish that the client understood that the fee it was being charged reflected a public-spirited discount, even if it may not have been expressly stated that this was the case."[121] The difference here is we have no evidence of a discount; we have no fee agreement or affidavit from Local 98 attesting to its understanding of a discount. All the evidence is to the contrary; Jennings Sigmond is a boutique labor law firm representing unions at this market rate. We cannot find a union's false claims lawsuit is the same as employees seeking retirement benefits. If so, every union case brought under a fee shifting statute would allow the union counsel to later seek higher rates. We are not aware of precedent carving this exception for unions as opposed to any other relator under the False Claims Act.

Farfield argues we should not apply *Covington* because it is relied on almost exclusively in the District of Columbia Circuit and it is not binding on us. Farfield argues even if *Covington* applied, Local 98 did not meet its burden of demonstrating the reasonableness of the requested hourly rate. It argues there is no evidence Jennings Sigmond charged the union reduced rates based on "public spirited" or "non-economic reasons," as the Firm is for-profit, not a special interest firm "seeking to do good for poor clients." Farfield argues Local 98 did not provide affidavits from other attorneys regarding prevailing rates and in three other cases litigated by Jennings Sigmond in this circuit, the firm sought only its usual hourly rates and not the higher CLS rates even in cases where it represented a union.[122] For example, Jennings Sigmond represented a union in *Carpenters Health and Welfare Fund v. Reyes*.[123] In that case, Jennings Sigmond sought

delinquent contributions to the union's health and welfare fund. It obtained a default judgment against the defendant and moved for attorney's fees. In an attorney declaration supporting its fee petition, a Jennings Sigmond attorney swore the "normal hourly rates" of a shareholder attorney is $340, an associate attorney is $330, and paralegals at $110. Jennings Sigmond only sought "judgment for fees in the bills, which reflect a special fee schedule with the Carpenters Health and Welfare Fund."[124]

Farfield cites a recent case from the Court of Appeals of the District of Columbia, *Baylor v. Mitchell Rubenstein & Associates, P.C.*, where the court rejected requested fees higher than the plaintiff and her counsel's agreed-upon hourly rates.[125] On plaintiff's appeal, the Court of Appeals rejected plaintiff's argument her "counsel's actual rate should not equate to the reasonable rate because the actual rate was discounted out of public-interest concerns."[126] Although the court recognized cases like *Covington* where "we have sometimes approved going above the actual billing rate when it was discounted for public-interest reasons, those cases had considerable evidence about prevailing market rates and public-interest motivations" and concluded plaintiff did not provide support for "her assertion and falls well short of overcoming our deferential review."[127]

Farfield argues if we award Local 98 fees based on the CLS rates instead of Jennings Sigmond's usual hourly rates, Local 98 will receive a "huge windfall" which is not the intent of the False Claims Act.

We agree with Farfield's objection regarding use of the CLS rates. But we disagree with its calculation. The purpose of shifting the obligation to pay attorney's fees is to encourage counsel to undertake cases which Congress views as promoting the general welfare. The legislative purpose in fee shifting statutes is to "provide plaintiffs asserting specified federal rights with 'fees

which are adequate to attract competent counsel, but which do not produce windfalls to attorneys.'"[128]

Every lawyer taking a civil rights or False Claims Act case is arguably acting to further the general welfare. In so doing, they may reduce their customary rates. Unlike *Covington*, where the lawyers gave the ten indigent prisoner clients a break on the customary hourly rates, Jennings Sigmond customarily charges these rates to all their clients. Attorney Gelman swears Jennings Sigmond is a ten-person boutique firm representing unions.[129] He does not swear charging higher rates to other clients. Jennings Sigmond did not lose monthly revenue while waiting for a court award. To the contrary, Jennings Sigmond charges these customary rates across the board and Local 98 paid them.

The best evidence of market rates, outside of the *Covington* situation where lawyers give needy clients a break for public interest reasons, is what the willing client pays the willing lawyer. Absent contrary evidence, Jennings Sigmond chose to bill hourly rates based on market factors. It billed, and Local 98, paid over $1.3 Million dollars. Local 98 is not a needy client. It has fiduciary obligations to its members to ensure prudent spending of dues in litigation. Jennings Sigmond's boutique firm focuses on this type of work. It presumably seeks work from its union clients, including the bigger cases.

For some reason, Jennings Sigmond did not produce a fee agreement for this representation. We do not suggest it violated the Rules of Professional Conduct; the fairer conclusion is Jennings Sigmond customarily charges these rates because it the amount Local 98 is willing to pay for litigation. And Local 98 could find other counsel. Jennings Sigmond is not bound to represent Local 98; if Local 98 would pay more on an hourly rate (or at least agree to pay more should counsel be successful), Jennings Sigmond would bill at the higher rates. A fee

agreement would offer us the best evidence of what Local 98 was willing to pay. A fee agreement would also offer the lawyer and client the flexibility of setting rates even if the client can only pay a portion of those fees on a current basis with the balance of hourly fees paid upon success. The best evidence of the market rate in this District for this type of Davis-Bacon case (and Attorney Gelman swears this is the only case he is aware) is the rate Local 98 agreed to pay.

We sustain Farfield's objection to the higher rates sought. We reduce the fee request to the actual hourly rates. Attorney Gelman swears to the range of hourly rates over twelve years: from $250 to $375 for attorneys; $75 to $110 for paralegals; $110 for clerks; and $75 for law students. Farfield agrees Local 98 paid $1,324,435.64 in fees over the twelve years. Local 98 does not dispute this payment. We have no evidence Local 98 owes further fees. But Local 98 concedes thirty-two percent of the time billed to it— and paid—is not part of this fee petition. The withdrawn time is largely from Paralegal Foley's efforts on the spreadsheet in Phase 4.

We sustain Farfield's objection to Local 98's petition based on hourly rates it did not bill as market rates. Given the amount paid reflecting customary rates, and deducting the hours now withdrawn by Local 98 at those $110 and $65 customary hourly rates, we reduce the petition by $119,611.50.

### 2. We overrule Farfield's objection to Paralegal Foley's customary rates.

In a virtually identical argument as made to the number of hours billed, Farfield argues "much of the time" spent by Paralegal Foley on the spreadsheet constitutes "nothing more than data entry" and fees should not be awarded at the paralegal rate. Farfield does not indicate which of Paralegal Foley's hours should be reduced to a clerical rate, although we noted we have no idea the scope of Paralegal Foley's work because of inadequate descriptions.

Local 98 argues, as it did in reply to Farfield's reduction in Paralegal Foley's hours, the spreadsheet required more than simply data entry and Paralegal Foley "masterminded" the spreadsheet key to the entire case.

Paralegal Foley has eighteen years' experience as a paralegal and has expertise in data management.[130]  There is no dispute Paralegal Foley developed the spreadsheet after culling information from hundreds of thousands of documents.  The spreadsheet became the central piece of evidence both for liability and damages.[131]

Jennings Sigmond billed Paralegal Foley's rate at $110 per hour throughout the litigation.[132] Jennings Sigmond billed its four clerks, described as "legal assistant/clerk" by Attorney Gelman, at $110 per hour.[133]  Having determined we will award rates actually billed by Jennings Sigmond to Local 98, there is no difference in the rate between Paralegal Foley and the clerk rate; both are billed at $110 per hour.  Farfield does not object to the hourly rate charged by Jennings Sigmond for clerks.  We award fees for Paralegal Foley's work based on $110 per hour.

### C.  We overrule Farfield's challenge to "fees on fees."

Farfield objects to an award of fees incurred by Local 98 in preparing the fee petition. Local 98 seeks $13,062.50 in attorney's fees for twenty-eight hours of work.[134]  Local 98 supplemented its fee petition by seeking an additional $2,952 for time incurred by Attorney Goodley to prepare and attend the deposition of Attorney Gelman taken by counsel for Farfield in connection with the fee petition.[135]

Farfield argues we must apply our Court of Appeals' analysis in *Palmer* to the "fees on fees" petition, considering it separately from the original fee petition and applying the two-step *Henley* analysis.  Farfield does not specifically challenge the "fees on fee petition" or suggest how,

or why, we should reduce the fees sought. It simply argues we should apply the *Palmer* analysis. Local 98 does not reply.

In *Palmer*, our Court of Appeals directed us to apply a two-step analysis to "fees on fees": "(1) as with all fee petitions, [the district court] must first determine whether the fees on fees are reasonable; and (2) once the reasonability analysis is complete, the [district court] must consider the success of the original fee petition and determine whether the fees on fees should be reduced based on the results obtained."[136] We are cautioned "the reduction analysis for the fees generated from litigating the fee petition is independent from the reduction analysis applied to the underlying litigation."[137] Citing an earlier decision, our Court of Appeals directed "we believe that the fee reduction rationale of *Hensley*, because it is intended to ensure the award of a reasonable fee in light of the results obtained, applies by force of the Court's reasoning to fees generated in the litigation of a fee petition, and compels us to treat the fee petition litigation as a separate entity subject to lodestar and *Hensley* reduction analysis."[138]

Applying the two-step analysis of *Palmer*, we conclude the fees on fees are reasonable at the Jennings Sigmond's regular rates billed to Local 98. Finding its regular rates reasonable, we consider the success of the underlying fee petition to determine whether fees on fees should be reduced based on the results obtained. Considering we are awarding Local 98 for all of the time it paid to Jennings Sigmond for the time allocated to the success in this case, Local 98's underlying fee petition is successful, and we will not reduce fees incurred in preparing the fee petition.

Attorney Gelman swore the Firm expended 28 hours in its fee petition broken down by:[139]

| Attorney/Paralegal | Hours | Rate | Total |
|---|---|---|---|
| Attorney Gelman | 14 | $375 | $5,250 |
| Attorney Goodley | 6.5 | $290 | $1,885 |
| Attorney McCarthy | 3.5 | $250 | $875 |
| Paralegal Foley | 4 | $110 | $440 |
| **Total** | 28 | | $8,450 |

We award $8,450 in preparing the fee petition.

**D.  Summary of approved fees.**

After this detailed analysis of each Farfield objection, we partially sustain Farfield's objections and reduce the amount of reasonable attorney's fees to $1,229,927.55:

| | |
|---|---|
| Total amount billed to, and paid by, Local 98 from 2008 to January 23, 2020 on 7,222.18 total hours billed.[140] | $1,338,711.05 |
| Voluntary 32% reduction of paralegal/clerk hours (1,066.4 hours) worked in Phase 4 to account for the case proceeding only on the Wayne Junction Project plus reduction of 35.5 hours for all staff who worked on the case for less than fifteen hours.<br><br>Total 1,101.9 hours voluntarily reduced:<br><br>1,066.4 x $110 (billed hourly rate for paralegal/clerks) = $117,304<br><br>35.5x $65 = 2,307.50 | ($119,611.50) |
| Fees after voluntary reduction | $1,219,099.55 |
| Fees for preparing fee petition (28 hours at Jennings Sigmond's billed rates) | + $8,450 |
| Fees for preparing and attending deposition of Attorney Gelman (8.2 hours at $290/hour; Attorney Goodley's billed rate) | + $2,378 |
| **Total fees** | **$1,229,927.55** |

**E.  We partially sustain Farfield's challenge to vague costs and expenses.**

Local 98 seeks $223,541.42 in costs divided by (1) costs paid by Jennings Sigmond on behalf of Local 98 in the amount of $73,377 in photocopies, postage charges, delivery charges, copy services, filing fees, fax charges, travel costs, and transcripts;[141] and, (2) costs paid directly by Local 98 in the amount of $150,164.42.  Jennings Sigmond asserts the largest portion of costs

incurred by it and Local 98 fall into three main categories: (1) Special Master costs paid by Local 98; (2) computerized legal research paid by the Firm; and (3) court reporter, deposition, and trial transcripts costs paid by Local 98.[142]

Farfield argues the $73,377 in costs incurred by Jennings Sigmond must be disallowed in their entirety because it failed to provide supporting data to explain its expenses. It argues the expenses incurred directly by Local 98 must be reduced by fifty percent because Local 98 achieved only limited success. By Farfield's calculation, costs should be reduced to $75,082.21 from total costs of $223,541.42.

In its reply, Local 98 clarified it "no longer seeks reimbursement" for certain "non-customary expenses" totaling $20,032.39, to be subtracted from the $73,377 costs initially sought by Local 98.[143] Removing the now-abandoned costs amounts to $53,344.61 incurred by Jennings Sigmond. Local 98 argues these expenses are "the type of expenses routinely charged to paying clients in litigation matters and, therefore, the full requested amount should be reimbursed" and Farfield's attempt to strike all expenses paid by the Jennings Sigmond firm is "overbroad [and] disregards the customarily reimbursable expenses, such as deposition transcripts, which is of course necessary and compensable."[144]

The False Claims Act provides a successful plaintiff "shall also receive an amount for reasonable expenses which the court finds to have been necessarily incurred, plus reasonable attorneys' fees and costs."[145] Out-of-pocket litigation expenses such as postage, photocopying, telephone calls, facsimile transmissions, messengers, local travel, Westlaw, and transcripts can be considered reasonable expenses.[146] Farfield does not argue costs paid by Jennings Sigmond and Local 98 are unnecessarily incurred; it argues only (a) the Jennings Sigmond costs are not properly

described to allow us to determine whether they are necessarily incurred and (b) costs paid directly by Local 98 should be reduced by fifty percent, like its attorney's fees, for limited success.

We apply the same standards to our review of costs as our review of attorney's fees.[147] "A fee petition must 'be specific enough to allow the district court to determine if the hours claimed are unreasonable for the work performed.'"[148] In *Loughner*, our Court of Appeals reversed and remanded the district court's award of attorney's fees and costs. It found a one-page statement of costs containing dates and descriptions, and an affidavit swearing to the accuracy of costs, failed to "include supporting data explaining the relevant purpose of the expenditures."[149] Our Court of Appeals found "[c]ounsel failed to provide the District Court with any reasonable basis justifying the expenditures in this case" and concluded "[t]here is no evidence in the record under which we can evaluate whether the District Court abused its discretion in allowing the claim for costs."[150] Similarly, considering a relator's fee petition in a False Claims Act case, the United States District Court for the District of Columbia reduced expenses for expense records found "downright ubiquitous," and reduced expenses by forty percent.[151]

Given Farfield's objection, we carefully review each of the petitioned costs. Jennings Sigmond offers little or no description for the challenged entries.[152] Absent a description in the costs, we examine the time records for the same period to determine if the billing professional described the effort in time entries:

| Date | Cost | Narrative | Time records |
|------|------|-----------|--------------|
| 10/1/2008 | 79.49 | Computer Research - Westlaw | yes - 9/26/08; 9/30/08 |
| 11/1/2008 | 59.13 | Computer Research - Westlaw | yes - 10/8/08; 10/9/08; 10/10/08; 10/13/08; 10/23/08 |
| 12/1/2008 | 83.65 | Computer Research - Westlaw | yes - 11/28/08 |
| **10/17/2009** | **23.64** | **Special Delivery** | **no description** |
| **5/7/2011** | **28.19** | **Special Delivery** | **no description** |

| 9/1/2011 | 481.99 | Computer Research - Westlaw on 8/25/11 & 8/30/11 | yes |
|---|---|---|---|
| 9/1/2011 | 273.73 | Computer Research - Westlaw on 8/26/11 & 8/29/11 | yes |
| 11/1/2011 | 159.90 | Computer Research - Westlaw | yes - research in November 2011 |
| 2/1/2012 | 212.91 | Computer Research - Westlaw on 1/24/12 & 1/25/12 | yes |
| 2/1/2012 | 57.67 | Computer Research - Westlaw on 1/20/12 &1/24/12 | yes |
| 2/1/2012 | 726.63 | Computer Research - Westlaw on 1/4/12; 1/5/12; 1/6/12; 1/7/12; 1/8/12; 1/10/12; 1/11/12; 1/14/12; 1/15/12; 1/16/12 & 1/17/12 | yes |
| 2/1/2012 | 177.95 | Computer Research - Westlaw on 1/24/12; 1/25/12; 1/26/12 & 1/30/12 | yes |
| 2/1/2012 | 52.14 | Computer Research - Westlaw on 1/17/12 | yes |
| 2/1/2012 | 27.26 | Computer Research - Westlaw on 1/3/12 | yes |
| 2/1/2012 | 258.54 | Computer Research - Westlaw on 1/9/12 | yes |
| 3/1/2012 | 168.03 | Computer Research - Westlaw on 2/2/12; 2/7/12; 2/9/12; 2/14/12 & 2/15/12 | yes |
| 4/1/2012 | 177.97 | Computer Research - Westlaw on 3/7/12 & 3/11/12 | yes |
| **4/14/2012** | **17.65** | **Special Delivery** | **no description** |
| 5/1/2012 | 8.00 | Computer Research - Westlaw on 4/9/12 | yes |
| 6/1/2012 | 1.72 | Computer Research - Westlaw | yes - 5/2/12 |
| 11/1/2013 | 18.81 | Travel, Taxi (2x) on 11/12/13 | Attendance at conferences |
| **1/14/2014** | **19.25** | **Special Delivery** | **no description** |
| 2/1/2014 | 48.01 | Computer Research - Westlaw | yes - dates in January 2014 |
| 4/1/2014 | 15.37 | Travel on 4/30/14 | Hearing before Judge Stengel |
| 6/1/2014 | 80.66 | Travel, Tolls, Parking & Taxi on 6/16/14 & 6/19/14 | 6/16/14 - Attendance at strategy meeting 6/19/14 - Travel to Lancaster |
| **8/1/2014** | **7.60** | **Travel, Taxi on 8/12/14** | **no corresponding entry** |
| 10/1/2014 | 6.85 | Travel, Taxi on 10/2/14 | Phone conference with Court and opposing counsel |
| 2/1/2015 | 46.31 | Travel, Gas, Tolls and Parking on 2/22/15 & 2/23/15 | Travel to and from settlement conference |

| | | | |
|---|---|---|---|
| 3/1/2015 | 98.90 | Travel regarding Allentown Mediation on 2/23/15 | Travel to and from settlement conference |
| 6/22/2015 | 78.00 | Travel, Mileage and Tolls for Atty J. Goodley | Travel to and from settlement conference |
| 6/22/2015 | 52.93 | Travel for Atty M. Gelman | Travel to and from settlement conference |
| 9/1/2015 | 252.33 | Computer Research - Westlaw on 8/14/15 & 8/18/15 | yes |
| 10/1/2015 | 66.44 | Computer Research - Westlaw on 9/1/15 | yes |
| 11/1/2015 | 62.60 | Computer Research - Westlaw on 10/2/15 | yes |
| 12/1/2015 | 210.38 | Computer Research - Westlaw regarding Employee Search on 11/17/15 | yes |
| 12/1/2015 | 76.16 | Computer Research - Westlaw regarding Sheaffer Research on 11/2/15 | yes |
| 12/1/2015 | 22.18 | Travel, Taxi on 12/9/15 & 12/15/15 | Travel to and from discovery meeting with Master Merenstein |
| 1/5/2016 | 10.75 | Travel, Taxi | Travel to and from discovery meeting with Master Merenstein |
| 2/19/2016 | 27.37 | Travel, Taxi (2) on 2/19/16 & 2/25/16 | Travel to and from witness meeting |
| 4/1/2016 | 46.34 | Computer Research - Westlaw | yes - dates in March 2016 |
| 4/1/2016 | 139.01 | Computer Research - Westlaw | yes - dates in March 2016 |
| 4/1/2016 | 195.48 | Computer Research - Westlaw | yes - dates in March 2016 |
| 5/1/2016 | 411.41 | Travel, Hotel (2x), Parking and Food on 5/11/16 & 5/12/16 | Travel to and from depositions |
| 6/1/2016 | 139.89 | Computer Research - Westlaw | yes - in May 2016 |
| 6/1/2016 | 145.82 | Travel, Mileage and Tolls on 6/7/16 & 6/8/16 | Travel to and from depositions |
| 6/1/2016 | 12.36 | Travel, Taxi on 6/13/16 | Attendance at meeting |

| | | | |
|---|---|---|---|
| 6/1/2016 | 539.13 | Travel, Marriott Lancaster, Parking, Tolls, Food, Mileage and Business Center on 6/7/16 and 6/8/16 | Travel for depositions |
| 7/1/2016 | 22.31 | Computer Research - Westlaw | yes - in June 2016 |
| 7/1/2016 | 543.14 | Travel, Tolls, Hotel, Mileage (162), Parking and Food on 7/6/16 & 7/8/16 | Travel for depositions |
| 8/1/2016 | 286.33 | Travel, Mileage, Hotel, Parking and Tolls on 8/22/16-8/23/16 | Travel for depositions |
| **8/17/2016** | **8.60** | **Pickup/Delivery Charge 8/18/16** | **no delivery on 8/18; hand-delivered an exhibit on 8/10/16** |
| 9/1/2016 | 230.24 | Computer Research - Westlaw | yes - bunch of dates in August 2016 |
| 9/1/2016 | 286.28 | Travel, Tolls, Hotel, Mileage (158) and Parking on 8/31/16-9/1/16 | Travel for depositions |
| 9/1/2016 | 223.49 | Travel, Parking, Mileage (382) and Tolls on 9/6/16 | Travel for deposition |
| 9/1/2016 | 169.49 | Travel, Mileage (124), Taxi (2x) on 9/15/16 | Trave for deposition |
| 10/1/2016 | 105.02 | Computer Research - Westlaw on 9/15/16 regarding Employee Search | yes |
| 10/1/2016 | 29.16 | Travel, Mileage to Collegeville (54 mi) on 10/5/16 | Travel to and from deposition |
| **10/1/2016** | **6.12** | **Travel, Taxi on 10/10/16** | **conference call with Master Merenstein** |
| 11/1/2016 | 52.99 | Computer Research - Westlaw | yes – dates in October 2016 |
| 12/1/2016 | 594.47 | Computer Research - Westlaw | yes - dates in November 2016 |
| **1/1/2017** | **15.96** | **Travel, Taxi (2x) on 1/30/17** | **office conference** |
| 2/1/2017 | 1876.57 | Computer Research - Westlaw | yes - dates in January 2017 |
| 2/1/2017 | 16.57 | Travel, Taxi (2x) | Hearing before Judge Stengel |
| 3/1/2017 | 1098.83 | Computer Research - Westlaw | yes - dates in February 2017 |
| 4/1/2017 | 109.29 | Computer Research - Westlaw | yes - dates in March 2017 |

| | | | |
|---|---|---|---|
| 10/1/2017 | 1013.52 | Computer Research - Westlaw | yes - dates in September 2017 |
| 11/1/2017 | 256.53 | Computer Research - Westlaw | yes - dates in October 2017 |
| **10/1/2018** | **21.82** | **Special Delivery** | **no description** |
| 11/1/2018 | 158.96 | Computer Research - Westlaw | yes - dates in October 2018 |
| 11/1/2018 | 1651.09 | Computer Research - Westlaw | yes - dates in October 2018 |
| **1/1/2019** | **25.68** | **Special Delivery** | **no description** |
| **1/1/2019** | **31.00** | **Special Delivery** | **no description** |
| **1/1/2019** | **31.00** | **Special Delivery** | **no description** |
| **5/1/2019** | **27.84** | **Travel to and from Meeting at Local 126 (48 Miles)** | **no billing** |
| 6/1/2019 | 57.19 | Computer Research - Westlaw | yes in May 2019 |
| 6/1/2019 | 20.08 | Travel - Mileage (Riggs Diestler-Cherry Hill) to and from (26 mi) and Tolls | Travel to and from meeting - 5/31/19 |
| 8/1/2019 | 1353.20 | Computer Research - Westlaw | yes - dates in July 2019 |
| 8/1/2019 | 674.65 | Computer Research - Westlaw | yes - dates in July 2019 |
| 8/1/2019 | 24.73 | Travel - Uber to and from Court for Settlement Conference by Atty J. Goodley on 8/22/19 | Travel for oral argument on MFSJ |
| 9/1/2019 | 89.76 | Computer Research - Westlaw | yes - dates in August 2019 |
| 9/1/2019 | 846.11 | Computer Research - Westlaw | yes - dates in August 2019 |
| 9/1/2019 | 76.07 | Computer Research - Westlaw | yes - dates in August 2019 |
| **9/1/2019** | **17.93** | **Travel Expenses for Atty J. Goodley on 9/19/19** | **prep witnesses** |
| 9/1/2019 | 28.42 | Travel Expenses for Atty M. Gelman on 9/23/19 (Mileage 49 x .58) | Travel to and from trial prep |
| 10/1/2019 | 376.97 | Computer Research - Westlaw - 9/27/19 | yes |
| 10/1/2019 | 177.06 | Computer Research - Westlaw - 9/17/19 | yes |
| 10/1/2019 | 163.56 | Computer Research - Westlaw - 9/13/19 | yes |
| 11/1/2019 | 11.44 | Travel - Taxi to Oral Argument 11/22/19 | Attend oral argument on post-trial filings |
| 12/1/2019 | 295.32 | Computer Research - Westlaw - 11/18/19 & 11/20/19 | yes |
| 12/1/2019 | 1132.97 | Computer Research - Westlaw - 11/13/19 | yes |

We sustain Farfield's objections to the **bolded** costs above. We have no description or nexus to time worked on those billed costs which could allow us to find these costs related to work on the Farfield case during or around the same time frame as the cost. We deduct $282.28 from the requested costs paid by Jennings Sigmond as lacking a basis to find these costs are related to this case.

We overrule Farfield's objection to fees paid by Local 98 based on limited success. Farfield offers no basis, even after we afforded it discovery into these bills, to distinguish whether these costs furthered the common theme of the successful False Claims Act theory. Farfield's effort to strike the fees paid to the Special Master it agreed to appoint lacks merit. It also cannot claim the other third-party charges to court reporters did not relate to the success at trial. As we described above, Local 98 succeeded in a difficult, apparently unique, challenge to Farfield's misclassification of workers. Local 98 paid the costs to further a successful litigation strategy.

We find $203,226.45 in reasonable costs incurred in obtaining the successful findings of Farfield's violation of federal law resulting in today's Judgment.

### III. Conclusion

A review of the extensive docket and filings confirms Local 98 and Farfield hired skilled lawyers who aggressively sought to further or defend their interests in a unique challenge by a union local to a contractor's worker classifications on federal funded projects under the False Claims Act. At times over the twelve years, both counsel over-lawyered the case. But our role today is not second-guessing lawyer effort at the moment or offering after-the-fact speculation on how counsel could have succeeded with less time invested. Lawyers need to pursue discovery and remedies consistent with their professional obligations and accurately and contemporaneously record their efforts. Congress motivates private lawyers to pursue misrepresentations in federally

funded projects by allowing them to move for reasonable fees and costs incurred in recovering funds for the United States. The lawyers cannot control their opponent's strategy or vigor. They cannot abandon their clients when the opposing contractor makes them work harder than they budgeted for the representation. Congress precludes the successful lawyers from obtaining a windfall; it does not preclude them from recovering the fees paid by their client for services related to the recovery for the United States.

We partially grant Local 98's motion for fees and costs. As reflected in today's Judgment, Farfield is obligated to pay $1,229,927.55 in reasonable fees and $203,226.45 in reasonable costs.

---

[1] 40 U.S.C. § 3142 (formerly 40 U.S.C. § 276a). "The Davis-Bacon Act … appl[ies] to contractors and subcontractors performing work on federally funded or assisted contracts in excess of $2,000 for the construction, alteration, or repair of public buildings or public works. Davis-Bacon Act contractors and subcontractors must pay their laborers and mechanics no less than the locally prevailing wages and fringe benefits for corresponding work on similar projects in the area." *Askew v. R.L. Reppert, Inc.*, 721 F. App'x 177, 180 n.2 (3d Cir. 2017) (citing UNITED STATES DEPARTMENT OF LABOR, WAGE AND HOUR DIVISION (WH) DAVIS BACON AND RELATED ACTS, https://www.dol.gov/whd/govcontracts/dbra.htm).

[2] ECF Doc. No. 238-3 at 5 (using the pagination assigned by the CM/ECF docketing system). In response to Farfield's discovery requests relating to Local 98's fee petition, Jennings Sigmond responded it "is not in possession" of the engagement letter between it and Local 98.

[3] ECF Doc. Nos. 16, 17.

[4] ECF Doc. No. 199. Judge Stengel earlier appointed Attorney Merenstein as a Special Master to resolve discovery issues. *See* ECF Doc. No. 110.

[5] ECF Doc. Nos. 172, 173.

[6] ECF Doc. Nos. 233, 234.

[7] ECF Doc. No. 238.

[8] ECF Doc. No. 235-1 at 2-3.

[9] *Id.* at 3.

[10] *Id.* at 4.

[11] *Id.*

[12] *Id.* at 4-5.

[13] ECF Doc. No. 25.

[14] ECF Doc. Nos. 16, 17, 30.

[15] ECF Doc. No. 30 at ¶¶ 2-9.

[16] *Id.* at ¶ 40.

[17] ECF Doc. Nos. 47, 48.

[18] ECF Doc. No. 51.

[19] ECF Doc. No. 53.

[20] *Id.* at 6, n.1.

[21] The parties disputed the meaning of the "phase codes."  Local 98 contended the phase codes show the performance of electrical work while Farfield contended it used its phase codes for internal accounting purposes only and denied the phase codes showed its employees performed electrical work.

[22] ECF Doc. No. 214 at ¶ 87. At trial before Special Master Merenstein, the parties stipulated to the spreadsheet and agreed Local 98's damages expert verified the spreadsheet is 99.781% accurate.  ECF Doc. No. 231-28 at 16, Stipulation of Counsel at ¶ 56.

[23] ECF Doc. No. 235-1 at 7.

[24] ECF Doc. Nos. 107, 108.  Farfield argues Local 98 caused the discovery disputes by refusing to limit discovery to the five projects in its amended complaint seeking, for example, "production of documents for ALL of Defendant's projects from January 1, 2001, through the date of the discovery responses" and did not withdraw its requests until resolution of discovery disputes with Special Master Merenstein.  ECF Doc. No. 239 at 5.  This overreaching must be addressed at the time through motion practice.  Even if we could double-check these requests, Farfield does not suggest how much time we should deduct other than its argument we must cut hours by fifty percent because Local 98 withdrew its claims on projects other than Wayne Junction.  We lack a basis to strike time on individual discovery issues.

[25] ECF Doc. No. 110.

[26] ECF Doc. No. 118.

[27] ECF Doc. No. 235-2

[28] *Id.* at ¶ 24.

[29] *Id.*

[30] *Id.*

[31] ECF Doc. No. 235-1 at 8.

[32] ECF Doc. No. 136.

[33] ECF Doc. No. 142.

[34] Upon Judge Stengel's retirement, the Clerk of Court reassigned this case first to The Honorable Joseph F. Leeson, Jr. and then to our docket. ECF Doc. Nos. 144, 146.

[35] ECF Doc. No. 235-1 at 11.

[36] ECF Doc. No. 233.

[37] ECF Doc. No. 236.

[38] ECF Doc. No. 237.

[39] ECF Doc. No. 238.

[40] ECF Doc. No. 238-1.

[41] 31 U.S.C. § 3730(d)(2).

[42] *Simring v. Rutgers*, 634 F.App'x 853, 857 (3d Cir. 2015) (citing *Pennsylvania v. Del. Valley Citizens' Council for Clean Air*, 478 U.S. 546, 564 (1986)).

[43] *United States ex rel. Palmer v. C&D Tech., Inc.*, 897 F.3d 128, 139 (3d Cir. 2018) (quoting *Rode v. Dellarciprete*, 892 F.2d 1177, 1183 (3d Cir. 1990)).

[44] *Id.*

[45] *Id.* (internal quotations omitted).

[46] *Id.* at 137 (quoting *Bell v. United Princeton Properties, Inc.* 884 F.2d 713, 720 (3d Cir. 1989)).

[47] *Id.* (quoting *Rode*, 884 F.2d at 721-23).

[48] *Id.* at 139.

[49] *Clemens v. N.Y. Cent. Mut. Fire Ins. Co.*, 903 F.3d 396, 398 (3d Cir. 2018) (quoting *Brown v. Stackler*, 612 F.2d 1057, 1059 (7th Cir. 1980)).

[50] The 3,114.2 hours performed by attorneys is broken down to 3,082 hours for work performed in Phases 1 – 11 from January 2008 to January 2020; 24 hours for work performed on the fee petition; and 8.2 hours to prepare and attend deposition of Attorney Gelman. *See* ECF Doc. No. 253-2, Gelman Declaration at ¶¶ 5, 21; ECF Doc. No. 238-1.

[51] The 3,627.3 hours performed by paralegals and clerks is broken down to 3,633.3 hours of work in Phases 1 – 11 from January 2008 to January 2008 and 4 hours for work performed on the fee petition. *See* ECF Doc. No. 235-2, Gelman Declaration at ¶¶ 5, 21.

[52] *Id.* at ¶ 5.

[53] ECF Doc. No. 239-3.

[54] *Id.* at 108 (using pagination assigned by the CM/ECF docketing system).

[55] *Id.*

[56] ECF Doc. No. 239 at 4.

[57] ECF Doc. No. 235-2 at ¶ 24.

[58] *Id.*

[59] ECF Doc. No. 239 at 4-5.

[60] Farfield identifies the total claims underpayment as to Wayne Junction as $787,387. *See* ECF Doc. No. 239 at 5. This is incorrect, at least at the time of trial. At trial, Local 98 claimed $449,055.54 in total underpayment of wages to misclassified groundmen and laborers on the Wayne Junction Project. *See* ECF Doc. No. 216-2 at ¶ 65 (Local 98's Proposed Conclusions of Law submitted to Special Master Merenstein).

[61] ECF Doc. No. 235-2 at ¶ 24(a).

[62] ECF Doc. No. 242 at 2.

[63] *Id.*

[64] *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

[65] *Id.*

[66] *Id.* at 436.

[67] *Id.* at 434.

[68] *Id.*

[69] *Id.* at 435.

[70] *Id.* (footnote omitted).

[71] *Id.* at 440.

[72] *Id.* at 435, n.11.

[73] *McCutcheon v. America's Servicing Co.*, 560 F.3d 143, 151 (3d Cir. 2009) (quoting W. *Va. Univ. Hosps., Inc. v. Casey*, 898 F.2d 357, 363 (3d Cir. 1990) (addressing fee petition in Truth in Lending Act case); *see also Hahnemann Univ. Hosp. v. All Shore, Inc.*, 514 F.3d 300, 311 (3d Cir. 2008) (rejecting "proportionality rule for attorney's fees under ERISA").

[74] ECF Doc. No. 239-1, N.T. Gelman at 83-85.

[75] ECF Doc. No. 235-5.

[76] ECF Doc. No. 235-1 at 7.

[77] ECF Doc. No. 214 at ¶ 87.

[78] ECF Doc. No. 239-1, N.T. Gelman at 101-102.

[79] Farfield arrives at this number as follows:  The total amounts invoiced from January 1, 2008 through April 30, 2019 is $1,043,684.14. Paralegal Foley's billed hours in this period total $354,662 (2,251.4 hours + 972.8 hours = 3,224.2 hours x Paralegal Foley's hourly rate of $110 = $354,662).  Subtracting the value of all Paralegal Foley's time of $354,662 from the total amount of $1,043,684.14 invoiced in this period come to $689,022.14.  *See* ECF Doc. No. 239 at 19-20.

[80] ECF Doc. No. 242 at 9.

[81] ECF Doc. No. 242-3 at 37-38.

[82] ECF Doc. No. 235-4 at 22-36.

[83] ECF Doc. No. 235-2 at ¶ 24.

[84] *Id.*

[85] ECF Doc. No. 239 at 4-5.

[86] *Rode*, 892 F.2d at 1191 n.13; *see also McGuffey v. Brink's, Inc.*, 598 F. Supp. 2d 659, 671 (E.D. Pa. 2009) (finding challenge to 18.8 hours of billed time described as "Research," "Review

research," "Research ADEA," or "Research ERISA" sufficient for the court to determine whether the costs claims were unreasonable for the work performed).

[87] *Tenalfy Eruv Ass'n, Inc. v. Borough of Tenafly*, 195 F.App'x 93, 100-01 (3d Cir. 2006) (quoting *Washington v. Phila. Cty. Ct. of Common Pleas*, 89 F.3d 1031, 1037 (3d Cir. 1996)).

[88] *Pasternack v. Klein*, No. 14-2275, 2017 WL 4642283, at *3 (E.D. Pa. Oct. 17, 2017) (quoting *Hatchett v. City of Phila.*, No. 09-1708, 2010 WL 4054285, at *4 (E.D. Pa. Oct. 15, 2010)).

[89] ECF Doc. No. 235-2, Gelman Declaration at ¶ 19(c).

[90] *Id.* at ¶ 4.

[91] ECF Doc. No. 238-1.

[92] ECF Doc. No. 235-4 at 2.

[93] For example, Jennings Sigmond discounted bills in December 2018 and January 2019 by fifty percent. Jennings Sigmond discounted a December 10, 2018 bill of $10,080.50 to $5,040.25 and January 10, 2019 bill of $10,801.50 to $5,400.75. *See* ECF Doc. No. 239-2 at 8 (using pagination assigned by the CM/ECF docketing system).

[94] ECF Doc. No. 239-2.

[95] ECF Doc. No. 239-7.

[96] *Id.*

[97] ECF Doc. No. 239 at 15.

[98] ECF Doc. No. 235-1 at 18.

[99] *Palmer*, 897 F.3d at 131.

[100] *Id.* at 138. Our Court of Appeals vacated and remanded the case solely on the "fees on fees" issues but affirmed the district court in all other respects, including the reduction of fees.

[101] *Id.* at 132.

[102] 256 F.3d 181, 187-88 (3d Cir. 2001).

[103] *Id.*

[104] No. 13-2983, 2019 WL 4280494 (E.D. Pa. Sept. 9, 2019).

[105] 57 F.3d 1101 (D.C. Cir. 1995).

[106] We may analogize to fee awards under 42 U.S.C. § 1988 when analyzing fee awards under the False Claims Act. *United States ex rel. Atkinson v. Pennsylvania Shipbuilding Co*., 528 F.Supp.2d 533, 540 n.8 (E.D.Pa. 2007) ("Because Congress intended the standard under § 3730(d)(4) to reflect the standard under § 1988, the court will rely on cases analyzing § 1988 where relevant. *See generally* 99 Sen. Rep. 345 (discussing that "[t]his standard [in § 3730(d)(4)] reflects that which is found in section 1988 of the Civil Rights Attorneys Fees Awards Act of 1976")).

[107] *Covington*, 57 F.3d at 1103.

[108] *Id.*

[109] *See* ECF Doc. No. 235-7.

[110] 842 F.2d 1436 (1988) ("*SPIRG*").

[111] *Id.* at 1438.

[112] *Id.* at 1448.

[113] 465 U.S. 886 (1984).

[114] *SPIRG*, 842 F. 2d at 1449.

[115] *Id.* at 1448.

[116] *Id.* at 1438.

[117] *Bd. of Tr. of Hotel and Restaurant Emp. Local 25 v. JPR, Inc.*, 136 F.3d 794 (3d Cir. 1998).

[118] *Id.* at 797.

[119] *Id.*

[120] *Id.* at 797, 806.

[121] *Id.* at 807.

[122] ECF Doc. No. 239 at 13.

[123] No. 17-5107, 2018 WL 3437212 (E.D. Pa. July 16, 2018).

[124] *Id.*

[125] 282 F. Supp. 3d 203 (D.D.C. 2017); *aff'd*, 735 F. App'x 733 (D.C. Cir. 2018).

[126] *Baylor*, 735 F. App'x at 735.

[127] *Id.*

[128] *Hensley*, 461 U.S. at 443–44 (citing S.Rep. No. 94–1011, 94th Cong., 2d Sess. 6 (1976)) (addressing purpose of 42 U.S.C. § 1988 awarding fees in civil rights cases).

[129] See ECF Doc. No. 235-2 at ¶19(a) – (d).

[130] ECF Doc. No. 235-2, Gelman Declaration at ¶ 14.

[131] ECF Doc. No. 214 at ¶ 87.

[132] ECF Doc. No. 235-2, Gelman Declaration at ¶ 5.

[133] Attorney Gelman swears Paralegal Foley's hourly rate is $110, Paralegal Lauren Skala's hourly rate began at $75 and increased to $110 per hour on December 1, 2013. *Id.* at ¶ 5. Farfield does not object to time billed by Paralegal Skala. Attorney Gelman swears the hourly rates for the Firm's clerks Shakoor George, Jamall Edwards, Lauren Exum, and Michael Skala is $110. *Id.* The Firm also had "staff" assigned to the case, identified only by their initials, billed at $65 per hour. Attorney Gelman voluntarily deducted all hours (35.5) performed by staff who worked for less than fifteen hours on the case, *Id.* at ¶ 24(b). Farfield does not demand Paralegal Foley's time be reduced to $65 per hour; only his hours should be charged at a clerk's rate. Attorney Gelman swears the firm's clerk rate is $110 per hour.

[134] ECF Doc. No. 235-1 at 20; ECF Doc. No. 235-2, Gelman Declaration at ¶ 21.

[135] ECF Doc. No. 238.

[136] *Palmer*, 897 F.3d at 142.

[137] *Id.*

[138] *Id.* (quoting *Institutionalized Juveniles v. Sec'y of Pub. Welfare*, 758 F.2d 897, 924 (3d Cir. 1985)).

[139] ECF Doc. No. 235-2, Gelman Declaration at ¶ 21.

[140] ECF Doc. No. 239-3 at 108 (using the pagination assigned by the CM/ECF docketing system).

[141] ECF Doc. No. 235-4 at 64-68 (using the pagination assigned by the CM/ECF docketing system).

[142] ECF Doc. No. 235-1 at 21-22; ECF Doc. No. 235-4 at 64; ECF Doc. No. 235-6 at 2-3.

[143] ECF Doc. No. 242 at 10; 242-4. Local 98 does not seek reimbursement for the following costs:

| 12/1/2014 | $1,431.00 Concordance Native Viewer |
| --- | --- |

| | |
|---|---|
| 11/19/2015 | $1,431.00 Concordance Native Viewer |
| 2/11/2015 | $1,431.00 Concordance Native Viewer |
| 2/19/2016 | $1,600.00 Witness Locator Fee |
| 3/31/2016 | $1,470.00 Professional Fees |
| 3/31/2016 | $1,418.00 Concordance Native Viewer |
| 4/1/2016 | $1,418.00 Concordance Native Viewer |
| 5/1/2016 | $1,418.00 Concordance Native View [sic] |
| 5/31/2016 | $7,649.74 Investigative Services |
| 4/1/2017 | $765.65 Reimbursement Check 53709 dated 4/6/17 sent to IBEW Local Union No. 98. Expenses previously billed and paid by Local 98. Check voided, never cashed |
| **TOTAL:** | **$20,032.39** |

[144] ECF Doc. No. 242 at 10.

[145] 31 U.S.C.§ 3730(d)(2).

[146] *Salazar v. District of Columbia*, 123 F.Supp.2d 8, 16–17 (D.D.C. 2000).

[147] *Loughner v. University of Pittsburgh*, 260 F.3d 173, 181 (3d Cir. 2001).

[148] *Id.* (citing *Washington*, 89 F.3d at 1037).

[149] *Id.*

[150] *Id.*

[151] *Miller v. Holzmann*, 575 F.Supp.2d 2, 58 (D.D.C. 2008), *amended in part, vacated in part, United States ex rel. Miller v. Bill Harbert Int'l. Const., Inc*., 786 F.Supp.2d 110 (D.D.C. 2011).

[152] For example, Jennings Sigmond seeks reimbursement for costs associated with Westlaw legal research. Costs for research appear to be posted at the beginning of every month. No description other than "Computer Research – Westlaw" forced us to comb through attorney time records to determine who conducted legal research. In doing so, we located legal research time providing context to the computer research costs for the same time.